**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Nick Salinske, for himself and all others similarly situated, | ) ) | |
| | ) | Case No. 08 C 3017 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Judge Wayne R. Anderson |
| Calumet City, Illinois, | ) | Magistrate Judge Morton Denlow |
| Defendant. | ) | |

**CITY OF CALUMET CITY'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

**I.    Factual Context, Summary of the Ordinance and the Ordinance in Operation**

In these times of rampant foreclosures caused by the subprime lending crisis and deterioration of the housing market, cities more than ever need tools to maintain the quality of the housing stock and combat urban decay. According to a recent local newspaper article, "Foreclosures 'Weigh' on Municipalities," **Defendant's Ex. 1**, in 2005 there were 304 foreclosure filings in Calumet City. Currently the "City has about 560 foreclosure properties out of 17,000 residential and commercial addresses," which amounts to an 85% increase. The threat to the City housing stock caused by foreclosures "definitely weighs on the City" of Calumet City. Maintaining the quality of its housing stock is a real-world problem in Calumet City.

The Point-of-Sale Ordinance is one measure designed to maintain housing values. It simply requires that before owners can sell property, and subject to various constitutional protections, they need to submit that property to a point of sale inspection in order to determine that the property complies with applicable building and zoning regulations. The Ordinance also protects against people running out on their water bills.

These Ordinances are commonplace. A Google search of "point-of-sale inspection ordinances" will yield information relating to hundreds of such ordinances throughout the

country. **Exhibit 2** to this Memorandum is a fact sheet explaining the ordinance in Shaker Heights, Ohio.

Our Motion to Dismiss summarizes the Calumet City Ordinance in detail and provides a hypothetical example of how the Ordinance operates. This Memorandum will focus on the legal issues.

II.     <u>**Scope of Challenge and Relevant Legal Standard**</u>

Plaintiff seeks to enjoin the enforcement of the Ordinance based solely on the allegations of Counts I and II. See Motion for Preliminary Injunction at page 6, Prayer for Relief numbers 1, 2. "A preliminary injunction is an 'extraordinary and drastic remedy.' It should never be awarded as of right…" <u>Munaf v. Geren</u>, 128 S.Ct. 2207, 2210 (2008). A preliminary injunction "should not be granted unless the movant by a clear showing carries the burden of persuasion," <u>Goodman v. Illinois Department of Financial and Professional Regulation</u>, 430 F.3d 432, 437 (2005), with reference to the four factors of reasonable likelihood of success on the merits, lack of adequate remedy at law, balance of hardships tipping in plaintiff's favor, and no harm to the public interest if the injunction is granted. <u>Id</u>. The grant of a preliminary injunction is "the exception rather than the rule," <u>Siegel v. LePore</u>, 234 F.3d 1163, 1175 (11th Cir. 2000).

This is a facial challenge to an ordinance. This case does not involve any First Amendment claims. The Court will therefore follow the familiar rule that "[f]acial challenges to legislation are generally disfavored." <u>FW/PBS v. Dallas</u>, 493 U.S. 215, 223 (1990). This important limiting principle was brought home twice this term by the Supreme Court. <u>Washington State Grange v. Washington State Republican Party</u>, 128 S.Ct. 1184, 1191 (2008). Facial challenges are disfavored because they "often rest on speculation," resulting in "premature interpretation of statutes …." Facial challenges "threaten to short circuit the democratic process

by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  See also, Crawford v. Marion County Election Board, 128 S.Ct. 610, 622-3 (2008).

A party asserting a facial challenge is seeking to vindicate not only his rights, but also those of others who may be adversely impacted by the law, City of Chicago v. Morales, 527 U.S. 41, 55 (n.22) (1999).  The plaintiff "bears the burden of proving that the law could never be applied in a constitutional manner."  DA Mortgage v. City of Miami Beach, 486 F.3d 1254, 1262 (11th Cir. 2007).  Therefore, this Court's review of the Ordinance and the Motion should be in light of the Supreme Court's expressions of "increasing skepticism of facial challenges in recent years."  Warshak v. U.S., 532 F.3d 521, 529-30 (6th Cir. 2008) (gathering cases).

