**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICK SALINSKE, for himself and all others similarly situated, | ) ) ) | Case No. 08-cv-03017 |
| *Plaintiffs,* | ) ) | Judge Wayne R. Andersen |
| v. | ) ) | Magistrate Judge Morton Denlow |
| CALUMET CITY, ILLINOIS, | ) ) | |
| *Defendant.* | ) ) | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW SUPPORTING THEIR MOTION
FOR PRELIMINARY INJUNCTION**

In its Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Opp."),

Defendant Calumet City, Illinois ("City") either concedes key points or fails to address them.

Additionally, City misrepresents facts and misinterprets applicable law. City also did not submit

any evidence (*e.g.*, affidavits) to refute the allegations of Plaintiff Nick Salinske's ("Salinske")

Verified Class Action Complaint. In sum, City failed to demonstrate that Salinske and all others

similarly situated (collectively, "Plaintiffs") are not entitled to injunctive relief.

Below, we show why injunctive relief is even more necessary for the class now than

when Salinske first filed his motion. After Salinske filed this motion, Salinske was fortunate to

find a buyer for his legal nonconforming property. As predicted in the allegations of the

Complaint and Motion for Preliminary Injunction, City used the Point of Sale Inspection

Ordinance ("Ordinance") to interfere and obstruct the sale of Salinske's property, resulting in the

loss of the sale and imminent foreclosure of Salinske's property. Below, in Section I, Plaintiffs

correctly identify the property interest at stake (*i.e.*, the right to freely alienate property). In

Section II, Plaintiffs examine the impact of City's Ordinance (*e.g.*, an increased number of

foreclosures) and set forth in detail City's recent use of the Ordinance to obstruct the sale of

Salinske's property.  In Section III, Plaintiffs show they are entitled to injunctive relief because (A) Plaintiffs are likely to succeed on the merits, (B) City's denial of Plaintiffs' constitutional right to alienate their property is, as a matter of law, an irreparable harm for which there is no adequate remedy, (C) the deprivation of Plaintiffs' constitutional rights outweighs any alleged harm to City, and (D) the public interest is best served by granting injunctive relief.

I.    **CITY MISREPRESENTS THE PROPERTY INTEREST AT STAKE; THE PROPERTY INTEREST AT STAKE IS THE ALIENABILITY OF PROPERTY.**

In an effort to mislead the Court and minimize the harm being caused to Plaintiffs, City erroneously claims that the property interest at stake in Counts I and II of the Complaint is "money – the cost of repairs," nothing more than a $500 tax imposed on the sale of property. Opp. at 9.  City is wrong.  The property interest at stake is Plaintiffs' constitutional right to freely sell their property without undue interference by the government.  Compl. at ¶ 2 ("Plaintiffs seek a declaration that [the Ordinance] is unconstitutional because it [] unreasonably and unconstitutionally restrains property owners' right to sell their property without due process of law); *see also* Opening Memorandum ("Mem.") at 7-9.  This suit is not about the costs of the repairs required by City's Ordinance, but the unconstitutional restraints the Ordinance imposes on the alienability of property without due process.  As explained next, the restraints of the Ordinance are not idle speculation.  They are very real and recently led to Salinske losing the opportunity to sell his property.

II.   **ENFORCEMENT OF THE ORDINANCE *INCREASES* THE NUMBER OF FORECLOSURES IN CITY AND WILL LIKELY LEAD TO FORECLOSURE OF SALINSKE'S PROPERTY.**

In an ironic twist, City argues that foreclosures in City have increased 85% between 2005 and the present and that the "threat to City housing stock caused by foreclosures 'definitely weighs on the City.'"  Opp. at 1.  The irony is that City's enforcement of the Ordinance actually

2

*increases* the number of foreclosures in City. Rather than facilitate sales of property that are necessary to avoid foreclosure, the Ordinance actually makes selling homes exceedingly difficult leading to foreclosures that would be avoided if City did not interfere with sales of property. Indeed, Salinske and the plaintiffs in *Mann v. Calumet City, Illinois*, Case No. 08-cv-555 (N.D. Ill.)(Coar, J.), are prime examples of City's own conduct increasing the number of foreclosures.

In July 2008, Salinske found a potential buyer for his property. Ex. A, Hanrahan Declaration at ¶ 3. After Salinske's buyer made his offer, Salinske's real estate broker went to City's Department of Inspectional Services to determine what needed to be done to complete the sale of the property. *Id*. at ¶ 4. City admitted that Salinske's tax records confirmed that the property has been taxed as a two flat since Salinske acquired it in 1989, but, nevertheless, told Salinske's broker, without providing due process, that Salinske's property is "illegal" nonconforming and must be deconverted before it can be sold. *Id*. City even went so far as claiming that if the building on Salinske's property was destroyed, *nothing* could be re-built on the property. *Id*. After being informed of City's position and contentions, the potential buyer's agent informed Salinske's agent that he would not purchase the property because he was only interested in the property if it could be purchased (and subsequently leased) as a two flat. *Id*. at ¶ 5. To date, Salinske has been unable to locate another buyer or sell his property and he will likely lose his property to foreclosure as a result of City's interference with the sale of his property. *Id*.

Similarly, the Manns entered into a contract for the sale of their property in the fall of 2006 and scheduled the closing of the sale for October 30, 2006. Ex. B, Houston-Mann Declaration at ¶ 3. City informed the Manns and the prospective buyer that, even though City's file indicated that the Manns' property was "legal nonconforming," City would not issue a

certificate of occupancy unless the Manns' property was deconverted to fewer units. *Id*. at ¶¶ 2, 5. Without the certificate of occupancy, the potential buyer did not want and was unable to close the sale on the Manns' property. *Id*. at ¶¶ 6, 8. To date, the Manns have not located another buyer or sold their property and may lose their property to foreclosure. *Id*. at ¶¶ 9-10.

## III.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.

Injunctive relief is warranted because Plaintiffs satisfied each of the following elements: (1) some likelihood of success on the merits; (2) irreparable harm if the preliminary injunction is denied for which there is no adequate remedy at law; (3) the irreparable harm to Plaintiffs if preliminary injunctive relief is denied outweighs the harm to City if such preliminary relief is granted; and (4) the public interest will be served if injunctive relief is granted. *See e.g., Jak Prod., Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993). Each element is discussed below.

### A.    Likelihood of Success on the Merits.

#### 1.    City Has Failed To Demonstrate That The Ordinance Is Not An Unreasonable Restraint On The Right To Sell Property.

As detailed in Plaintiffs' Opening Memorandum, the Ordinance unreasonably and unconstitutionally restrains the alienability of the Plaintiffs' property in several ways. Mem. at 7-9. Further, Judge Shadur has twice ruled that there is a "substantial likelihood of success" on the claim that the Ordinance is unconstitutional because it interferes with the right to sell property. Although Judge Shadur was analyzing prior versions of the Ordinance, the core aspect of the Ordinance -- that property owners cannot sell property until City says they can -- has remained the constant central provision of the Ordinance through its various amendments. Nowhere does City deny this. Judge Shadur's prior rulings, therefore, provide persuasive authority supporting issuance of injunctive relief. In all events, an examination of the Ordinance and City's attempts to defend it show that Judge Shadur was plainly right. Specifically, (1) the

Ordinance provides that property cannot be sold unless City says it can be sold by deciding that

the property has "passed" a point of sale inspection by completing all required repairs; (2) the

Ordinance contains no limitations on the type of repairs City can order as a precondition of the

right to sell property; and (3) the Ordinance contains unreasonably long deadlines that result in

unreasonable delays causing the loss of sales and/or a decrease in property value.  Mem. at 7-8.

City does not dispute Plaintiffs' argument (1).  Therefore, for the reasons set forth in

Plaintiffs' Opening Memorandum, Plaintiffs have shown a likelihood of success on the claim

that the Ordinance unconstitutionally interferes with the right to freely transfer property.

In response to Plaintiffs' argument (2), City contends that the "scope of search and types

of repair the City may require are specific and limited," citing Ordinance §§ (c)(1) and (e).  Opp.

at 5.  City's position is without merit.  Section (c)(1), Compliance with Property Maintenance

Code, generically provides that "all structures shall be in compliance with Article X, Sections

14-691 and 14-692 of this Chapter 14, 'Property Maintenance Code.'"  (*See* Ex. A to Mem.).

Section 14-691 is a wholesale adoption of the 2006 International Property Maintenance Code

with Section 14-692 simply amending certain sections thereof.  Neither section specifies or limits

the scope of City's searches or the repairs it may order.  Section (e), Refusal to Consent, Warrant

Procedures, relates to the contents of a warrant application.  City misrepresents to the Court that

Section (e) limits inspections "to a determination whether there are violations of the code

provisions identified."  Section (e) simply states that the application for an administrative search

warrant shall include the aforementioned statement.  Thus, City has not rebutted Plaintiffs'

argument that there are no limitations on the scope of searches conducted pursuant to the Ordinance nor the nature of repairs that City can request as a precondition to a sale of property.[1]

In response to Plaintiffs' argument (3), City refers to its Johnson hypothetical presented in its Motion to Dismiss Complaint, which concludes that "the notice, inspection and reinspection process will be completed within 45 days at the outside." Mot. to Dismiss at 4-6. The Johnson hypothetical is irrelevant. The issue is not how the Ordinance *might* work, but what it actually says. Moreover, the Johnson hypothetical is a best-case scenario based upon numerous assumptions and disregarding many of the realities of the real estate market. The assumptions include at least the following: (i) Mr. Johnson can locate a contractor who can complete all repairs within 14 days or Mr. Johnson has the skills, materials and time to complete all the repairs himself within 14 days; (ii) Mr. Johnson has the financial resources to make the repairs; (iii) no reinspections are required; (iv) City does not order any additional repairs after reinspection (the Ordinance does not prevent City from ordering new and additional repairs not identified in the original inspection); and (v) City immediately issues a Certificate of Compliance after reinspection (the Ordinance imposes no time limit on when City must issue a Certificate of Compliance after reinspection (Ex. A to Opening Memorandum at § 14-1(h))).