### III. Plaintiffs Have No Likelihood of Success on the Merits

#### A. Legal Framework

Point of sale inspection ordinances are common. They aim "to prevent the surreptitious conversion of single family homes to multi-family dwellings, and to retard the physical deterioration of the housing stock … Point of sale ordinances like this one are common building and zoning code enforcement measures and are aimed at maintaining the quality of municipal housing stocks."  Main Street Organization of Realtors v. Calumet City, 505 F.3d 742, at 743-4 (Opinion of the Court) and 750 (Judge Sykes, concurring).

Because Counts I-II are facial challenges involving neither First Amendment rights nor suspect classifications, the Court's review of the Ordinance is extremely deferential. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982). "Economic regulation" such as this "is subject to a less strict vagueness test," Id. at 489, because "the

3

consequences of imprecision are qualitatively less severe" with an enactment involving "civil rather than criminal penalties." Id.

A reviewing Court should consider "only whether the ordinance is wholly arbitrary," meaning that a law has no rational relationship to a legitimate state interest. Vaden v. Village of Maywood, 809 F.2d 361, 363 (7th Cir. 1987); Greater Chicago Combine and Center v. City of Chicago, 431 F.3d 1065, 1072 (7th Cir. 2005).

Finally, Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." The first step in any such claim is to "identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994).

**B.      History of Point-of-Sale Ordinances**

Many cities throughout the country have adopted point of sale housing inspection ordinances. Dome Realty v. City of Paterson, 83 N.J. 212, 416 A.2d 334 (N.J. 1980) Butcher v. City of Detroit, 156 Mich.App. 165, 401 N.W.2d 260 (Mich.Ct.App. 1986), *cert. denied*, 482 U.S. 905 (1987) (upholding Detroit ordinance as a rational way of addressing fraud and dealing with the problem of housing deterioration and "combat[ting] housing deterioration."). 156 Mich.App. at 170; City of Vincennes v. Emmons, 842 N.E.2d 155, 158 (Ind. 2006) at n.6 (collecting cases). The Detroit ordinance upheld in Butcher "is generally representative of those enacted in other municipalities throughout the country." Hetzel, "The Search for Effective and Cost-Efficient Housing Strategies: Enforcing Housing Condition Standards Through Code Inspections at Time of Sale or Transfer," C431 ALI-ABA 1531 (1989), Appendix B.

These cases teach that a city may rationally determine that these codes are best enforced when property ownership is changing hands. Anderson, American Law of Zoning, §19.3

(because illegal alterations frequently occur literally behind closed doors, municipalities "undertake to plug the gap through the use of occupancy permits").

      C.      **Count I: The Point of Sale Inspection Ordinance Does Not Amount To An Unreasonable Restraint On "The Right Of Property Owners To Transfer Their Property."**

Count I alleges that the Ordinance "is unconstitutional because it violates [unidentified] protections in the U.S. Constitution against unreasonable governmental restriction on the right to sell private property." ¶39. It is true that the Ordinance regulates the right to sell real property. Like Illinois and Cook County, Calumet City requires sellers to pay a tax before they can convey real estate. Plaintiffs concede that the City has the right to both tax the sale of property and enforce its building codes. If the City can (i) restrain the sale of property by way of a tax, and (ii) regulate the condition of structures, then (iii) it is rational to use one regulatory mechanism to facilitate compliance with the other. When property ownership is transitioning, privacy interests diminish, and the parties may be negotiating these repairs themselves. Another "particular advantage of point of sale inspection over other types of inspection is that it is conducted at time when money is available…" Delman v. City of Cleveland Heights, 41 Ohio St. 3d 1, 534 N.E.2d 835 (1989).