In any event, whether a property owner is fortunate enough to experience the best-case delay of 45 days, City admits that the Ordinance restrains the free alienability of property for well over a month in the best of circumstances. In today's tumultuous real estate market, City's restraint of a property owner's ability to sell for over a month could be the difference between closing a sale and foreclosure. Indeed, that is exactly the predicament Salinske is in.

---

[1]    Moreover, the only purported limitation in the Ordinance -- that property is inspected to make sure it is in "good repair" -- is no limitation at all. This issue is discussed in more detail in Section III.A.2.c. below.

City concedes that ordering repairs through the Ordinance is unnecessary. Even if repairs are not required by the Ordinance, they will still be required "because the typical form real estate contract grants the buyer pre-closing inspection rights" and "the parties may be negotiating these repairs themselves." Mot. to Dismiss at 5; Opp. at 5. The fact that an inspection pursuant to the Ordinance is unnecessary supports injunctive relief. Indeed, the crux of Plaintiffs' position is that buyer and seller ought to be able to conclude their transaction (*e.g.*, by adjusting the price to take into account needed repairs after a buyer's inspection) without the government telling them what they need to do and otherwise interfering with a private transaction. The market and private negotiations should control, not the whim of a City inspector.

City's remaining cursory arguments are unpersuasive and easily dismissed (as they were by Judge Shadur).

- City notes that other municipalities have adopted point of sale inspection ordinances. Opp. at 1-2, 4, Ex. 2. City has not submitted copies of those unrelated ordinances and does not claim that all point of sale inspection ordinances are identical. Nor could it. For example, the Detroit ordinance addressed in *Butcher* did not provide that the city could hold up the sale pending repairs. The fact that other cities have adopted different types of point of sale inspection ordinances does not mean that City's Ordinance does not unconstitutionally restrain Plaintiffs' right to alienate their property or lack procedural due process.

- According to City, because it is permitted to tax the sale of property and enforce building codes, "it is rational to use one regulatory mechanism to facilitate compliance with the other." Opp. at 5. City's theory is flawed. Although municipalities are permitted to impose certain taxes in certain circumstances and authorized to enact codes to protect the health and safety of residents, they are not authorized to use such taxes and codes to limit the

alienability of property. Op. Ill. Atty' Gen. No. 94-024 (Oct. 25, 1994), 1994 WL 601863 (West 1992)(*See* Ex. K to Opening Memorandum); *Petropoulos v. Chicago*, 5 Ill. 2d 270, 274-75, 125 N.E.2d 522, 525 (Ill. 1955)(legal restrictions rendering property unsaleable "would be an utter violation of a man's right to alienate property").

- City describes the allegation that the Ordinance requires the use of a "licensed contractor" as "empty-headed" because the Ordinance does not prevent do-it-yourself repairs by property owners. The problem is Plaintiffs have not made any such allegation. However, the Complaint does allege, and City does not dispute, that a property owner is prohibited from having repairs done by a family member or unlicensed person (Compl. at ¶ 16).

- City claims that the allegation that even if a property is in compliance, the City may nevertheless ignore the Ordinance and refuse to issue a Certificate of Compliance, is speculation. Opp. at 6. Salinske, unfortunately, is not speculating. As detailed at Section II above, City informed Salinske's real estate broker that, even though City's tax records confirmed that Salinske's property was a two flat, City would not issue a certificate of occupancy unless Salinske's property was deconverted. Moreover, the Ordinance contains no safeguards against City refusing to issue a Certificate of Compliance for any reason whatsoever.

- Without offering any support at all, City professes: "Plaintiff's [] concerns, relating to no 'meaningful right to a hearing' are belied by the terms of the Ordinance, which provides multiple opportunities for predeprivation review." Opp. at 6. As detailed in Section III.A.2. below, the Ordinance, in fact, does not provide procedural due process as it fails to provide *pre-deprivation* due process. The Ordinance, by its terms, takes away Plaintiffs' right to sell their property until City says they can sell it. Indeed, City recently stopped the sale of Salinske's property by simply declaring that it had to be deconverted. No due process is

provided prior to City's taking of Plaintiffs' right to sell (and none was provided to Salinske). The fact that Plaintiffs can appeal a decision after the right to sell has been taken does not cure the constitutional problems with the Ordinance.

- In response to Plaintiffs' allegation that the Ordinance does not provide any detail regarding the due process protection of a water bill hearing and requires the owner to pay the disputed bill "under protest" while challenging the bill (Compl. ¶ 37), City cites *Memphis Light, Gas & Water v. Kraft*, 436 U.S. 1 (1978), averring that the lack of detail with respect to the water bill hearing "does not go to the facial validity of the Ordinance." Opp. at 7. *Memphis Light*, however, undermines City's position. *Memphis Light* held:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. . . . The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'   436 U.S. at 13-14.

Again, the Ordinance does not provide any detail regarding the hearing and, more importantly, City makes no attempt whatsoever to argue that it does.

- City also argues that this Court should not consider Count I because Plaintiffs allege "no independent constitutional violation and the process is replete with pre and postdeprivation state remedies." Opp. at 7 (citing *Gen. Auto*, 526 F.3d at 991). However, plaintiffs need establish "either an independent constitutional violation or the inadequacy of state remedies" only as a prerequisite to as-applied challenges, not facial challenges. *E.g.*, *Gen. Auto*, 526 F.3d at 991; *accord Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 907 F.2d 239, 242–43 (1st Cir. 1990) (citing cases) ("The district court erred in ruling that a facial substantive due process challenge to a zoning ordinance . . . is not ripe for adjudication until [plaintiff exhausts state remedies]."); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386

(1926); *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 166 (3d Cir. 2006). Even were an independent constitutional violation required in this case (which it is not), Plaintiffs allege that the Ordinance violates the Fourth Amendment and also that the Ordinance fails to provide procedural due process.

- Strangely, City argues that the Supreme Court has never "constitutionalized" Plaintiffs' "'restraint on alienation' theory," yet admits that the Supreme Court has acknowledged the "ancient doctrine disfavoring restraints and [sic] alienation of property." Opp. at 7 (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 188 n.3 (1995)). Indeed, it is the Supreme Court's "time-honored practice of viewing restraints on alienation of property with disfavor." *Asgrow Seed*, 513 U.S. at 194 (citing *Sexton v. Wheaton*, 21 U.S. 229 (1823)). Moreover, as explained in Plaintiffs' response to City's Motion to Dismiss Complaint, the due process clause plainly provides that the government may not deprive a person of his right to alienate his property without due process. *See* Opposition to Motion to Dismiss at 3.

- City takes issue with the Illinois Attorney General opinion letter which unequivocally states that municipalities are not permitted to interfere with the right to freely sell property, arguing that it only applies to non-home rule municipalities. Opp. at 8-9. The Illinois Attorney General made no distinction between home rule and non-home rule municipalities with respect to the holdings important to this dispute. Indeed, the opinion letter unequivocally states "*In no instance*, however, are municipalities authorized to limit the alienability of property in order to enforce [] codes." Mem. at 9. Moreover, City ignores the other controlling authorities cited for the proposition that the due process clause provides that the government may not deprive a person of his right to sell property without due process.

10

2.    **The Ordinance Lacks Procedural Due Process.**

(a)    ***Post-Deprivation* Review Procedures Are Insufficient As Due Process Requires *Pre-Deprivation* Review.**

On pages 9 through 13 of their Opening Memorandum, Plaintiffs (1) explain that procedural due process requires a *pre-deprivation* hearing, and (2) detail how the Ordinance fails to comply with this requirement because it provides no hearing or review *prior to* the deprivation of the right to sell property.  City's brief does not dispute that procedural due process requires a *pre-deprivation* hearing.  In response to Plaintiffs' claim that the Ordinance fails to provide *pre-deprivation* review, City simply makes a single, conclusory statement that "the Ordinance [] provides multiple opportunities for predeprivation review," without any citation to any part of the Ordinance.  Opp. at 6.  The fact that City was only able to muster a single, conclusory statement without any reference to the Ordinance is not surprising, as only a cursory review of the Ordinance demonstrates that there are no *pre-deprivation* review procedures. Mem. at 11-13.

Rather than address Plaintiffs' arguments and authorities, City simply outlines the *post-deprivation* "layers of review" under the Ordinance which are available only after the City has deprived property owners of the right to sell their property.  Opp. at 11.  Of course, *post-deprivation* review is insufficient to satisfy procedural due process.  Mem. at 9-13; *see also Memphis Light*, 436 U.S. at 16 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557-558 (1974)(the Supreme Court "consistently has held that 'some kind of hearing is required at some time *before* a person is finally deprived of his property interests.'")(emphasis added)).

(b)    **Deconversion Provisions Lack Pre-Deprivation Due Process.**

City makes no argument in response to Plaintiffs' argument that the Ordinance contains no procedural due process protection against City improperly ordering the deconversion of legal nonconforming property as a precondition of the right to sell.  Compl. at ¶ 44; Mem. at 5.  Nor

could it.  As evidenced by the recent unfortunate events involving Salinske's attempt to sell his legal nonconforming property, the lack of due process can lead to tragic results, including the loss of one's home.