In an effort to create a constitutional issue, paragraphs 33-39 rely on repeated misstatement of the Ordinance. The scope of search and types of repair the City may require are specific and limited. See subsection (c)(1), (specifying provisions for compliance) and subsection (e) (limiting warranted inspections "to a determination whether there are violations of the code provisions identified").

The paragraph 36 claim that the Ordinance requires the use of a "licensed contractor" is empty-headed. The Ordinance does not prevent homeowner do-it-yourself repair work. It

5

provides only that <u>if</u> an owner contracts for repairs, the work has to be done by a licensed contractor. The Ordinance does not prevent Mr. Salinske from scraping his own gutters or replacing defective switch plates.

Paragraph 36 speculates that even if a property is in compliance, the City may nevertheless ignore the Ordinance and refuse to issue a Certificate of Compliance. That speculative fear has nothing to do with the facial validity of the Ordinance; it merely raises state a potential state law mandamus issue. Speculation about hypothetical applications of the Ordinance has no place in a facial challenge. <u>Washington State Grange</u>, 128 S.Ct. at 1193-4.

Plaintiffs' next two concerns, relating to no "meaningful right to a hearing" are belied by the terms of the Ordinance, which provides multiple opportunities for predeprivation review. The concerns about inspections and reinspections taking "an unreasonably long period of time" are also not true. As shown by the Johnson hypothetical in our Motion to Dismiss, the timing of these compliance measures works well with the contract-to-deed cycle of a real estate transaction.[1]

Paragraph 37 complains that the Ordinance does not provide detail regarding the water bill hearing. The absence of such detail does not go to the facial validity of the Ordinance; <u>Memphis Light, Gas & Water v. Kraft</u>, 436 U.S. 1, 11-12 (1978) teaches that all due process requires is the opportunity for a "presentation to a designated employee of a customer's complaint that he is being overcharged," in the setting of an "informal consultation with designated personnel empowered to correct a mistaken determination."

---

[1] Because an inspection is good for six months, an owner contemplating sale can get this done before she has a signed contract to sell her property.

The Count I "restraint on alienation" challenge must be analyzed under a rational basis analysis and is best viewed as a substantive due process challenge. National Paint & Coatings Assn. v. City of Chicago, 45 F.3d 1124, 1129 (7th Cir. 1995); New Burnham Prairie Homes v. Village of Burnham, 910 F.2d 1474, 1480-81 (7th Cir. 1990). General Auto Service Station v. City of Chicago, 526 F.3d 991 (7th Cir. 2008) shows the Court that the Count I challenge fails.[2]

Substantive due process is not "a blanket protection against unjustifiable interferences with property." Id. at 1000. It is only a "modest limitation that prohibits government action only when it is random and irrational." Id. Plaintiff has the heavy burden of showing the Ordinance is "arbitrary and unreasonable, bearing no substantial relationship to the public health, safety or welfare." Id. at 1001. The law survives under the rational basis test if the reason for the deprivation is not "so inadequate that the judiciary will characterize it as 'arbitrary.'" Id.

In this case, "because the right infringed upon is an interest in property rather than life or liberty," the Count I claim must establish "either an independent constitutional violation, or the inadequacy of state remedies to redress the deprivation" before a court will even "consider whether the interference with property is arbitrary or irrational." Id. at 1001. In the present case, Plaintiff alleges no independent constitutional violation and the process is replete with pre and postdeprivation state remedies.

The Supreme Court has never constitutionalized plaintiff's "restraint on alienation" theory, referring to it only as "an ancient doctrine disfavoring restraints and alienation of property." Asgrow Seed Company v. Winterboer, 513 U.S. 179, 188 (1995) at n.3. Municipal land use regulations are constitutional unless they are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." Euclid v. Ambler

---

[2] For purposes of our analysis of this case, and for ease of reading, we will drop internal quotations and citations.