(c)      <strong><u>The Ordinance Is Unconstitutionally Vague.</u></strong>

The Ordinance is void for vagueness because it mandates that property be in "good repair" without explaining what is "good repair."  Mem. at 13.  City's responses lack merit.

City's initial response – although far from clear – is that it is the legislature's duty to determine what building code provisions are reasonable and further public health, safety, and welfare.  Opp. at 9.  This "argument" does not respond to Plaintiffs' claim that the Ordinance is unconstitutionally vague.  And while it is conceivable that "little" repairs have a positive impact (Opp. at 9-10), City again misses the point, which is that the Ordinance does not identify which "little" repairs constitute "good repair" and, therefore, the Ordinance is unconstitutionally vague.  Historically, City has relied on the "good repair" provisions of the Ordinance to require cosmetic repairs such as repairing a soap dish before permitting the sale of property.

City's next response is that its inspectors do not have unfettered discretion because the Ordinance incorporates the International Property Maintenance Code.  Specifically, City cites International Property Maintenance Code Sections 304.1 ("The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety or welfare") and 305.1 ("The interior of a structure and equipment therein shall be maintained in good repair, structurally sound and in a sanitary condition").  Opp. at 10.  City then sums up its response with only the conclusory statement that "[p]eople with common intelligence can understand what it means to keep a house in good repair."  Opp. at 10.  City offers nothing in support of its conclusion, and does not even attempt to explain how "people with common intelligence" could understand these sections to mean that (apparently) you must

12

have working soap dishes for property to be in "good repair." City's failures are not surprising,

as they simply underline the fact that the Ordinance is unconstitutionally vague.

City's reliance upon foreign authorities, several of which are criminal matters, to argue

that "in good repair" is not unconstitutionally vague, is misplaced. City first cites a case that

interpreted a specific section of the Mine Act. *Freeman United Coal Mining Co. v. Federal*

*Mine Safety & Health Review Commission*, 108 F.3d 358 (D.C. Cir. 1997). The court

determined that the term "maintained" was not unconstitutionally vague within the Mine Act and

ruled that "any reasonable prudent person would recognize that allowing steel beams supporting

a walkway to corrode and deteriorate to the point of collapse constitutes a failure to maintain a

facility in good repair." 108 F.3d at 362. City's reliance on *City of Cleveland Heights v. G.&C.*

*Properties*, 1974 WL 184833 (Oh. App. 1974)(Ex. C), is also misplaced as the Ohio Court of

Appeals narrowly ruled that the meaning of "good repair" was understandable "with respect to

screens on windows." *Id*. at *1. The 47-year old California criminal case, *People v. Balmer*, 17

Cal. Rptr. 612 (1961), is also unpersuasive as it appeals a conviction for violating California's

Administrative Code governing nursing and convalescent homes. Finally, City offers an

unpublished New Jersey case which found that some of the provisions of the BOCA National

Property Maintenance Code of 1993 were not unconstitutionally vague. *Reedy v. Borough of*

*Collingswoods*, 2005 WL 1490478 (D.N.J. 2005)(Ex.D). However, the codes at issue in *Reedy*

did not deprive a property owner of his right to sell if code violations were found, but rather, a

citation was issued requiring violators to appear at a municipal court proceeding where they

could face fines and imprisonment if the necessary repairs were not made. *Id*. at *1.

**B.    The Denial Of Plaintiffs' Constitutional Right Is An Irreparable Harm For Which There Is No Adequate Remedy.**

City does not dispute that, as a matter of law, the deprivation of a constitutional right is an "irreparable injury" for which there is no adequate remedy at law.  Opp. at 12-13. Accordingly, this factor weighs in favor of granting Plaintiffs' request for injunctive relief.

**C.    Deprivation Of Plaintiffs' Constitutional Right Outweighs Any Alleged Harm To City.**

According to City, injunctive relief will prevent City from maintaining the quality of its housing stock and that such harm outweighs any harm suffered by Plaintiffs.  Opp. at 13.  City's argument is wholly without merit.

City does not and cannot deny that it may maintain housing stock quality through enforcement of its Code Enforcement Ordinance and Rental Dwelling Inspection Ordinance, both of which eliminate code violations related to health and safety (and do so without infringing on property owners' right to freely alienate their property).  Indeed, City conceded as much in the *Walker* litigation which was before Judge Shadur.  *See* Mem. at 7, Ex. J.  Moreover, City acknowledges that, to the extent its housing stock is maintained through repairs ordered under the Ordinance, the housing stock will likewise be maintained without enforcing the Ordinance "because the typical form real estate contract grants the buyer pre-closing inspection rights" and "the parties may be negotiating these repairs themselves."  Mot. to Dismiss at 5; Opp. at 5.

As importantly, City ignores that, beginning upon the entry of the August 8 Injunction and lasting until the recent dismissal of the *Walker* litigation, City has not enforced the Ordinance (either because it was enjoined from doing so or agreed not to).  Since August 8, 2006, there have been over 611 sales of property that have closed in City.  Ex. E, Joseph Declaration at ¶ 3.  City has presented no evidence showing that these 600-plus closings have

harmed City, adversely affected the health or safety of City citizens and properties, or prevented City from maintaining the quality of City's housing stock.

### D.    Enjoining Enforcement Of The Ordinance Best Serves The Public Interest.

City argues that the public is best served by permitting enforcement of the Ordinance. Opp. at 13.  Rather than identifying specific public interests that enforcement would advance, City asserts an injunction should be denied because the Ordinance was "adopted and amended through the democratic process" and *City's* defense of the Ordinance "demonstrates the commitment of the *community* to the importance of enforcing the Ordinance." *Id.*

City's first argument is nonsensical.  City fails to explain how the fact that the Ordinance was "adopted and amended through the democratic process" has anything to do with promoting the public interest or whether the Ordinance is constitutional.  The real issue is whether the public interest would be best served by an injunction.  The answer is plainly yes because protecting the constitutional rights of City's property owners, which an injunction will do, is plainly in the best interests of the public.

### CONCLUSION

For the reasons herein and in Plaintiffs' Opening Memorandum, the Court should grant Plaintiffs' immediate injunctive relief.

August 29, 2008

Philip C. Stahl
Patrick T. Nash
Donald P. Bunnin
Mark A. Semisch
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois  60606
(312) 704-7700

Respectfully submitted,

**NICK SALINSKE, FOR HIMSELF AND ALL OTHERS SIMILARLY SITUATED**

By:    _____/s/ Patrick T. Nash_____
             One of their Attorneys

## CERTIFICATE OF SERVICE

I, Patrick T. Nash, certify that on this 29th day of August, 2008, I electronically

filed **PLAINTIFFS' REPLY MEMORANDUM OF LAW SUPPORTING THEIR**

**MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the

CM/ECF system which will send notification of said filing to:

> Mark H. Sterk
> Odelson & Sterk, Ltd.
> 3318 West 95th Street
> Evergreen Park, Illinois  60805
>
> John B. Murphey
> Rosenthal, Murphey & Coblentz
> 30 North LaSalle Street
> Suite 1624
> Chicago, IL  60602

/s/  Patrick T. Nash

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICK SALINSKE, for himself and all others similarly situated, | ) ) ) | |
| | ) | Case No. 08-cv-03017 |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Judge Wayne R. Anderson |
| | ) | Magistrate Judge Morton Denlow |
| CALUMET CITY, ILLINOIS, | ) ) ) | |
| *Defendant.* | ) ) | |

## DECLARATION OF DONNA HANRAHAN

I, DONNA HANRAHAN, declare as follows:

1.      The following facts are personally known to me, and if called to testify, I could and would competently testify thereto.

2.      I am a realtor licensed in Illinois and Indiana. Pursuant to a written exclusive agreement, I acted as realtor for the property located at 527 155th Street, Calumet City, Illinois, which is owned by Plaintiff Nick Salinske ("Salinske").

3.      In July 2008, Salinske found a potential buyer for his property, which is listed for $130,000. The potential buyer stated that he was willing to purchase the property for between $115,000 and $120,000, subject to his confirmation that there were no major problems with the property. The price range orally offered to Salinske was acceptable to him.

4.      After Salinske's buyer made his oral offer, I went to Defendant Calumet City, Illinois' ("City") Department of Inspectional Services to determine what needed to be done to complete the sale of the property. During my meeting with City, City confirmed that the tax records for Salinske's property confirmed that the property has been taxed as a two flat since

Salinske acquired it. Nonetheless, City told me that Salinske's property is "illegal" nonconforming and must be deconverted to a single family home before it can be sold. City also claimed that if the building on Salinske's property was destroyed, *nothing* could be re-built on the property.

5.    After being informed on City's position and contentions, the potential buyer's agent informed me that he would not purchase the property because he was only interested in the property if it could be purchased (and subsequently leased) as a two flat. To date, Salinske has been unable to locate another buyer or sell his property. Salinske has informed me that he will likely lose his property to foreclosure as a result of City's interference with the sale of his property.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 28, 2008

*Donna Hanrahan*

Donna Hanrahan

(THU)AUG 28 2008 14:28/ST. 14:25/No. 7500000511 P  3          FROM McColly Real Estate Crete

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HUSSEIN H. MANN and DEBRA HOUSTON-MANN, | ) )  ) |
| *Plaintiffs,* | ) )  ) |
| v. | ) )  ) |
| CALUMET CITY, ILLINOIS, | ) )  ) |
| *Defendant.* | ) |

Case No. 08-cv-00555

Judge David H. Coar

## DECLARATION OF DEBRA HOUSTON-MANN IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

DEBRA HOUSTON-MANN declares as follows:

1.    The following facts are personally known to me, and if called to testify, I could and would competently testify thereto.