Realty, 272 U.S. 365, 395 (1926); Lingle v. Chevron U.S.A., 544 U.S. 528, 541 (2005). Our Motion cites to ample remedies under Illinois law for a property owner upset about an inspector's interpretation of building codes or the City's determination regarding illegal use of land. Based on these available remedies, the Court should find the Ordinance constitutional without the necessity of a rational basis analysis.

The Ordinance also easily survives rational bases scrutiny. Maintaining the quality of the housing stock and preventing urban (or in our case, suburban) decline, are quintessential public purposes. Utilizing the municipal transfer tax as a vehicle for obtaining code compliance is a rational means for a local government to further those legitimate goals.

The flaws alleged in Count I are either misreads of the Ordinance or potential as-applied issues which do not undercut the law's facial validity. For example, ¶12 hypothecates unrestricted intrusive searches of bedrooms and closets. The Ordinance requires either consent by the homeowner (which results in a waiver of the ¶12 privacy concerns) or an administrative warrant (which will circumscribe the scope and nature of an administrative search). Paragraph 13's reference to a "prior ordinance" is irrelevant to this Court's analysis of the present Ordinance.

Count I's theory depends entirely on a 1994 letter opinion written by the Illinois Attorney General to the Illinois Department of Financial Institutions. The letter opinion responds to a question of whether non-home rule municipalities in Illinois (Calumet City is home rule) had the statutory authority to "require the inspection of documents and the payment of fees prior to the transfer of real property lying within the municipality." The advisory opinion was that non-home rule municipalities lacked the statutory authority to impose a transfer tax.

The letter opinion is irrelevant to this constitutional challenge. The Attorney General was commenting on a question of Illinois municipal statutory authority, not a principle of constitutional law. The comment lacks any citation to authority. As such, it is worthless as authority on a matter of constitutional law. This Ordinance is rational. It is constitutional on its face.

### C.    Count II: The Ordinance Does Not Violate Procedural Due Process

Before discussing process issues, it will be helpful to identify the property interests at stake in Counts I and II. In the case of the code compliance requirements, the "property" at stake is money—the cost of repairs. If the transfer tax on a $200,000 home is $1,600 and there are $500 in identified repairs, the sellers must pay an additional $500 "tax" to sell their house.[3] The property interest at stake is a variable based on the condition of individual houses.

#### 1.    Vagueness/Unfettered Discretion

Count II complains that the City's codes are vague because they use terms such as "good repair." ¶¶13; 43. They also argue that the Ordinance gives an inspector "unfettered discretion to order repairs unrelated to conditions that affect health or safety or the public good." ¶43. Plaintiff's "what ifs" do not undercut the Ordinance's facial validity. Any such concerns are fully redressable under Illinois law on a case-by-case basis.

It is for the legislature to determine what building code provisions are reasonable and further the public health, safety and welfare. Plaintiff may think that replacing floor tiles, painting a bedroom wall, repairing closet doors, and repairing kitchen cabinets are merely "cosmetic repairs unrelated to public health and safety." Am. Cplt. ¶13. But the City may disagree with Mr. Salinske, subscribe to the "broken window" theory (made famous by Rudy

---

[3] This hypothetical cost assumes contracted as opposed to do-it-yourself repair work.

Guliani when he was Mayor of New York City), and rationally determine that making sure these "little cosmetic" repairs are made will have a positive cumulative impact on the housing stock. See, James Q. Wilson, "Broken Windows: The Police and Neighborhood Safety," www.theatlantic.com/doc/198203/broken-windows.