2.    My husband, Hussein Mann, and I are homeowners in Calumet City, Illinois. Our property is located at 514 Forsythe. We have always understood that the property is a legal nonconforming use. We purchased the property from a Calumet City official. The previous owner owned and operated the property as a multiple-family dwelling. When I purchased the property from the Calumet City official, I was not informed that it was not legal nonconforming or that it would have to be deconverted. Since we have owned it, the property has had two units. The upstairs unit has a separate exterior entrance at the back of the property. The property sits on two lots, each with its own Property Index Number: 30-08-401-033-0000 and 30-08-401-034-0000. We have paid and continue to pay taxes on both lots.

151505v1

3.      In the fall of 2006, my husband and I listed our property for sale and entered into a contract for the sale of the property. We scheduled the closing of the sale for October 30, 2006 at 2:00 p.m.

4.      At 12:00 p.m. on October 30, 2006, the buyer and I went to Calumet City's Department of Inspectional Services to purchase the necessary transfer stamps. Rebecca, an employee at the Calumet City Department of Inspectional Services, required the payment of the final water bill before Calumet City would issue the transfer stamps.

5.      Rebecca also refused to issue the certificate of occupancy. Rebecca explained that the buyer could not occupy the property until it was deconverted. Rebecca then warned the buyer that if the buyer closed on the property Calumet City could eventually demand the deconversion of the property.

6.      Without the certificate of occupancy, the buyer did not want to close the sale of the property on October 30.

7.      I called the Calumet City Inspectional Services on October 31 to request further information about the decision to prohibit occupancy of the property. Again, I spoke with Rebecca. During our conversation, Rebecca agreed to issue a certificate of occupancy for the property prior to deconversion.

8.      On November 1, 2006 I contacted the buyer. The buyer was concerned about the threatened deconversion of the property. Also, the buyer could no longer afford to close the sale of the property because, as a result of the delay by Calumet City, she had to use the money for the closing to renew the lease on her current apartment.

9.      My husband and I are again attempting to sell our property.

151505v1

2

10.    As a result of the City's action, I suffered an emotional and financial hardship. The lives of my husband and I have been turned upside down by Calumet City's conduct. We thought we were going to sell the property on October 30, 2006 and packed all of our belongings. We had found a new place to live and had to put down money to hold the new place. We lost that money. We have borrowed money for repairs on our home. Because the closing did not happen, we had no money to pay the people who we borrowed from who expected to get their money back after closing. We are confined to a home that we can't sell due to the deconversion law. We were not aware of the deconversion laws when we purchased our home. We want to sell this property as a Multi-Unit. This has caused us severe financial, mental, physical and emotional stress. My husband and I lost the costs directly associated with the sale, including lost wages, the negotiated settlement amount for the property's second mortgage, the cost of work and inspections required to close property, and the security deposit for the place we intended to move upon the closing of the property. Moreover, it is likely that I will lose the property to foreclosure as I am several months behind the first mortgage.

3

151505v1

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 26, 2008                    *Debra Houston-Mann*

151505v1

# EXHIBIT C

Westlaw.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1974 WL 184833 (Ohio App. 8 Dist.)

City of Cleveland Heights v. G. & C. Properties
Ohio App. 8 Dist.,1974.
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio, Eighth District, Cuyahoga
County.
City of Cleveland Heights, APPELLEE,
v.
G. & C. Properties, APPELLANT.
NO. 33031.

October 24, 1974.

APPEAL FROM CLEVELAND HEIGHTS MUNI.
COURT, No. 76937.

Jules N. Koach, for plaintiff appellee.
Melvin M. Gross, for defendant appellant.

**JOURNAL ENTRY**

PER CURIAM.
*1 This cause came on to be heard upon the
pleadings and the transcript of the evidence and the
record in the Cleveland Heights Municipal Court, and
was argued by counsel for the parties; and upon
consideration, the court finds no error prejudicial to
the appellant and therefore the judgment of the
Cleveland Heights Municipal Court is affirmed. Each
assignment of error was reviewed and upon review
the following disposition was made:

Defendant is a partnership owning rental property in
the City of Cleveland Heights. On June 6, 1973,
defendant was charged with violation of Section
1351.09 of the Codified Ordinances of Cleveland
Heights, which states in part:

"'1351.09 REQUIRED VENTILATION AREA
AND SCREENS.

* * *

(b) Every openable window and outside door of a
dwelling unit shall be equipped with screens,
maintained in a state of good repair, and such screens
shall be in position in such windows from May 1, of
each year through October 30 of each year. Nothing
herein contained shall require screens in air
conditioned rooms.'"

"(Ord. 58-1972. Passed 9-18-72.)"

Defendant entered a plea of not guilty and on August
13, 1973, trial was had without a jury in the
Cleveland Heights Municipal Court and defendant
was found guilty. From this verdict defendant appeals
assigning five errors. Defendant's first assignment
contains two distinct assignments.

Defendant's assignment of error I(a) is:

*Section 135.09(b) [sic] of the Cleveland Heights
Code should be declared inoperative and void as
violative of the due process clause of the Fifth and
Fourteenth Amendments to the United States
Constitution.*

The argument under this assignment alleges that the
ordinance is void for vagueness. Defendant contends
that the words "in good repair" are vague and cites in
support *Chincone v. Liquor Control Commission*
(1969), 20 Ohio App.2d 43, 251 N.E.2d 864. The
*Chincone* case holds that a statute is void where it is
"so vague" that men of common intelligence must
necessarily guess at its meaning. Here, one need not
guess at what "good repair" means. This is easily
understood by men of common intelligence with
respect to screens on windows. See Note, Void for
Vagueness Doctrine, 109 U. Pa. L. Rev., 67 at 91.
Further, defendant was charged with having "no
screens" (Tr. 9) on the windows.

Defendant's assignment I(a) is without merit and is
overruled.

Defendant's assignment of error I(b) is:

*If the court should find that the ordinance is [sic]*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1974 WL 184833 (Ohio App. 8 Dist.)

question is not vague, then the appellant submits that said ordinance is void and inoperative as it is unreasonable and descriminatory [sic] in derogation of appellant's constitutional rights.

Defendant argues that the ordinance is (1) not within the police powers of the municipality, (2) is not reasonable and is discriminatory, and (3) does not bear a substantial relation to the purpose sought.

**\*2** With respect to the first test, the intent of the ordinance is to regulate buildings. This has been held within the police powers. *Cincinnati v. Sternkamp* (1896), 54 Ohio St. 284, 43 N.E. 490, *cf. Gates v. Board* (1967), 10 Ohio St.2d 48, 225 N.E.2d 222.

As to the second test, there is a presumption in favor of validity of ordinances adopted by municipal corporations. *Benjamin v. City of Columbus* (1957); 104 Ohio App. 293, 148 N.E.2d 695; *aff'g.* 167 Ohio St. 103, 146 N.E.2d 854; *City of Steubenville, ex rel. Blackburn v. Targoss* (1965), 3 Ohio App.2d 21, 209 N.E.2d 486. The burden is on the party attacking the ordinance to prove by clear and convincing evidence that it is unreasonable. We cannot say that requiring screens in good repair in non-air conditioned windows is unreasonable. Defendant argues that it is discriminatory in exempting air conditioned rooms. This classification of air conditioned and non-air conditioned is reasonable in light of the purpose of the ordinance. *Alkire v. Cashman* (S.D.Ohio, 1972), 35 Ohio Misc. 55, 350 F.Supp. 360. And there is no proof that those within the classes are treated differently. *City of Franklin v. Harrison* (1959), 112 Ohio App. 423, 160 N.E.2d 15, aff'g. 171 Ohio St. 329, 170 N.E.2d 739.

The third test is also met. There is no evidence in the record or argument on appeal as to the purpose of the ordinance. But it is obvious what the purpose is and the requirement of screens in good repair in non-air conditioned rooms bears a substantial relationship to this purpose.

Defendant's assignment I(b) is without merit and is overruled.

Defendant's second assignment of error is:

*Section 135.09(b)[sic] of the Cleveland Heights Code*

is unconstitutional with respect to the appellant in that it is retroactive in effect and therefore cannot be enforced against appellant.

In *Gates Co. v. Housing Appeals Board* (1967), 10 Ohio St.2d 48, 225 N.E.2d 222, the Supreme Court held that building standards enacted subsequent to the continued use of real property do not apply unless the non-conformance would constitute a nuisance. The Cleveland Heights ordinance was enacted subsequent to the continued use of defendant's property without screens. However in *Gates*, the Supreme Court noted:

...[Defendant] is unable to finance the improvements demanded, which may well cost as much as 50 per cent of the present fair market value of the property.

We are convinced that the foregoing is sufficient to prevent the enforcement of the Code, .... *Id.* at 50, 225 N.E.2d 222.

**\*3** Defendant alleges that "a substantial sum of money would have to be expended" in order to comply with the ordinance. (Brief for appellant, at 6.) Nowhere is it alleged that the burden imposed on defendant here approaches the burden on defendant in *Gates*. In *Gates*, defendant would have been required to install no less than six "flush water closet, lavatory basin and bathtub or shower." The Cleveland Heights ordinance is merely requiring screens in good repair. Defendant's second assignment of error is without merit and is overruled.