Count II's "unfettered discretion" argument is likewise without merit. A law is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what it is prohibited and must contain explicit standards to avoid arbitrary and discriminatory enforcement. Native American Arts v. Bundy-Howard, Inc., 168 F.Supp.2d 905, 909 (N.D. Ill. 2001). The codes which are incorporated by reference into the Ordinance are anything but vague. See, Cplt. Ex. B. Sections 304 and 305 of the International Property Maintenance Code are densely detailed. Plaintiff focuses on Section 304.1 of the IPMC, providing that an exterior of a structure must be maintained "in good repair, structurally sound and sanitary, so as to not pose a threat to the public health, safety or welfare," and 305.1, which provides that the interior must be maintained "in good repair, structurally sound and in sanitary condition."

People with common intelligence can understand what it means to keep a house in good repair. Beyond that, Sections 304.01 and 305.01 are general requirements whose terms are further refined and fleshed out by the subsequent code provisions. Numerous cases have held that laws requiring properties to be maintained "in good repair" are not unconstitutionally vague. Freeman United Coal Mining v. Federal Mine Safety, 108 F.3d 358, 362 (CADC 1997); People v. Beecher, 153 Misc.2d 247, 580 N.Y.S.2d 980 (N.Y. Just. Ct. 1992); City of Cleveland Heights v. G.&C. Properties, 1974 WL 184833 (Ohio Ct. App. 1974); People v. Balmer, 17 Cal.Rptr. 612

(Cal. Super. 1961) ("the words clean, sanitary, and good repair are not so vague and indefinite as to make the administrative code sections unconstitutional.").

An identical vagueness challenge to the same municipal model building code provisions was rejected by the court in Reedy v. Borough of Collingswood, 2005 WL 1490478 (D.Ct. 2005). The code sections under challenge used terms like "sound and in good repair," and "maintained in good condition." See *8-9. In denying a motion for preliminary injunction, the court was "not persuaded that the above provisions contain language that is so ambiguous and technical so as to deprive the ordinary citizen in Collingswood of constitutional required notice." Accordingly, Count II's void for vagueness challenge should be rejected.

### 2. Code Compliance/ Procedural Due Process

The Ordinance provides multiple layers of procedural due process to an individual who disputes the administrative determination of either needed repairs or payment for water services owed. Subsection (g)(2) provides fast track review of an initial administrative repair decision by "an independent hearing officer." Final administrative determination are appealable to the City's Zoning Board of Appeals, and thereafter to the Illinois courts. This process destroys plaintiff's' due process challenge to the repair requirements.

Plaintiff's corollary claims (Am. Cplt. ¶16) that repairs will take too long because the Ordinance mandates the use of contractors is a manufactured misreading. Subsection (h), "Follow up Repairs; Reinspections," says that "a party issued a notice of repairs"—the owner— "shall proceed to make such repairs." Subsection (k) provides only that any contractors who perform the repairs "shall be licensed by the City."

The homeowners of Calumet City may rest assured that their time watching This Old House has not been in vain—they are free to fix their own screens and gutters.

### D. Conclusion – the Ordinance Is Constitutional.

The Ordinance is rational.  It provides ample due process.  Therefore, it is constitutional and plaintiffs have no likelihood of success on the merits.

### IV. Plaintiff Fails to Satisfy Any of the Other Elements for a Preliminary Injunction

#### A. Any Claim of Irreparable Injury Is Speculative and May Not Serve as a Basis for Preliminary Injunctive Relief

The Seventh Circuit has "repeatedly held that a 'speculative' injury does not constitute an irreparable injury justifying injunctive relief."  Singer Co. v. P. R. Mallory & Co., Inc., 671 F.2d 232, 235 (7th Cir. 1982).  In the present case, any potential injury to plaintiff rests on multiple layers of speculation.  First, plaintiff has to trigger the operation of the Ordinance by stating his intent to sell.  If plaintiff doesn't consent to a search and the City chooses not to obtain a warrant, then plaintiff will proceed to closing unaffected by any of the Ordinance's provisions.

If the plaintiff does consent to a search, or if a warrant is obtained, it is speculative as to whether any code violations will be found.  The nature and extent of any repair costs are speculative.  For all we know, the house may be in pristine condition and will be given a clean bill of health on first inspection.