Defendant's third assignment of error is:

*The trial court's failure to supply appellant with properly requested findings of fact and conclusion of law constituted prejudicial error.*

At the conclusion of trial defendant moved for written findings of fact and conclusions of law. (Tr. 14). The court responded: "You prepare them and I will sign them," to which defendant responded: "Okay." (Tr. 15). There is nothing in the record to indicate that defendant submitted findings of fact and conclusions of law which were refused by the trial court. Defendant's third assignment of error is without merit and is overruled.

Defendant's fourth assignment of error is:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1974 WL 184833 (Ohio App. 8 Dist.)

*The judgment was not supported by the weight of the evidence.*

The only witness that was called was the building inspector who testified as to what he saw and introduced photographs. On cross examination he was not impeached. (Tr. 10-11). The evidence amply supports the verdict. Defendant's fourth assignment of error is without merit and is overruled.

Defendant's fifth assignment of error is:

*No plea was ever taken from appellant in violation of the due process clause of the Fifth and Fourteenth Amendments to the Unites States Constitution.*

We find in the record that on July 23, 1973, defendant entered a plea of not guilty. <u>Crim. R. 5</u> states in part: "In misdemeanor cases the defendant *may* be called upon to plead at the initial appearance."(Emphasis added). Defendant's fifth assignment of error is without merit and is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Heights Muni. Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to <u>Rule 27 of the Rules of Appellate Procedure</u>. Exceptions.

JACKSON, P.J., MANOS, J., WASSERMAN, J., CONCUR.
(Wasserman, J, Retired Judge, Sitting by Assignment.)
**\*4** N.B. This entry is made pursuant to the third sentence of Rule 22D, Ohio Rules of Appellate Procedure. This is an announcement of decision, (see Rule 26). Ten (10) days from the date hereof this document will be stamped to indicate journalization, at which time it will become the judgment and order

of the court and time period for review will begin to run.

Ohio App. 8 Dist.,1974.
City of Cleveland Heights v. G. & C. Properties
Not Reported in N.E.2d, 1974 WL 184833 (Ohio App. 8 Dist.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

Reedy v. Borough of Collingswood
D.N.J.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
Gayle REEDY, et al., Plaintiffs,
v.
BOROUGH OF COLLINGSWOOD, Defendant.
No. Civ. 04-4079(JBS).

June 22, 2005.

F. Michael Daily, Jr., Westmont, New Jersey, for
Plaintiffs.
Joseph M. Nardi, III, Brown & Connery, LLP,
Westmont, New Jersey, for Defendant.

OPINION

SIMANDLE, J.
*1 Plaintiffs, twelve owners of duplexes located in
Collingswood, New Jersey, brought this action
against Defendant, Borough of Collingswood
("Borough"), on behalf of all owners of owner-
occupied duplexes within the Borough, of which
there are presently approximately 187, claiming
violations of federal and state law. This matter is
presently before the Court upon Plaintiffs' application
for a preliminary injunction, and the motion by
Defendant to dismiss the Complaint under Rule
12(b)(6), Fed.R.Civ .P. For the reasons explained
infra, the Court will deny the request for injunctive
relief and grant the motion to dismiss in part.[FN1]

> FN1. An Order to Show Cause was filed on
> September 9, 2004, [Docket Item 5,] and the
> Court heard oral argument on October 13,
> 2004. Subsequently, the parties submitted
> supplemental briefs as to several issues, and
> requested that the Court permit them
> additional time to discuss settlement options.
> By letter dated December 14, 2004, counsel
> for Plaintiffs informed the Court that the
> parties were unable to resolve the matter
> extrajudicially, and asked the Court to
> "move forward with the presently pending
> motions."

I. BACKGROUND

Pursuant to the Borough's original municipal code,
enacted in 1949, duplex dwellings were permitted
property uses. (Compl.¶ 22.) By Ordinance No. 846,
adopted in 1985, the Borough eliminated the
conversion from single family homes to multi-family
dwellings. By Ordinance No. 1126, adopted in 1997,
the Borough amended the Borough Code and
rendered duplexes non-conforming uses. (Id. ¶¶ 22,
23.)

Pursuant to §§ 237-6 and 237-10 of the Borough's
Municipal Code, all rental units must register and pay
an annual rental registration fee.[FN2]Additionally all
rental units are subject to inspections. Inspections are
conducted on all rental properties registered in the
Borough on an annual basis and as needed based
upon observation or information indicating
inadequate conditions. The Borough utilizes
members of the fire department to conduct the
property maintenance inspections of registered rental
properties in the Borough.

> FN2. "Rental unit" is defined by the Code
> as "a dwelling unit or commercial unit
> which is available for lease or rental
> purposes."The definition does not include
> that portion of a rental facility occupied by
> the owner. Code § 237-4.

If an inspection reveals violations of the property
maintenance and fire safety codes, the property
owner is advised, in writing, of the deficiencies. If
the required repairs are not made by the owner within
a stated time period, a citation may be issued or
additional time to cure may be granted to the owner
upon request. If a citation is issued, violators are
required to appear at a municipal court proceeding
where they face fines up to $1,000 for each violation
for each day and imprisonment for a period not to
exceed 90 days. The Borough Code explicitly
excludes an administrative appeals process.[FN3]

> FN3. On March 21, 1994, the Borough
> adopted by reference into its municipal code
> the BOCA National Property Maintenance

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

Page 2

Code of 1993 ("BOCA Code"). Though the BOCA Code provides for the right to an administrative appeal of a citation for property maintenance code violation, the Borough Code excludes those provisions.

This Court has not been made aware of any outstanding notices of violation or municipal court summonses or complaints issued to Plaintiffs since the inception of this suit. (Oct. 15, 2004 Amet Cert. ("Amet Cert.") ¶ 7.) Moreover, since the inception of the property maintenance code inspection process, no property owners of owner-occupied duplexes have been incarcerated, nor have any daily fines been imposed and collected against them.[FN4](*Id.* ¶ 5.)

> FN4. In September 2003, following an inspection at her property, Plaintiff Elena Flynn was notified of the need to correct twelve alleged maintenance code violations at her duplex. A reinspection occurred roughly eight months later, in May of 2004, which revealed that only two of the twelve original alleged violations remained. The Borough allowed Ms. Flynn an additional two weeks to correct the violations, though further reinspection revealed that she apparently had not done so. At that time, a municipal court summons was issued setting a June 2004 court date. Prior to that date, the Borough determined that Ms. Flynn had abated the final two violations and dismissed the matter, without any costs or penalties being assessed. (Amet Cert. ¶ 8.)

Plaintiffs brought suit in this Court alleging claims under the First, Fourth, Fifth and Fourteenth Amendments, as well as the New Jersey Constitution and New Jersey state law, seeking a preliminary injunction and damages. Count One of the Complaint alleges violations of Plaintiffs' procedural due process and equal protection rights under the Fifth and Fourteenth Amendments. In Counts Two, Three, Four and Seven Plaintiffs allege violations of their substantive due process and equal protection rights under the Fifth and Fourteenth Amendments. In Count Five Plaintiffs allege violations of their Fourth and Fourteenth Amendment rights guaranteeing freedom from unreasonable searches. Count Six alleges violations of the First Amendment. Finally, in Count Eight Plaintiffs allege that the Borough

Ordinance is an invalid exercise of municipal authority in violation of the New Jersey Constitution. Defendant has moved to dismiss the Complaint under Fed.R.Civ.P. 12(b)(6) in its entirety.

## II. STANDARDS OF REVIEW

### A. *Preliminary Injunction*

*2 Issuing a preliminary injunction is "an 'extraordinary remedy' and should be restricted to 'limited circumstances.'" *Instant Air Freight Co. v. C.F. AirFreight, Inc.,* 882 F.2d 797, 800 (3d Cir.1988). In ruling on a motion for a preliminary injunction, the Court must consider: (1) the likelihood that the moving party will prevail on the merits; (2) the extent to which, if any, the moving party will be irreparably harmed; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is granted; and (4) the public interest. *AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994). The moving party bears the burden of proving that all elements required for an injunction are met. See*Adams v. Freedom Forge Corp.,* 204 F.3d 475, 486 (3d Cir.2000). A preliminary injunction should issue only if the party seeking it produces evidence sufficient to convince the court that all four factors favor preliminary relief. *Shire US, Inc. v. Barr Labs, Inc.,* 329 F.3d 348, 352 (3d Cir.2003); *AT & T v. Winback and Conserve Program, Inc.,* 42 F.3d at 1427.

### B. *Motion To Dismiss*

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). When deciding a Rule 12(b)(6) motion, the court may only take into consideration the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint matter. *Chester County Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir.1990). A district court must accept any and all reasonable inferences derived from those facts, *Unger v. Nat'l Residents Corp. v. Exxon Co., U.S .A.,* 761 F.Supp. 1100, 1107 (D.N.J.1991); *Gutman v. Howard Sav. Bank,* 748 F.Supp. 254, 260

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

Page 3

(D.N.J.1990), and the court must view all allegations in the complaint in the light most favorable to the plaintiff. *SeeScheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

It is not necessary for the plaintiff to plead evidence, and it is not necessary to plead the facts that serve as the basis for the claim. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977); *In re Midlantic Corp. Shareholder Litigation,* 758 F.Supp. 226, 230 (D.N.J.1990). The question before the court is not whether plaintiffs will ultimately prevail but, rather, whether they can prove any set of facts in support of their claims that would entitle them to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). In other words, in deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the non-movant, plaintiff's allegations state a legal claim. *Markowitz,* 906 F.2d at 103.