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction . . . a plaintiff must do more than merely allege imminent harm . . . a plaintiff must demonstrate immediate threatened injury as a prerequisite to a preliminary injunctive relief."  Caribbean Marine Service v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

Plaintiffs's claim of irreparable injury rests on multiple layers of speculation. He has failed to show the type of immediate threatened injury necessary for a preliminary injunction.

      **B.**     **The Balance of Harms and Public Interest Weigh Against Enjoining the Ordinance**

The City has a legitimate public interest in maintaining the quality of its housing stock. The Ordinance's enforcement mechanisms are a means of achieving that legitimate goal. The City's interest is not simply a factor to be considered in evaluating success on the merits; "the ability of a city to enact and enforce measures it deems to be in the public interest is still an equity to be considered in balancing hardships." Heideman v. South Salt Lake City, 348 F.3d 1182, 1191 (10th Cir. 2003). Plaintiff has furnished nothing which coming close to carrying his burden to show that the speculative harm outweighs the harm to the City in maintaining the quality of its housing stock if the enforcement of the Ordinance is suspended pending the disposition of this lawsuit.

The public interest would not be served by enjoining enforcement of the Ordinance. This Ordinance has been adopted and amended through the democratic process. The history of this litigation and the City's defense of the Ordinance against multiple assaults by the Realtors' Association (the real plaintiff in this case) demonstrates the commitment of this suburban community to the importance of enforcing the Ordinance. That public interest outweighs any claim demonstrated by these plaintiffs with respect to Counts I and II.

**V.** **Conclusion**

The Motion for Preliminary Injunction should be denied.

    Respectfully submitted,

    City of Calumet City

    By:   /s/ John B. Murphey

| | |
|---|---|
| JOHN B. MURPHEY/ARDC #1992635 | MARK STERK/ARDC #3125540 |
| Rosenthal, Murphey & Coblentz | Odelson & Sterk, Ltd. |
| 30 North LaSalle Street, Suite 1624 | 3318 West 95th Street |
| Chicago, Illinois 60602 | Evergreen Park, Illinois 60805 |
| Tel. (312) 541-1070 | Tel. (708) 424-5678 |
| Fax (312) 541-9191 | Fax (708) 424-5829 |

G:\rmcj\Calumet City\Salinske\MemLawOppMP.doc

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 8, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all parties listed below:

| | |
|---|---|
| Philip C. Stahl | Mark H. Sterk |
| Patrick T. Nash | Odelson & Sterk |
| Donald P. Bunnin | 3318 W. 95th St. |
| Mark A. Semisch | Evergreen Park, Ill. 60805 |
| Grippo & Elden | |
| 111 South Wacker Drive | |
| Chicago, Illinois 60606 | |

        /s/    Douglas M. Doty
ROSENTHAL, MURPHEY & COBLENTZ
Attorneys for Calumet City
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070
Fax: (312) 541-9191




Your online Real Estate search begins and ends here.

| Home | Opinion | Sports | Entertainment | Features | Announcements | Classified | Homes |

Local   National   Business   Lake   Porter   Illinois   Indiana   Health   Events   Blogs   Multimedia   Records   Weather   Traffic

Search     ARCHIVES BROUGHT TO YOU BY      Advanced Search   Archives

# Foreclosures 'weigh' on municipalities

Story    Discussion





SUBSCRIBE    RSS FEE

BY KIRSTEN SRINIVASAN
kirstens@nwitimes.com
219.933.4158 | Sunday, July 20, 2008 |    4 comment(s)

Font Size:

    In addition to costing people their homes, foreclosures carry a price tag for municipalities, officials say.

Lansing increased its budget for mowing lawns on vacant properties to $20,000 this year, Lansing Village President Dan Podgorski said. The village tries to find out who owns the property and bill them or place a lien on the home, but the costs of employee time tracking homes and legal expenses add up, he said.