III. DISCUSSION

A. *State Law Claim*

*3 Plaintiffs here challenge the Borough Municipal Code under both federal and state law. Plaintiffs' state law claim is set forth in Count Eight, which alleges that the Borough Ordinance is an invalid exercise of municipal authority in violation of the New Jersey Constitution. (Compl.¶¶ 80, 81.) The New Jersey Supreme Court has previously considered under New Jersey law a municipal housing inspection code of rental property similar in kind to that presently before this Court. On claims for which New Jersey law provides the rule of decision, *Erie R.R. v. Tompkins,* 304 U.S. 64 (1938), provides that this Court is bound by that precedent; for the reasons now explained, this Court determines that it is dispositive of the state law claims presently before the Court.[FN5]

> FN5. Plaintiffs' federal constitutional claims will be discussed *infra.*

In *Dome Realty, Inc. v. City of Paterson,* 416 A.2d 334 (N.J.1980), the plaintiffs brought suit against Paterson, a municipal corporation of New Jersey, as well as the Paterson Division of Community Improvements, challenging the constitutionality of

"An Ordinance Requiring a Certificate of Occupancy for Re-Rental of Dwelling Units" under both the federal and New Jersey constitutions. The ordinance applied to all rented residential dwellings, save two-family structures where one of the dwellings was owner-occupied. Under the ordinance as originally enacted, the landlord of an affected dwelling was required to obtain a certificate of occupancy immediately prior to allowing a new tenant to take possession. As a condition of issuing the certificate, the city department required an inspection of the rental unit. Subsequent amendments to the ordinance, which were also before the court on review, provided for an appeals process by any aggrieved person.

In upholding the ordinance under both state and federal law, the court in *Dome Realty* noted at the outset that, "[a]s a general principle, it is established beyond question that municipalities, being created by the State, have no powers save those delegated to them by the Legislature and the State Constitution."*Id.* at 341.Thus, the court there focused its initial inquiry on whether the ordinance was a proper exercise of legislative authority by Paterson.

"Under this approach the first question is whether the State Constitution prohibits delegation of municipal power on a particular subject because of the need for uniformity of regulation throughout the State."*Id.* If the state legislature may so delegate authority, the second question is whether the legislature has, in fact, done so. Finally, a court is to consider whether the particular delegation of authority at issue has been preempted by other State statutes governing the identical subject matter. In other words, "[t]he third part of the analysis reflects the Legislature's prerogative to divest delegated authority from a municipality."*Id.*

In *Dome Realty,* the court answered all three questions in the affirmative. First, the court noted that "[t]he State Constitution expressly permits the Legislature to delegate to municipalities the responsibility for regulating local land use by means of zoning schemes," so as to deal with local housing conditions. *Id.* at 342 (citing N.J. Const. (1947), Art. IV, § 6 par. 2). Indeed, the court there held that "enforcement of local housing standards is a particularly apt matter for local determination."*Dome Realty,* 416 A.2d at 342. For those reasons, the Court held that "the enforcement of local housing codes is a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

Page 4

matter that is constitutionally appropriate for local initiative."*Id.*

**\*4** Second, having determined that the legislature had the power to delegate authority for the enforcement of local housing, the court in *Dome Realty* explained that the legislature had, in fact, exercised that authority.[FN6] One source of municipal authority relied on by the court was N.J.S.A. 40:48-2.12a, providing:

> FN6. Citing the then newly enacted N.J.S.A. 40:48-1.12m, the court determined that "[i]n unmistakable terms" the legislature had granted to municipalities the power to prohibit new rentals of residential dwellings except after an official inspection. Because the plaintiffs in that suit were complaining of inspections which both pre- and post-dated the statute's enactment, the court was compelled to further discuss whether a basis for municipal authority existed independently of the statute. Here, because no single statute constitutes a comparable explicit exercise of power, the Court will focus its attention in the following discussion only on these independent bases.

The governing body of any municipality may make, amend, repeal and enforce ordinances to regulate buildings and structures and their use and occupation to prevent and abate conditions therein harmful to the health and safety of the occupants of said buildings and structures and the general public in the municipality.[FN7]

> FN7. In this case, Defendant similarly relies on N.J.S.A. 40:48-2.12a in support of its argument that the legislature has unequivocally authorized municipalities to inspect and regulate rental properties. (Def. Supp. Br. at 2.) This Court agrees. To be sure, as the court in *Dome Realty* pointed out, N.J.S.A. 40:48-2.12a was enacted as part of "An Act concerning municipalities in relation to the regulation of buildings and structures and their use and occupancy, and supplementing Title 40 of the Revised Statutes," which "contains various sections authorizing municipal registration of rental dwellings, N.J.S.A. 40:48-2.12c, abatement of defective conditions by municipal

expenditures, N.J.S.A. 40:48-2.12f, and the appointment of custodians or receivers to supervise proper maintenance of rental dwellings, N.J.S.A. 40:48-2.12g to -2.12k."*Id.* at 343-44.Those provisions, though, were made optional at the discretion of the municipality and, thus, "[t]he general grant of enforcement authority in N.J.S.A. 40:48-2.12a does not restrict its scope to the several individual authorizations contained in later provisions of the act. This section would be devoid of independent significance if we construed it as a mere summary of specific authorizations."*Id* . at 344.Thus, quite contrary to Plaintiffs' contention here, a broad reading of N.J.S.A. 40:48-2.12a N.J.S.A. does not render -2.12c "meaningless."

A second "independently adequate source of delegated power" also exists, the court in *Dome Realty* held, in N.J.S.A. 40:48-2, the general "police power" statute. "Such a broad 'reservoir of police power' is alone sufficient to permit municipal regulation of minimum standards for rental housing-an area that vitally affects 'health, safety and welfare' of residential tenants."*Dome Realty,* 416 A.2d at 344 (internal citations omitted).

Relying on N.J.S.A. 40:48-2.12a and -2, *Dome Realty* held that the municipal ordinance at issue was a valid exercise of authority delegated to it by the state legislature and, thus, that the second part of the three-part test had been satisfied. The court then turned to the question of preemption, holding that it could "find no indication-much less one that is clear-that the Legislature intended State regulation and enforcement of minimum standards of habitability to be exclusive. We therefore find no preemption by the Legislature."*Dome Realty,* 416 A.2d at 346.

For the same reasons expressed in *Dome Realty,* this Court concludes that the ordinance at issue is a proper exercise of municipal authority under New Jersey law and does not offend the State constitution. Count Eight, therefore, will be dismissed. The next step of this Court's inquiry, then, is whether the ordinance here runs afoul of the federal constitution. For the following reasons, this Court determines that, with one possible exception, it does not.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

## B. *Fourth Amendment*

Plaintiffs allege in Count Five of the Complaint that the inspection, registration and regulation of Plaintiffs' properties by the Borough constitute unconstitutional searches. (Compl.¶ 71.) The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Under the Fourth Amendment, a 'search' occurs 'when an expectation of privacy that society is prepared to consider reasonable is infringed.'" *Overstreet*, 305 F.3d at 576 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

**\*5** "Here the plaintiff's [sic] have made factual allegations that the inspector firemen are bullying their way into the owner's areas without consent under the guise of the rental inspection ordinance."[FN8] (Pls. Reply Br. at 14.) Pursuant to § 237-11 of the Collingswood Code:

> FN8. Initially, the Court notes that the Plaintiffs likely do not have standing to contest the inspections of their rental properties. *United States v. Salvucci*, 448 U.S. 83, 91 (1980); *see Godshalk v. Borough of Bangor*, 2004 U.S. Dist. LEXIS, at \*31 (E.D.Pa. May 5, 2004) ("[O]wnership alone is insufficient to confer standing to contest a search" under the Fourth Amendment). In any event, as the following discussion makes clear, Plaintiffs' Fourth Amendment claims must be dismissed.

The inspection officers are hereby authorized to make inspections to determine the condition of *rental facilities, rental units and rooming/boarding houses,* in order that they may promote the purposes of this article to safeguard the health, safety and welfare of the occupants of rental facilities, rental units and rooming/boarding houses and of the general public.

For the purpose of making such inspections, the inspecting officers are hereby authorized to enter, examine and survey *rental facilities, rental units and rooming/boarding houses* at all reasonable times. The owner or occupant of every rental facility, rental unit and rooming/boarding house shall give the inspecting officer free access to the *rental facility, rental unit and rooming/boarding house* at all times, for the purpose of such inspections, examinations and surveys.
(emphasis added). Additionally, under § 237-21 of the Borough Code, any person who violates any provision of article 237 shall, upon conviction in the Municipal Court, be liable to a fine up to $1,000 and/or imprisonment for up to 30 days.

In support of their Fourth Amendment claims, Plaintiffs rely primarily on *Camara v. Municipal Court of San Francisco*, 387 U.S. 523 (1967), where the United States Supreme Court held that the resident-owner of a dwelling could not be prosecuted for refusing entry to a municipal housing official for purposes of conducting an inspection. The Court there held that the "administrative searches of the kind at issue ... are significant intrusions upon the interests protected by the Fourth Amendment, that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual...."*Id.* at 534.

This Court concludes that the ordinance at issue here is sufficiently dissimilar from the one in *Camara* so as to distinguish that holding. The housing code provision in *Camara* stated that:

Authorized employees of the City departments or City agencies, so far as may be necessary for the performance of their duties, shall, upon presentation of proper credentials, have the right to enter, at reasonable times, *any building, structure, or premises in the City* to perform any duty imposed upon them by the Municipal Code.