"It's hard to measure the costs, but it certainly exceeds the maintenance of cutting a lawn," Podgorski said.

Problems from foreclosures are being felt in municipalities throughout the region, said Ed Paesel, executive director of the South Suburban Mayors & Managers Association.

"The worst part is folks losing homes," Paesel said. "But beyond that, once they've left the home, villages are left with abandoned properties. Sometimes, they have a hard time finding out whose property it is, weeds go up and vandalism and those kinds of issues, and of course, there's the loss of the tax base."

Last year, Lansing had 201 foreclosure filings, according to the Woodstock Institute. Podgorski said he didn't have exact numbers for this year, but foreclosures have definitely grown.

"We are seeing the same thing everybody else is seeing, an increase in the number of foreclosures and houses that are vacant in our village, and we are trying to get a handle on the number of houses and locations as much as we can," he said.

The challenge is tracking the homes and making sure they don't become eyesores and obvious targets with junk mail piling up on the front porch and tall grass outside, he said.

Calumet City also spends a lot on boarding up homes and lawn service, Calumet City Communications Director Eric Schneider said. The city has about 560 foreclosed properties out of about 17,000 residential and commercial addresses, he said.

"It definitely weighs on the city," Schneider said.

"The majority of banks keep up with the property, but, in instances where the grass is left to grow too high and it's not properly secured, we have to step in as the city and make sure our neighborhood and the property is kept up for the good of the neighbors and community," he said.

The Calumet City Council recently approved a resolution supporting all efforts of the state General Assembly to protect homeowners' rights and to help homeowners avoid foreclosure. It also co-hosted a foreclosure prevention seminar in June.

South Suburban Mayors & Managers has been meeting with major lenders and local banks to talk about how it can help ease the foreclosure crisis on a local level, Paesel said. The organization also plans to host a meeting with municipal officials about issues municipalities face with foreclosures and how they are handing them, he said.



Buy Stocks - $4 F
No account or investmer today.
www.sharebuilder.com

Refinance $300,00
$300,000 Mortgage for



DEFENDANT'S EXHIBIT
I

## Marketplace

Jobs   Homes   Au

MECHANICAL * Me

Breakout: Local foreclosure filings by year
Municipality 2005 2006 2007
Calumet City 304 416 470
Dolton 303 379 413
South Holland 199 237 289
Lansing 119 158 201
Lynwood 73 82 70

SOURCE: The Woodstock Institute

Previous Story | Next Story                                              Share  Email  Print

## Back to story  4 comment(s)

Please note: The following are comments from readers. In no way do they represent the views of The Times or Lee Enterprises. We will not edit or alter your comments, but we do reserve the right to not post or to remove comments that violate our code of conduct. No comment may contain potentially libelous statements; obscene, explicit or racist language; personal attacks, insults or threats. Terms of Service

**pay up** wrote on Jul 20, 2008 10:54 AM:

" send the bill for mowing to the banks
who own the property "

**kidding** wrote on Jul 20, 2008 8:23 AM:

" Eric- For the good of the community? What a joke. I almost choked on my bagel. Take a ride down the streets. "

**Ron and Debbi** wrote on Jul 20, 2008 8:14 AM:

" I can't believe we finally got recognition, just the wrong kind. We're on that list but we're coming off! You can deduct one from South Holland next year! "

**Fed Up** wrote on Jul 20, 2008 6:57 AM:

" If I don't pay my water bill they don't care what the expenses are...they bill for the $$ to recover as well. Do the same here. Put the lien on with those costs as well. There doesn't need to be a profit, but cover the costs. These officials need some business savvy. "