*Id.* at 526 (emphasis added). First, the Collingswood ordinance pertains only to entry by inspection officers for the purpose of inspections and surveys, while the San Francisco code broadly applied to all "authorized employees" as necessary to perform "any duty." Second, as already noted, the Collingswood ordinance only authorizes inspections of "rental

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

facilities, rental units and rooming/boarding houses," and not, like in *Camara,* the inspection of the plaintiff's personal dwelling. And, as the court held in *Dome Realty,* there is a "diminished nature of the landlord's privacy interest in an apartment which he is making available for rent." 416 A.2d at 350. To be sure, the ordinance in *Dome Realty* permitted inspection of vacant apartments immediately prior to being rented. In this case, on the other hand, the ordinance does not make that distinction. Regardless, though, unlike in *Camara* the plaintiffs here are not using the apartment as a residence or place of business. Plaintiffs' privacy interest in their duplex rental units is, thus, attenuated. Plaintiffs' Fourth Amendment claims will be dismissed.

## C. *Substantive Due Process and Equal Protection*

*6 In Counts Two, Three, Four and Seven Plaintiffs allege that Defendant violated their substantive due process and equal protection rights by (1) treating duplexes as a non-conforming use,[FN9] (2) utilizing improperly trained firemen to conduct the inspections, and (3) defining "rental unit" in such a way as to prohibit duplex owners from "defin[ing] their families." (Compl. ¶¶ 62, 65, 68 and 77.)

> FN9. In Count Four Plaintiffs claim that the inspection process constitutes selective enforcement in violation of due process and equal protection. (Compl.¶ 68.) For the same reasons as Count Two, Count Four will be dismissed as well.

First, Plaintiffs allege in Count Two that treating duplexes as a non-conforming use under the Collingswood Code "while permitting all other forms of residential uses, constitute[s] arbitrary and capricious acts which have deprived" Plaintiffs of substantive due process and equal protection of the law. (Compl.¶ 62.) Defendant maintains that the Borough is permitted to prohibit certain types of structures while permitting others "so long as the government action rationally furthers some legitimate government purpose."[FN10](Def. Br. at 15.) "In determining whether a municipal ordinance is arbitrary or unreasonable, courts place a heavy burden on the proponents of invalidity." *Dome Realty,* 416 A.2d at 347. The proponent of invalidity must produce "proofs that preclude the possibility that there could have been any set of facts known to the

legislative body or which could reasonably be assumed to have been known which would rationally support a conclusion that the enactment is in the public interest." *Id.* (citing *Hutton Pk. Gardens v. West Orange Town Council,* 350 A.2d 1 (N.J.1975)).

> FN10. Defendant initially notes that "[t]o the extent that Plaintiffs' duplexes are valid pre-existing, non-conforming use[s], there has been and will be no effort by the Borough to prosecute the use of the structures as duplexes."(Def. Br. at 15.)

Here, Defendant offers the following governmental purposes for prohibiting duplexes: (1) multi-family dwellings cause a more dense population; (2) single family homes promote more of a community feeling; (3) single family homes reduce traffic congestion; and (4) duplexes historically have fallen into a greater state of disrepair through the passage of time. (Def. Br. at 16.) With these interests in mind, this Court is persuaded that the ordinance here extending regulation to multifamily dwellings is not arbitrary or unreasonable and, thus, that Plaintiffs as a matter of law will not be able to produce adequate proofs supporting their claims.

Furthermore, as in *Dome Realty,* 416 A.2d at 351, Plaintiffs here "do not allege the existence of a fundamental interest in conducting their business as landlords; nor do they claim that landlords constitute a constitutionally suspect class.""In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams,* 397 U.S. 471, 485 (1970). Accordingly, Plaintiffs here must demonstrate that the classification lacks any rational basis." *Id* . (citing *San Antonio School District v. Rodriguez,* 411 U.S. 1 (1973)). This Court holds that the governmental interests identified by Defendant, *supra,* are rational and, thus, do not offend the Fourteenth Amendment. For theses reasons, Count Two will be dismissed.

*7 Next, Plaintiffs allege in Count Three that the inadequate training of the inspectors causes the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

Page 7

ordinances at issue to be "enforced in an arbitrary and capricious manner," in violation of Plaintiffs' substantive due process and equal protection rights. (Compl.¶ 65.) N.J.S.A. 40:48-2.32 provides: "The governing body of a municipality may contract with a volunteer fire company or companies to perform inspections pursuant to this act and in such case designate as agents of the municipality, for such purpose, the members of such fire company or companies."Pursuant to that provision, Defendant utilizes inspectors who are appropriately qualified. (See Def. Ex. E.) Thus, Plaintiffs' claim that the inspectors are improperly trained and inadequately certified, without more, is meritless.[FN11]Count Three will be dismissed.

> FN11. Plaintiffs additionally complain of the presence of "friends and other persons of no official standing" who "accompany" officials during the course of property inspections, (Compl.¶¶ 41, 42.) The Court is not troubled by that allegation as far as its substantive due process and equal protection analysis is concerned, as Plaintiffs do not suggest that these individuals participate in any way in the inspection process.

Finally, in Count Seven Plaintiffs claim that the Borough Code's definition of "rental unit" prohibits duplex owners from "defin[ing] their families" in violation of their substantive due process rights. Section 237-4 of the Collingswood Code defines "rental unit" as "[a] dwelling unit or commercial unit which is available for lease or rental purposes. Rental unit shall not include that portion of a rental facility occupied by the owner."[FN12]All rental units are subject under the Collingswood Code to registration, licensing and periodic inspections. See Collingswood Code § 237 etseq. Plaintiffs maintain that the exclusion of duplexes from the definition of "rental unit" unconstitutionally infringes upon their right to "define their families" in the manner they choose. (Pls. Reply Br. at 15-16.) Plaintiffs cite a litany of privacy cases in support thereof: Roe v. Wade, 410 U.S. 113 (1973) (holding the right to an abortion is fundamental as guaranteed by the Due Process Clause of the Fourteenth Amendment, though that a right is not absolute); Loving v. Virginia, 388 U.S. 1, 12 (1967) (holding the freedom to marry is fundamental); Griswold v. Connecticut, 381 U.S. 479 (1965) (holding there exists a constitutional right to

privacy which encompasses the right to use contraceptives); Pierce v. Society of Sisters, 268 U.S. 510 (1925) (holding parents enjoy the right to be free from government interference in determining how to direct the upbringing and education of their children); Meyer v. Nebraska, 262 U.S. 390 (1923) (finding a liberty interest within the Fourteenth Amendment in a teacher's right to teach and parents' right to engage the teacher in educating their children); Prince v. Massachusetts, 321 U.S. 158 (1944) (holding the custody, care and nurture of children resides first in the parents); Skinner v. Oklahoma, 316 U.S. 535 (1942) (noting marriage and procreation are fundamental to the very existence and survival of the race).

> FN12. "Rental Facility" is defined in the same section as "[e]very building, group of buildings or a portion thereof consisting of less than three dwelling units and has sleeping facilities for less than 25 occupants, kept, used, maintained, advertised or held out to be a place where living accommodations are supplied, whether furnishes or unfurnished, for pay or other consideration, to one or more individuals."

Relying on these cases, Plaintiffs contend that "an owner who has children or invites family members to live with [him], subjects himself to the burden of the Borough's registration, licensing and inspection scheme in regard to his property, even though there exists no landlord-tenant relationship."(Pls. Reply Br. at 16.) Plaintiffs' argument overlooks the fact that only those duplex units that are leased or rented shall be subject to registration, licensing and inspection. See Code § 237-4. If a duplex owner were to rent or lease a dwelling unit to a family member, then a landlord-tenant relationship would of course exist and, thus, the Borough has the power to regulate the rental property. See,e.g., N.J.S.A. 40:48-2.12m; N.J.S.A. 2A:42-1etseq. Outside of the landlord-tenant context, however, Plaintiffs' right to "define their family" is in no way limited by the Borough Ordinance. An owner may permit friends or family to occupy a unit for free without any landlord-tenant relationship. Plaintiffs' substantive due process claim alleging otherwise will be dismissed.

D. First Amendment Retaliation

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

**\*8** In Count Six Plaintiffs allege that the "actions of the Borough of Collingswood and its agents in retaliating against the plaintiffs for exercising their rights to speak on matters of public concern" violated Plaintiffs First Amendment rights. (Compl.¶ 74.) Plaintiffs plead no facts, however, to support that claim. Indeed, Plaintiffs have not identified, either in the Complaint, in their written submissions to the Court, or at oral argument, any instance where they engaged in speech relating to the conduct of which they complain. Plaintiffs' First Amendment claim must fail as pleaded.

### E. *Procedural Due Process*

Plaintiffs allege in Count One that by failing to provide adequate notice and an appeals process for violations of the Code deprives them of their rights under the Fifth and Fourteenth Amendments. (Compl.¶ 59.)