## Post a comment  Once your comments are approved, they will appear here.

**Name:**

**Email:**
(optional)

**Comments:**

---

a factory authorized

MAINTENANCE Ma
local food manufactu

SALES HOME Impro
Top Pay. Call Brady

HEALTHCARE EXP
ASSISTANT/NURSE
Respond to: P.O. Bo

RESTAURANT Quiz
Main St, Crown Poin

View All

Search Jobs

## 3-day Foreca

☼ FRIDAY HIGH
☼ SATURDAY I
☼ SUNDAY HIG

5-day forecast

## Free Time

• Sudoku
• More Games

## Sections

Homepage
News
Sports
Features
Entertainment
Obituaries
Classifieds

# Shaker Heights *Point of Sale* Fact Sheet

Revised 12/05

**Seller Obligation:** Owners of residential real estate, including single-family and two-family dwellings, duplexes, apartments, and condominiums, are required to obtain a Certificate of Inspection (Point of Sale) prior to entering into an agreement to sell or convey an interest in such property.

**Application Fee:** The fee for the Point of Sale inspection is $100 for a single-family and $125 for a two-family. The fee for apartments is $100 for the first unit and $25 for each additional.

**Reinspection Fees:** A reinspection fee of $25 is charged for each requested reinspection after the first two requested reinspections, to be paid at the time of issuance of the Certificate of Compliance or a transfer release.

**Required Use of Certificate:** Sellers must provide the prospective purchaser with a copy of the Certificate of Inspection or a copy of a Certificate of Compliance prior to the execution of a contract of sale.

**Time Limit:** The Certificate of Inspection or Certificate of Compliance provided to the purchaser must have been issued within one (1) year prior to the agreement.

**Buyer's Acknowledgement:** An Acknowledgement Form signed by the purchaser affirming receipt of a Certificate of Inspection or Certificate of Compliance must be deposited in escrow and a copy provided to the Housing Inspection Department as a condition of title transfer.

**Escrow Requirement:** If all violations listed on a Certificate of Inspection are not corrected prior to transfer of title, an escrow account must be established and funds, in an amount not less than $100 and equal to 150% of the estimated cost of repairs, must be deposited to pay for the cost to correct all remaining violations.

**Escrow Determination:** The amount to be held in escrow shall be determined by procuring a written estimate from a company currently registered to do business in Shaker Heights. The estimate must reflect current market rates for labor and materials, and be itemized to correspond to the Point of Sale inspection notice. The City may reject an estimate that fails to reasonably reflect the fair market cost of repairs.

**City Estimate:** If the party establishing the escrow (seller or buyer) can demonstrate to the City that, after a good faith effort, he/she is unable to obtain a written estimate, the City may establish the amount of the escrow with the understanding that such determination is non-negotiable.

**Escrow Notification:** The escrow agent must notify the Housing Inspection Department in writing of the amount of funds proposed to be held to correct all remaining violations.

**Transfer Release:** If the City determines the estimate and escrow amount comply with the requirements of the ordinance, a written transfer release will be issued.

**Escrow Disbursement:** Funds held in escrow shall be disbursed only upon written authorization from the City. If the amount held is less than $5,000, no funds shall be released until all violations are corrected. If the amount is $5,000 but less than $20,000, the City may authorize one (1) partial release of funds from escrow if it is determined that substantial progress has been made in correcting the violations and that sufficient funds remain in escrow to correct all remaining violations. If the amount is $20,000 but less than $40,000, two (2) partial releases may be approved. If the amount is $40,000 but less than $60,000, three (3) partial releases may be approved. On escrow accounts equal to or exceeding $60,000, four (4) partial releases may be authorized.

**Escrow Agent Obligation:** No person, firm or corporation acting in the capacity of an escrow agent in any real estate transaction shall transfer title or disburse funds from any sale unless the provisions of Chapter 1415 of the Housing Code have been satisfied.

**Failure to Comply:** Any person violating any provision of Chapter 1415 of the Housing Code is guilty of a misdemeanor of the first degree and shall be punished as provided in Section 101.99 of the General Provisions of the Codified Ordinances.



DEFENDANT'S EXHIBIT 2