"It is established that a law fails to meet the requirements of the Due Process Clause if it so vague and standardless that it leaves the public uncertain as to the conduct it prohibits."*City of Chicago v. Morales,* 527 U.S. 41, 56 (1999). Plaintiffs here maintain that such uncertainty permeates the Collingswood Municipal Code, thereby rendering it unconstitutionally vague. Specifically, Plaintiffs contend that the Collingswood Code includes "numerous ambiguous and technical terms that leave ordinary people uncertain as to much of the conduct it prohibits."(Pls. Br. at 13.) Plaintiffs cite the following provisions of the BOCA Code, incorporated by reference by the Collingswood Code, in support of this proposition:

(1) PM-303.1; prohibition on "noxious weeds";

(2) PM-303.3; requirement that all sidewalks and driveways be maintained in "a proper state of repair";

(3) PM-303.7; requirement that accessory structures be kept "structurally sound and in good repair";

(4) PM-304.8; requirement that all overhang extensions be maintained in "good repair" and be "properly anchored" so as to be kept in a "safe and sound condition";

(5) PM-304.9; requirement that all chimneys and towers be maintained "structurally safe and sound, and in good repair";

(6) PM-304.10 and 305.6; requirement that handrails and guards be "firmly fastened and capable of supporting normally imposed loads" and shall be "maintained in good condition";

(7) PM-304.11; requirement that all windows and doorframes be kept in "sound condition" and "good repair";

(8) PM-304.13; requirement that all exterior doors and hardware be "maintained in good condition";

(9) PM-304.15; requirement that guards for basement windows that are openable to be supplied with ratproof shields, storm windows or "other approved protection";

(10) PM-305.1; requirement that the interior of a structure and equipment therein be "maintained in good repair" and "structurally sound";

(11) PM-305.2; requirement that supporting structural members be "maintained structurally sound" and "be capable of supporting the imposed loads";

**\*9** (12) PM-305.3; requirement that peeling paint, cracked or loose plaster, decayed wood, and "other defective surface conditions" found on interior surfaces including windows and doors, be corrected";

(13) PM-405.10; requirement that all spaces to be occupied for food preparations purposes contain "suitable space and equipment" to store and prepare food in a sanitary manner";

(14) PM-505.1; requirement that all plumbing fixtures by "properly installed" and "maintained in a safe, sanitary and functional condition."

In *Morales,* 527 U.S. at 45-46, the Court struck down as unconstitutionally vague a statute that prohibited "criminal street gang members" from "loitering" with one another or with other persons in any public place. That ordinance created a criminal offense punishable by a fine not to exceed $500, imprisonment up to six

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

Page 9

months, and a mandatory 120 hour community service requirement. *Id.* at 47.In striking down the statute, the Court first noted that "the purpose of the fair notice requirement [of Due Process] is to enable the ordinary citizen to conform his or her conduct to the law."*Id.* at 58.Here, the Court is not persuaded that the above provisions contain language that is so ambiguous and technical so as to deprive the ordinary citizen in Collingswood of constitutionally required notice.

Plaintiffs additionally argue, though, that their due process rights are violated by Defendant's failure to provide an appeals process for review of contested inspections. In *Ex parte Young*, 209 U.S. 123 (1908), the Court reviewed the constitutionality of two separate state acts, both of which governed railway freight and passenger rates. Violations of either act subjected the accused to imprisonment not exceeding ninety days, while only violation of the passenger rate act subjected the violator to both imprisonment and fine. *Id.* at 145.No appeals process was provided to challenge violations.[FN13]

> FN13. Defendant argues that the facts of *Ex parte Young* are distinguishable from the facts in the instant case in that the potential fines were more severe than the ones here. This Court is not persuaded. To be sure, the act in *Ex parte Young* subjected violators to fines up to $5,000, in today's dollars a significant sum. Here, however, violators of the Collingswood Code are subject to fines of $1,000 for *each violation* for *each day* the violation occurs. (Collingswood Code § 237-21.) In other words, the potential total in the scheme at issue here is just as severe, if not more so, than the one examined in *Ex parte Young.*

Under the scheme in *Ex parte Young,* the Court held,

[t]he company, in order to test the validity of the acts, must find some agent or employe to disobey them at the risk stated. The necessary effect and result of such legislation must be to preclude a resort to the courts (either state or Federal) for the purpose of testing its validity. The officers and employees could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them, in case the court

should decide that the law was valid. The result would be a denial of a hearing to the company.

*Ex parte Young,* 209 U.S. at 145-46. In other words, "[i]t may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affected its rights."*Id.* at 147.

*10 To be sure, the Court in *Ex parte Young* distinguished "case[s] where the validity of the act depends upon the existence of a fact which can be determined only after investigation of a very complicated and technical character," from the "ordinary case of a statute upon a subject requiring no such investigation and over which the jurisdiction of the legislature is complete in any event."*Id.* at 148.Arguably, the ordinance at issue here is more akin to the latter than to the former. However, the Court concludes that whether or not this is the "ordinary case" is a question of fact that can not properly be decided at this juncture.

Defendant argues that although the Collingswood ordinance contains no appeals process as outlined in the BOCA Code, property owners in the Borough do have "appeal rights." (Def. Br. at 14.) Specifically, property owners are advised of the code violations, in writing, and given a reasonable time period to cure. If the required repairs are not made by the owner within the stated time period, a citation may be issued or additional time to cure may be granted to the owner upon request. If a citation is issued, a municipal court hearing is scheduled in which the violation is prosecuted and a penalty in sought. That is the very argument that the Court implicitly rejected in *Ex parte Young.*Indeed, the Court there was concerned that the severity of the potential penalties would discourage individuals from even risking the violation of the law, thereby closing the courts to legal challenges altogether. For these reasons, Plaintiffs' due process claim will survive Defendant's motion to dismiss. The Court, therefore, must decide whether Plaintiffs are entitled to a preliminary injunction upon this sole remaining ground.

As already noted, in considering an application for a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

preliminary injunction, courts must evaluate, among other factors, the extent to which, if any, the moving party will be irreparably harmed. *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994). "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir.2000). Rather, "[a] plaintiff has the burden of proving a clear showing of *immediate* irreparable injury.'" *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.1989) (emphasis added) (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987)). Plaintiffs here can not make such a showing and, thus, they are not entitled to a preliminary injunction.[FN14]

> FN14. Although "[c]ourts have ... held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights," *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 578 (6th Cir.2002) (citing *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992) (holding plaintiffs may establish irreparable harm based on an alleged violation of their Fourth Amendment rights)), under Third Circuit jurisprudence "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe*, 868 F.2d at 72-73 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 112-13 (1983)). The Court here need not reach that issue, though, as Plaintiffs can not demonstrate the requisite immediacy.

Plaintiffs here argue that they "are sustaining recurrent violations of their legal rights. The inspections are continuing and each time a citation is issued the property owner must forgo a hearing or risk criminal sanctions. Money cannot compensate for this continuing loss of due process rights." (Pls. Br. at 32.) As a result, Plaintiffs argue, they have "demonstrated irreparable harm." (*Id.*) Defendant, on the other hand, argues that Plaintiffs are not able to satisfy the requirement of "immediate irreparable injury" in that "there is no contention that Plaintiffs have been or will be prosecuted by reason of their

ownership of duplexes."[FN15] (Def. Br. at 9.) This Court agrees with Defendant, especially considering that "[s]ince the inception of the property maintenance code inspection process for duplexes, no property owners of owner-occupied duplexes have been incarcerated, nor have any daily fines been imposed and collected against the owners of owner-occupied duplexes as a result of the property maintenance code inspection process."(10/15/04 Amet Cert. ¶ 5.) For these reasons, Plaintiffs are not entitled to a preliminary injunction on their Due Process claims.

> FN15. Moreover, Defendant concedes that "[t]o the extent that ... duplexes existed prior to the amendment to the Borough Code prohibiting duplexes in the Borough ..., the use of the subject properties as duplexes appears to be a valid, pre-existing, non-conforming use, against which no municipal prosecution is permitted or sought by the Borough."(Def. Br. at 9.)

**\*11** This holding-that Plaintiffs have not demonstrated a likelihood of immediate and irreparable harm to their due process rights-should not be interpreted as an endorsement of the lack of an appellate review procedure in the Collingswood ordinance. Indeed, the more sensible practice may be, as the BOCA Code suggests, to have some sort of informal appeal if the owner disputes that the violation is warranted under the terms of the ordinance. The lack of such an appeal process at present, however, has not been shown upon the record in this case to have harmed Plaintiffs, or to be likely to cause harm in the immediate future.

## IV. CONCLUSION

As the foregoing discussion explains, Plaintiffs have failed to state a claim upon which relief can be granted on their First and Fourth Amendment, Substantive Due Process, Equal Protection, and State constitutional claims. Accordingly, those claims will be dismissed. Plaintiffs' due process claim will remain, though Plaintiffs are not entitled to a preliminary injunction. The accompanying Order will be entered.

D.N.J.,2005.
Reedy v. Borough of Collingswood

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

Not Reported in F.Supp.2d, 2005 WL 1490478 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NICK SALINSKE, for himself and all others<br>similarly situated,<br><br>       *Plaintiffs,*<br><br>v.<br><br>CALUMET CITY, ILLINOIS,<br><br><br>       *Defendant.* | )<br>)<br>)<br>)<br>)  Case No. 08-cv-03017<br>)<br>)  Judge Wayne R. Anderson<br>)  Magistrate Judge Morton Denlow<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF THOMAS JOSEPH
## IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
## ORDER AND/OR PRELIMINARY INJUNCTION

I, THOMAS JOSEPH, declare as follows:

1. The following facts are personally known to me, and if called to testify, I could and would competently testify thereto.

2. I act as Government Affairs Director for the Mainstreet Organization of Realtors® ("Association") for the South and Southwest Suburban Cook and Will counties.

3. Since August 8, 2006 there have been at least 611 sales of property that have closed in Calumet City, Illinois ("City"). As of July 9, 2008, there were 564 active listings of property in City. Data supporting these facts is available through the Multiple Listing Service.

490921.2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July /0th, 2008

Thomas Joseph