**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICK SALINSKE, for himself and all others similarly situated, | ) ) ) | |
| | ) | Case No. 08-cv-03017 |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Judge Wayne R. Andersen |
| | ) | Magistrate Judge Morton Denlow |
| | ) | |
| CALUMET CITY, ILLINOIS, | ) ) | |
| | ) | |
| *Defendant.* | ) ) ) | |

**MOTION OF MAINSTREET ORGANIZATION
OF REALTORS® FOR LEAVE TO INTERVENE**

Mainstreet Organization of Realtors® ("Association"), by its attorneys, Grippo &

Elden LLC, hereby move, pursuant to Rule 24(a)(2) and/or Rule 24(b)(1)(B) of the Federal Rules

of Civil Procedure, for leave to intervene in this action. In support of its motion, Association

states as follows:

        1.     In this action, Plaintiff Nick Salinske ("Salinske"), for himself and all

others similarly situated (collectively, "Plaintiffs"), purport to challenge the constitutionality of

Defendant Calumet City's ("City") Point of Sale Inspection Ordinance ("POS Inspection

Ordinance"). Plaintiffs have also filed a motion for a preliminary injunction seeking to enjoin

enforcement of the POS Inspection Ordinance and an amended motion for class certification

seeking to have this action proceed as a class action with a class consisting of all owners of

residential property in City. As explained further below, the constitutionality of City's POS

Inspection Ordinance was the subject of litigation filed by Association against City in April

2006. Association moves to intervene to file a verified complaint in intervention for temporary

restraining order, preliminary injunction, permanent injunction, declaratory, and other relief.  In

other words, Association's complaint in intervention seeks relief identical to the relief sought by

Plaintiffs.  In compliance with Rule 24(c), Association's proposed complaint in intervention is

attached hereto as Exhibit A.

WHY ASSOCIATION'S INVOLVEMENT IS NECESSARY

2.      Association is an association of real estate brokers and salespersons

licensed by the State of Illinois.  Pursuant to written exclusive agreements (Ex. B), Association's

members "list" and "sell" their client's residential property in City.  Association's members also

assist buyer-clients that wish to own property in City.  Association's members' livelihoods

derive from the commissions they earn listing or selling real estate on behalf of their seller-

clients and assisting their buyer-clients in the purchase of real estate.  In other words, if the sale

of property does not close, Association's members earn nothing; if the property sells at a lower

price, they earn less.  Association's members are bound to follow City's POS Inspection

Ordinance if they want to conduct business and, in reality, are the ones that ensure compliance

with the POS Inspection Ordinance on their clients' part.

3.      This case presents the same issues raised in litigation brought by the

Association (then called the Realtor Association of West/South Suburban Chicagoland) in April

2006, entitled *Realtor Association of West/South Suburban Chicagoland v. Calumet City*, No. 06

C 2271 (N.D. Ill.)(Shadur, J.) (the "Association Litigation").  Like the Plaintiffs here,

Association challenged the constitutionality of City's then-enacted point of sale inspection

ordinance.  On August 8, 2006, Judge Shadur enjoined the enforcement of that ordinance (the

"August 8 Injunction").  (Ex. C).  Subsequently, City amended its ordinance and moved to

dissolve the injunction entered on August 8 by Judge Shadur.  Judge Shadur granted City's

2

motion to dissolve and, after hearing from the parties, on December 8, 2006, enjoined City's newly-amended ordinance (the "December 8 Injunction"). (Ex. D). Thus, while Association was the plaintiff challenging the POS Inspection Ordinance, it was able to move the litigation forward expeditiously (obtaining entry of two injunctions in eight months).

4.      City appealed the entry of the December 8 Injunction. On October 17, 2007, the Seventh Circuit vacated the December 8 Injunction on the ground that, while Association satisfied the requirements of Article III standing, Association lacked "prudential" standing to challenge City's then-enacted point of sale inspection ordinance. *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742 (7th Cir. 2007), *cert. denied*, 2008 U.S. LEXIS 4558, 76 U.S.L.W. 3635 (U.S. June 2, 2008).

5.      In light of the Seventh Circuit's ruling, three separate lawsuits have been filed by City property owners seeking to reinstate the injunctive relief entered by Judge Shadur. As explained below, despite prompt and diligent action by City property owners, the individual lawsuits have not been able to, and may not in the future be able to, obtain the prompt relief obtained by Association in its lawsuit because (a) of City's litigation tactics, and (b) the considerable risk that certain of the pending claims may not go forward because the property owner plaintiffs may lose their property to foreclosure as a result of City's unconstitutional interference with sales of the subject property (or, if they are lucky, they may sell their property).

6.      For example, in *Walker v. Calumet City*, No. 07 C 6148 (N.D. Ill.) (Shadur, J.), which was filed in October 2007, City persuaded Judge Shadur to delay consideration of pending motions for class certification and injunctive relief for several months. Before Judge Shadur could rule on the motions, City "mooted" the claim by representing that it would not enforce its POS Inspection Ordinance against the designated class representative

because her property had recently passed an annual rental dwelling inspection under a separate

ordinance (even though the POS Inspection Ordinance nowhere states that it does not apply if

property passes a rental dwelling inspection).[1]

        7.     There is also substantial risk that the plaintiffs in the two other actions,

this action and *Mann v. Calumet City*, No. 08 C 555 (N.D. Ill.) (Coar, J.), may not be able to

continue to prosecute their claims through the Court's decision on the pending motions for

injunctive relief because the plaintiffs may lose their property to foreclosure. The Manns, which

the undersigned represent, are in imminent danger of losing their property to foreclosure. The

likely loss of their property results directly from City's violation of Judge Shadur's injunction in

October 2006 when City interfered with the sale of the Manns' property by telling the Manns

that the property had to be "deconverted" to fewer units even though City's own records show

that the Manns' property is legal nonconforming.   Similarly, Salinske, the plaintiff in this case,

is also in imminent danger of losing his property due to City's interference with the potential sale

of his property after he filed his lawsuit and sought injunctive relief. In July 2008, Salinske

found a potential buyer for his property, which is listed for $130,000. Ex. F, Hanrahan

Declaration at ¶ 3. The potential buyer stated that he was willing to purchase the property for

between $115,000 and $120,000, a price acceptable to Salinske, subject to confirmation there

were no major problems with the property. *Id*. After the oral offer to purchase, Salinske's real

estate broker went to City's Department of Inspectional Services to determine what needed to be

done to close the transaction. *Id*. at ¶ 4. City told Salinske's broker that the tax records

---

[1]     Association disputes that City's representation that it would not enforce its POS Inspection Ordinance mooted Walker's claims. *See e.g., Horina v. City of Granite City*, No. 05-cv-0079, 2005 U.S. Dist. LEXIS 36386, at *11-12 (S.D. Ill. Aug. 29, 2005)(the Seventh Circuit "has long recognized . . . that a defendant cannot moot a claim simply by voluntarily ceasing behavior when it is free to resume that behavior at any time".) (Ex. E). Association also disputes that the Court could consider mootness before deciding the pending class certification motion because "the mooting of the named plaintiff's claim in a class action by the defendant's satisfying the claim does not moot the action so long as . . . a motion for class certification has been made and not ruled on." *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 546-47 (7th Cir. 2003).

confirmed that Salinske's property has been taxed as a two flat since Salinske acquired it in 1989. *Id.* City, however, told Salinske that his property was "illegal" nonconforming and must be deconverted to a single family home before it can be sold. *Id.* City also claimed that if the building on Salinske's property was destroyed, *nothing* could be re-built on the property. *Id.* After being informed of City's statements, the potential buyer decided to not purchase Salinske's property because he was only interested in purchasing (and subsequently leasing) the property as a two flat. *Id.* at ¶ 5. To date, Salinske has been unable to locate another buyer or sell his property and will likely lose it to foreclosure. *Id.* Moreover, even if the Manns and Salinske do not lose their properties, they may (with luck) sell them, which might also impact their ability or desire to continue to prosecute their claims.[2]

8.      As a result of the events described above, the interests of Association's members have been, and will continue to be, adversely affected. For example, Salinske's broker lost the commission on the sale of Salinske's property. Permitting the Association to intervene will allow this case to move forward promptly without the threat of City trying to manufacture another mootness argument (as it did in *Walker*) and without the risk that the plaintiff might lose his or her property to foreclosure (as will likely happen to the Manns and Salinske).

## WHY INTERVENTION IS PROPER

9.      By this motion, Association seeks leave to intervene in this action to assert its claims seeking, among other things, a declaration that City's POS Inspection Ordinance is unconstitutional and that City's uniform refusal to issue re-build letters (*i.e.*, stating that legal nonconforming property can be rebuilt as such in accordance with City's Zoning Ordinance) in

---

[2]      On September 2, 2008, Alonzo Smiley filed a motion to substitute himself as proposed class representative in this litigation.

connection with the sale of legal nonconforming property is unconstitutional. To be clear, Association seeks relief identical to the relief sought by Plaintiffs.

10.    An applicant for intervention as of right pursuant to Rule 24(a)(2) must establish four elements: (1) the application is timely; (2) the applicant has an interest in the property or transaction which is the subject of the action; (3) disposition of the action may impede or impair the applicant's ability to protect that interest; and (4) no existing party adequately represents the applicant's interest. *Security Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1380 (7th Cir. 1995). Here, Association satisfies all elements.

11.    First, Association's motion is timely. *NAACP v. New York*, 413 U.S. 345, 365-66 (1973) (timeliness is determined by all the circumstances in a case and is determined by the court in the exercise of its sound discretion); *United States v. South Bend Comm. Sch. Bd.*, 710 F.2d 394, 396 (7th Cir. 1983) (although Rule 24 does not "specify rigid time limits . . . As soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation he must move promptly to intervene"). This action was filed on May 23, 2008. To date, the Court has not issued any rulings on the merits of this suit and no discovery has been conducted. Accordingly, intervention is timely.

12.    As to the second and third elements, it is plain that Association has a substantial interest in the matters raised by this litigation, including any determination of whether City's POS Inspection Ordinance is constitutional. A determination by this Court on that constitutional question will undoubtedly impact the rights of Association. As a practical matter, resolution of this action could potentially impair or impede Association's rights unless they are permitted to intervene.

533354.3

13.    As to the fourth factor, the existing parties (either Salinske or Smiley (*see* n.2)) cannot adequately represent Association's interests to the extent City's litigation tactics or other developments result in the loss of their property.  Consequently, the Court "must permit" Association to intervene.

14.    Permissive intervention under Rule 24(b) is also proper.  In deciding whether to grant permissive intervention under Rule 24(b) courts consider only three factors:  (1) whether the motion is timely; (2) whether a common question of law or fact exists; and (3) whether the intervention will unduly delay or prejudice the adjudication of the original party's rights. Fed.R.Civ.P. 24(b);  *Wilfong v. Rent-A-Center*, No. 00-cv-0680, 2001 U.S. Dist. LEXIS 16958, at *5 (S.D. Ill. May 14, 2001) (Ex. G).  Here, Association satisfies all three requirements.

15.    With respect to the first element, as explained in Paragraph 11, above, this motion is timely.

16.    The second element is easily met here because Plaintiff's claims and Association's claims are identical.  Both of their claims involve a facial challenge to the POS Inspection Ordinance (counts I and II of Plaintiffs' complaint and counts I and II of Association's complaint in intervention).  In addition, Plaintiffs and Association have at least the following factual and legal issues in common (with respect to all counts in Plaintiff's complaint and Association's complaint in intervention):  (a) whether the POS Inspection Ordinance is unconstitutional because it unreasonably and unconstitutionally restrains property owners' right to sell their property without due process of law; (b) whether the POS Inspection Ordinance is unconstitutional because it fails to provide procedural due process; and (c) whether City's refusal to issue re-build letters and/or other confirmation that property is legal nonconforming is

unconstitutional and in violation of 65 ILCS 5/11-13-1 because City effectively prohibits owners

of legal nonconforming property from selling such property as nonconforming.

17.     As to the third element, intervention will not unduly delay or prejudice the

adjudication of Plaintiffs' or City's rights.  As discussed with respect to the first element, the

Court has issued no decisions as to the merits and no discovery has been conducted.  As

discussed with respect to the second element, Association's claims are such that there is no delay

or prejudice to be caused by permitting Association to intervene and file its complaint in

intervention.

### THE SEVENTH CIRCUIT'S DECISION DOES NOT PRECLUDE INTERVENTION

18.     The Seventh Circuit's ruling that Association lacks "prudential standing"

to challenge the constitutionality of the ordinance has no bearing whatsoever on whether

Association ought to be allowed to intervene in this case because the Seventh Circuit concluded

that Association does have Article III standing to challenge City's POS Inspection Ordinance.

*Mainstreet Org. of Realtors*, 505 F.3d at 745.  At most, that is all that is needed.  *See also*

*Korczak v. Sedeman*, 427 F.3d 419, 422 (7th Cir. 2005) (the predominant rule is that an

intervenor need not otherwise have independent standing to file a motion to intervene); *United*

*States v. Sidley Austin Brown & Wood LLP*, No. 03 C 9355, 2004 U.S. Dist. LEXIS 7355, at *4

(N.D. Ill. Apr. 28, 2004)(the intervenor-by-permission does not have to be a person who would

have been a proper party at the beginning of the suit, since of the two tests for permissive joinder

of parties, a common interest of law or fact and some right to relief arising from the same

transaction, only the first is stated as a limitation on intervention)(citation omitted) (Ex. H).

19.     In addition, even if independent standing is required, Association can

establish standing on two different bases that were not before the Seventh Circuit.  First,

533354.3

Association has standing under *Havens Realty v. Coleman*, 455 U.S. 363 (1982), because City's

unlawful conduct has caused an "injury to [Association's] corporate purpose." Under *Havens*,

an organization has standing to sue in its own right when the organization's purposes and

activities are frustrated by the defendant's unlawful conduct. As the Seventh Circuit noted in

*Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990), "*Havens* makes clear . . .

that the only injury which need be shown to confer standing . . . is deflection of the agency's

time and money" from its corporate purpose and activities. Here, Association's interests include

safeguarding and advancing the interests of property owners and furthering the interests of home

and other real property ownership. (Ex. I). These purposes and activities are frustrated by City's

enforcement of the POS Inspection Ordinance. For example, Association's time and money

have been diverted from its corporate activities by the Association Litigation, its efforts to

intervene in this suit, and other actions designed to enjoin the enforcement of the POS Inspection

Ordinance. Unless and until City's unconstitutional and unreasonable conduct is enjoined,

Association will be forced to continue to deflect its time and money. Moreover, City will sap the

time and money of Association and its members in instances where members market and put

together the sale of a property only to have City, by invoking the POS Inspection Ordinance,

prevent the sale of the property (which happened to both the Manns and Salinske). Thus,

Association has standing in its own right.

      20.    Second, Association also has associational standing to assert it members'

rights in those situations (such as the situation involving Salinske) where the member has a

brokerage contract with a homeowner who is unable to sell their property due to City's conduct.

The Seventh Circuit made it perfectly clear that such a standing theory, which it concluded was

not at issue in the earlier litigation, would likely suffice. The Seventh Circuit stated: "[a]

member of [Association] who had a brokerage contract with a homeowner harmed by the ordinance might be able to argue that the contract gave him (the broker) a property right of which he was being deprived." *Mainstreet Org. of Realtors*, 505 F.3d at 746.  Because Association's members enter into exclusive right to sell agreements with their clients (Ex. B), Association would plainly have associational standing to assert the claims of its members which the Seventh Circuit recognized in its decision. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

   21. Under *Hunt*, "an association has standing to bring suit on behalf of its members when:  (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Association plainly meets this test under the theory left open by the Seventh Circuit.  First, as recognized by the Seventh Circuit, Association members who enter into exclusive right to sell brokerage contracts with their clients would have standing to sue City for interference with sales. The second *Hunt* prong is also satisfied because the Association seeks to protect interests that are germane to its purposes which include "further[ing] the interest of home and other real property ownership" and "safeguard[ing]" and "advanc[ing]" the interests of those engaged in real estate transactions.  (Ex. I).  The third *Hunt* prong is also satisfied because, since all Association members enter into form exclusive right to sell contracts (Ex. B), individual participation is not required (especially since no individual Association member is seeking monetary damages).

   22. For the reasons set forth above, Association requests that the Court grant it leave to intervene and grant it leave to file the complaint in intervention attached hereto as Exhibit A.

WHEREFORE, Association respectfully requests that the Court grant it leave to intervene.

DATED:  September 3, 2008

Respectfully submitted,

**MAINSTREET ORGANIZATION OF REALTORS®**


By:/s/ Patrick T. Nash_____
One of His Attorneys

Philip C. Stahl
Patrick T. Nash
Donald P. Bunnin
Mark A. Semisch
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

533354.3

## CERTIFICATE OF SERVICE

I, Patrick T. Nash, certify that on this 3rd day of September, 2008, I served the

foregoing **MOTION OF MAINSTREET ORGANIZATION OF REALTORS® FOR**

**LEAVE TO INTERVENE** to the following by Electronic Mail Transmission via the ECF

System upon:

Mark H. Sterk
ODELSON & STERK, LTD.
3318 West 95th Street
Evergreen Park, Illinois  60805

John B. Murphey
ROSENTHAL, MURPHEY & COBLENTZ
30 North LaSalle Street
Suite 1624
Chicago, IL  60602

/s/ Patrick T. Nash
Patrick T. Nash

# EXHIBIT A, PART 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICK SALINSKE, for himself and all others similarly situated, | ) ) ) | Case No. 08-cv-03017 |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Judge Wayne R. Andersen Magistrate Judge Morton Denlow |
| CALUMET CITY, ILLINOIS, | ) ) ) | |
| *Defendant.* | ) ) ) | |
| MAINSTREET ORGANIZATION OF REALTORS®, | ) ) ) | |
| *Intervenor-Plaintiff,* | ) ) | |
| v. | ) ) ) | |
| CALUMET CITY, ILLINOIS, | ) ) ) | |
| *Intervenor-Defendant.* | ) ) | |

**MAINSTREET ORGANIZATION OF REALTORS'® VERIFIED COMPLAINT IN
INTERVENTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY
INJUNCTION, PERMANENT INJUNCTION, DECLARATORY AND OTHER RELIEF**

Intervenor-Plaintiff Mainstreet Organization of Realtors® ("Association"), by its

attorneys, Grippo & Elden LLC, for its complaint in intervention against defendant, Calumet

City, Illinois ("City"), states as follows:

## NATURE OF THE ACTION

1.     Association asserts its claims for injunctive, declaratory and other relief,

pursuant to 42 U.S.C. § 1983, and 28 U.S.C. §§2201 and 2202 to redress the deprivation, under

color of law, of rights guaranteed to Association, by the United States Constitution and under

533881.2

Illinois law.  Association seeks declarations that certain provisions of Chapter 14 of the

Municipal Code of Calumet City, Illinois, (the "Code"), codified through Ordinance No. 08-06,

enacted January 31, 2008, are facially unconstitutional.  Moreover, Association seeks a

declaration that City's conduct in refusing to issue "re-build" letters and/or confirm that property

is legal nonconforming in connection with the sale of legal nonconforming property constitutes

an unconstitutional and unreasonable restraint on the right to freely transfer property.

       2.     More particularly, Association seeks a declaration that Section 14-1 of

Article I of Chapter 14 of the Code (the "Point of Sale Inspection Ordinance," attached as Ex.

A), is unconstitutional because it (a) unreasonably and unconstitutionally restrains property

owners' right to sell their property without due process of law, (b) fails to provide procedural due

process, and (c) unreasonably and unconstitutionally deprives Association's members' property

rights derived from the commission they earn pursuant to exclusive selling agreements by selling

real estate on behalf of their seller-clients and assisting their buyer-clients in the purchase of real

estate.  In addition, Association seeks a declaration that City's policy of refusing to issue re-build

letters and/or to confirm that property is legal nonconforming in connection with the sale of legal

nonconforming property effectively forces owners of legal nonconforming property to conform

their property to the current zoning classification if they want to sell it.  Such conduct

unreasonably interferes with the right to freely sell property and violates state law prohibiting the

immediate elimination of legal nonconforming property.  Such conduct also unreasonably and

unconstitutionally takes Association's members' property rights derived from the commissions

they earn with respect to legal nonconforming properties pursuant to exclusive right to sell

agreement they enter into with their clients.

533881.2

3.      Association requests immediate declaratory and injunctive relief by which the Court, among other things, would preliminarily and permanently enjoin enforcement of the Point of Sale Inspection Ordinance and declare the Point of Sale Inspection Ordinance unconstitutional.

4.      Association challenges the constitutionality of the Point of Sale Inspection Ordinance on its face because it takes City owners' and Association's members' property rights, without due process.  A judgment from this Court will redress the harm being suffered and directly advance and protect the interests of Association.

5.      Association has standing to intervene in this suit because the Seventh Circuit has ruled that Association has Article III standing to challenge City's Point of Sale Inspection Ordinance.  *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745 (7th Cir. 2007), *cert. denied*, 2008 U.S. LEXIS 4558, 76 U.S.L.W. 3635 (U.S. June 2, 2008).

6.      In addition, Association has standing because City's enforcement of the Point of Sale Inspection Ordinance has caused injury to Association's corporate purposes and interests, which include safeguarding and advancing the interests of property owners and furthering the interests of home and other real property ownership.  Ex. B.  City's unlawful conduct has also diverted Association's time and money from its corporate activities by Association (then called the Realtor Association of West/South Suburban Chicagoland) filing suit against City in April 2006, entitled *Realtor Association of West/South Suburban Chicagoland v. Calumet City*, No. 06 C 2271 (N.D. Ill.)(Shadur, J.), its efforts to intervene in this suit, and other actions designed to enjoin the enforcement of the Point of Sale Inspection Ordinance.  Moreover, City's enforcement of the Point of Sale Inspection Ordinance has diverted Association's and its members' resources in instances where members market and put together

3

sales of property only to have City prevent the sale of the property by invoking the Point of Sale Inspection Ordinance.

7.      Association also has associational standing because Association's members enter into exclusive right to sell agreements with their clients. Ex. C. Under the exclusive right to sell agreements, Association's members have a property interest (*i.e.* sales commission) in the sale of their client's property. By invoking the Point of Sale Inspection Ordinance and preventing the sale of their client's property, City is depriving Association's members of their property interest.

## JURISDICTION AND VENUE

8.      Association's claims arise under the United States Constitution. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

9.      City is subject to personal jurisdiction in this district and venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this district.

## PARTIES

10.     Association is an association of real estate brokers and salespersons licensed by the State of Illinois. Association's members "list" and "sell" their client's residential property in City, pursuant to written exclusive agreements. Ex. C. Association's members also assist buyer-clients that wish to own property in City. Association's members' livelihoods derive from the commissions they earn listing or selling real estate on behalf of their seller-clients and assisting their buyer-clients in the purchase of real estate. In other words, if the sale of property does not close, Association's members earn nothing; if the property sells at a lower price, they earn less. Association's members are bound to follow City's Point of Sale Inspection Ordinance if they want to conduct business and, in reality, are the ones that ensure compliance with the Point of Sale Inspection Ordinance on their clients' part.

4

11.     Defendant Calumet City, Illinois is a unit of local government incorporated under the laws of Illinois.  City is located in Cook County, Illinois.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

I.     **Summary Of Point Of Sale Inspection Ordinance.**

12.     The Point of Sale Inspection Ordinance (Ex. A) and other provisions of the Code provide that property can only be sold if City issues transfer stamps.  Code §§ 82-325, 82-328.  In all but one instance,[1] the only way for sellers to obtain transfer stamps is to first obtain a final or conditional "Certificate of Compliance" from City and to pay any outstanding water bill (even if disputed).  Code §§ 14-1(h); 14-1(i); § 82-327(b).  City will issue a Certificate of Compliance only if it decides that property "passed" a point of sale inspection.  To "pass" an inspection and obtain a Certificate of Compliance, a property owner must make all repairs (using a licensed and bonded contractor unless the property owner makes the repairs himself) ordered by City after the inspection.  *Id.*; *see also id.* at § 14-1(k).

13.     The Point of Sale Inspection Ordinance results in the immediate deprivation of a home owner's right to sell her property until City decides to permit it.  Upon issuance of an inspector's repair order, the home owner is prohibited from selling her property until repairs are made.  The Point of Sale Inspection Ordinance provides the home owner no due process prior to this deprivation of her right to sell her property.

14.     In addition, the Point of Sale Inspection Ordinance requires citizens to pay the water bill before City will issue transfer stamps.  *Id.* at § 14-1(i).  Although the Point of Sale Inspection Ordinance states that an owner can dispute the water bill in a "predeprivation hearing," the ordinance does not explain the due process protections, if any, of such hearing and

---

[1]     The only situation in which a Certificate of Compliance is not required to obtain transfer stamps is when an owner refuses his consent to an inspection and City fails to obtain a warrant to conduct the search.  Code §14-1(f).

requires the owner to pay the bill "under protest" while he challenges it.  Thus, if a property

owner wants to sell his property, he must capitulate and pay (albeit "under protest") what City

claims it is owed.  *Id.*  Otherwise, he will be unable to obtain the necessary transfer stamp.  *Id.*

      15.    The Point of Sale Inspection Ordinance does not restrict, in any way, the

scope of searches.  Rather, City inspectors are permitted to search for *any* violation of City's

"Property Maintenance Code" (regardless of whether the violation relates to health or safety

issues).  Moreover, the Point of Sale Inspection Ordinance does not contain any limitations on

the duration or location of inspections (*e.g.*, there is no limitation on inspectors searching

bedrooms, closets, desks or other areas where private or personal property may be stored).

Rather than placing limitations on the scope of searches (*e.g.,* limiting searches to matters that

concern health and safety), the Point of Sale Inspection Ordinance states that "[a]ll structures

shall be incompliance with Article X, Sections 14-691 and 14-692 of this Chapter 14, 'Property

Maintenance Code.'"  Ex. A at §14-1(c)(1).  Sections 14-691 and 14-692, in turn, expressly

adopt the "2006 International Property Maintenance Code" (the "International Code") with

minor modifications.  Ex. D.  The International Code is not limited to conditions that affect

health and safety.  *Id.*  Nor does the International Code restrict the type of things City can order

to be "repaired" before it will issue transfer stamps.  Rather, the International Code contains

provisions requiring maintaining property in "good repair."  *See id.*, at §§ 304, 305.  Under the

International Code, City inspectors have unfettered discretion to search for as long as, and for

whatever, and wherever they want.  Property owners have no notice of the conditions that fail to

constitute "good repair" before a search.  City inspectors have unfettered discretion to order

"repairs" that must then be made by a licensed and bonded contractor or the homeowner himself.

16.    Under a similar prior ordinance (which was amended during the pendancy of related litigation filed by Association) City repeatedly stopped sales of property (by refusing to issue Certificates of Compliance) until property owners made "cosmetic repairs" unrelated to health, safety, and public welfare such as:

a.    Painting windows, tightening a loose soap dish, replacing a "decorative cover" on a vanity;

b.    Replacing floor tiles, tightening a loose soap dish, painting a bedroom wall, putting a "globe" on a light, painting a bathroom ceiling;

c.    Repairing closet doors, painting door trims, repairing kitchen cabinets; and

d.    "Patch – Paint – Clean – Decorate."

17.    City can -- as it has in the past -- improperly rely on the "good repair" provisions of the International Code to order any kind of cosmetic repair it wants as a condition to the right to sell private property.  A seller of property cannot stop an overly intrusive search or refuse to make cosmetic repairs because the seller needs a "Certificate of Compliance" to obtain a "transfer stamp" to transfer the property.  The seller/owner is completely at the mercy of the inspector's unfettered discretion in conducting the search and ordering repairs.  Under the Point of Sale Inspection Ordinance, property owners must capitulate to an inspector's demands, even if the repair work is unnecessary from a public health or safety standpoint, if they want to sell their property.

18.    The Point of Sale Inspection Ordinance permits City to order the "deconversion" of "illegally converted" property. Ex. A at §§ 14-1(c)(2), 14-1(g).  The Point of Sale Inspection Ordinance contains no due process protection against City improperly ordering the deconversion of *legal nonconforming* property as a precondition of the right to sell the

7

property. There is no pre-deprivation hearing at which property owners are permitted to be represented by counsel and to submit evidence that the property is legal. *Id.* Thus, City may prevent the sales of *legal nonconforming* property simply by declaring it illegal. *Id.*

19. The Point of Sale Inspection Ordinance also unreasonably restrains the free alienability of property by allowing City unreasonably long time periods for City to conduct its searches, order repairs, and make re-inspections. *See id.* A at § 14-1(d) (allowing City 28 days to conduct inspection after receipt of notice of transfer), § 14-1(g)(1) (granting City three additional days after inspection to issue inspection report), § 14-1(h) (granting City three additional days to complete re-inspections after repairs are made). The Ordinance imposes *no* limit on the number of reinspections City may require because "new repairs" may be ordered during reinspection, and *no* time limit on when City must issue a Certificate of Compliance after reinspection. *Id.* at § 14-1(h) (no limitation on when City must issue Certificate of Compliance after all repairs are made). An owner is prohibited from having repairs done by a family member or unlicensed person. Thus, where repairs are ordered under the Point of Sale Inspection Ordinance, City can, at a minimum, prevent sales of private property for at least fifty days (assuming conservatively, that (i) it takes ten days for a home owner to find a licensed and bonded contractor who can make all repairs, and for such contractor to make repairs, and (ii) City issues a Certificate of Compliance within ten days after reinspection). During such time, sales can and will be lost.

**II.    Zoning Code And City's Policy Of Refusing To Issue Re-Build Letters And/Or Confirmation That Property Is Legal Nonconforming.**

20. The Zoning Code provides that legal nonconforming property cannot be rebuilt as-such if it is damaged by more than 50%. Relevant excerpts at Ex. E, Zoning Code at §5.5. This provision of the Zoning Code thus also means that, if legal nonconforming property is

damaged by less than 50%, it can be rebuilt or repaired as legal nonconforming property, even if current zoning restrictions would otherwise limit what could be built on the land.

21.     When an owner of legal nonconforming property finds a buyer for his property, the buyer's lender almost uniformly asks City to issue a letter that states that, if the legal nonconforming property is damaged, it can be re-built as legal nonconforming property consistent with the Zoning Code.  City uniformly refuses to issue such "re-build" letters.  Indeed, City uses a pre-printed form as part of its procedures that explicitly states that City will not issue re-build letters, despite the Zoning Code's provisions permitting rebuilding of legal nonconforming property.

22.     In addition, buyers and/or their lenders often ask City to confirm that property is legal nonconforming (*e.g.*, by confirming that all existing units in a four-unit building can be leased even though the property is located in an area zoned for fewer than four units) before agreeing to either buy property or loan money to prospective purchasers for the purchase of property in City.  City refuses to provide such information requested by buyers and/or their lenders.

23.     As a result of City's conduct, notwithstanding that the Point of Sale Inspection Ordinance states that only "illegally" converted property must be deconverted, City, in reality, forever prohibits the sale of legal nonconforming property because lenders will not loan money to buyers in the absence of a re-build letter and/or confirmation that property is, in fact, legal nonconforming.  This means that, if an owner of legal nonconforming property wants to sell his property, he is forced to modify or deconvert it, without due process or compensation by City.

9

### III.    Other Relevant Codes.

24.    City has also enacted a Code Enforcement Ordinance (Ex. F), to prosecute property owners who fail to maintain their property in compliance with City's building and maintenance codes. *Id.* City can also remedy health and safety related code violations through its Rental Dwelling Inspection Ordinance (Ex. G), which permits City to annually inspect multi-unit dwellings. Unlike the Point of Sale Inspection Ordinance, neither the Code Enforcement Ordinance nor the Rental Dwelling Inspection Ordinance is tied to the transfer of property. Rather, City may invoke the provisions (including as respects illegal conversions) whenever it believes that there is a code violation that poses a risk to public health and safety.

25.    Unlike the Point of Sale Inspection Ordinance, the Code Enforcement Ordinance contains *pre-deprivation* due process protections. For example, under the Code Enforcement Ordinance, before a property owner can be fined, a property owner is entitled to an administrative hearing where he is permitted to be represented by counsel, to present testimony and other evidence to challenge City's complaint, and to subpoena and cross-examine City officials regarding the alleged code violation. Ex. F at §§ 2-943, 2-946. Further, a property owner may petition for rehearing of an adverse decision before the enforcement administrator, *Id.* at § 2-949, and appeal any final decision to a Cook County Court. *Id.* at § 2-950. Finally, if a property owner is found guilty of a code violation, he is fined, *id.* at § 2-952, not deprived of his Constitutional right to sell and transfer his property. None of these pre-deprivation due process protections are present in the Point of Sale Inspection Ordinance.

26.    Under the Code, when a property passes the Rental Dwelling Inspection the property owner receives a Certificate of Occupancy that is valid for one year. Ex. G at §14-711(e). Passing the Rental Dwelling Inspection does not negate the requirements of the Point of Sale Inspection Ordinance. As such, regardless of the outcome of the Rental Dwelling

10

Inspection, a property owner must submit to both an annual rental inspection and an inspection at the point of sale.

**IV.    Impact Of The Point Of Sale Inspection Ordinance On Association And City Property Owners.**

27.    Transfer of every property in City that is subject to the Point of Sale Inspection Ordinance is enjoined until City permits transfer, without any pre-injunction due process. The unconstitutional taking of the right to alienate property depresses the value of all residential property in City.

28.    Since August 8, 2006, there have been at least 611 sales of property that have closed in City. As of July 9, 2008, there were 564 active listings of property in City. As of July 17, 2008, there were 44 residential real estate listings in City with contracts pending.

29.    Each of the 44 properties under contract will continue to be subject to an unconstitutional taking of the right to transfer prior to closing if City is permitted to enforce the Point of Sale Inspection Ordinance. Similarly, the 564 properties currently listed for sale will continue to be at risk of unconstitutional taking of the right to transfer by City pursuant to the Point of Sale Inspection Ordinance.

30.    Association's members' commissions with respect to each of the 44 property under contract will be deprived if City's enforcement of the Point of Sale Inspection Ordinance is not enjoined. Likewise, without the relief requested herein, Association's members' commissions as to the 564 properties currently listed for sale will remain in jeopardy. Moreover, Association's members' are at risk of losing their commissions with respect to their buyer-clients purchases of property in City should City be permitted to enforce the Point of Sale Inspection Ordinance.

11

## CAUSES OF ACTION

### COUNT I: THE POINT OF SALE INSPECTION ORDINANCE UNREASONABLY RESTRAINS THE RIGHT OF PROPERTY OWNERS TO TRANSFER THEIR PROPERTY

31.    Association repeats and realleges the allegations set forth in Paragraphs 1-30, as though fully set forth herein.

32.    Title 42, Section 1983 of the United States Constitution provides as follows:

> Every person who, under the color of an statute, ordinance, regulation, custom, or usage of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

33.    City, as a municipal corporation under the laws of Illinois, is a "person" that is subject to suit under 42 U.S.C. § 1983.

34.    The Point of Sale Inspection Ordinance unreasonably and unconstitutionally restrains the alienability of property. The Point of Sale Inspection Ordinance provides that property cannot be sold unless City issues a transfer stamp. Ex. A § 14-1(h) and Code §§ 82-325, 82-327(b), 82-328. With one limited exception (*see* n. 1), the only way to obtain a transfer stamp is to first obtain a "Certificate of Compliance" which, in turn, can only be obtained if an inspector decides that property "passed" a point of sale inspection. *Id.* There are no limitations on the scope of searches required by the Point of Sale Inspection Ordinance or the type of repair City can require as a condition of the right to sell property. A property owner can "pass" a point of sale inspection only if it completes all repairs required by the inspector -- even if those repairs are cosmetic in nature -- by using a licensed contractor or doing it himself. *Id.* at § 14-1(k). Thus, even if property complies with all City codes, a property owner may not

12

transfer his property if City refuses to issue a "Certificate of Compliance." When City fails or refuses to issue a "Certificate of Compliance" a property owner has no meaningful right to a hearing to contest the inspector's decision. *Id.* Even where City eventually issues a Certificate of Compliance, it prohibits sales of property for an unreasonably long period of time while inspections, repairs and re-inspections take place.

35. In addition, the Point of Sale Inspection Ordinance requires a seller to pay the water bill before City will issue transfer stamps. *Id.* at § 14-1(i). Although an owner can dispute the water bill in a "predeprivation hearing," the ordinance does not provide any detail regarding the due process protection of such hearing and requires the owner to pay the disputed bill "under protest" while he challenges the bill if he wants to obtain a transfer stamp. *Id.*

36. Although cities are permitted to adopt ordinances to protect public health and safety, they may not use such ordinances to restrict the free transfer of property. *See* Op. Ill. Att'y Gen. No. 94-024 (Oct. 25, 1994), 1994 WL 601863 ("Municipalities are authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 *et seq.*) (West 1992) to adopt a number of ordinances and codes designed to protect public health and safety, and are authorized to enforce such codes by requiring permits, fees, and fines ... Further, municipalities may impose various fees for other services relating to real property. *In no instance, however, are municipalities authorized to limit the alienability of property in order to enforce such code.*") (emphasis added)(Ex. H).

37. Association and its members have suffered and will continue to suffer immediate and irreparable harm from enforcement of the Point of Sale Inspection Ordinance. The Point of Sale Inspection Ordinance is unconstitutional because it violates the protections in the United States Constitution against unreasonable governmental restriction on the right to sell

13

private property and deprives Association's members' property rights. This irreparable harm to Association and its members will substantially outweigh any harm to City if immediate relief is granted. Even if the Point of Sale Inspection Ordinance is enjoined, City can protect public health and safety with the Code Enforcement Ordinance and Rental Dwelling Inspection Ordinance.

38.    There is no adequate remedy at law. Money damages are not adequate to remedy the immediate loss of the Constitutional right to alienate property.

**WHEREFORE**, Association prays for the following relief:

a.    A declaration that the Point of Sale Inspection Ordinance is unconstitutional;

b.    A temporary restraining order, preliminary and permanent injunction prohibiting City from enforcing the Point of Sale Inspection Ordinance and enjoining City from prohibiting the sale of property or refusing to issue transfer stamps in the absence of a point of sale inspection and/or issuance of a "Certificate of Compliance;"

c.    An award of reasonable attorneys fees and expenses as part of the costs of this action, pursuant to 42 U.S.C. § 1988; and

d.    Such other relief as the Court deems just and proper.

## COUNT II: LACK OF PROCEDURAL DUE PROCESS

39.    Association repeats and realleges the allegations set forth in Paragraphs 1-30, as though fully set forth herein.

40.    The Point of Sale Inspection Ordinance fails to provide procedural due process. Among other things, the due process clause requires that, at a minimum, a hearing must be provided *before* a property right -- here, the right to transfer property -- can be taken. The

14

533881.2

Point of Sale Inspection Ordinance immediately deprives a property owner of her right to sell her property and an Association's member's property rights without first providing due process. The Point of Sale Inspection Ordinance prohibits the transfer of every residential property unless City consents, but no pre-deprivation due process protection attaches. In effect, City has enjoined the transfer of residential property -- without a complaint, evidence, a hearing or any procedural or substantive rules -- until it decides to consent.

       41.     In addition, the Point of Sale Inspection Ordinance requires that property be in "good repair" before it can pass a Point of Sale Inspection but fails to notify a property owner of what conditions fail to constitute "good repair" and is, therefore, void for vagueness. City has historically relied on the "good repair" provisions to require property owners to make cosmetic repairs such as repairing soap dishes before allowing property to be sold. An inspector has unfettered discretion to order repairs unrelated to conditions that affect health or safety or the public good. The Point of Sale Inspection Ordinance contains no standards to prevent arbitrary enforcement. An owner must comply with any repair order before he can obtain the transfer stamp necessary to close the sale of the property. Property owners must capitulate to City's inspectors' demands, even if the repair order is mistaken, unnecessary from a public health or safety standpoint or otherwise improper, if they want to sell their property. Owners are not permitted to make their own repairs; they must use a licensed contractor and endure unnecessary cost and delay. The home seller has no protection if an inspector conditions City's consent on "repairs" that have no relationship to health or safety. Such a scheme does not comport with due process. It is also unconstitutionally vague.

       42.     As respects deconversions, the Point of Sale Inspection Ordinance does not provide *any* procedural due process protection to ensure that City does not wrongfully

15

deprive property owners of the "valuable property right" to sell and transfer legal nonconforming property. The ordinance does not provide any notice of how City will determine whether property is "legal" or "illegal." Further, property owners and Association members are not granted a meaningful hearing before an independent tribunal, where they can be represented by counsel, rebut City's positions or submit evidence to show that the property is not an illegal conversion.

      43.     Association and its members have suffered and will continue to suffer immediate and irreparable harm from enforcement of the Point of Sale Inspection Ordinance, including its deconversion provisions, because the Point of Sale Inspection Ordinance fails to provide procedural due process guaranteed by the United States Constitution. This irreparable harm to Association and its members will substantially outweigh any harm to City if immediate relief is granted. Even if the Point of Sale Inspection Ordinance is enjoined, City can protect public health and safety with the Code Enforcement Ordinance and Rental Dwelling Inspection Ordinance.

      44.     There is no adequate remedy at law. Money damages are not adequate to remedy the immediate loss of Constitutional rights.

     **WHEREFORE**, Association prays for the following relief:

        a.     A declaration that the Point of Sale Inspection Ordinance is unconstitutional under the United States Constitution;

        b.     A temporary restraining order, preliminary and permanent injunction prohibiting City from enforcing the Point of Sale Inspection Ordinance and enjoining City from prohibiting the sale of property or refusing to issue transfer

stamps in the absence of a point of sale inspection and/or issuance of a

"Certificate of Compliance;"

c.      An award of reasonable attorneys fees and expenses as part of the costs of

this action, pursuant to 42 U.S.C. § 1988; and

d.      Such other relief as the Court deems just and proper.

**COUNT III: CITY UNCONSTITUTIONALLY REFUSES TO
ISSUE RE-BUILD LETTERS AND/OR CONFIRM THAT PROPERTY IS LEGAL
NONCONFORMING TO FORCE THE DECONVERSION OR
MODIFICATION OF LEGAL NONCONFORMING PROPERTY AS A
CONDITION OF THE RIGHT TO SELL SUCH PROPERTY**

45.     Association repeats and realleges the allegations set forth in Paragraphs 1-

30, as though fully set forth herein.

46.     The right to continued use of, and the right to sell, legal nonconforming

property are constitutionally protected property rights.  Under Illinois law, the right to continue a

legal nonconforming use can only be taken away gradually and only if necessary for health and

safety reasons.  65 ILCS 5/11-13-1.

47.     The Point of Sale Inspection Ordinance, the Zoning Ordinance and City's

refusal to issue re-build letters and/or confirmation that property is legal nonconforming

effectively prohibits owners of legal nonconforming property from selling it unless they

immediately deconvert it or conform it to the current zoning classification.  The Zoning

Ordinance states that legal nonconforming property cannot be rebuilt as such if it is damaged by

more than 50%.  Ex. E.  This, of course, means that if legal nonconforming property is damaged

by less than 50%, it can be rebuilt as legal nonconforming even if current zoning regulations

would otherwise restrict what could be built.  Notwithstanding the terms of the Zoning

Ordinance, City arbitrarily and uniformly refuses to issue re-build letters (that state legal

nonconforming property can be built as such if damaged by less than 50%) that buyers' lenders

17

uniformly require. City's pre-printed forms state that City will not issue re-build letters. Buyers'

lenders will not loan buyers money in the absence of a re-build letter. City also refuses to

confirm for buyers and/or their lenders whether property is, in fact, legal nonconforming. Thus,

under the current scheme, owners of legal conforming property are forever barred from selling

their legal nonconforming property unless they deconvert.

48.    City applies the Zoning Code and refuses to issue re-build letters and/or

confirmation that property is legal nonconforming in such a way that unreasonably restrains the

rights of owners of legal nonconforming property from selling their property as legal

nonconforming. City's conduct thus also violates 65 ILCS 5/11-13-1.

49.    Association and its members have suffered and will continue to suffer

immediate and irreparable harm from City's refusal to issue re-build letters and confirmation of

the legal nonconforming status of property because City's conduct effectively prohibits owners

of legal nonconforming property from selling such property as legal nonconforming and deprives

Association's members' of their property rights associated with the sale of legal nonconforming

property. Thus, City's conduct in refusing to issue re-build letters and/or confirmation of the

legal nonconforming status of property violates the protections in the United States Constitution

against unreasonable governmental restriction on the right to sell private property and

deprivation of property rights. This irreparable harm to Association and its members will

substantially outweigh any harm to City if immediate relief is granted. City can protect public

health and safety with the Code Enforcement Ordinance and Rental Dwelling Inspection

Ordinance.

50.    There is no adequate remedy at law. Money damages are not adequate to

remedy the immediate loss of Constitutional rights.

533881.2

**WHEREFORE**, Association prays for the following relief:

a.    A declaration that City's refusal to issue re-build letters is unconstitutional under the United States Constitution and violates 65 ILCS 5/11-13-1;

b.    A declaration that City's refusal to confirm for buyers or their lenders whether property is legal nonconforming is unconstitutional under the United States Constitution and violates 65 ILCS 5/11-13-1;

c.    A temporary restraining order, preliminary and permanent injunction prohibiting City from refusing to issue re-build letters and/or confirmation regarding whether property is legal nonconforming;

d.    An award of reasonable attorneys fees and expenses as part of the costs of this action, pursuant to 42 U.S.C. § 1988; and

e.    Such other relief as the Court deems just and proper.

DATED:  September ___, 2008                    Respectfully submitted,

                                        **MAINSTREET ORGANIZATION OF
                                        REALTORS®**

Philip C. Stahl
Patrick T. Nash
Donald P. Bunnin                        By: _/s/ Patrick T. Nash_____
Mark A. Semisch                             One of Its Attorneys
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

19

# Exhibit A

2008-Feb-15 12:11 PM    13125419191    1/11
ROSENTHAL MURPHYCOBLENT Fax:13125419191    Feb 15 2008 11:51am P003/011

# THE CITY OF CALUMET CITY
## COOK COUNTY, ILLINOIS

## ORDINANCE
## NUMBER 08-06

## AN ORDINANCE AMENDING CHAPTERS 14 AND 82
## OF THE MUNICIPAL CODE OF CALUMET CITY REGARDING
## POINT OF SALE INSPECTIONS AND
## REAL ESTATE TRANSFER TAX

**MICHELLE MARKIEWICZ QUALKINBUSH, Mayor**
Gloria L. Dooley, City Clerk

EDWARD GONZALEZ
THADDEUS JONES
BRIAN WILSON
GERALD A. TARKA
NIKOLAOS MANOUSOPOULOS
CYNTHIA M. PALLICK
LENI WOSCZYNSKI
Aldermen

Published in pamphlet form by authority of the Mayor and City Council of the City of Calumet City on 1-31-08
ODELSON & STERK, LTD. - City Attorneys - 3318 West 95th Street - Evergreen Park, Illinois 60805

ORDINANCE NO. 08 - 06

AN ORDINANCE AMENDING CHAPTERS 14 and 82 OF THE MUNICIPAL CODE OF
CALUMET CITY REGARDING
POINT OF SALE INSPECTIONS AND REAL ESTATE TRANSFER TAX

WHEREAS, the City of Calumet City has reviewed the provisions of its Municipal Code governing Point of Sale Inspections; and

WHEREAS, it is the intention of the City of Calumet City to continue to provide for periodic inspections of dwellings upon the transfer of interest or ownership thereof; and

WHEREAS, the City of Calumet City believes it is in the best interests of the health, safety and welfare to make the following amendments to its Ordinance regarding Point of Sale Inspections.

NOW, THEREFORE, be it ordained by the Mayor and City Council of the City of Calumet City, Cook County, Illinois, in the exercise of Calumet City's home rule powers as follows:

Section 1:    Chapter 14, Article I, Section 14-1 of the Municipal Code of the City of Calumet City is hereby amended by deleting the text thereof and substituting the following text in its place:

## Sec. 14-1. *Point of Sale Inspection Requirement; Certificate of Compliance Procedures*

(a) *Department Created; Definition; General Requirement.*

1.    A Department of Inspectional Services is hereby created pursuant to this section. The Department of Inspectional Services ("Department") shall be headed by a Director of Inspectional Services ("Director," which shall also include the Director's designees) who shall be appointed by the Mayor with the advice and consent of the City Council. All inspectional services concerning point of sale matters within the City, including building and housing, shall be under the jurisdiction of the Department. The building commissioner, electrical inspector, plumbing inspector, housing director and all Department inspectors and staff shall be responsible for reporting to the Director relative to all matters relating to this section and the Director shall have full authority to direct, train and provide appropriate personnel subject to City Council approval as to expenditures and/or requirements as provided herein.

2008-Feb-15 12:11 PM    13125419191    5/11    ROSENTHALMURPHYCOBLENT Fax:13125419191    Feb 15 2008 11:52am P005/011

2.    For the purpose of this section, the term "Point of Sale Inspection" means an inspection of real property by the Department conducted in connection with a taxable transfer of real estate to determine whether the condition of said property conforms to the specific regulations identified in this Section.

3.    A Point of Sale Inspection shall be required relative to any transfer of any interest in property which is subject to this Section, except as exempted herein.

(b)    *Notice of Transfer of Real Property Required.* Whenever an owner of real property in the City proposes to engage in a transfer of real property in the City which is subject to taxation under Chapter 82, Article X of the Calumet City Municipal Code (Real Estate Transfer Tax), such owner shall provide the Department a Notice of Transfer for said property, on a form therefore provided by the Department.

(c)    Compliance *Inspection; Pertinent Code Requirements.* The Notice of Transfer form shall also constitute the Director's request to inspect such property ("Compliance Inspection") to determine whether such property is in compliance with the following specific requirements, which the corporate authorities of the City find are related to the public health, safety and welfare:

(1)    *Compliance with Property Maintenance Code.* All structures shall be in compliance with Article X, Sections 14-691 and 14-692 of this Chapter 14, "Property Maintenance Code."

(2)    *Inspection to Determine Possible Illegal Conversions.* All structures shall be inspected to determine whether they have been illegally converted. For purposes of this subsection, "illegally converted" means that the property was converted to another or additional use beyond that for which the property was originally permitted, and which [i] is in violation of the property's zoning limitations and [ii] is not a legal nonconforming use under Section V of the City Zoning Ordinance.

(d)    *Proposed Compliance Inspection.* When the owner files the Notice of Transfer, the Department will schedule a proposed Compliance Inspection to be conducted within 28 calendar days of the Notice. The Notice of Transfer Form shall includes the following:

(1)    Date and time of the proposed Compliance Inspection;

(2)    A statement that the owner or occupant has the right to withhold consent to the Compliance Inspection and require the City to obtain a warrant to conduct the inspection;

(3)    For occupied rental dwellings, the City must also request and obtain the consent of the tenant prior to conducting any inspection; and

(4)    A space for the owner and/or to indicate that the owner and/or tenant either consent to the Compliance Inspection, or refuse consent.

(e)    *Refusal to Consent; Warrant Procedures.* If the owner or occupant does not consent to the proposed inspection, the Director may appear before any judge in the Circuit Court of Cook County and seek an administrative search warrant to allow an inspection. Any such application shall be made within 10 calendar days after the owner's nonconsent. The application for the warrant shall specify the basis upon which the warrant is being sought and shall include a statement that the inspection will be limited to a determination whether there are violations of the Code provisions identified in this Section, and whether there have been any illegal conversions. The Court may consider any of the following factors along with such other matters as it deems pertinent in its decision as to whether a warrant shall issue:

(1)    eyewitness account of violation;
(2)    citizen complaints;
(3)    tenant complaints;
(4)    plain view violations;
(5)    violations apparent from City records;
(6)    property deterioration;
(7)    age of property;
(8)    nature of alleged violation;
(9)    condition of similar properties in the area;
(10)    documented violations on similar properties in the area;
(11)    passage of time since last inspection;
(12)    previous violations on the property.

(f)    *Uninspected Property; Transfer Stamps.* In the event the owner or occupant refuses to consent to an inspection, and the Director does not seek a warrant (or if Court refuses an application for the warrant), the Department shall notify the City Clerk that "Uninspected Property" transfer stamps may issue. In connection with the issuance of transfer stamps, the City Clerk shall advise the purchaser of such property that it is "Uninspected Property."

(g)    *Inspection Procedures; Appeal.*

(1)    In the event consent is given or a warrant issues, the Department shall conduct the Compliance Inspection as provided in subsection (c) and (d). Within 5 business days after the Compliance Inspection the Department shall issue a written notice of violations and repairs, if any, necessary to bring the property into compliance with this Section. In the event the inspection reveals a structure which has been illegally converted, the Department shall issue a Notice of Deconversion specifying the measures which must be taken in order to bring the illegally converted structure into compliance with applicable zoning regulations.

4

    (2)    In the event the owner disputes the determination of violations and repairs, the owner may file a request for administrative review on a form provided by the City. An independent administrative hearing officer appointed by the City shall convene an administrative hearing within five (5) business days from the date of appeal. Upon completion of the administrative hearing, the hearing officer will issue a final determination of violation and repairs.

    (3)    In the event an owner disagrees with an administrative issuance of a notice of deconversion, said owner may appeal to the Zoning Board of Appeals in accordance with Section 12.5 of the City's Zoning Ordinance.

**(h)** *Follow-Up Repairs; Reinspection.* A party issued a notice of repairs as provided for in subsection (g) shall proceed to make such repairs. Upon completion of said repairs and notice thereof to the Department, the Department will conduct a reinspection within 3 business days thereafter. Upon completion of the follow-up repairs, and the completion of any deconversion measures required by the Department, the Department shall issue a Certificate of Compliance.

**(i)** *Payment of Current Water Bills; Predeprivation Hearing.* The seller must pay the current water bill (as defined in Section 82-327(b) of the Municipal Code) and other fees owed by the seller to Calumet City, prior to the issuance of transfer stamps. In the event the owner disputes any such obligation (or, any portion thereof), the Office of City Clerk shall promptly provide the owner with a predeprivation due process hearing consistent with the principles enunciated in *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978). The City Clerk's office shall provide the hearing with 3 business days of a request. If the owner disputes the City's determination as to liability, the owner may pay said bill under protest, and may pursue any remedies available to said seller to recover the claimed overcharge.

**(j)** *Conditional Certificate of Compliance; Procedures.* An owner who has not completed the repairs identified through the inspection may nevertheless transfer ownership of property if:

    (1)    The owner or agent has deposited with the City an amount of money determined by the Director or his designee to be sufficient to bring the structure into compliance with all City building and zoning ordinances and any applicable housing, fire or property maintenance codes or regulations; and

    (2)    The buyer, conveyee, transferee, assignee or successor in title, ownership or interest (hereinafter "buyer") has entered into an agreement with the City whereby the buyer agrees to bring the structure into compliance within the time period determined by the Director or his designee, to bring the structure into compliance with all applicable Code requirements within a period not to exceed

5

2008-Feb-15 12:11 PM    13125419191    8/11
ROSENTHAL MURPHY COBLENT Fax: 13125419191    Feb 15 2008 11:53am P008/011

one hundred eighty (180) calendar days after the closing of the transaction ("closing")

(3)     If the buyer enters into such an agreement, a Conditional Certificate of Compliance will issue in order to allow the closing to be completed. The Conditional Certificate of Compliance shall be issued by the Department and shall terminate on the one hundred eighty first day after closing and no extensions shall be granted. A buyer who elects to accept the premises subject to the inspection with existing violations, and who agrees, in order to close, to be responsible as provided herein, shall execute a sworn affidavit satisfactory to the Director which will clearly indicate that the buyer is fully aware of the existing violations as well as the possibility of violations that may have existed but were undiscovered due to lack of access and agrees to accept the requirement and obligation to bring the structure into compliance within one hundred eighty (180) days of the closing. The City shall issue a Certificate of Compliance upon completion of the repairs necessary to bring the dwelling or structure into compliance.

(4)     In the event the buyer fails to complete the required repairs, and have the repairs verified on reinspection, the Director is hereby authorized to pursue enforcement proceedings through the Calumet City administrative adjudication process, or, at his discretion, through the Circuit Court of Cook County. The buyer hereby agrees to submit to the jurisdiction and venue of the Calumet City Administrative Adjudication Process and the Circuit Court of Cook County and to waive service of summons subject only to the notice requirement as required by law in order to enable the City to expeditiously obtain an order of compliance with this section.

(5)     If reasonable proof that the repairs have been completed is not received by the Director or his designee within the required period for the repairs to be completed, the City may also issue a citation for violation of this Chapter and/or the escrow repair agreement, and may also pursue any applicable administrative or judicial remedies to bring the
structure and property into compliance with applicable codes and regulations.

(6)     The fine for violations of this Chapter shall be not less than one hundred dollars ($100) nor more than one thousand dollars ($1,000.00) per day for each day the violations remain uncorrected.

(k)     *Licensed and Bonded Contractors.* All contractors performing repairs identified in the point of sale inspection, or issuing certifications shall be licensed by the City and bonded and

6

shall make available, upon request, copies of their license(s), verification of their liability insurance, errors and omissions insurance policies, and surety bond.

(l)    *Validity of Certificate of Compliance.*    A Certificate of Compliance issued to the seller shall be valid for one hundred eighty (180) days from the date of issuance.

(m)    *No Warranty.* In issuing a certificate of compliance or a conditional certificate of compliance, the City and its agents do not make any warranty, representation or statement nor does it intend to insure or guarantee to either buyer or seller of the property subject to the point of sale inspection or any of their designees, agents, representatives, heirs or assigns or any other interested party, including mortgage companies, insurance companies, banks or any other party which may have any interest relative to the property subject to the point of sale inspection, nor does the City affirm that there are no additional unnoted violations relative to any other provisions of any of the Municipal Code of the City of Calumet City, or relevant statutes, ordinances, rules and regulations of the County of Cook, the State of Illinois or the United States of America.

(o)    *Inspection Fee Schedule.*

    (1)    The fee for a point of sale inspection shall be one hundred fifty dollars ($150.00) for all single-family residential inspections. The failure of an owner/seller or his designee to appear at the time of inspection shall result in a fifty dollar ($50.00) penalty.

    (2)    The fee for a point of sale inspection shall be one hundred fifty dollars ($150.00) plus twenty-five additional dollars ($25.00) for each residential unit in excess of one unit.

    (3)    A fee of twenty cents ($0.20) per square foot shall be charged for each commercial/industrial unit inspected with a minimum fee of two hundred dollars ($200.00) per commercial/industrial unit.

    (4)    Each fee set for the above covers the cost of one (1) follow-up inspection to verify compliance. In the event that additional inspections are required because full compliance did not exist at the time of the reinspection, then an additional reinspection fee of fifty dollars ($50.00) per unit shall be assessed.

    (5)    If an owner, agent or tenant has failed to appear for two previously scheduled inspections, an additional inspection fee of fifty dollars ($50.00) per unit shall be assessed.

**Section 2:**    Section 82-327(b) of the Calumet City Municipal Code is hereby amended to provide as follows:

7

(b) The City Clerk shall issue no stamps for the transfer of any dwelling, structure, commercial or industrial building unless the grantor/seller (i) presents a "Certificate of Compliance" or other certificate indicating compliance with appropriate city ordinances and/or codes signed by an authorized signatory of the department of inspectional services or (ii) presents an "Uninspected Property" notice to the City Clerk pursuant to Section 14-1(f) of the City Code. The City Clerk shall provide the purchaser notice whether the property is inspected or uninspected.

Additionally, prior to the issuance of transfer tax stamps, and subject to the procedures as set forth in Section 14-1(f) of the City Code, the grantor/seller shall present to the city clerk proof of a current paid water bill. The term "current" shall be defined as the most recent bill issued to the grantor/seller and certified as same by an authorized official of the water department of the city. The water department shall not issue certification of a paid water bill relative to any transfer of title unless the new owner's name and address is supplied to an official of the water department simultaneously upon request for certification of a paid water bill. Grantors/sellers who are exempt from the requirement of purchase of transfer stamps shall be required to comply with the requirements of this section, and shall have the Section 14-1(f) procedural rights.

**Section 3:**    If any section, paragraph, clause or provision of this ordinance shall be held invalid, the invalidity thereof shall not effect any of the other provisions of this ordinance.

**Section 4:**    All ordinances in conflict herewith are hereby repealed to the extent of such conflict.

**Section 5:**    This ordinance shall be in full force and effect from and after its passage, approval and publication as provided by law.

8

Ord. #08-6

ADOPTED this 31st day of February, 2008, pursuant to a roll call vote as follows:

|  | YES | NO | ABSENT | PRESENT |
|---|---|---|---|---|
| Gonzalez |  | x |  |  |
| Jones | x |  |  |  |
| Pallick | x |  |  |  |
| Manousopoulos | x |  |  |  |
| Tarka | x |  |  |  |
| Wilson | x |  |  |  |
| Wosczynski | x |  |  |  |
| Quakenbush (Mayor) |  |  |  |  |
| TOTAL | 7 |  |  |  |

APPROVED by the Mayor on January 31, 2008.

Michelle Markiewicz Quakenbush
MAYOR

ATTEST:

Gloria Dooley
CITY CLERK

C:\Documents and Settings\deputy clerk\Local Settings\Temporary Internet Files\Content.IE5\LRVZ194E\amending chap 14 & 82 1(1)31.08.wpd

9

Ord. #08-6

# hp LaserJet 4345mfp series



## Fax Call Report                                                      1

Grippo & Elden LLC
(312)704-7700
2008-Feb-15 12:11 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 544 | 2008-Feb-15 12:05 PM | Receive | 13125419191 | 5:34 | 11 | Success |

# EXHIBIT A, PART 2

# Exhibit B

# B Y L A W S
## of the
## Mainstreet Organization of REALTORS®

## A R T I C L E   I   -   N A M E

**Section 1. Name**
The name of this organization shall be the Mainstreet Organization of REALTORS®, hereafter referred to as the "Association."

**Section 2. REALTORS®**
Inclusion and retention of the term REALTORS® in the name of the Association shall be governed by the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS® as from time to time amended.

## A R T I C L E   I I   -   O B J E C T I V E S

The objects of the Association are:

**Section 1.**
To unite those engaged in the recognized branches of the real estate profession for the purpose of exerting a beneficial influence upon the profession and related interests.

**Section 2.**
To promote and maintain high standards of conduct in the real estate profession as expressed in the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®.

**Section 3.**
To provide a unified medium for real estate owners and those engaged in the real estate profession whereby their interests may be safeguarded and advanced.

**Section 4.**
To further the interest of home and other real property ownership.

**Section 5.** To safeguard and advance the interests of real estate owners, occupants or users, and those engaged in the real estate profession.

**Section 6.** To ensure that real estate services are not denied to any individual because of age, race, color, religion, sex, ancestry, marital status, physical or mental handicap, familial status, national origin, sexual orientation, military status, dishonorable discharge from the military service, or any other class protected by the Illinois Human Right Act.

**Section 7.** To ensure strict compliance by federal, state and local governments or their agencies, with the Constitution of the United States and the Illinois State Constitution in real estate matters.

Section 8.  To protect, secure and vindicate through petition and, if necessary, litigation, the rights of owners, occupants or other users of real estate and real estate professionals, secured by the Constitution of the United States and the Illinois State Constitution.

Section 9.
To unite those engaged in the real estate profession with the Illinois Association of REALTORS® and the NATIONAL ASSOCIATION OF REALTORS®, thereby furthering their own objectives throughout the state and the nation and obtaining the benefits and privileges of membership therein.

Section 10.
To designate, for the benefit of the public, individuals authorized to use the terms REALTOR® and REALTORS® as licensed, prescribed, and controlled by the NATIONAL ASSOCIATION OF REALTORS®.

# A R T I C L E   I I I   -   J U R I S D I C T I O N

Section 1.
The territorial jurisdiction of the Association as a member of the NATIONAL ASSOCIATION OF REALTORS® shall include the following area:

> All of the County of DuPage plus that area in Cook County contiguous to DuPage County and bounded as follows:  **ON THE NORTH:** all of Leyden Township in Cook County except that portion of Park Ridge in Leyden Township and except O'Hare International Airport and that part of the City of Chicago leading thereto, but including Elmwood Park, River Grove, Franklin park, Schiller Park, and Northlake Village. **ON THE EAST:** south along the Des Plaines River beginning at North Avenue to the north side of Cermak Road; west along Cermak Road to the west side of 19th Avenue, then to the south boundary of Broadview, Illinois;  west to the Indiana Harbor Belt Railroad; south along the Indiana Harbor Belt Railroad to 26th Street; then east to Harlem Avenue;  south along Harlem Avenue to Ogden Avenue;  west on Ogden Avenue to Custer Avenue;  south on Custer Avenue to 47th Street;  east on 47th Street to 1st Avenue;  south on 1st Avenue to the Illinois and Michigan Canal.  **ON THE SOUTH:** west along the Illinois and Michigan Canal to Cook-DuPage County line, including the villages of Riverside, Brookfield, LaGrange, LaGrange Park, Western Springs, Countryside, LaGrange Highland, and lands south of these villages to the Illinois and Michigan Canal.

> Where the Cal-Sag Canal meets the Will County Line; South on the Will County Line to the East jog (135th Street); East on 135th Street to South jog (Will/Cook Road); South on Will/Cook Road to 183rd Street to Harlem Avenue; South on Harlem Avenue to Interstate 80; South on the Will County Line and proceeding in a straight line South to the Will County/Kankakee County Line; East to the Illinois/Indiana State Line; North along said Line to 138th Street; West on 138th Street to Indiana Street; North on Indiana Street to Little Calumet River; Then, in a West by Northwesterly direction along the Little Calumet River to Morgan Street; North on Morgan Street

> to 127th Street; East on 127th Street to Halsted; North on Halsted Street to Chicago Limits (123rd Street); West on 123rd Street to Ashland; North on Ashland to 119th Street to Sacramento; North on Sacramento to

115th Street; West on 115th Street to Crawford Avenue; North on Crawford Avenue to 103rd Street; East on 103rd Street to California Avenue; North on California Avenue to 99th Street; East on 99th Street to Western Avenue; North on Western Avenue to 87th Street; West on 87th Street to Cicero Avenue; North on Cicero Avenue to 79th Street; West on 79th Street to Cal-Sag Canal; Southwesterly along Cal-Sag Canal to Will County Line, point of beginning.   To include Communities of Evergreen Park, Hometown, Bridgeview, Justice, Lemont, Orland Park, Tinley Park, Matteson, Beecher, Sauk Village, Lynwood, Lansing, Calumet City and Burnham.   Worth Township (Except Chicago); Calumet Township (Except Chicago); Thornton Township in Blue Island; and Orland, Bremen, and Palos Townships – All in Cook County.

Townships included in the Will Country area included in those boundaries are Will, Monee, Crete, and Washington, excluding the portion of the town of Peotone which lies in the Township of Will (in the Will County area); and also, city limits of Calumet City and Burnham.

Section 2.
Territorial jurisdiction is defined to mean the right and duty to control the use of the terms REALTOR® and REALTORS®, subject to the conditions set forth in these Bylaws and those of the NATIONAL ASSOCIATION OF REALTORS®, in return for which the Association agrees to protect and safeguard the property right of the National Association in the terms.


# A R T I C L E   I V  -  M E M B E R S H I P

There shall be eight (8) classes of Members as follows:

Section 1.　REALTOR® Members
　　　　a.　　　　REALTOR® Members, whether primary or secondary, shall be:

(1) Individuals who, as sole proprietors, partners, corporate officers, or branch office managers, are engaged actively in the real estate profession, including buying, selling, exchanging, renting or leasing, managing appraising for others for compensation, counseling, building, developing or subdividing real estate, and who maintain or is associated with an established real estate office in the state of Illinois or a state contiguous thereto. All persons who are partners in a partnership, or all officers in a corporation who are actively engaged in the real estate profession within the state or a state contiguous thereto shall qualify for REALTOR® Membership only, and each is required to hold REALTOR® Membership (except as provided in the following paragraph) in an Association of REALTORS® within the state or a state contiguous thereto unless otherwise qualified for Institute Affiliate Membership as described in Section 1 (b) of Article IV.

In the case of a real estate firm, partnership, or corporation, whose business activity is substantially all commercial, only those principals actively engaged in the real estate business in connection with the same office, or any other offices within the jurisdiction of the board in which one of the firm's principals holds REALTOR® membership, shall be required to hold REALTOR® membership unless otherwise qualified for Institute Affiliate Membership as described in Section 1 (b) of Article IV.

(2) Individuals licensed by the State of Illinois who are engaged in the real estate profession other than as principal, partner, corporate officer or branch office manager, and as such are associated with a REALTOR® Member and meet the qualifications set out in Article V.

(3) Corporate officers (who may be licensed or unlicensed) of a real estate brokerage franchise organization with at least one hundred fifty (150) franchisees located within the United States, its insular possessions and the commonwealth of Puerto Rico, elected to membership pursuant to the provisions in the NAR Constitution and Bylaws. Such individuals shall enjoy all of the rights, privileges and obligations of REALTOR® membership (including compliance with the Code of Ethics) EXCEPT: obligations related to Board mandated education, meeting attendance, or indoctrination classes or other similar requirements; the right to use the term REALTOR® in connection with their franchise organization's name; the right to hold elective office in the local Board, State Association and National Association.

b.   Primary and secondary REALTOR® Members. An individual is a primary member if the Association pays state and national dues based on such member. An individual is a secondary member if state and national dues are remitted through another association/board. One of the principals in a real estate firm must be a Designated REALTOR® Member of the Association in order for licensees affiliated with the firm to select the Association as their "primary" Association.

c.   Designated REALTOR® Members. Each firm shall designate in writing one REALTOR® Member who shall be responsible for all duties and obligations of membership including the obligation to arbitrate pursuant to Article 17 of the Code of Ethics and the payment of Association dues as established in Article X of the Bylaws. The Designated REALTOR® must be a sole proprietor, partner, corporate officer, or branch office manager acting on behalf of the firm's principal(s) and must meet all other qualifications for REALTOR® Membership established in Article V, Section 2, of the Bylaws.

Section 2.    Institute Affiliate Members

Institute Affiliate Members shall be individuals who hold a professional designation by an Institute, Society, or Council affiliated with the NATIONAL ASSOCIATION OF REALTORS® that addresses a specialty area other than residential brokerage or individuals who otherwise hold a class of membership in such Institute, Society, or Council that confers the right to hold office. Any such individual, if otherwise eligible, may elect to hold REALTOR® membership, subject to payment of applicable dues for such Membership.

Section 3.  Affiliate Members

Affiliate Members shall be real estate owners and other individuals or firms who, while not engaged in the real estate profession as defined in Section 1, Parts a or b, of this Article, have interests requiring information concerning real estate and are in sympathy with the objects of the Association. (They shall not be eligible to vote or hold elective office in this Association.)

Section 4.  Public Service Members

Public Service Members shall be individuals who are interested in the real estate profession as salaried employees of educational, public utility, governmental, or other similar organizations, but are not engaged in the real estate

profession on their own account or in association with an established real estate business. (They shall not be eligible to vote or hold elective office in this Association.)

Section 5. Honorary Members
Honorary Members shall be individuals who have performed notable service for the real estate profession, for the Association, and for the public; and whose honorary membership has been approved by a vote of the Board of Directors. Honorary Members shall also include any past president who has been with the Association for at least 20 years. Honorary Members do not pay local dues.

Section 6.     Student Members
Student Members shall be individuals who are seeking an undergraduate or graduate degree with a specialization or major in real estate at institutions of higher learning and who have completed at least two years of college and at least one college level course in real estate, but are not engaged in real estate business on their own account or not associated with an established real estate office. (They shall not be eligible to vote or hold elective office in this Association.)

Section 7.     REALTORS® Emeritus
A REALTOR® Member who has achieved forty (40) cumulative years of membership as a REALTOR® and/or REALTOR-ASSOCIATE® in the National Association, and this Association or another association/board is entitled to membership classification as a "REALTOR® Emeritus," subject to approval by the Board of Directors of the NATIONAL ASSOCIATION OF REALTORS®.

Section 8.     Honorary Life Members
Any past President or other REALTOR® Member who is no longer actively engaged in the field of real estate and who has been proposed and approved by two-thirds of the Board of Directors shall be an Honorary Life Member. Honorary Life Members shall have the privileges and rights of REALTOR® Members.

Section 9.     Distinguished Members
The Distinguished Membership category will be a tool to show appreciation for those members who have served the Association for twenty-five years or longer and who are leaving the real estate field but want to remain a part of the Association.

# A R T I C L E   V  -  Q U A L I F I C A T I O N   A N D   E L E C T I O N

Section 1. Application
An application for membership shall be made in such manner and form as may be prescribed by the Board of Directors and made available to anyone requesting it. The application form shall contain among the statements to be signed by the applicant (1) that applicant agrees as a condition of membership to thoroughly familiarize himself with the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®, the Constitution, Bylaws, and Rules and Regulations of the Association and of the State and National Associations and, if elected a Member, to abide by the Constitutions and Bylaws and Rules and Regulations of the Association and of the State and National Associations and, if a REALTOR® Member, to abide by the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®, including the obligation to arbitrate controversies arising out of real estate transactions as specified by Article 17 of the Code of Ethics and as further specified in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®, as from time to time amended, and (2) that applicant

consents that the Association may invite and receive information and comment about applicant from any member or other person and that response to the invitation shall be conclusively deemed to be privileged and not form the basis of any action for slander, libel, or defamation of character. The applicant shall, with the form of application, have access to a copy of the Bylaws, Constitution, Rules and Regulations, and Code of Ethics referred to above.

Section 2. Qualification

    a.    An applicant for REALTOR® Membership

        1.    Shall supply satisfactory evidence as follows:

            (a)    If a principal, partner, corporate officer, or branch office manager, written evidence that he is actively engaged in the real estate business, that he maintains a current valid real estate broker's or salesperson's license or is licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property, and that he has a place of business within the state or a state contiguous thereto.

            (b)    If an individual other than a principal, partner, corporate officer, or branch office manager, a written application affirming that he is associated either as an employee or as an independent contractor with a REALTOR® Member who maintains an established real estate business.

        2.    Shall complete a course of instruction covering the Bylaws and Rules and Regulations of the Association, the Bylaws of the Illinois Association of REALTORS®, and the Constitution, Bylaws, and Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®. Failure to satisfy this requirement within _____90_____ days of the date that provisional membership was granted, will result in denial of the membership application or terminating of provisional membership.

        3.    Shall agree, if elected to membership, to abide by the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and the Constitution, Bylaws, and Rules and Regulations of the Association, the Illinois Association and the National Association.

        4.    Shall agree to attend or complete, on at least a biennial basis, continuing education instruction of at least six hours; of which 3 hours must be on the Code of Ethics. Deadline for the completion of this education requirement shall coincide with that established for the continuing education required by Illinois state law, and courses taken to meet the continuing education required by Illinois state law may coincidentally meet the Association education requirement. Failure to meet the education requirement of the Association shall result in suspension of membership until such time as the requirement has been met.

    b.    Applicants for membership as Affiliate Members, Public Service Members, Honorary Members, Student Members, REALTORS® Emeritus, and Honorary Life Members shall meet such requirements and follow such procedures as are defined in Article IV and further implemented as necessary by the Board of Directors.

Section 3.  Ethics Training

a.  Shall be required to complete quadrennial ethics training of not less than two hours and thirty minutes of instructional time effective January 1, 2001, through December 31, 2004, and for successive four-year periods thereafter.  This requirement will be satisfied upon presentation of documentation that the member has completed a course of instruction conducted by this or another association, the State Association of REALTORS®, the NATIONAL ASSOCIATION OF REALTORS®, or any other recognized educational institution or provider which meets the learning objectives and minimum criteria established by the NATIONAL ASSOCIATION OF REALTORS® from time to time.  REALTOR® members who have completed training as a requirement of membership in another association and REALTOR® members who have completed the New Member Code of Ethics Orientation during any four year cycle shall not be required to complete additional ethics training until a new four year cycle commences.  Failure to satisfy this requirement within __90__ days of the date that membership was granted, will result in denial of the membership application or terminating of membership.

Failure to satisfy this requirement shall be considered a violation of membership duty for which REALTOR® membership shall be suspended.

Members suspended for failing to meet the requirement for the first four (4) year cycle (2001-2004) will have until December 31, 2005 to meet the requirement.  Failure to meet the requirement by that time will result in automatic termination of membership.

Failure to meet the requirement of the second (2005 – 2008) cycle and subsequent four (4) year cycles will result in suspension of membership for the first two months (January and February) of the year following the end of any four (4) year cycle or until the requirement is met, whichever occurs sooner.  On March 2 of that year, the membership of member who is still suspended as of that date will be automatically terminated.

Section 4.  Election

The procedure for election to membership shall be as follows:

a.  The Membership Department shall determine whether the class of membership for which applicant is applying is one for which he would be eligible if otherwise possessing the qualifications of membership.  It shall then give written notice to the REALTOR® Members of such application and invite written comment thereon.  Written notice can be given via, mail, e-mail or by publishing in the "Insider" publication.

b.  If any REALTOR® Member objects to the approval of the application, basing such objection on lack of qualification as set forth in these Bylaws, the REALTOR® member must submit the objection in writing.

c.  The Membership Department shall report its findings to the Board of Directors in writing.  If an objection has arisen to the approval of the application, the objecting member shall be invited to appear before the Board and substantiate his objections.  Objections which are not substantiated shall be totally disregarded.  The Board may not find objections substantiated without (1) informing the applicant in advance, in writing, of the objections and the identity of the objecting

member and (2) giving the applicant a full opportunity to appear before the Board and establish his qualifications.

d.  The Board of Directors shall review the qualifications of the applicant and then vote on his eligibility to membership. If the applicant receives a majority vote of the Board of Directors, he shall be declared elected to membership and shall be so advised by notice in writing. Such membership is conditioned upon attendance at a mandatory orientation session within three subsequent offerings of the orientation.

e.  An application for membership shall be acted upon by the Board of Directors within sixty (60) days from the date of application for membership.

f.  The Board of Directors may not reject an application without first giving the applicant an opportunity to appear before it, to call witnesses in his behalf, to be represented by counsel, and to make such statements as he deems relevant. The Board of Directors may also have counsel present. The Board of Directors shall cause written minutes to be made of any hearing before it or may electronically or mechanically record the proceedings.

g.  If the Board of Directors determines that the application shall be rejected, it shall record its reasons with the Secretary-Treasurer. If the Board of Directors believes that the applicant may resort to legal action because of rejection of his application, it may specify that rejection shall become effective upon entry in a suit by the Association for a declaratory judgment by a court of competent jurisdiction of a final judgment declaring that the rejection violates no rights of applicant.

# ARTICLE VI - PRIVILEGES AND OBLIGATIONS

Section 1.
The privileges and obligations of members, in addition to those otherwise provided in these Bylaws, shall be as specified in this Article.

Section 2.
Any member of the Association may be reprimanded, fined, placed on probation, suspended, or expelled by the Board of Directors for a violation of these Bylaws or Association Rules and Regulations not inconsistent with these Bylaws, after a hearing as provided in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®. Although members other than REALTOR® Members are not subject to the Code of Ethics or its enforcement by the Association, such members are encouraged to abide by the principles established in the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and conduct their business and professional practices accordingly. Further, members other than REALTOR® Members may, upon recommendation by a hearing panel of the Professional Standards Committee and/or action of the Board of Directors, be subject to discipline as described above for any conduct which, in the opinion of the Board of Directors, applied on a non-discriminatory basis, reflects adversely on the terms REALTOR® or REALTORS® and the real estate industry or for conduct that is inconsistent with or adverse to the objectives and purposes of the Association, the Illinois Association of REALTORS®, and the NATIONAL ASSOCIATION OF REALTORS®.

**Section 3.**

Any REALTOR® Member of the Association may be disciplined by the Board of Directors for violations of the Code of Ethics or other duties of membership, after a hearing as described in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®, provided that the discipline imposed is consistent with the discipline authorized by the Professional Standards Committee of the NATIONAL ASSOCIATION OF REALTORS® as set forth in the Code of Ethics and Arbitration Manual of the National Association.

**Section 4.    REALTOR® Members**

 a. Only those REALTOR® Members, both primary and secondary, whose financial obligations to the Association are paid in full and whose educational requirement has been met shall be entitled to vote and to hold elective office in the Association.

 b. Resignations of members shall become effective when received in writing by the Board of Directors. The resignation does not release the member from any past financial obligation. However, if the member submitting the resignation is indebted to the Association for dues, fees, fines, or other assessments of the Association or any of its services and/or has failed to meet the education requirement, the Association may condition the right of the resigning member to re-apply for membership upon payment in full of all such monies owed and/or completion of the education requirement. Resignation does not negate any pending arbitration. If a member resigns from the Association with an ethics complaint pending, the Board of Directors may condition the right of the resigning member to re-apply for membership upon certification that he will submit to the pending ethics proceeding and will abide by the decision of the hearing panel; or if a member resigns or otherwise causes membership to terminate, the duty to submit to arbitration continues in effect even after membership lapses or is terminated, provided that the dispute arose while the former member was a REALTOR®; or if the member resigns without having complied with an award or arbitration, the Board of Directors may condition any re-application of the former member upon his promise to pay the award, plus any costs that have previously been established as due and payable by the former member, provided that the award has not, in the meanwhile, been otherwise satisfied.

 c. REALTOR® Members who have been suspended or terminated for failure to meet the education requirement may be reinstated in good standing by completing the requirement and rendering proof of completion to the Association within one year of the effective date of suspension or termination.

 d. Only REALTOR® Members may use the terms REALTOR® and REALTORS®, which use shall be subject to the provisions of Article VIII.

 e. REALTOR® Members have the primary responsibility to safeguard and promote the standards, interests, and welfare of the Association and the real estate profession.

 f. If a REALTOR® Member is a principal in a firm, partnership, or corporation and is suspended or expelled, the firm, partnership, or corporation shall not use the terms REALTOR® or REALTORS® in connection with its business during the period of suspension or until readmission to REALTOR® Membership or unless connection with the firm, partnership, or corporation is severed, whichever may apply. The membership of all other principals, partners, or corporate officers shall suspend or terminate during the period of suspension of the disciplined member, or

until readmission of the disciplined member, or unless connection of the disciplined member with the firm, partnership, or corporation is severed, whichever may apply. Further, the membership of REALTORS® other than principals who are employed by or affiliated as independent contractors with the disciplined member shall suspend or terminate during the period of suspension of the disciplined member or until readmission of the disciplined member or until connection of the disciplined member with the firm, partnership, or corporation is severed or unless the REALTOR® Member (non-principal) elects to sever his connection with the REALTOR® and affiliate with another REALTOR® Member in good standing in the Association, whichever may apply. If a REALTOR® Member other than a principal in a firm, partnership, or corporation is suspended or expelled, the use of the terms REALTOR® and REALTORS® by the firm, partnership, or corporation shall not be affected.

g.    As required by state law, each office or branch office must have a Designated Broker Manager.

Section 5. Institute Affiliate Members
Institute Affiliate Members shall have rights and privileges and be subject to obligations as are prescribed by the Board of Directors consistent with the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS®.

Section 6. Affiliate Members
Affiliate Members shall have such privileges and rights and be subject to such obligations as may be prescribed by the Board of Directors.

Section 7. Public Service Members
Public Service members shall have such privileges and rights and be subject to such obligations as may be prescribed by the Board of Directors.

Section 8. Honorary Members
Honorary Members shall have such privileges and rights and be subject to such obligations as may be prescribed by the Board of Directors.

Section 9. Student Members
Student Members shall have such privileges and rights and shall be subject to such obligations as may be prescribed by the Board of Directors.

Section 10. REALTORS® Emeritus
A REALTOR® Emeritus is not obligated to pay dues for himself, but is obligated to pay annual membership dues based on the number of licensees employed by or associated with the REALTOR® Emeritus. Only REALTORS® Emeritus whose financial obligations to the Association are paid in full shall be entitled to vote and to hold elective office in the Association.

Section 11. Honorary Life Members
Honorary Life Members shall have such privileges and rights and be subject to such obligations and disciplines as may be prescribed by the Board of Directors.

Section 12. Harassment

Any member of the Association may be reprimanded, placed on probation, suspended or expelled for harassment of an Association or MLS employee or Association Officer or Director after a hearing in accordance with the established procedures of the Association. Disciplinary action may also consist of any sanction authorized in the association's Code of Ethics and Arbitration Manual. As used in this Section, harassment means any verbal or physical conduct including threatening or obscene language, unwelcome sexual advances, stalking, actions including strikes, shoves, kicks, or other similar physical contact, or threats to do the same, or any other conduct with the purpose or effect of unreasonably interfering with an individual's work performance by creating a hostile, intimidating or offensive work environment. The decision of the appropriate disciplinary action to be taken shall be made by the investigatory team comprised of the President, and President-elect and/or Vice President and one member of the Board of Directors selected by the highest ranking officer not named in the complaint, upon consultation with legal counsel for the Association. If the complaint names the President, President-Elect or Vice President, they may not participate in the proceedings and shall be replaced by the Immediate Past President or, alternatively, by another member of the Board of Directors selected by the highest ranking officer not named in the complaint.

# ARTICLE VII - PROFESSIONAL STANDARDS AND ARBITRATION

Section 1.

The responsibility of the Association and of Association members relating to the enforcement of the Code of Ethics, the disciplining of members and the arbitration of disputes, and the organization and procedures incidental thereto shall be governed by the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®, as from time to time amended, which by reference is made a part of these Bylaws.

Section 2.

It shall be the duty and responsibility of every REALTOR® Member of this Association to abide by the Constitution and Bylaws and the Rules and Regulations of the Association, the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS®, including the duty to arbitrate controversies arising out of real estate transactions as specified by Article 17 of the Code of Ethics and as further defined by and in accordance with the procedures set forth in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS® as from time to time amended.

Section 3.

Professional Standards and Arbitration Section 53. The Award. If an award has been rendered, the nonprevailing party must, within (10) days following receipt of the award, either (1) pay the award to the party(ies) named in the award or (2) deposit the funds with the board Secretary or Board Executive Officer to be held in a special Board escrow account maintained for this purpose. Failure to satisfy the award or to deposit the funds with the Board within this time period may be considered a violation of a membership duty and may subject the member to disciplinary action at the discretion of the Board of Directors.

The nonprevailing party shall have twenty (20) days following receipt of the award to request procedural review of the arbitration hearing procedure or to have legal counsel notify the board Secretary or Executive Officer that a legal challenge to the validity of the award has been initiated.

If a request for limited procedural review of the arbitration procedure is received within twenty (20) days, the funds deposited with the Board shall be retained in the Board's escrow account until the review is completed. If the arbitration award is confirmed by the Board of Directors following the conduct of the limited procedural review, the nonprevailing party shall have an additional fifteen (15) days to institute an appropriate legal challenge to the validity of the arbitration award. In such case, the nonprevailing party shall also cause legal counsel to advise the Board in writing that a suit challenging the validity of the arbitration award has been filed during this additional fifteen (15) day period. After fifteen (15) days, if written notice of a suit challenging the validity of the arbitration award has not been received by the Board, the funds shall be released from escrow and paid to the prevailing party. If written notification is received during the fifteen (15) day period, the funds will be held in escrow pending the determination of the matter by a court of competent jurisdiction.

If the nonprevailing party does not request the Board to conduct a procedural review of the arbitration hearing process during the twenty (20) day period following service of the award, then written notification that a legal challenge has been instituted must be received within the twenty (20) days following service of the award. Failure to provide written notification that a suit challenging the validity of the award has been filed within twenty (20) days following service of the award will result in the award being paid from the Board's escrow to the prevailing party.

# ARTICLE VIII - USE OF THE TERMS REALTOR® AND REALTORS®

Section 1.
Use of the terms REALTOR® and REALTORS® by members shall, at times, be subject to the provisions of the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS® and to the rules and regulations prescribed by its Board of Directors. The Association shall have the authority to control, jointly and in full cooperation with the NATIONAL ASSOCIATION OF REALTORS®, use of the terms within its jurisdiction. Any misuse of the terms by members is a violation of a membership duty and may subject members to disciplinary action by the Board of Directors after a hearing as provided for in the Association's Code of Ethics and Arbitration Manual (Amended 6/06).

Section 2.
REALTOR® Members of the Association shall have the privilege of using the terms REALTOR® and REALTORS® in connection with their places of business within the state or a state contiguous thereto so long as they remain REALTOR® Members in good standing. No other class of membership shall have this privilege.

Section 3.
A REALTOR® Member who is a principal of a real estate firm, partnership, or corporation may use the terms REALTOR® and REALTORS® only if all the principals of such firm, partnership, or corporation who are actively engaged in the real estate profession within the state or a state contiguous thereto are REALTOR® Members of the Association or Institute Affiliate Members as described in Section 1 (b) of Article IV.

(a) in the case of a REALTOR® member who is a principal of a real estate firm, partnership, or corporation whose business activity is substantially all commercial, the right to use the term REALTOR® or REALTORS® shall be limited to office locations in which a principal, partner, corporate officer, or branch office manager of the firm,

partnership or corporation holds REALTOR® membership.  If a firm, partnership, or corporation operates additional places of business in which no principal, partner, corporate officer, or branch office manager holds REALTOR® membership, the term REALTOR® or REALTORS® may not be used in any reference to those additional places of business.

**Section 4.**
Institute Affiliate Members shall not use the terms REALTOR® or REALTORS® nor the imprint of the emblem seal of the NATIONAL ASSOCIATION OF REALTORS®.

# ARTICLE IX - STATE AND NATIONAL MEMBERS

**Section 1.**
The Association shall be a member of the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS®.  By virtue of such membership, each REALTOR® Member of the Association shall be entitled to membership in the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS® without further payment of dues. The Association shall continue as a member of the State and National Associations unless, by a majority vote of all its REALTOR® Members, decision is made to withdraw, in which case the State and National Associations shall be notified at least one month in advance of the date designated for the termination of such membership.

**Section 2.**
The Association recognizes the exclusive property right of the NATIONAL ASSOCIATION OF REALTORS® in the terms REALTOR® and REALTORS®.  It shall forthwith discontinue use of the terms in any form in its name upon ceasing to be a member of the National Association or upon a determination by the Board of Directors of the National Association that it has violated the conditions imposed upon the terms.

**Section 3.**
The Association hereby adopts the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and agrees to enforce the code among its membership.  Although members other than REALTOR® Members are not subject to the Code of Ethics or its enforcement by the Association, such members are encouraged to abide by the principles established in the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and to conduct their business and professional practices accordingly.  The Association agrees to abide by the Constitution, Bylaws, Rules and Regulations, and policies of the

National Association and the Illinois Association of REALTORS®, and all its members shall subscribe to and comply therewith.

# ARTICLE X - DUES AND ASSESSMENTS

Section 1.

a.  Application Fee.  The Board of Directors may adopt an application fee for REALTOR® Membership in reasonable amount, not exceeding three times the amount of the annual dues for REALTOR® Membership, which shall be required to accompany each application for REALTOR® Membership and which shall become the property of the Association upon final approval of the application.

b.  Reinstatement Fee.  Any member may be reinstated, with a reinstatement fee, during the current year if dues for the current year and all other fees are paid in full.

c.  Initiation Fee.  Any member reinstating membership that has lapsed more than the current year will be required at the time of rejoining to pay all current membership fees along with the initiation fee.

d.  MLS Fees Medical Waiver.  A MLS medical waiver may be granted by the Board of Directors under the following conditions:
    1.  Medication (Must be accompanied by a doctor's note, with an expiration date).
    2.  Non-listing and/or non-selling officer of the company.  (President, Vice-President, Treasurer; must supply an affidavit of such position).
    3.  Family Medical Waiver. (Must be accompanied by a doctor's note, with an expiration date).
    At the end of such MLS Medication Waiver, the REALTOR® member shall be reinstated with no additional fees except the unpaid MLS fees prior to granting the MLS Medical Waiver shall be paid in full.

e.  Military MLS Fees and Membership Dues Waiver.  A MLS Medical Waiver and Membership Dues Waiver may be granted by the Board of Directors under the following conditions:
    1.  Active Military Service (Must be accompanied by documentation of active service).
    At the end of such MLS/Membership Medical Waiver, the REALTOR® member shall be reinstated with no additional fees except the unpaid MLS fees and Association dues prior to granting the MLS/Membership Medical Waiver shall be paid in full.

Section 2. Dues

a.  REALTOR® Members.  The annual dues of each Designated REALTOR® Member shall be in an amount to be established annually by the Board of Directors, plus an additional amount to be established annually by the Board of Directors times the number of real estate brokers, salespersons, branch office managers, and licensed or certified appraisers (1) who are employed by or affiliated as independent contractors or who are otherwise directly or indirectly licensed with such REALTOR® Member and (2) who are not REALTOR® Members of any Association in the state or a state contiguous thereto or Institute Affiliate Members of the Association.  In calculating the dues payable to the Board by a Designated REALTOR® Member, non-member licensees as defined above shall not be included in the computation of dues if the Designated REALTOR® has paid dues based on said non-member licensees in another association/board in the state or a state contiguous thereto, provided the Designated REALTOR® notifies the Association in writing of the identity of the association/board to which dues have been remitted.  The annual dues of each

REALTOR® Member other than the Designated REALTOR® shall be in an amount to be established annually by the Board of Directors. In the case of a Designated REALTOR® Member in a firm, partnership, or corporation whose business activity is substantially all commercial, any assessments for non-member licensees shall be limited to licensees affiliated with the Designated REALTOR®, (as defined in this paragraph) in the office where the Designated REALTOR® holds membership, and any other offices of the firm located within the jurisdiction of this Association.

(1)For the purpose of this Section, a REALTOR® Member of a Member Board shall be held to be any Member who has a place or places of business within the state or a state contiguous thereto and who, as a principal, partner, corporate officer, or branch office manager of a real estate firm, partnership, or corporation, is actively engaged in the real estate profession as defined in Article III, Section 1, of the Constitution of the NATIONAL ASSOCIATION OF REALTORS®. An individual shall be deemed to be licensed with a REALTOR® if the license of the individual is held by the REALTOR®, or by any broker who is licensed with the REALTOR®, or by any entity in which the REALTOR® has a direct or indirect ownership interest and which is engaged in other aspects of the real estate business (except as provided for in Section 2(a) (1) hereof) provided that such licensee is not otherwise included in the computation of dues payable by the principal, partner, corporate officer, or branch office manager of the entity.

A REALTOR® with a direct or indirect ownership interest in an entity engaged exclusively in soliciting and/or referring clients and customers to the REALTOR® for consideration on a substantially exclusive basis shall annually file with the association on a form approved by the association a list of the licensees affiliated with that entity and shall certify that all of the licensees affiliated with the entity are solely engaged in referring clients and customers and are not engaged in listing, selling, leasing, managing, counseling or appraising real property. The individuals disclosed on such form shall not be deemed to be licensed with the REALTOR® filing the form for purposes of this Section and shall not be included in calculating the annual dues of the Designated REALTOR®.

Membership dues shall be prorated for any licensee included on a certification form submitted to the association who during the same calendar year applies for REALTOR® membership in the association. However, membership dues shall not be prorated if the licensee held REALTOR® membership during the preceding calendar year.

b.    Institute Affiliate Members. The annual dues of each Institute Affiliate Member shall be as established in Article II of the Bylaws of the NATIONAL ASSOCIATION OF REALTORS®.

c.    Affiliate Members. The annual dues of each Affiliate Member shall be as prescribed from time to time by the Board of Directors. Statements issued to Affiliate Members for dues shall show as separate items an allocation of local Association dues to reflect the Association's dues obligations to the Illinois Association.

d.    Public Service Members. The annual dues of each Public Service Member shall be as prescribed from time to time by the Board of Directors, plus the annual dues for the Illinois Association of REALTORS®.

e.      Student Members.  Dues payable, if any, shall be at the discretion of the Board of Directors.

f.      Honorary Members, and Honorary Life Members.  No dues shall be payable.

g.      REALTOR® Emeritus.  REALTOR® Emeritus dues will be waived effective beginning the quarter of which approval of the designation is awarded.  Such designation for National Association membership shall be furnished by the NATIONAL ASSOCIATION OF REALTORS® certificate.

Section 3.  Dues Payable
Dues for all members shall be payable annually in advance on the first day of December.  All outstanding fees or monies owed to the Association must be current in accordance to the Association's financial policies for membership to be renewed. Dues shall begin on the first day of the month in which a member shall be notified of election and shall be prorated for the year.

Section 4.  Non-Payment of Financial Obligations
If dues, fees, fines, and other assessments including amounts owed to the Association or the Association's Multiple Listing Services are not paid within thirty (30) days after the due date, membership or services of the non-paying member shall automatically terminate unless, within that time, the amount due is paid or is disputed in writing.  However, no action shall be taken to suspend or expel a member for non-payment of the disputed amount until the accuracy of the amount owed has been confirmed by the Board of Directors.  A former member who has had his membership or services suspended or terminated for non-payment of dues, fees, fines, or other assessments duly levied in accordance with the provisions of these Bylaws or the provisions of other rules and regulations of the Association or any of its services, departments, or divisions may apply for reinstatement in a manner prescribed for new applicants, after making payment in full of all accounts due as of the date of suspension or termination.

Section 5.  Deposit
All monies received by the Association for any purpose shall be deposited to the credit of the Association in a financial institution or institutions selected by resolution of the Board of Directors.

Section 6.  Expenditures
The Board of Directors shall administer the finances of the Association and approve the annual budget, provided, however, that the total Association expenditure in any fiscal year of the Association shall not exceed the total Association revenue of that fiscal year plus ten percent (10%) of the reserves.

Section 7.  Segregation of Dues
The Treasurer shall record separately the dues collected and owing to the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS® and shall forward such dues to the respective Associations when collected.  No portion of the sums collected on behalf of the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS® shall be used for purposes of the Association.

Section 8.  Audit
The accounts of the Association shall be audited annually effective the last day of the fiscal year, and report of such audit shall be furnished to the Board of Directors for their review and approval.

Section 9. Certification of REALTORS®
Each Designated REALTOR® Member of the Association shall certify to the Association annually on a form provided by the Association a complete listing of all individuals licensed with the Designated REALTOR® Member firm within the state and shall designate a primary association/board for each individual. These declarations shall be used for purposes of calculating dues under Article X, Section 2, Part a, of the Bylaws. Designated REALTOR® Members shall also notify the Association of the affiliation of any licensee with the firm or of the severance of affiliation of any licensee with the firm within ten (10) days of the affiliation or severance of affiliation.

# ARTICLE XI - OFFICERS AND DIRECTORS

Section 1. Officers
The officers of the Association shall be a President, a President-Elect, and a Secretary-Treasurer. The officers shall serve for a term of one (1) year. The Board of Directors, at the March meeting preceding the annual election, shall from the Board of Directors elect the officers for the next year, except for the President. The President-Elect shall become President the year following his election to President-Elect. The Immediate Past President is ineligible for any office.

Section 2.  Duties of Officers
    a.    The duties of the officers shall be such as their titles, by general usage, would indicate and such as may be assigned to them by the Board of Directors.

    b.    The President-Elect shall assume the duties of the President if the President is unable to serve. The President may delegate other duties, as deemed necessary and appropriate.

Section 3.  Executive Committee
The Board of Directors, by resolution adopted by a majority of the number of Directors fixed by the Bylaws or otherwise, shall designate the Immediate Past President, President, President-Elect, and Secretary-Treasurer to constitute an Executive Committee, which Committee, to the extent provided in such resolution, shall have and exercise all the authority of the Board of Directors in the management of the Association, except as otherwise required by law. Vacancies in the membership of the Committee shall be filled by the Board of Directors at a regular or special meeting of the Board of Directors. The Executive Committee shall keep regular minutes of its proceedings and report the same to the Association when required.

Section 4. Board of Directors
    a.    The governing body of the REALTOR® Association of West/South Suburban Chicagoland shall be a Board of Directors. The Board of Directors shall consist of the Immediate Past President, President, President-Elect, Treasurer, one REALTOR® member of the Commercial Investment Committee (confirmed by the Board of Directors), one Affiliate member (confirmed by the Board of Directors), and eleven (11) additional members who are authorized to hold elective office in the Association. No member may hold an elected office in the REALTOR® Association of West/South Suburban Chicagoland, or participate on the Board of Directors unless the member's primary income is derived from the real estate industry.

1.  Affiliate Director: There shall be one director who shall be an Affiliate Member (the "Affiliate Director"). The Affiliate Director shall be selected by the President-Elect, with the advice and consent of the Board of Directors, at any meeting of the Board of Directors prior to September 1 of each year. The Affiliate Director may not vote on professional standards matters relating to the enforcement of professional standards or recommendations of hearing panels related to ethics and arbitration hearings. Affiliate Director shall not sit on appeal or procedural review panels for the board. The term of the Affiliate Director shall commence on September 1 and shall be for one year or until a qualified successor is duly appointed.

2. Commercial Director: There shall be one director who shall be a Commercial Member (the "Commercial Director"). The Commercial Director shall be selected by the President-Elect, with the advice and consent of the Board of Directors, at any meeting of the Board of Directors prior to September 1 of each year. The Commercial Director may vote on all matters. The term of the Commercial Director shall commence on September 1 and shall be for one year or until a qualified successor is duly appointed.

b.  The eleven (11) elected Directors shall each serve a term of three (3) years. The terms of four (4) Directors shall expire each year, except that every third year the terms of three (3) Directors shall expire. No Director may serve more than two (2) consecutive terms, whether elected or appointed. In the instance of being appointed to fill an unexpired term, an appointee serving eighteen (18) months or more of the unexpired term will be considered to have served a full term.

Section 5. Chief Executive Officer
The Chief Executive Officer shall be an employee REALTOR® Association of West/South Suburban Chicagoland, and subject to the direction and control of the Executive Committee; shall be in charge of the business of REALTOR® Association of West/South Suburban Chicagoland®; shall see that the resolutions and directions of the Board of Directors are carried into effect except in those instances in which that responsibility is specifically assigned to some other person by the Executive Committee; and shall have such other duties as may be prescribed by the Executive Committee from time to time.

Section 6. Election of Officers and Directors
a.  At the October Board of Directors meeting, the President shall appoint, with the approval of the Board of Directors, a Nominating Committee consisting of seven (7) REALTOR® Members authorized to vote (with no more than one (1) per firm) including the Immediate Past President, who may serve as Chairman. Prior to the March Board of Directors meeting, announcement of the formation of the Nominating Committee shall be sent to the members authorized to vote reciting the names, addresses, and telephone numbers of the members of the Nominating Committee and urging members to submit profiles of members for nomination for a position on the Board. A report of the Nominating Committee shall be presented to the Board of Directors at the April Board of Directors meeting. The minimum number of nominees the Nominating Committee may submit to the Board of Directors is the number of positions available; the maximum number of nominees is three (3) times the number of positions available. No member of the Nominating Committee may be nominated by the Committee. If approved by the Board of Directors, the slate will be furnished to those members authorized to vote within two (2) weeks after approval. Additional candidates for the offices to be filled may be placed in nomination by a petition signed by three (3) percent of the members authorized to vote. The petition shall be filed with the

Secretary-Treasurer at least four (4) weeks before the election. The Secretary-Treasurer shall send notice of such additional nominees to all members authorized to vote before the election.

b.  At the April Board of Directors meeting, the President shall appoint, with the approval of the Board of Directors, an Election Committee consisting of three (3) members authorized to vote who are not candidates, not on the Board of Directors, and not on the Nominating Committee. The Election Committee shall conduct the election by establishing the form of ballots and the election rules and procedures as it deems appropriate, subject to the approval of the Board of Directors.

c.  The election shall be held no later than the last Monday in June. The entire membership may vote for all Directors. The candidates with the highest number of votes will fill the positions. In the event of a tie for any Director position available, a run-off election between the candidates who are tied shall be conducted.

Section 7. Vacancies

a.  A vacancy on the Board of Directors shall be filled by appointment by the President, with the approval of the Board of Directors, for the balance of the term, or until the next annual election. A vacancy shall be discussed at the Board of Directors meeting following the vacating of the position.

b.  In the event that a vacancy is created by the election of a Director to the Executive Committee prior to the expiration of that Director's term, the vacancy shall be filled, prior to the vacating of the position, by appointment by the President, subject to the approval of the Board of Directors.

Section 8. Suspension and Removal of Officers and Directors

Any officer elected or appointed by the Board of Directors and any Director may be suspended or removed by the Board of Directors whenever, in its judgment, the best interests of the Association would be served thereby. A two-thirds (2/3) majority vote is needed for such suspension or removal except that, in the suspension or removal of a Director, the two-thirds (2/3) majority must equal at least fifty percent (50%) of the number of Directors holding office. The unexcused absence of any Director from three (3) meetings shall be grounds for removal from the Board of Directors.

Section 9. Meetings

a.  Regular Meetings. The Board of Directors shall designate a regular time and place of meetings.

b.  Special Meetings. Special meetings of the Board of Directors or the Executive Committee may be called by the President or at the request of any two (2) members thereof.

c.  Notice of Meetings. Notice of any special meeting shall be given at least three (3) days previous thereto by notice to each Director at his business address or e-mail address. The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting.

    d.      Quorum. A majority of the number of Directors holding office shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, except that a quorum for considering the suspension or removal of a Director shall be two thirds (2/3) of the number of Directors holding office.

**Section 10. Indemnification of Directors and Officers**

The REALTOR® Association of West/South Suburban Chicagoland shall indemnify every Director or Officer against expenses reasonably incurred by him in connection with any action, suit, or proceeding to which he may be made a party by reason of his being or having been a Director or officer of the REALTOR® Association of West/South Suburban Chicagoland, except in relation to matters as to which he shall be adjudged in such action, suit, or proceeding to be liable for negligence or misconduct in the performance of duty; in the event of settlement, indemnification shall be provided if it shall be found by a majority of the Directors not involved in the matter in controversy that it was in the interests of the REALTOR® Association of West/South Suburban Chicagoland that such settlement be made and that such Director or officer was not guilty of negligence or misconduct. The foregoing right of indemnification shall not be exclusive of other rights to which such Director or officer may be entitled.

**Section 11.  Manner of Acting**

The act of the majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

**Section 12.  Presumption of Assent**

A Director of the Association who is present at a meeting of the Board of Directors at which action on any Association matter is taken shall be conclusively presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Treasurer of the Association immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favor of such action.

# A R T I C L E   X I I   -   M E E T I N G S

**Section 1.  Annual Meeting**

The annual meeting of the Association shall be held during September of each year, the date, place, and hour to be designated by the Board of Directors.

**Section 2.  Other Meetings**

Meetings of the Association members may be held at such other times as the President or the Board of Directors may determine, or upon the written request of at least ten (10) percent of the members authorized to vote.

**Section 3.  Notices of Meetings**

Written notice shall be given to every member entitled to participate in the meeting at least one week preceding all meetings. If a special meeting is called it shall be accompanied by a statement of the purpose of the meeting.

**Section 4.  Quorum**

A quorum for the transaction of business shall consist of three (3) percent of the members authorized to vote.

# Article XIII - VOTING OF THE MEMBERSHIP

**Section 1.**
The Board of Directors shall pass a resolution authorizing the submission of the question or questions to be voted upon by the membership.

**Section 2.**
Notice shall be sent to the membership in writing at least fifteen (15) days prior to the date of the ballot and shall include the voting procedure and the deadline for receiving ballots. No ballot received after 4:00 p.m. on the effective date shall be counted.

**Section 3.**
The Board of Directors shall determine the voting procedure, which may include voting in person at a meeting or a polling place and/or voting by fax, mail, or internet. Each ballot must be properly submitted, and each voter must be a member in good standing and provide proper identification.

**Section 4.**
Any vote taken only at a polling place must have a response of a minimum of three (3) percent of the members authorized to vote, and any vote taken only at a meeting must have a quorum present. To be valid, any vote which includes ballots submitted by fax, mail, or internet, must have a response of a minimum of five (5) percent of the members authorized to vote.

**Section 5.**
A majority of the ballots received shall decide the question submitted except for the election of Directors, which shall be determined as established in Article XI, Section 6 and Section 7.

# ARTICLE XIV - COMMITTEES

**Section 1. Standing Committees**
The President shall appoint Chairmen and Committee members from among the REALTOR® and Affiliate members, subject to confirmation by the Board of Directors, for the following standing committees:

> Commercial Investment Committee
> Governmental Affairs Committee
> Grievance Committee
> Professional Standards Committee

**Section 2. Special Committees/Task Forces.**
The President shall appoint, subject to confirmation by the Board of Directors, special committees and/or task forces, in addition to those listed below, as deemed necessary:

> Affiliates Task Force
> Broker/Lawyer Committee

Financial Task Force
Fair Housing/Cultural Diversity Program

**Section 3. Organization**
All committees and other groups shall be of such size and shall have such duties, functions, and powers as may be assigned to them by the President or the Board of Directors, except as otherwise provided in these Bylaws.

**Section 4. President**
The President shall be an ex officio member of all committees and other groups and shall be notified of their meetings.

**Section 5. Notice of Meetings**
Notice shall be given to every member entitled to participate in the meeting.

# ARTICLE XV - FISCAL AND ELECTIVE YEAR

**Section 1.**
The fiscal year of the Association shall be the Calendar Year.

**Section 2.**
The term of office of any officer or director of the Association shall commence September 1.

# ARTICLE XVI - RULES OF ORDER

Robert's Rules of Order, latest edition, shall be recognized as the authority governing the meetings of the Association, its Board of Directors, and its committees in all instances wherein the provisions do not conflict with these Bylaws.

# ARTICLE XVII - AMENDMENTS

**Section 1.    Manner of Amendment**
These Bylaws may be amended by a majority vote by those members authorized to vote in accordance with the procedure outlined in Article XIII.

**Section 2. Notice of Amendment**
Written notice of consideration of an amendment and the substance of such amendment shall be given to every member authorized to vote at least fifteen (15) days prior to the date of the vote.

Section 3. Exceptions
    a.    Article IX may be amended only by a two-thirds (2/3) majority vote of a quorum of all members authorized to vote.
    b.    The Board of Directors may, at any regular or special meeting of the Board of Directors at which a quorum is present, approve amendments to the Bylaws which are mandated by the NATIONAL ASSOCIATION OF REALTORS® policy.
    c.    Amendments to these Bylaws affecting the admission or qualification of REALTOR® Members and Institute Affiliate Members, the use of the term REALTOR® and REALTORS®, or any alteration in the territorial jurisdiction of the Association shall become effective upon approval by the Board of Directors of the NATIONAL ASSOCIATION OF REALTORS®.

# ARTICLE XVIII – DISSOLUTION AND MERGER

Section 1.
Upon dissolution or winding up of the affairs of this Association, the Board of Directors, after providing for payment of all obligations, shall distribute any remaining assets to the Illinois Association of REALTORS® or, within its discretion, to any other non-profit tax-exempt organization.

Section 2.
Provided that the Association shall be the Surviving Corporation, Members shall not be entitled to vote on Mergers or consolidations of the Association. The Board of Directors of the Association, by an affirmative vote of a majority of the directors in office, at a meeting of the Board of Directors, or by written consent signed by all the directors in office, shall vote on a merger or consolidation in which the Association shall be the Surviving Corporation. In the event the Association shall not be the Surviving Corporation of a merger or consolidation, the Members shall be entitled to vote on such merger or consolidation.

# ARTICLE XIX - MULTIPLE LISTING SERVICE

Section 1. Authority
The Association shall maintain for the use of its members a multiple listing service, which shall be subject to the Bylaws of the REALTOR® Association of West/South Suburban Chicagoland and such Rules and Regulations as may be hereinafter adopted.

Section 2. Purpose
A Multiple Listing Service is a means by which authorized Participants make blanket unilateral offers of compensation to other Participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants in enhanced; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which Participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so

Participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as a procuring cause of the sale (or lease).

Section 3.  Participation
Any REALTOR® member of this Association or of any other member association/board, who is a principal, partner, or corporate officer or a branch manager acting on behalf of a principal, shall be eligible, without further qualifications, to participate in the multiple listing service upon agreeing in writing to conform to the Rules and Regulations and to pay the costs incidental thereto.  However, under no circumstances are any individuals or firms, regardless of membership status, entitled to multiple listing service "Membership" or "Participation" unless they hold a current valid Illinois real estate broker's license and are capable of offering and accepting cooperation and compensation to and from other Participants or are licensed or certified by the State of Illinois to engage in the appraisal of real property.  Use of information developed by or published by an Association multiple listing service is strictly limited to the activities authorized under a participant's licensure or certification, and unauthorized uses are prohibited.  Further, none of the foregoing is intended to convey "Participation" or "Membership" or any right of access to information developed by or published by an Association multiple listing service where access to such information is prohibited by law.

Section 4.  Supervision
The activities of the multiple listing service shall be operated under the supervision of the Multiple Listing Service Of Northern Illinois (MLSNI), in accordance with the MLSNI Bylaws and its Rules and Regulations.

Section 5.  Representation on MLSNI Board of Directors
a.  Nomination of Representative(s).  The President shall nominate, subject to confirmation by the Board of Directors, one representative to the Board of Directors of MLSNI and such additional representatives as may be determined by the MLSNI Shareholders.

b. Vacancies.  Vacancies in unexpired terms shall be filled as in the case of original nominees.

c.  Tenure and Qualification.  Tenure and qualification shall be in accordance with the MLSNI Bylaws.

Section 6.  Access to Comparable and Statistical Information
Members who are actively engaged in real estate brokerage, management, mortgage financing, appraising, land development, or building, but who do not participate in the multiple listing service, are nonetheless entitled to receive, by purchase or lease, all information other than current listing information that is generated wholly or in part by the multiple listing service including "comparable" information, "sold" information, and statistical reports. This information is provided for the exclusive use of members and individuals affiliated with members who are also engaged in the real estate business and may not be transmitted, retransmitted, or provided in any other manner to any unauthorized individual, office, or firm except as otherwise specified in the multiple listing service Rules and Regulations.  Members who receive such information, either as an Association service or through the Association's multiple listing service, are subject to the applicable provisions of the multiple listing service Rules and Regulations whether they participate in the multiple listing service or not.

# A R T I C L E   X X   -   C O N F L I C T   O F   I N T E R E S T

**Section 1. Contracts, Sales and Purchases:**

a.      Directors, Officers, Committee Members or Employees of the Association shall not be financially interested in any contract made by them in their official capacity on behalf of the Association, nor shall they be purchasers at any sale or vendors at any purchase made by them in their official capacity on behalf of the Association, unless the full nature and extent of such financial interest and/or status as prospective purchaser or vendor has first been disclosed in writing to the Association.

b.      The Association shall authorize, approve or ratify a contract in good faith by a vote of its members or Directors sufficient for that purpose without counting the vote or votes of the Directors, Officers, Committee Members or Employees who has disclosed said interest and who shall be ineligible to vote thereon.

**Section 2. Confidential Information.**

a.      Directors, Officers, Committee Members or Employees of the Association shall not disclose to any other person, confidential information acquired by them in the course of their official duties, or use any such information for the purpose of pecuniary gain in any manner which is contrary to the best interests of the Association.

b.      This section shall not apply to any disclosure made to any law enforcement agency, nor to any disclosure made pursuant to subpoena or other similar legal process.

# Exhibit C



### Mainstreet Organization of REALTORS®
### STANDARD RESIDENTIAL EXCLUSIVE MARKETING AGREEMENT

BROKER (Name and Address):                     SELLER(s)* (Name and Address):

_____          _____

_____          _____

_____          _____

*Seller represents and warrants that title to the property is in the name of _____
_____ and Seller has the authority to sell the Property.

**1. Property:** This Agreement is between the above-mentioned "Broker" and "Seller," in consideration of their acceptance of the terms hereof and, of Broker's efforts to advertise, market, promote, and sell the real estate commonly known as
Address:_____,
Unit No: _____, City: _____,
County: _____, State: _____, Zip Code: _____,
Permanent Index No.:_____, hereinafter referred to as "Property."

Condo, Coop, or Townhome Parking Space Included: (check type) ___deeded space; ___limited common element; ___assigned: Parking space # _____
**2. Term and Conditions:**  The term of this Agreement begins 12:01 A.M. Month:_____ Day:_____
Year:_____ and terminates 11:59 P.M. Month:_____ Day: _____ Year:_____ ("marketing period").
Seller gives to Broker the exclusive right to market, sell, option, or exchange the Property to qualified purchasers and to share the Property with participants in the Multiple Listing Service of Northern Illinois, Inc., and/or any other Multiple Listing Service in which Broker is a participant, in accordance with the applicable rules and regulations of that Multiple Listing Service.

(_____/_____)  **THE PARTIES UNDERSTAND AND AGREE THAT IT IS ILLEGAL FOR EITHER OF THEM TO**
*(Seller(s)'s Initials)*  **DISCRIMINATE AGAINST ANY PROSPECTIVE SELLER OR LESSOR ON THE BASIS OF RACE, AGE, COLOR, RELIGION, SEX, ANCESTRY, MARITAL STATUS, PHYSICAL OR MENTAL HANDICAP, FAMILIAL STATUS, NATIONAL ORIGIN, SEXUAL ORIENTATION, OR ANY OTHER CLASS PROTECTED BY ARTICLE 3 OF THE ILLINOIS HUMAN RIGHTS ACT.  THE PARTIES AGREE TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, AND LOCAL FAIR HOUSING LAWS.**

**3. Marketing Price:** The price shall be $_____
**4. Possession:** Possession is to be negotiated at time of sales contract.
**5. Seller's Designated Agent:**  Broker designates and Seller accepts _____
("Seller's Designated Agent"), a sales associate affiliated with Broker, as the only legal agent of Seller to market and sell Seller's Property. Broker reserves the right to appoint additional designated agents for Seller when, in Broker's discretion, it is necessary. If additional designated agents are appointed, Seller shall be informed in writing within a reasonable time of such appointment. Seller authorizes Seller's Designated Agent, from time to time, to allow another sales associate, who is not an agent of the Seller, to sit an open house of Seller's Property or provide similar support to Designated Agent in the marketing of Seller's Property. Seller understands and agrees that this Agreement is a contract for Broker to market and sell Seller's Property and that Seller's Designated Agent is the only legal agent of Seller.  Seller's Designated Agent will be primarily responsible for the direct marketing and sale of Seller's Property.  The duties owed to Seller as referred to in the Illinois Real Estate License Act of 2000, will only be owed to Seller by the Designated Agent.  The Broker and the Designated Agent will have only those duties to the Seller as are required by statute.
**6. Possible Dual Agency:**  The above named Designated Agent (hereinafter sometimes referred to as "Licensee") may undertake a dual representation (represent both the seller or landlord and the buyer or tenant) for the sale or lease of the Property. Seller acknowledges he was informed of the possibility of this type of representation. Before signing this document, Seller must read the following:
Representing more than one party to a transaction presents a conflict of interest, since both clients may rely upon Licensee's advice and the clients' respective interests may be adverse to each other.  Licensee will undertake this representation only with the written consent of ALL clients in the transaction. Any agreement between the clients as to a final contract price and other terms is a result of negotiations between the clients acting in their own best interests and on their own behalf.  Seller acknowledges that Licensee has explained the implications of dual representation, including the risks involved, and understands that he has been advised to seek independent advice from advisors or attorneys before signing any documents in this transaction.

_____ *Broker Initial*                          _____ *Seller(s) Initial* _____ *Seller(s) Initial*
*Address:* _____

*(Page 1 of 6) October 2005 Form 6000 Mainstreet Organization of REALTORS®*

60  WHAT A LICENSEE CAN DO FOR CLIENTS WHEN ACTING AS A DUAL AGENT:
61  1.  Treat all clients honestly.
62  2.  Provide information about the Property to the buyer or tenant.
63  3.  Disclose all latent material defects in the Property that are known to Licensee.
64  4.  Disclose financial qualification of the buyer or tenant to the Seller or landlord.
65  5.  Explain real estate terms.
66  6.  Help the buyer or tenant to arrange for Property inspections.
67  7.  Explain closing costs and procedures.
68  8.  Help the buyer compare financing alternatives.
69  9.  Provide information about comparable properties that have sold so both clients may make educated decisions on what
70      price to accept or offer.
71
72  WHAT A LICENSEE CANNOT DISCLOSE TO CLIENTS WHEN ACTING AS A DUAL AGENT:
73  1.  Confidential information that Licensee may know about the clients, without the client's permission.
74  2.  The price the seller or landlord will take other than the listing price without permission of the seller or landlord.
75  3.  The price the buyer or tenant is willing to pay without permission of the buyer or tenant.
76  4.  A recommended or suggested price the buyer or tenant should offer.
77  5.  A recommended or suggested price the seller or landlord should counter with or accept.
78
79  **If Seller is uncomfortable with this disclosure and dual representation, please let Licensee know.  Seller is not required to**
80  **accept this section unless Seller wants to allow the Licensee to proceed as a Dual Agent in this transaction.**

81  ☐                ☐          By checking "Yes" and initialing, Seller acknowledges that Seller has read and understands
82  Yes            No          this section and voluntarily consents to the Licensee acting as a Dual Agent (that is, to
83  (_____/_____)            representing BOTH the Seller or landlord and the buyer or tenant) should that become
84  *(Seller(s)'s Initials)*          necessary.
85

86  **7. Buyer's Agent:** Seller acknowledges that Seller has been informed and understands that as part of Broker's real estate business,
87  Broker, from time to time, enters into representation Agreements with Buyers, and, as such, may designate certain of its Sales
88  Associates as Exclusive Buyers Agents for the purpose of showing and negotiating the purchase of real estate listed with Broker or
89  other real estate Brokerage firms.
90  **8. Buyer Confidentiality:**  Seller understands that Broker and/or Designated Agent may have previously represented a buyer who
91  is interested in Seller's Property.  During that representation, Broker and/or Designated Agent may have learned material
92  information about the Buyer that is considered confidential.  Under the law, neither Broker nor Designated Agent may disclose any
93  such confidential information to Seller even though the Broker and/or Designated Agent now represent the Seller.
94  **9. Broker's Affiliates:**  Seller understands and agrees that other Sales Associates affiliated with Broker, may represent the actual
95  or prospective Buyer of Seller's Property.  Further, Seller understands and agrees that if the Property is sold through the efforts of
96  a Sales Associate affiliated with Broker who represents the Buyer, the other Sales Associate affiliated with Broker will be acting as
97  a Buyer's Designated Agent.
98  **10. Consent to Represent Other Sellers:**  Seller understands and agrees that Broker and Designated Agent may from time to time
99  represent or assist other Sellers who may be interested in selling their Property to Buyers.  The Seller consents to Broker's or
100 Designated Agent's representation of such other Sellers before, during, and after the expiration of this Exclusive Marketing
101 Agreement and expressly waives any claims including but not limited to breach of duty or breach of contract based solely upon
102 Broker's or Designated Agent's representation or assistance of other Sellers who may be interested in selling their Property to
103 Buyers.
104 **11. Brokerage Fee:**  In consideration of the obligations of the Broker, the Seller agrees:
105 (a) To pay Broker, at the time of closing of the sale of the property and from the disbursement of the proceeds of said sale,
106 compensation in the amount of _____% of the sale price (to be distributed _____% to the listing office
107 and _____% to the selling office) for the Broker's services in effecting the sale by finding a Buyer ready, willing, and able to
108 purchase the property.  If the transaction shall not be closed because of refusal, failure, or inability of the Seller to perform, the
109 Seller shall pay the sales commission in full to Broker upon demand. Should a sale be in pending or contingent status at the
110 expiration of this Agreement, Seller shall pay Broker the full commission set forth upon closing of said sale.
111 (b) To pay Broker the commission specified above if Broker procures a buyer, if the Property is sold within said time by Seller or
112 any other person, or if the property is sold within _____ days from the expiration date herein to any prospect to whom
113 the said listing information was submitted during the term of this exclusive agreement.  However, Seller shall not be obligated to
114 pay said commission if a valid, written listing agreement is entered into during the term of said protection period with another
115 broker and the sale of the Property is made during the term of the subsequent listing agreement.

_____ *Broker Initial*                    _____ *Seller Initial* _____ *Seller Initial*
*Address:* _____

116 **12. Administration Fee:** In addition to the Brokerage commission set forth herein, Seller shall pay Broker an administration fee
117 of _____ to offset Broker's administration costs in processing this Agreement. Said fee shall be paid
118 to Broker on _____.

119 **13. Cooperation and Compensation:** Broker is authorized to show the Property to prospective buyers through cooperating
120 agents; and Broker, on a case-by-case basis, may pay a part of its brokerage commission to cooperating brokers. Broker is
121 authorized, in its sole discretion, to determine with which brokers it will cooperate and the amount of compensation that it will
122 offer cooperating brokers in the sale of Seller's Property. Seller acknowledges that the compensation offered to such cooperating
123 brokers may vary from broker to broker.

124 **14. Title Insurance and Survey:** Seller acknowledges that Seller has not added to nor disposed of any part of the Property, or
125 gained any easements in favor of or against the Property not disclosed in the Title Guaranty Policy except as stated herein. Prior to
126 closing, Seller agrees to furnish at Seller's expense a title insurance commitment for an Owner's Title Insurance Policy in the
127 amount of the sale price, showing good title in the owner's name. After a sales contract has been signed, arrangements must be
128 made to secure title insurance and schedule the closing. Seller understands that Seller is not required to use any particular title
129 insurance company and that Seller or Seller's attorney may select any qualified licensed company for Seller's title insurance needs.
130 Not less than one (1) business day prior to closing, except where the subject property is a condominium, Seller may be required, at
131 Seller's expense, to furnish a Plat of Survey dated not more than six (6) months prior to the date of closing, prepared by an Illinois
132 registered land surveyor, showing any encroachments, measurements of all lot lines, all easements of record, building set-back
133 lines of record, fences, all building and other improvements on the real estate and distances therefrom to the nearest two lot lines.
134 In addition, the boundary survey to be provided shall be a boundary survey conforming to the requirements of the Illinois Department of
135 Professional Regulation found at 68 Ill. Adm. Code, Sec. 170.56. The survey shall show all corners staked and flagged or
136 otherwise monumented. The survey shall have the following statement prominently appearing near the professional land surveyor
137 seal and signature: "This professional service conforms to the current Illinois minimum standards for a boundary survey. A
138 Mortgage Inspection, as defined, is not a boundary survey, and does not satisfy the necessary requirements."

139
140 With regard to the issuance of title insurance:

141 ☐ ( ____/____ ) Seller authorizes Broker to order title insurance and related services on Seller's behalf through _____
142 *Seller(s)'s Initials* _____, an affiliate of Broker, for the estimated charges as disclosed
143 in the Federal and State Disclosure Statements provided Seller by Broker.

144 ☐ ( ____/____ ) Seller directs that _____ provide the title insurance
145 *Seller(s)'s Initials* and related services as stated above.

146 ☐ ( ____/____ ) Seller or Seller's attorney will make the necessary arrangements for title insurance and any related services.
147 *Seller(s)'s Initials*

148
149 **15. Fixtures and Personal Property:** All of the fixtures and personal property stated herein are owned by Seller and, to the best
150 of Seller's knowledge, are in operating condition unless otherwise noted. Seller agrees to transfer to Buyer all fixtures, all heating,
151 electrical, and plumbing systems together with the following items of personal property by Bill of Sale (Check or enumerate
152 applicable items):

| | | | |
|---|---|---|---|
| ___ Refrigerator | ___ All Tacked Down Carpeting | ___ Fireplace Screen(s)/Door(s)/Grate(s) | ___ Central Air Conditioning |
| ___ Oven/Range/Stove | ___ All Window Treatments & Hardware | ___ Fireplace Gas Logs | ___ Electronic or Media Air Filter |
| ___ Microwave | ___ Built-in or Attached Shelving | ___ Existing Storms & Screens | ___ Central Humidifier |
| ___ Dishwasher | ___ Smoke Detector(s) | ___ Security System(s) (owned) | ___ Sump Pump(s) |
| ___ Garbage Disposal | ___ Ceiling Fan(s) | ___ Intercom System | ___ Water Softener (owned) |
| ___ Trash Compactor | ___ TV Antenna System | ___ Central Vac & Equipment | ___ Outdoor Shed |
| ___ Washer | ___ Window Air Conditioner(s) | ___ Electronic Garage Door Opener(s) | ___ Attached Gas Grill |
| ___ Dryer | ___ All Planted Vegetation | with ___ Transmitter(s) | ___ Light Fixtures (as they exist) |
| ___ Satellite Dish and System | ___ Invisible Fence System, Collar(s) and Box | | |

162 Other items included: _____
163 Items NOT included: _____
164 Unless otherwise agreed to in writing by Seller and Buyer, Seller shall warrant to Buyer that all fixtures, systems and personal
165 property included in this Agreement shall be in operating condition at possession, except: _____
166 _____. A system or item shall be deemed
167 to be in operating condition if it performs the function for which it is intended, regardless of age, and does not constitute a threat to
168 health or safety.

169 **16. Home Warranty:** Seller shall agree to provide to Buyer a limited home warranty program from _____
170 _____ at a charge of $ _____. Seller acknowledges that a
171 home warranty program is a limited warranty with a deductible. (STRIKE THROUGH IF NOT OFFERED.)

172 **17. Disclosure:** All inquires about this Property made directly to Seller shall be immediately referred to Broker and/or Seller's
173 Designated Agent. Seller understands that the information which Seller provides to Seller's Designated Agent as marketing
174 information will be used to advertise Seller's Property to the public and submitted to the Multiple Listing Service. It is essential

____ *Broker Initial*                                    ____ *Seller Initial* ____ *Seller Initial*
Address: _____

175   that this information be accurate and truthful. Seller agrees to comply with the provisions of the Illinois Residential Real Property
176   Disclosure Act, and, if applicable, the Federal Lead Based Paint Disclosure Regulations. Seller shall complete the applicable
177   disclosure document(s) in a timely manner, shall not knowingly provide false or inaccurate information therein, and shall comply
178   with all local government ordinances. Although Seller is marketing Seller's Property in its present physical condition, Seller
179   understands that Seller may be held responsible by a buyer for any latent or hidden, undisclosed defects in the Property which are
180   known to Seller but which are not disclosed to buyer. Seller shall indemnify, save, defend and hold Broker, Broker's Sales
181   Associates, and Seller's Designated Agent harmless from all claims, disputes, litigation, judgments and/or costs (including
182   reasonable attorney's fees), whether or not frivolous, arising from any misrepresentations made by the Seller, from any incorrect
183   information supplied by the Seller, or from any material fact concerning the Property including latent defects which the Seller fails
184   to disclose. Further, Seller shall indemnify, save, defend, and hold Broker, Broker's Sales Associates, and Seller's Designated
185   Agent harmless from any claim, loss, damage, or injury to any person or Property while viewing the Property arising from the
186   condition of Seller's Property.
187   **18. Broker Limitations:** The Broker's sole duty is to effect a sale of the Property. The Broker, Seller's Designated Agent,
188   members of the Multiple Listing Service(s) to which the Broker belongs, and the Mainstreet Organization of
189   REALTORS® and are not charged with the custody of the Property, its management, maintenance, upkeep, or repair. Illinois
190   law allows Brokers to prepare the sales contract using approved preprinted forms, but does not allow Brokers, real estate agents, or
191   sales associates to draft other legal documents required to close the sale. Therefore, the Seller agrees to draft and furnish, or have
192   Seller's attorney draft and furnish all other legal documents necessary to close the sale.
193   **19. Minimum Standards:** Illinois law provides that all exclusive brokerage agreements must specify that the sponsoring broker,
194   (   /   )    through one or more sponsored licensees, must provide at a minimum, the following services: (1) accept delivery
195   *Seller's Initials*   of and present to the client offers and counter-offers to buy, sell, or lease the client's property or the property the
196   (   /   )    client seeks to purchase or lease; (2) assist the client in developing, communicating, negotiating, and presenting
197   *Broker Initials*   offers, counter offers, and notices that relate to the offers and counteroffers until a lease or purchase agreement is
198   signed and all contingencies are satisfied or waived; and (3) answer the client's questions relating to the offers,
199   counter-offers, notices, and contingencies.
200   **20. Marketing Authorization:** Broker is authorized to advertise, promote, and market the Property which shall include, but not
201   be limited to, in Broker's sole discretion, the display of signs, placement of the Property in any Multiple Listing Service in which
202   Broker is a participant, and promotion of the Property through any electronic medium and/or on any Internet Homepage to which
203   the Broker may subscribe. Broker is authorized to affix a keybox to the Property, and provided the owner is absent, any MLS
204   participant or subscriber associated with the Multiple Listing Service(s), whether acting as Buyer's agent or otherwise, shall have
205   the right, through use of said keybox, to show the Property at any reasonable time. It is not a requirement of the Multiple Listing
206   Service or Broker that a Seller allow use of a keybox. Seller acknowledges that neither listing nor selling Broker, the Mainstreet
207   Organization of REALTORS®, nor any Multiple Listing Service is an insurer against the loss of Seller's
208   personal property. Seller is advised to safeguard or remove valuables now located on said Property. Seller is further advised to
209   verify the existence of said valuables and obtain personal property insurance through Seller's insurance agent. Further, Seller
210   hereby grants Broker and Broker shall have the right, and Seller acknowledges that Broker may have an obligation under
211   applicable Multiple Listing Service rules and regulations as a condition of placing Seller's Property in such Multiple Listing
212   Service, to release information as to the amount of selling price, type of financing, and number of days to sell the Property to any
213   Multiple Listing Service of which Broker is a member at the time the Property is sold and closed.
214   **21. Taxes and Assessments:** All taxes and all usually prorated expenses shall be prorated pursuant to the terms of the sales
215   contract. Seller shall disclose any assessments or special taxes for improvements or lien for improvements, either of record or in
216   process, applicable to the Property marketed herein, and should the Seller receive any notice thereof, Seller agrees to notify the
217   Broker immediately.
218   **22. Earnest Money:** **The Earnest Money shall be held by the Listing Broker, in trust for the mutual**
219   **benefit of the Parties in a manner consistent with Illinois State Law. Upon initial closing, or**
220   **settlement, or upon breach of Contract, the Earnest Money shall be applied first to the payment of any**
221   **expenses incurred by the Broker on Seller's behalf in the sale, and second to payment of the Broker's**
222   **sales commission, rendering the surplus, if any, to the Seller. If a dispute arises between Seller and**
223   **Buyer as to whether a default has occurred, Broker shall hold the Earnest Money and pay it out as**
224   **agreed in writing by Seller and Buyer or as directed by a court of competent jurisdiction. In the event**
225   **of such dispute, Seller agrees that Broker may deposit the funds with the clerk of the Circuit Court by**
226   **an action in the nature of interpleader. Seller agrees Broker may be reimbursed from the Earnest**
227   **Money for all costs, including reasonable attorney's fees, related to the filing of the interpleader and**
228   **hereby agrees to indemnify and hold Broker harmless from any and all claims and demands, including**
229   **the payment of reasonable attorney's fees, costs, and expenses arising out of such default, claims, and**
230   **demands. If Seller defaults, Earnest Money, at the option of Buyer, shall be refunded to Buyer, but**

_____ *Broker Initial*                                              _____ *Seller Initial*_____ *Seller Initial*
*Address:* _____

231 such refunding shall not release Seller from the obligation of this Marketing Agreement. There shall
232 be no disbursement of Earnest Money unless Escrowee has been provided written agreement from
233 Seller and Buyer. In anticipation of Closing, the Parties direct Escrowee to close the account no
234 sooner than 10 (ten) business days prior to the anticipated Closing date.
235 **23. Amendments:** Should it be necessary to amend or modify this Agreement, facsimile signatures of all parties to this
236 Marketing Agreement are accepted as original signatures. This Agreement may be executed in multiple copies and Seller's
237 signature hereon acknowledges that Seller has received a signed copy.
238 **24. Mediation:** Any controversy or claim arising out of, or relating to, this Agreement, or the breach thereof, shall be mediated, in
239 accordance with rules, then pertaining, of the American Arbitration Association, Chicago, Illinois.
240 **25. Indemnification of Broker:** Seller agrees to indemnify Broker and to save, defend, and hold Broker harmless on account of
241 any and all loss, damage, cost, or expense (including reasonable attorney's fees) incurred by Broker, arising out of this Agreement,
242 or in the collection of fees or commissions due Broker pursuant to the terms and conditions of this Agreement provided Broker is
243 not at fault.
244 **26. Disclaimer:** Seller acknowledges that Broker and Seller's Designated Agent are acting solely as real estate professionals, and
245 not as attorney, tax advisor, surveyor, structural engineer, home inspector, environmental consultant, architect, contractor, or other
246 professional service provider. Seller understands that such other professional service providers are available to render advice or
247 services to the Seller, if desired, at Seller's expense.
248 **27. Costs of Third-Party Services or Products:** Seller is responsible for the costs of all third-party products or services such as
249 surveys, soil tests, title reports, well and septic tests, etc.
250 **28. Lease of Property:** Although the purpose of this Agreement is to bring about a sale, option, or exchange of the Property,
251 Seller agrees to pay Broker a leasing commission of _____ if the Property is leased within the marketing period.
252 If the tenant to whom the Property is leased later purchases the Property, Seller agrees to pay Broker a sales commission of
253 _____ on the full sale price.
254 **29. Severability:** In case any one or more provisions of this Agreement shall, for any reason, be held to be invalid, illegal, or
255 unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this
256 Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.
257 **30. Notice:** All notices required shall be in writing and shall be served by one Party to the other Party. Notice to any one of the
258 multiple-person Party shall be sufficient notice to all. Notice shall be given in the following manner:
259   (a) By personal delivery of such notice; or
260   (b) By mailing of such notice to the addresses recited herein by regular mail and by certified mail, return receipt requested.
261     Except as otherwise provided herein, notice served by certified mail shall be effective on the date of mailing; or
262   (c) By sending facsimile transmission. Notice shall be effective as of date and time of facsimile transmission, provided that
263     the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time). In
264     the event fax notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the
265     first business day after transmission; or
266   (d) By sending e-mail transmission. Notice shall be effective as of date and time of e-mail transmission, provided that the
267     notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time), and
268     provided further that the **recipient provides written acknowledgment to the sender** of receipt of the transmission (by e-
269     mail, facsimile, or by regular mail). In the event e-mail notice is transmitted during non-business hours, the effective date
270     and time of notice is the first hour of the first business day after transmission.
271 **31. Entire Agreement:** This Agreement constitutes the complete understanding and entire agreement between the parties relating
272 to the subject thereof, and any prior agreements pertaining thereto, whether oral or written, have been merged and integrated into
273 this Agreement. This Agreement may not be terminated or amended prior to its termination date without the express written
274 consent of both parties to this Agreement.
275 Seller hereby acknowledges receipt of a signed copy of this Agreement and all attachments. The attachments include the
276 following  (HERE LIST ALL ATTACHMENTS): _____
277 _____
278 *(Signatures are required of all who have a legal or equitable interest in the Property)*
279 _____
280 BROKER                                          SELLER
281
282 _____                    _____
283 BY (Signature)                                  SELLER
284
285 _____                    _____
286 DATE                                            ADDRESS
287
288 _____
DESIGNATED AGENT
_____ *Broker Initial*                         _____ *Seller Initial* _____ *Seller Initial*
Address: _____

289
290  DATE _____    E-MAIL ADDRESS _____
291
292  _____
293  PHONE _____    PHONE _____  FAX _____
294
295  _____
296  OFFICE _____    DATE _____
297

_____ *Broker Initial*                                    _____ *Seller Initial* _____ *Seller Initial*
Address: _____

# EXHIBIT A, PART 3

# Exhibit D



A Member of the International Code Family®

# INTERNATIONAL PROPERTY MAINTENANCE CODE®

ICC
INTERNATIONAL
CODE COUNCIL®

## 2006

2006 International Property Maintenance Code®

First Printing: January 2006
Second Printing: November 2006

ISBN-13: 978-1-58001-263-8 (soft)
ISBN-10: 1-58001-263-9 (soft)
ISBN-13: 978-158001-311-6 (e-document)
ISBN-10: 1-58001-311-2 (e-document)

COPYRIGHT © 2006
by
INTERNATIONAL CODE COUNCIL, INC.

ALL RIGHTS RESERVED. This 2006 *International Property Maintenance Code®* is a copyrighted work owned by the International Code Council, Inc. Without advance written permission from the copyright owner, no part of this book may be reproduced, distributed or transmitted in any form or by any means, including, without limitation, electronic, optical or mechanical means (by way of example and not limitation, photocopying, or recording) or in an information storage retrieval system). For information on permission to copy material exceeding fair use, please contact: Publications, 4051 West Flossmoor Road, Country Club Hills, IL 60478-5795. Phone 1-888-ICC-SAFE (422-7233).

Trademarks: "International Code Council," the "International Code Council" logo and the "International Property Maintenance Code" are trademarks of the International Code Council, Inc.

PRINTED IN THE U.S.A.

# PREFACE

## Introduction

Internationally, code officials recognize the need for a modern, up-to-date property maintenance code governing the maintenance of existing buildings. The *International Property Maintenance Code*®, in this 2006 edition, is designed to meet this need through model code regulations that contain clear and specific property maintenance requirements with required property improvement provisions.

This 2006 edition is fully compatible with all *International Codes*® (I-Codes®) published by the International Code Council (ICC)®, including the *International Building Code*®, ICC *Electrical Code*®—*Administrative Provisions*, *International Energy Conservation Code*®, *International Existing Building Code*®, *International Fire Code*®, *International Fuel Gas Code*®, *International Mechanical Code*®, ICC *Performance Code*®, *International Plumbing Code*®, *International Private Sewage Disposal Code*®, *International Residential Code*®, *International Wildland-Urban Interface Code*™ and *International Zoning Code*®.

The *International Property Maintenance Code* provisions provide many benefits, among which is the model code development process that offers an international forum for code officials and other interested parties to discuss performance and prescriptive code requirements. This forum provides an excellent arena to debate proposed revisions. This model code also encourages international consistency in the application of provisions.

## Development

The first edition of the *International Property Maintenance Code* (1998) was the culmination of an effort initiated in 1996 by a code development committee appointed by ICC and consisting of representatives of the three statutory members of the International Code Council at that time, including: Building Officials and Code Administrators International, Inc. (BOCA), International Conference of Building Officials (ICBO) and Southern Building Code Congress International (SBCCI). The committee drafted a comprehensive set of regulations for existing buildings that was consistent with the existing model property maintenance codes at the time. This 2006 edition presents the code as originally issued, with changes reflected through the previous 2003 editions and further changes developed through the ICC Code Development Process through 2005. A new edition of the code is promulgated every three years.

This code is founded on principles intended to establish provisions consistent with the scope of a property maintenance code that adequately protects public health, safety and welfare; provisions that do not unnecessarily increase construction costs; provisions that do not restrict the use of new materials, products or methods of construction; and provisions that do not give preferential treatment to particular types or classes of materials, products or methods of construction.

## Adoption

The *International Property Maintenance Code* is available for adoption and use by jurisdictions internationally. Its use within a governmental jurisdiction is intended to be accomplished through adoption by reference in accordance with proceedings establishing the jurisdiction's laws. At the time of adoption, jurisdictions should insert the appropriate information in provisions requiring specific local information, such as the name of the adopting jurisdiction. These locations are shown in bracketed words in small capital letters in the code and in the sample ordinance. The sample adoption ordinance on page v addresses several key elements of a code adoption ordinance, including the information required for insertion into the code text.

## Maintenance

The *International Property Maintenance Code* is kept up to date through the review of proposed changes submitted by code enforcing officials, industry representatives, design professionals and other interested parties. Proposed changes are carefully considered through an open code development process in which all interested and affected parties may participate.

The contents of this work are subject to change both through the Code Development Cycles and the governmental body that enacts the code into law. For more information regarding the code development process, contact the Codes and Standards Development Department of the International Code Council.

While the development procedure of the *International Property Maintenance Code* ensures the highest degree of care, ICC, its membership and those participating in the development of this code do not accept any liability resulting from compliance or noncompliance with the provisions because ICC does not have the power or authority to police or enforce compliance with the contents of this code. Only the governmental body that enacts the code into law has such authority.

## Letter Designations in Front of Section Numbers

In each code development cycle, proposed changes to this code are considered at the Code Development Hearings by the ICC Property Maintenance/Zoning Code Development Committee, whose action constitutes a recommendation to the voting membership for final action on the proposed changes. Proposed changes to a code section having a number beginning with a letter in brackets are considered by a different code development committee. For example, proposed changes to code sections that have the letter [F] in front of them (e.g., [F] 704.1) are considered by the International Fire Code Development Committee at the Code Development Hearings.

The content of sections in this code that begin with a letter designation are maintained by another code development committee in accordance with the following:

[F] = International Fire Code Development Committee;

[P] = International Plumbing Code Development Committee;

[F] = International Fire Code Development Committee; and

[B] = International Building Code Development Committee.

## Marginal Markings

Solid vertical lines in the margins within the body of the code indicating a technical change from the requirements of the previous edition. Deletion indicators in the form of an arrow ( → ) are provided in the margin where an entire section, paragraph, exception or table has been deleted or an item in a list of items or a table has been deleted.

# ORDINANCE

The *International Codes* are designed and promulgated to be adopted by reference by ordinance. Jurisdictions wishing to adopt the 2006 *International Property Maintenance Code* as an enforceable regulation governing existing structures and premises should ensure that certain factual information is included in the adopting ordinance at the time adoption is being considered by the appropriate governmental body. The following sample adoption ordinance addresses several key elements of a code adoption ordinance, including the information required for insertion into the code text.

# SAMPLE ORDINANCE FOR ADOPTION OF
# THE *INTERNATIONAL PROPERTY MAINTENANCE CODE*
# ORDINANCE NO._____

An ordinance of the [JURISDICTION] adopting the 2006 edition of the *International Property Maintenance Code*, regulating and governing the conditions and maintenance of all property, buildings and structures; by providing the standards for supplied utilities and facilities and other physical things and conditions essential to ensure that structures are safe, sanitary and fit for occupation and use; and the condemnation of buildings and structures unfit for human occupancy and use, and the demolition of such existing structures in the [JURISDICTION]; providing for the issuance of permits and collection of fees therefor; repealing Ordinance No. _____ of the [JURISDICTION] and all other ordinances and parts of the ordinances in conflict therewith.

The [GOVERNING BODY] of the [JURISDICTION] does ordain as follows:

**Section 1.** That a certain document, three (3) copies of which are on file in the office of the [TITLE OF JURISDICTION'S KEEPER OF RECORDS] of [NAME OF JURISDICTION], being marked and designated as the *International Property Maintenance Code*, 2006 edition, as published by the International Code Council, be and is hereby adopted as the Property Maintenance Code of the [JURISDICTION], in the State of [STATE NAME] for regulating and governing the conditions and maintenance of all property, buildings and structures; by providing the standards for supplied utilities and facilities and other physical things and conditions essential to ensure that structures are safe, sanitary and fit for occupation and use; and the condemnation of buildings and structures unfit for human occupancy and use, and the demolition of such existing structures as herein provided; providing for the issuance of permits and collection of fees therefor; and each and all of the regulations, provisions, penalties, conditions and terms of said Property Maintenance Code on file in the office of the [JURISDICTION] are hereby referred to, adopted, and made a part hereof, as if fully set out in this ordinance, with the additions, insertions, deletions and changes, if any, prescribed in Section 2 of this ordinance.

**Section 2.** The following sections are hereby revised:

Section 101.1. Insert: [NAME OF JURISDICTION]

Section 103.5. Insert: [APPROPRIATE SCHEDULE]

Section 302.4. Insert: [HEIGHT IN INCHES]

Section 304.14. Insert: [DATES IN TWO LOCATIONS]

Section 602.3. Insert: [DATES IN TWO LOCATIONS]

Section 602.4. Insert: [DATES IN TWO LOCATIONS]

**Section 3.** That Ordinance No. _____ of [JURISDICTION] entitled [FILL IN HERE THE COMPLETE TITLE OF THE ORDINANCE OR ORDINANCES IN EFFECT AT THE PRESENT TIME SO THAT THEY WILL BE REPEALED BY DEFINITE MENTION] and all other ordinances or parts of ordinances in conflict herewith are hereby repealed.

**Section 4.** That if any section, subsection, sentence, clause or phrase of this ordinance is, for any reason, held to be unconstitutional, such decision shall not affect the validity of the remaining portions of this ordinance. The [GOVERNING BODY] hereby declares that it would have passed this ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses and phrases be declared unconstitutional.

**Section 5.** That nothing in this ordinance or in the Property Maintenance Code hereby adopted shall be construed to affect any suit or proceeding impending in any court, or any rights acquired, or liability incurred, or any cause or causes of action acquired or exist-

ing, under any act or ordinance hereby repealed as cited in Section 3 of this ordinance; nor shall any just or legal right or remedy of any character be lost, impaired or affected by this ordinance.

**Section 6.** That the [JURISDICTION'S KEEPER OF RECORDS] is hereby ordered and directed to cause this ordinance to be published. (An additional provision may be required to direct the number of times the ordinance is to be published and to specify that it is to be in a newspaper in general circulation. Posting may also be required.)

**Section 7.** That this ordinance and the rules, regulations, provisions, requirements, orders and matters established and adopted hereby shall take effect and be in full force and effect [TIME PERIOD] from and after the date of its final passage and adoption.

# TABLE OF CONTENTS

**CHAPTER 1  ADMINISTRATION** .............. 1

Section

101  General . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
102  Applicability . . . . . . . . . . . . . . . . . . . . . . 1
103  Department of Property Maintenance
     Inspection . . . . . . . . . . . . . . . . . . . . . . . . 1
104  Duties and Powers of the Code Official . . . . . . . . 2
105  Approval . . . . . . . . . . . . . . . . . . . . . . . . . . 2
106  Violations . . . . . . . . . . . . . . . . . . . . . . . . 2
107  Notices and Orders . . . . . . . . . . . . . . . . . . . 3
108  Unsafe Structures and Equipment . . . . . . . . . . . 3
109  Emergency Measures . . . . . . . . . . . . . . . . . . 4
110  Demolition . . . . . . . . . . . . . . . . . . . . . . . . 4
111  Means of Appeal . . . . . . . . . . . . . . . . . . . . 5

**CHAPTER 2  DEFINITIONS** . . . . . . . . . . . . . . . . . . 7

Section

201  General . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
202  General Definitions . . . . . . . . . . . . . . . . . . . 7

**CHAPTER 3  GENERAL REQUIREMENTS** . . . . . . 9

Section

301  General . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
302  Exterior Property Areas . . . . . . . . . . . . . . . . . 9
303  Swimming Pools, Spas and Hot Tubs . . . . . . . . . 9
304  Exterior Structure . . . . . . . . . . . . . . . . . . . . 10
305  Interior Structure . . . . . . . . . . . . . . . . . . . . 11
306  Handrails and Guardrails . . . . . . . . . . . . . . . 11
307  Rubbish and Garbage . . . . . . . . . . . . . . . . . . 11
308  Extermination . . . . . . . . . . . . . . . . . . . . . . 11

**CHAPTER 4  LIGHT, VENTILATION AND
              OCCUPANCY LIMITATIONS** . . . . . . 13

Section

401  General . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
402  Light . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
403  Ventilation . . . . . . . . . . . . . . . . . . . . . . . . 13
404  Occupancy Limitations . . . . . . . . . . . . . . . . . 13

**CHAPTER 5  PLUMBING FACILITIES AND
              FIXTURE REQUIREMENTS** . . . . . . 15

Section

501  General . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
502  Required Facilities . . . . . . . . . . . . . . . . . . . . 15

503  Toilet Rooms . . . . . . . . . . . . . . . . . . . . . . . 15
504  Plumbing Systems and Fixtures . . . . . . . . . . . 15
505  Water System . . . . . . . . . . . . . . . . . . . . . . . 15
506  Sanitary Drainage System . . . . . . . . . . . . . . . 16
507  Storm Drainage . . . . . . . . . . . . . . . . . . . . . 16

**CHAPTER 6  MECHANICAL AND ELECTRICAL
              REQUIREMENTS** . . . . . . . . . . . . . . 17

Section

601  General . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
602  Heating Facilities . . . . . . . . . . . . . . . . . . . . 17
603  Mechanical Equipment . . . . . . . . . . . . . . . . . 17
604  Electrical Facilities . . . . . . . . . . . . . . . . . . . 17
605  Electrical Equipment . . . . . . . . . . . . . . . . . . 18
606  Elevators, Escalators and Dumbwaiters . . . . . . . 18
607  Duct Systems . . . . . . . . . . . . . . . . . . . . . . . 18

**CHAPTER 7  FIRE SAFETY
              REQUIREMENTS** . . . . . . . . . . . . . . 19

Section

701  General . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
702  Means of Egress . . . . . . . . . . . . . . . . . . . . . 19
703  Fire-Resistance Ratings . . . . . . . . . . . . . . . . . 19
704  Fire Protection Systems . . . . . . . . . . . . . . . . . 19

**CHAPTER 8  REFERENCED STANDARDS** . . . . . . 21

**INDEX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# CHAPTER 1

# ADMINISTRATION

## SECTION 101
## GENERAL

**101.1 Title.** These regulations shall be known as the *Property Maintenance Code* of [NAME OF JURISDICTION], hereinafter referred to as "this code."

**101.2 Scope.** The provisions of this code shall apply to all existing residential and nonresidential structures and all existing premises and constitute minimum requirements and standards for premises, structures, equipment and facilities for light, ventilation, space, heating, sanitation, protection from the elements, life safety, safety from fire and other hazards, and for safe and sanitary maintenance; the responsibility of owners, operators and occupants; the occupancy of existing structures and premises, and for administration, enforcement and penalties.

**101.3 Intent.** This code shall be construed to secure its expressed intent, which is to ensure public health, safety and welfare in so far as they are affected by the continued occupancy and maintenance of structures and premises. Existing structures and premises that do not comply with these provisions shall be altered or repaired to provide a minimum level of health and safety as required herein.

**101.4 Severability.** If a section, subsection, sentence, clause or phrase of this code is, for any reason, held to be unconstitutional, such decision shall not affect the validity of the remaining portions of this code.

## SECTION 102
## APPLICABILITY

**102.1 General.** The provisions of this code shall apply to all matters affecting or relating to structures and premises, as set forth in Section 101. Where, in a specific case, different sections of this code specify different requirements, the most restrictive shall govern.

**102.2 Maintenance.** Equipment, systems, devices and safeguards required by this code or a previous regulation or code under which the structure or premises was constructed, altered or repaired shall be maintained in good working order. No owner, operator or occupant shall cause any service, facility, equipment or utility which is required under this section to be removed from or shut off from or discontinued for any occupied dwelling, except for such temporary interruption as necessary while repairs or alterations are in progress. The requirements of this code are not intended to provide the basis for removal or abrogation of fire protection and safety systems and devices in existing structures. Except as otherwise specified herein, the owner or the owner's designated agent shall be responsible for the maintenance of buildings, structures and premises.

**102.3 Application of other codes.** Repairs, additions or alterations to a structure, or changes of occupancy, shall be done in accordance with the procedures and provisions of the *International Building Code, International Fuel Gas Code, International Mechanical Code* and the ICC Electrical Code. Nothing in this code shall be construed to cancel, modify or set aside any provision of the *International Zoning Code*.

**102.4 Existing remedies.** The provisions in this code shall not be construed to abolish or impair existing remedies of the jurisdiction or its officers or agencies relating to the removal or demolition of any structure which is dangerous, unsafe and insanitary.

**102.5 Workmanship.** Repairs, maintenance work, alterations or installations which are caused directly or indirectly by the enforcement of this code shall be executed and installed in a workmanlike manner and installed in accordance with the manufacturer's installation instructions.

**102.6 Historic buildings.** The provisions of this code shall not be mandatory for existing buildings or structures designated as historic buildings when such buildings or structures are judged by the code official to be safe and in the public interest of health, safety and welfare.

**102.7 Referenced codes and standards.** The codes and standards referenced in this code shall be those that are listed in Chapter 8 and considered part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply.

**102.8 Requirements not covered by code.** Requirements necessary for the strength, stability or proper operation of an existing fixture, structure or equipment, or for the public safety, health and general welfare, not specifically covered by this code, shall be determined by the code official.

## SECTION 103
## DEPARTMENT OF PROPERTY
## MAINTENANCE INSPECTION

**103.1 General.** The department of property maintenance inspection is hereby created and the executive official in charge thereof shall be known as the code official.

**103.2 Appointment.** The code official shall be appointed by the chief appointing authority of the jurisdiction; and the code official shall not be removed from office except for cause and after full opportunity to be heard on specific and relevant charges by and before the appointing authority.

**103.3 Deputies.** In accordance with the prescribed procedures of this jurisdiction and with the concurrence of the appointing authority, the code official shall have the authority to appoint a deputy code official, other related technical officers, inspectors and other employees.

ADMINISTRATION

**103.4 Liability.** The code official, officer or employee charged with the enforcement of this code, while acting for the jurisdiction, shall not thereby be rendered liable personally, and is hereby relieved from all personal liability for any damage accruing to persons or property as a result of an act required or permitted in the discharge of official duties.

Any suit instituted against any officer or employee because of an act performed by that officer or employee in the lawful discharge of duties and under the provisions of this code shall be defended by the legal representative of the jurisdiction until the final termination of the proceedings. The code official or any subordinate shall not be liable for costs in an action, suit or proceeding that is instituted in pursuance of the provisions of this code; and any officer of the department of property maintenance inspection, acting in good faith and without malice, shall be free from liability for acts performed under any of its provisions or by reason of any act or omission in the performance of official duties in connection therewith.

**103.5 Fees.** The fees for activities and services performed by the department in carrying out its responsibilities under this code shall be as indicated in the following schedule.

[JURISDICTION TO INSERT APPROPRIATE SCHEDULE.]

## SECTION 104
## DUTIES AND POWERS OF THE CODE OFFICIAL

**104.1 General.** The code official shall enforce the provisions of this code.

**104.2 Rule-making authority.** The code official shall have authority as necessary in the interest of public health, safety and general welfare, to adopt and promulgate rules and procedures; to interpret and implement the provisions of this code; to secure the intent thereof; and to designate requirements applicable because of local climatic or other conditions. Such rules shall not have the effect of waiving structural or fire performance requirements specifically provided for in this code, or of violating accepted engineering methods involving public safety.

**104.3 Inspections.** The code official shall make all of the required inspections, or shall accept reports of inspection by approved agencies or individuals. All reports of such inspections shall be in writing and be certified by a responsible officer of such approved agency or by the responsible individual. The code official is authorized to engage such expert opinion as deemed necessary to report upon unusual technical issues that arise, subject to the approval of the appointing authority.

**104.4 Right of entry.** The code official is authorized to enter the structure or premises at reasonable times to inspect subject to constitutional restrictions on unreasonable searches and seizures. If entry is refused or not obtained, the code official is authorized to pursue recourse as provided by law.

**104.5 Identification.** The code official shall carry proper identification when inspecting structures or premises in the performance of duties under this code.

**104.6 Notices and orders.** The code official shall issue all necessary notices or orders to ensure compliance with this code.

**104.7 Department records.** The code official shall keep official records of all business and activities of the department specified in the provisions of this code. Such records shall be retained in the official records as long as the building or structure to which such records relate remains in existence, unless otherwise provided for by other regulations.

## SECTION 105
## APPROVAL

**105.1 Modifications.** Whenever there are practical difficulties involved in carrying out the provisions of this code, the code official shall have the authority to grant modifications for individual cases, provided the code official shall first find that special individual reason makes the strict letter of this code impractical and the modification is in compliance with the intent and purpose of this code and that such modification does not lessen health, life and fire safety requirements. The details of action granting modifications shall be recorded and entered in the department files.

**105.2 Alternative materials, methods and equipment.** The provisions of this code are not intended to prevent the installation of any material or to prohibit any method of construction not specifically prescribed by this code, provided that any such alternative has been approved. An alternative material or method of construction shall be approved where the code official finds that the proposed design is satisfactory and complies with the intent of the provisions of this code, and that the material, method or work offered is, for the purpose intended, at least the equivalent of that prescribed in this code in quality, strength, effectiveness, fire resistance, durability and safety.

**105.3 Required testing.** Whenever there is insufficient evidence of compliance with the provisions of this code, or evidence that a material or method does not conform to the requirements of this code, or in order to substantiate claims for alternative materials or methods, the code official shall have the authority to require tests to be made as evidence of compliance at no expense to the jurisdiction.

**105.3.1 Test methods.** Test methods shall be as specified in this code or by other recognized test standards. In the absence of recognized and accepted test methods, the code official shall be permitted to approve appropriate testing procedures performed by an approved agency.

**105.3.2 Test reports.** Reports of tests shall be retained by the code official for the period required for retention of public records.

**105.4 Material and equipment reuse.** Materials, equipment and devices shall not be reused unless such elements are in good repair or have been reconditioned and tested when necessary, placed in good and proper working condition and approved.

## SECTION 106
## VIOLATIONS

**106.1 Unlawful acts.** It shall be unlawful for a person, firm or corporation to be in conflict with or in violation of any of the provisions of this code.

2

**106.2 Notice of violation.** The code official shall serve a notice of violation or order in accordance with Section 107.

**106.3 Prosecution of violation.** Any person failing to comply with a notice of violation or order served in accordance with Section 107 shall be deemed guilty of a misdemeanor or civil infraction as determined by the local municipality, and the violation shall be deemed a strict liability offense. If the notice of violation is not complied with, the code official shall institute the appropriate proceeding at law or in equity to restrain, correct or abate such violation, or to require the removal or termination of the unlawful occupancy of the structure in violation of the provisions of this code or of the order or direction made pursuant thereto. Any action taken by the authority having jurisdiction on such premises shall be charged against the real estate upon which the structure is located and shall be a lien upon such real estate.

**106.4 Violation penalties.** Any person who shall violate a provision of this code, or fail to comply therewith, or with any of the requirements thereof, shall be prosecuted within the limits provided by state or local laws. Each day that a violation continues after due notice has been served shall be deemed a separate offense.

**106.5 Abatement of violation.** The imposition of the penalties herein prescribed shall not preclude the legal officer of the jurisdiction from instituting appropriate action to restrain, correct or abate a violation, or to prevent illegal occupancy of a building, structure or premises, or to stop an illegal act, conduct, business or utilization of the building, structure or premises.

## SECTION 107
## NOTICES AND ORDERS

**107.1 Notice to person responsible.** Whenever the code official determines that there has been a violation of this code or has grounds to believe that a violation has occurred, notice shall be given in the manner prescribed in Sections 107.2 and 107.3 to the person responsible for the violation as specified in this code. Notices for condemnation procedures shall also comply with Section 108.3.

**107.2 Form.** Such notice prescribed in Section 107.1 shall be in accordance with all of the following:

1. Be in writing.

2. Include a description of the real estate sufficient for identification.

3. Include a statement of the violation or violations and why the notice is being issued.

4. Include a correction order allowing a reasonable time to make the repairs and improvements required to bring the dwelling unit or structure into compliance with the provisions of this code.

5. Inform the property owner of the right to appeal.

6. Include a statement of the right to file a lien in accordance with Section 106.3.

**107.3 Method of service.** Such notice shall be deemed to be properly served if a copy thereof is:

1. Delivered personally;

2. Sent by certified or first-class mail addressed to the last known address; or

3. If the notice is returned showing that the letter was not delivered, a copy thereof shall be posted in a conspicuous place in or about the structure affected by such notice.

**107.4 Penalties.** Penalties for noncompliance with orders and notices shall be as set forth in Section 106.4.

**107.5 Transfer of ownership.** It shall be unlawful for the owner of any dwelling unit or structure who has received a compliance order or upon whom a notice of violation has been served to sell, transfer, mortgage, lease or otherwise dispose of such dwelling unit or structure to another until the provisions of the compliance order or notice of violation have been complied with, or until such owner shall first furnish the grantee, transferee, mortgagee or lessee a true copy of any compliance order or notice of violation issued by the code official and shall furnish to the code official a signed and notarized statement from the grantee, transferee, mortgagee or lessee, acknowledging the receipt of such compliance order or notice of violation and fully accepting the responsibility without condition for making the corrections or repairs required by such compliance order or notice of violation.

## SECTION 108
## UNSAFE STRUCTURES AND EQUIPMENT

**108.1 General.** When a structure or equipment is found by the code official to be unsafe, or when a structure is found unfit for human occupancy, or is found unlawful, such structure shall be condemned pursuant to the provisions of this code.

**108.1.1 Unsafe structures.** An unsafe structure is one that is found to be dangerous to the life, health, property or safety of the public or the occupants of the structure by not providing minimum safeguards to protect or warn occupants in the event of fire, or because such structure contains unsafe equipment or is so damaged, decayed, dilapidated, structurally unsafe or of such faulty construction or unstable foundation, that partial or complete collapse is possible.

**108.1.2 Unsafe equipment.** Unsafe equipment includes any boiler, heating equipment, elevator, moving stairway, electrical wiring or device, flammable liquid containers or other equipment on the premises or within the structure which is in such disrepair or condition that such equipment is a hazard to life, health, property or safety of the public or occupants of the premises or structure.

**108.1.3 Structure unfit for human occupancy.** A structure is unfit for human occupancy whenever the code official finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is insanitary, vermin or rat infested, contains filth and contamination, or lacks ventilation, illumination,

sanitary or heating facilities or other essential equipment required by this code, or because the location of the structure constitutes a hazard to the occupants of the structure or to the public.

**108.1.4 Unlawful structure.** An unlawful structure is one found in whole or in part to be occupied by more persons than permitted under this code, or was erected, altered or occupied contrary to law.

**108.2 Closing of vacant structures.** If the structure is vacant and unfit for human habitation and occupancy, and is not in danger of structural collapse, the code official is authorized to post a placard of condemnation on the premises and order the structure closed up so as not to be an attractive nuisance. Upon failure of the owner to close up the premises within the time specified in the order, the code official shall cause the premises to be closed and secured through any available public agency or by contract or arrangement by private persons and the cost thereof shall be charged against the real estate upon which the structure is located and shall be a lien upon such real estate and may be collected by any other legal resource.

**108.3 Notice.** Whenever the code official has condemned a structure or equipment under the provisions of this section, notice shall be posted in a conspicuous place in or about the structure affected by such notice and served on the owner or the person or persons responsible for the structure or equipment in accordance with Section 107.3. If the notice pertains to equipment, it shall also be placed on the condemned equipment. The notice shall be in the form prescribed in Section 107.2.

**108.4 Placarding.** Upon failure of the owner or person responsible to comply with the notice provisions within the time given, the code official shall post on the premises or on defective equipment a placard bearing the word "Condemned" and a statement of the penalties provided for occupying the premises, operating the equipment or removing the placard.

**108.4.1 Placard removal.** The code official shall remove the condemnation placard whenever the defect or defects upon which the condemnation and placarding action were based have been eliminated. Any person who defaces or removes a condemnation placard without the approval of the code official shall be subject to the penalties provided by this code.

**108.5 Prohibited occupancy.** Any occupied structure condemned and placarded by the code official shall be vacated as ordered by the code official. Any person who shall occupy a placarded premises or shall operate placarded equipment, and any owner or any person responsible for the premises who shall let anyone occupy a placarded premises or operate placarded equipment shall be liable for the penalties provided by this code.

### SECTION 109
### EMERGENCY MEASURES

**109.1 Imminent danger.** When, in the opinion of the code official, there is imminent danger of failure or collapse of a building or structure which endangers life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the structure, or when there is actual or potential dan-

ger to the building occupants or those in the proximity of any structure because of explosives, explosive fumes or vapors or the presence of toxic fumes, gases or materials, or operation of defective or dangerous equipment, the code official is hereby authorized and empowered to order and require the occupants to vacate the premises forthwith. The code official shall cause to be posted at each entrance to such structure a notice reading as follows: "This Structure Is Unsafe and Its Occupancy Has Been Prohibited by the Code Official." It shall be unlawful for any person to enter such structure except for the purpose of securing the structure, making the required repairs, removing the hazardous condition or of demolishing the same.

**109.2 Temporary safeguards.** Notwithstanding other provisions of this code, whenever, in the opinion of the code official, there is imminent danger due to an unsafe condition, the code official shall order the necessary work to be done, including the boarding up of openings, to render such structure temporarily safe whether or not the legal procedure herein described has been instituted; and shall cause such other action to be taken as the code official deems necessary to meet such emergency.

**109.3 Closing streets.** When necessary for public safety, the code official shall temporarily close structures and close, or order the authority having jurisdiction to close, sidewalks, streets, public ways and places adjacent to unsafe structures, and prohibit the same from being utilized.

**109.4 Emergency repairs.** For the purposes of this section, the code official shall employ the necessary labor and materials to perform the required work as expeditiously as possible.

**109.5 Costs of emergency repairs.** Costs incurred in the performance of emergency work shall be paid by the jurisdiction. The legal counsel of the jurisdiction shall institute appropriate action against the owner of the premises where the unsafe structure is or was located for the recovery of such costs.

**109.6 Hearing.** Any person ordered to take emergency measures shall comply with such order forthwith. Any affected person shall thereafter, upon petition directed to the appeals board, be afforded a hearing as described in this code.

### SECTION 110
### DEMOLITION

**110.1 General.** The code official shall order the owner of any premises upon which is located any structure, which in the code official's judgment is so old, dilapidated or has become so out of repair as to be dangerous, unsafe, insanitary or otherwise unfit for human habitation or occupancy, and such that it is unreasonable to repair the structure, to demolish and remove such structure; or if such structure is capable of being made safe by repairs, to repair and make safe and sanitary or to demolish and remove at the owner's option; or where there has been a cessation of normal construction of any structure for a period of more than two years, to demolish and remove such structure.

**110.2 Notices and orders.** All notices and orders shall comply with Section 107.

**110.3 Failure to comply.** If the owner of a premises fails to comply with a demolition order within the time prescribed, the

code official shall cause the structure to be demolished and removed, either through an available public agency or by contract or arrangement with private persons, and the cost of such demolition and removal shall be charged against the real estate upon which the structure is located and shall be a lien upon such real estate.

110.4 Salvage materials. When any structure has been ordered demolished and removed, the governing body or other designated officer under said contract or arrangement aforesaid shall have the right to sell the salvage and valuable materials at the highest price obtainable. The net proceeds of such sale, after deducting the expenses of such demolition and removal, shall be promptly remitted with a report of such sale or transaction, including the items of expense and the amounts deducted, for the person who is entitled thereto, subject to any order of a court. If such a surplus does not remain to be turned over, the report shall so state.

# SECTION 111
## MEANS OF APPEAL

111.1 Application for appeal. Any person directly affected by a decision of the code official or a notice or order issued under this code shall have the right to appeal to the board of appeals, provided that a written application for appeal is filed within 20 days after the day the decision, notice or order was served. An application for appeal shall be based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or the requirements of this code are adequately satisfied by other means.

111.2 Membership of board. The board of appeals shall consist of a minimum of three members who are qualified by experience and training to pass on matters pertaining to property maintenance and who are not employees of the jurisdiction. The code official shall be an ex-officio member but shall have no vote on any matter before the board. The board shall be appointed by the chief appointing authority, and shall serve staggered and overlapping terms.

111.2.1 Alternate members. The chief appointing authority shall appoint two or more alternate members who shall be called by the board chairman to hear appeals during the absence or disqualification of a member. Alternate members shall possess the qualifications required for board membership.

111.2.2 Chairman. The board shall annually select one of its members to serve as chairman.

111.2.3 Disqualification of member. A member shall not hear an appeal in which that member has a personal, professional or financial interest.

111.2.4 Secretary. The chief administrative officer shall designate a qualified person to serve as secretary to the board. The secretary shall file a detailed record of all proceedings in the office of the chief administrative officer.

111.2.5 Compensation of members. Compensation of members shall be determined by law.

111.3 Notice of meeting. The board shall meet upon notice from the chairman, within 20 days of the filing of an appeal, or at stated periodic meetings.

111.4 Open hearing. All hearings before the board shall be open to the public. The appellant, the appellant's representative, the code official and any person whose interests are affected shall be given an opportunity to be heard. A quorum shall consist of not less than two-thirds of the board membership.

111.4.1 Procedure. The board shall adopt and make available to the public through the secretary procedures under which a hearing will be conducted. The procedures shall not require compliance with strict rules of evidence, but shall mandate that only relevant information be received.

111.5 Postponed hearing. When the full board is not present to hear an appeal, either the appellant or the appellant's representative shall have the right to request a postponement of the hearing.

111.6 Board decision. The board shall modify or reverse the decision of the code official only by a concurring vote of a majority of the total number of appointed board members.

111.6.1 Records and copies. The decision of the board shall be recorded. Copies shall be furnished to the appellant and to the code official.

111.6.2 Administration. The code official shall take immediate action in accordance with the decision of the board.

111.7 Court review. Any person, whether or not a previous party of the appeal, shall have the right to apply to the appropriate court for a writ of certiorari to correct errors of law. Application for review shall be made in the manner and time required by law following the filing of the decision in the office of the chief administrative officer.

111.8 Stays of enforcement. Appeals of notice and orders (other than Imminent Danger notices) shall stay the enforcement of the notice and order until the appeal is heard by the appeals board.

# CHAPTER 2

# DEFINITIONS

## SECTION 201
### GENERAL

**201.1 Scope.** Unless otherwise expressly stated, the following terms shall, for the purposes of this code, have the meanings shown in this chapter.

**201.2 Interchangeability.** Words stated in the present tense include the future; words stated in the masculine gender include the feminine and neuter; the singular number includes the plural and the plural, the singular.

**201.3 Terms defined in other codes.** Where terms are not defined in this code and are defined in the *International Building Code, International Fire Code, International Zoning Code, International Plumbing Code, International Mechanical Code* or the ICC *Electrical Code*, such terms shall have the meanings ascribed to them as stated in those codes.

**201.4 Terms not defined.** Where terms are not defined through the methods authorized by this section, such terms shall have ordinarily accepted meanings such as the context implies.

**201.5 Parts.** Whenever the words "dwelling unit," "dwelling," "premises," "building," "rooming house," "rooming unit" "housekeeping unit" or "story" are stated in this code, they shall be construed as though they were followed by the words "or any part thereof."

## SECTION 202
### GENERAL DEFINITIONS

**APPROVED.** Approved by the code official.

**BASEMENT.** That portion of a building which is partly or completely below grade.

**BATHROOM.** A room containing plumbing fixtures including a bathtub or shower.

**BEDROOM.** Any room or space used or intended to be used for sleeping purposes in either a dwelling or sleeping unit.

**CODE OFFICIAL.** The official who is charged with the administration and enforcement of this code, or any duly authorized representative.

**CONDEMN.** To adjudge unfit for occupancy.

**[B] DWELLING UNIT.** A single unit providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking and sanitation.

**EASEMENT.** That portion of land or property reserved for present or future use by a person or agency other than the legal fee owner(s) of the property. The easement shall be permitted to be for use under, on or above a said lot or lots.

**EXTERIOR PROPERTY.** The open space on the premises and on adjoining property under the control of owners or operators of such premises.

**EXTERMINATION.** The control and elimination of insects, rats or other pests by eliminating their harborage places; by removing or making inaccessible materials that serve as their food; by poison spraying, fumigating, trapping or by any other approved pest elimination methods.

**GARBAGE.** The animal or vegetable waste resulting from the handling, preparation, cooking and consumption of food.

**GUARD.** A building component or a system of building components located at or near the open sides of elevated walking surfaces that minimizes the possibility of a fall from the walking surface to a lower level.

**HABITABLE SPACE.** Space in a structure for living, sleeping, eating or cooking. Bathrooms, toilet rooms, closets, halls, storage or utility spaces, and similar areas are not considered habitable spaces.

**HOUSEKEEPING UNIT.** A room or group of rooms forming a single habitable space equipped and intended to be used for living, sleeping, cooking and eating which does not contain, within such a unit, a toilet, lavatory and bathtub or shower.

**IMMINENT DANGER.** A condition which could cause serious or life-threatening injury or death at any time.

**INFESTATION.** The presence, within or contiguous to, a structure or premises of insects, rats, vermin or other pests.

**INOPERABLE MOTOR VEHICLE.** A vehicle which cannot be driven upon the public streets for reason including but not limited to being unlicensed, wrecked, abandoned, in a state of disrepair, or incapable of being moved under its own power.

**LABELED.** Devices, equipment, appliances, or materials to which has been affixed a label, seal, symbol or other identifying mark of a nationally recognized testing laboratory, inspection agency or other organization concerned with product evaluation that maintains periodic inspection of the production of the above-labeled items and by whose label the manufacturer attests to compliance with applicable nationally recognized standards.

**LET FOR OCCUPANCY OR LET.** To permit, provide or offer possession or occupancy of a dwelling, dwelling unit, rooming unit, building, premise or structure by a person who is or is not the legal owner of record thereof, pursuant to a written or unwritten lease, agreement or license, or pursuant to a recorded or unrecorded agreement of contract for the sale of land.

**OCCUPANCY.** The purpose for which a building or portion thereof is utilized or occupied.

**OCCUPANT.** Any individual living or sleeping in a building, or having possession of a space within a building.

**OPENABLE AREA.** That part of a window, skylight or door which is available for unobstructed ventilation and which opens directly to the outdoors.

DEFINITIONS

**OPERATOR.** Any person who has charge, care or control of a structure or premises which is let or offered for occupancy.

**OWNER.** Any person, agent, operator, firm or corporation having a legal or equitable interest in the property; or recorded in the official records of the state, county or municipality as holding title to the property; or otherwise having control of the property, including the guardian of the estate of any such person, and the executor or administrator of the estate of such person if ordered to take possession of real property by a court.

**PERSON.** An individual, corporation, partnership or any other group acting as a unit.

**PREMISES.** A lot, plot or parcel of land, easement or public way, including any structures thereon.

**PUBLIC WAY.** Any street, alley or similar parcel of land essentially unobstructed from the ground to the sky, which is deeded, dedicated or otherwise permanently appropriated to the public for public use.

**ROOMING HOUSE.** A building arranged or occupied for lodging, with or without meals, for compensation and not occupied as a one- or two-family dwelling.

**ROOMING UNIT.** Any room or group of rooms forming a single habitable unit occupied or intended to be occupied for sleeping or living, but not for cooking purposes.

**RUBBISH.** Combustible and noncombustible waste materials, except garbage; the term shall include the residue from the burning of wood, coal, coke and other combustible materials, paper, rags, cartons, boxes, wood, excelsior, rubber, leather, tree branches, yard trimmings, tin cans, metals, mineral matter, glass, crockery and dust and other similar materials.

**[B] SLEEPING UNIT.** A room or space in which people sleep, which can also include permanent provisions for living, eating and either sanitation or kitchen facilities, but not both. Such rooms and spaces that are also part of a dwelling unit are not sleeping units.

**STRICT LIABILITY OFFENSE.** An offense in which the prosecution in a legal proceeding is not required to prove criminal intent as a part of its case. It is enough to prove that the defendant either did an act which was prohibited, or failed to do an act which the defendant was legally required to do.

**STRUCTURE.** That which is built or constructed or a portion thereof.

**TENANT.** A person, corporation, partnership or group, whether or not the legal owner of record, occupying a building or portion thereof as a unit.

**TOILET ROOM.** A room containing a water closet or urinal but not a bathtub or shower.

**VENTILATION.** The natural or mechanical process of supplying conditioned or unconditioned air to, or removing such air from, any space.

**WORKMANLIKE.** Executed in a skilled manner; e.g., generally plumb, level, square, in line, undamaged and without marring adjacent work.

**YARD.** An open space on the same lot with a structure.

# CHAPTER 3

# GENERAL REQUIREMENTS

## SECTION 301
## GENERAL

**301.1 Scope.** The provisions of this chapter shall govern the minimum conditions and the responsibilities of persons for maintenance of structures, equipment and exterior property.

**301.2 Responsibility.** The owner of the premises shall maintain the structures and exterior property in compliance with these requirements, except as otherwise provided for in this code. A person shall not occupy as owner-occupant or permit another person to occupy premises which are not in a sanitary and safe condition and which do not comply with the requirements of this chapter. Occupants of a dwelling unit, rooming unit or housekeeping unit are responsible for keeping in a clean, sanitary and safe condition that part of the dwelling unit, rooming unit, housekeeping unit or premises which they occupy and control.

**301.3 Vacant structures and land.** All vacant structures and premises thereof or vacant land shall be maintained in a clean, safe, secure and sanitary condition as provided herein so as not to cause a blighting problem or adversely affect the public health or safety.

## SECTION 302
## EXTERIOR PROPERTY AREAS

**302.1 Sanitation.** All exterior property and premises shall be maintained in a clean, safe and sanitary condition. The occupant shall keep that part of the exterior property which such occupant occupies or controls in a clean and sanitary condition.

**302.2 Grading and drainage.** All premises shall be graded and maintained to prevent the erosion of soil and to prevent the accumulation of stagnant water thereon, or within any structure located thereon.

**Exception:** Approved retention areas and reservoirs.

**302.3 Sidewalks and driveways.** All sidewalks, walkways, stairs, driveways, parking spaces and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions.

**302.4 Weeds.** All premises and exterior property shall be maintained free from weeds or plant growth in excess of (jurisdiction to insert height in inches). All noxious weeds shall be prohibited. Weeds shall be defined as all grasses, annual plants and vegetation, other than trees or shrubs provided; however, this term shall not include cultivated flowers and gardens.

Upon failure of the owner or agent having charge of a property to cut and destroy weeds after service of a notice of violation, they shall be subject to prosecution in accordance with Section 106.3 and as prescribed by the authority having jurisdiction. Upon failure to comply with the notice of violation, any duly authorized employee of the jurisdiction or contractor hired by the jurisdiction shall be authorized to enter upon the

property in violation and cut and destroy the weeds growing thereon, and the costs of such removal shall be paid by the owner or agent responsible for the property.

**302.5 Rodent harborage.** All structures and exterior property shall be kept free from rodent harborage and infestation. Where rodents are found, they shall be promptly exterminated by approved processes which will not be injurious to human health. After extermination, proper precautions shall be taken to eliminate rodent harborage and prevent reinfestation.

**302.6 Exhaust vents.** Pipes, ducts, conductors, fans or blowers shall not discharge gases, steam, vapor, hot air, grease, smoke, odors or other gaseous or particulate wastes directly upon abutting or adjacent public or private property or that of another tenant.

**302.7 Accessory structures.** All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair.

**302.8 Motor vehicles.** Except as provided for in other regulations, no inoperative or unlicensed motor vehicle shall be parked, kept or stored on any premises, and no vehicle shall at any time be in a state of major disassembly, disrepair, or in the process of being stripped or dismantled. Painting of vehicles is prohibited unless conducted inside an approved spray booth.

**Exception:** A vehicle of any type is permitted to undergo major overhaul, including body work, provided that such work is performed inside a structure or similarly enclosed area designed and approved for such purposes.

**302.9 Defacement of property.** No person shall willfully or wantonly damage, mutilate or deface any exterior surface of any structure or building on any private or public property by placing thereon any marking, carving or graffiti.

It shall be the responsibility of the owner to restore said surface to an approved state of maintenance and repair.

## SECTION 303
## SWIMMING POOLS, SPAS AND HOT TUBS

**303.1 Swimming pools.** Swimming pools shall be maintained in a clean and sanitary condition, and in good repair.

**303.2 Enclosures.** Private swimming pools, hot tubs and spas, containing water more than 24 inches (610 mm) in depth shall be completely surrounded by a fence or barrier at least 48 inches (1219 mm) in height above the finished ground level measured on the side of the barrier away from the pool. Gates and doors in such barriers shall be self-closing and self-latching. Where the self-latching device is less than 54 inches (1372 mm) above the bottom of the gate, the release mechanism shall be located on the pool side of the gate. Self-closing and self-latching gates shall be maintained such that the gate will positively close and latch when released from an open position of 6 inches (152 mm) from the gatepost. No existing pool enclosure

shall be removed, replaced or changed in a manner that reduces its effectiveness as a safety barrier.

**Exception:** Spas or hot tubs with a safety cover that complies with ASTM F 1346 shall be exempt from the provisions of this section.

## SECTION 304
## EXTERIOR STRUCTURE

**304.1 General.** The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety or welfare.

**304.2 Protective treatment.** All exterior surfaces, including but not limited to, doors, door and window frames, cornices, porches, trim, balconies, decks and fences shall be maintained in good condition. Exterior wood surfaces, other than decay-resistant woods, shall be protected from the elements and decay by painting or other protective covering or treatment. Peeling, flaking and chipped paint shall be eliminated and surfaces repainted. All siding and masonry joints as well as those between the building envelope and the perimeter of windows, doors, and skylights shall be maintained weather resistant and water tight. All metal surfaces subject to rust or corrosion shall be coated to inhibit such rust and corrosion and all surfaces with rust or corrosion shall be stabilized and coated to inhibit future rust and corrosion. Oxidation stains shall be removed from exterior surfaces. Surfaces designed for stabilization by oxidation are exempt from this requirement.

**[F] 304.3 Premises identification.** Buildings shall have approved address numbers placed in a position to be plainly legible and visible from the street or road fronting the property. These numbers shall contrast with their background. Address numbers shall be Arabic numerals or alphabet letters. Numbers shall be a minimum of 4 inches (102 mm) high with a minimum stroke width of 0.5 inch (12.7 mm).

**304.4 Structural members.** All structural members shall be maintained free from deterioration, and shall be capable of safely supporting the imposed dead and live loads.

**304.5 Foundation walls.** All foundation walls shall be maintained plumb and free from open cracks and breaks and shall be kept in such condition so as to prevent the entry of rodents and other pests.

**304.6 Exterior walls.** All exterior walls shall be free from holes, breaks, and loose or rotting materials; and maintained weatherproof and properly surface coated where required to prevent deterioration.

**304.7 Roofs and drainage.** The roof and flashing shall be sound, tight and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof drains, gutters and downspouts shall be maintained in good repair and free from obstructions. Roof water shall not be discharged in a manner that creates a public nuisance.

**304.8 Decorative features.** All cornices, belt courses, corbels, terra cotta trim, wall facings and similar decorative features shall be maintained in good repair with proper anchorage and in a safe condition.

**304.9 Overhang extensions.** All overhang extensions including, but not limited to canopies, marquees, signs, metal awnings, fire escapes, standpipes and exhaust ducts shall be maintained in good repair and be properly anchored so as to be kept in a sound condition. When required, all exposed surfaces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**304.10 Stairways, decks, porches and balconies.** Every exterior stairway, deck, porch and balcony, and all appurtenances attached thereto, shall be maintained structurally sound, in good repair, with proper anchorage and capable of supporting the imposed loads.

**304.11 Chimneys and towers.** All chimneys, cooling towers, smoke stacks, and similar appurtenances shall be maintained structurally safe and sound, and in good repair. All exposed surfaces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**304.12 Handrails and guards.** Every handrail and guard shall be firmly fastened and capable of supporting normally imposed loads and shall be maintained in good condition.

**304.13 Window, skylight and door frames.** Every window, skylight, door and frame shall be kept in sound condition, good repair and weather tight.

**304.13.1 Glazing.** All glazing materials shall be maintained free from cracks and holes.

**304.13.2 Openable windows.** Every window, other than a fixed window, shall be easily openable and capable of being held in position by window hardware.

**304.14 Insect screens.** During the period from [DATE] to [DATE], every door, window and other outside opening required for ventilation of habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged or stored shall be supplied with approved tightly fitting screens of not less than 16 mesh per inch (16 mesh per 25 mm), and every screen door used for insect control shall have a self-closing device in good working condition.

**Exception:** Screens shall not be required where other approved means, such as air curtains or insect repellent fans, are employed.

**304.15 Doors.** All exterior doors, door assemblies and hardware shall be maintained in good condition. Locks at all entrances to dwelling units and sleeping units shall tightly secure the door. Locks on means of egress doors shall be in accordance with Section 702.3.

**304.16 Basement hatchways.** Every basement hatchway shall be maintained to prevent the entrance of rodents, rain and surface drainage water.

**304.17 Guards for basement windows.** Every basement window that is openable shall be supplied with rodent shields, storm windows or other approved protection against the entry of rodents.

**304.18 Building security.** Doors, windows or hatchways for dwelling units, room units or housekeeping units shall be provided with devices designed to provide security for the occupants and property within.

**304.18.1 Doors.** Doors providing access to a dwelling unit, rooming unit or housekeeping unit that is rented, leased or let shall be equipped with a deadbolt lock designed to be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort and shall have a lock throw of not less than 1 inch (25 mm). Such deadbolt locks shall be installed according to the manufacturer's specifications and maintained in good working order. For the purpose of this section, a sliding bolt shall not be considered an acceptable deadbolt lock.

**304.18.2 Windows.** Operable windows located in whole or in part within 6 feet (1828 mm) above ground level or a walking surface below that provide access to a dwelling unit, rooming unit or housekeeping unit that is rented, leased or let shall be equipped with a window sash locking device.

**304.18.3 Basement hatchways.** Basement hatchways that provide access to a dwelling unit, rooming unit or housekeeping unit that is rented, leased or let shall be equipped with devices that secure the units from unauthorized entry.

## SECTION 305
## INTERIOR STRUCTURE

**305.1 General.** The interior of a structure and equipment therein shall be maintained in good repair, structurally sound and in a sanitary condition. Occupants shall keep that part of the structure which they occupy or control in a clean and sanitary condition. Every owner of a structure containing a rooming house, housekeeping units, a hotel, a dormitory, two or more dwelling units or two or more nonresidential occupancies, shall maintain, in a clean and sanitary condition, the shared or public areas of the structure and exterior property.

**305.2 Structural members.** All structural members shall be maintained structurally sound, and be capable of supporting the imposed loads.

**305.3 Interior surfaces.** All interior surfaces, including windows and doors, shall be maintained in good, clean and sanitary condition. Peeling, chipping, flaking or abraded paint shall be repaired, removed or covered. Cracked or loose plaster, decayed wood and other defective surface conditions shall be corrected.

**305.4 Stairs and walking surfaces.** Every stair, ramp, landing, balcony, porch, deck or other walking surface shall be maintained in sound condition and good repair.

**305.5 Handrails and guards.** Every handrail and guard shall be firmly fastened and capable of supporting normally imposed loads and shall be maintained in good condition.

**305.6 Interior doors.** Every interior door shall fit reasonably well within its frame and shall be capable of being opened and closed by being properly and securely attached to jambs, headers or tracks as intended by the manufacturer of the attachment hardware.

## SECTION 306
## HANDRAILS AND GUARDRAILS

**306.1 General.** Every exterior and interior flight of stairs having more than four risers shall have a handrail on one side of the stair and every open portion of a stair, landing, balcony, porch, deck, ramp or other walking surface which is more than 30 inches (762 mm) above the floor or grade below shall have guards. Handrails shall not be less than 30 inches (762 mm) high or more than 42 inches (1067 mm) high measured vertically above the nosing of the tread or above the finished floor of the landing or walking surfaces. Guards shall not be less than 30 inches (762 mm) high above the floor of the landing, balcony, porch, deck, or ramp or other walking surface.

**Exception:** Guards shall not be required where exempted by the adopted building code.

## SECTION 307
## RUBBISH AND GARBAGE

**307.1 Accumulation of rubbish or garbage.** All exterior property and premises, and the interior of every structure, shall be free from any accumulation of rubbish or garbage.

**307.2 Disposal of rubbish.** Every occupant of a structure shall dispose of all rubbish in a clean and sanitary manner by placing such rubbish in approved containers.

**307.2.1 Rubbish storage facilities.** The owner of every occupied premises shall supply approved covered containers for rubbish, and the owner of the premises shall be responsible for the removal of rubbish.

**307.2.2 Refrigerators.** Refrigerators and similar equipment not in operation shall not be discarded, abandoned or stored on premises without first removing the doors.

**307.3 Disposal of garbage.** Every occupant of a structure shall dispose of garbage in a clean and sanitary manner by placing such garbage in an approved garbage disposal facility or approved garbage containers.

**307.3.1 Garbage facilities.** The owner of every dwelling shall supply one of the following: an approved mechanical food waste grinder in each dwelling unit; an approved incinerator unit in the structure available to the occupants in each dwelling unit; or an approved leakproof, covered, outside garbage container.

**307.3.2 Containers.** The operator of every establishment producing garbage shall provide, and at all times cause to be utilized, approved leakproof containers provided with close-fitting covers for the storage of such materials until removed from the premises for disposal.

## SECTION 308
## EXTERMINATION

**308.1 Infestation.** All structures shall be kept free from insect and rodent infestation. All structures in which insects or rodents are found shall be promptly exterminated by approved processes that will not be injurious to human health. After extermination, proper precautions shall be taken to prevent reinfestation.

GENERAL REQUIREMENTS

**308.2 Owner.** The owner of any structure shall be responsible for extermination within the structure prior to renting or leasing the structure.

**308.3 Single occupant.** The occupant of a one-family dwelling or of a single-tenant nonresidential structure shall be responsible for extermination on the premises.

**308.4 Multiple occupancy.** The owner of a structure containing two or more dwelling units, a multiple occupancy, a rooming house or a nonresidential structure shall be responsible for extermination in the public or shared areas of the structure and exterior property. If infestation is caused by failure of an occupant to prevent such infestation in the area occupied, the occupant shall be responsible for extermination.

**308.5 Occupant.** The occupant of any structure shall be responsible for the continued rodent and pest-free condition of the structure.

**Exception:** Where the infestations are caused by defects in the structure, the owner shall be responsible for extermination.

# CHAPTER 4

# LIGHT, VENTILATION AND OCCUPANCY LIMITATIONS

## SECTION 401
## GENERAL

**401.1 Scope.** The provisions of this chapter shall govern the minimum conditions and standards for light, ventilation and space for occupying a structure.

**401.2 Responsibility.** The owner of the structure shall provide and maintain light, ventilation and space conditions in compliance with these requirements. A person shall not occupy as owner-occupant, or permit another person to occupy, any premises that do not comply with the requirements of this chapter.

**401.3 Alternative devices.** In lieu of the means for natural light and ventilation herein prescribed, artificial light or mechanical ventilation complying with the *International Building Code* shall be permitted.

## SECTION 402
## LIGHT

**402.1 Habitable spaces.** Every habitable space shall have at least one window of approved size facing directly to the outdoors or to a court. The minimum total glazed area for every habitable space shall be 8 percent of the floor area of such room. Wherever walls or other portions of a structure face a window of any room and such obstructions are located less than 3 feet (914 mm) from the window and extend to a level above that of the ceiling of the room, such window shall not be deemed to face directly to the outdoors nor to a court and shall not be included as contributing to the required minimum total window area for the room.

> **Exception:** Where natural light for rooms or spaces without exterior glazing areas is provided through an adjoining room, the unobstructed opening to the adjoining room shall be at least 8 percent of the floor area of the interior room or space, but not less than 25 square feet (2.33 m²). The exterior glazing area shall be based on the total floor area being served.

**402.2 Common halls and stairways.** Every common hall and stairway in residential occupancies, other than in one- and two-family dwellings, shall be lighted at all times with at least a 60-watt standard incandescent light bulb for each 200 square feet (19 m²) of floor area or equivalent illumination, provided that the spacing between lights shall not be greater than 30 feet (9144 mm). In other than residential occupancies, means of egress, including exterior means of egress, stairways shall be illuminated at all times the building space served by the means of egress is occupied with a minimum of 1 footcandle (11 lux) at floors, landings and treads.

**402.3 Other spaces.** All other spaces shall be provided with natural or artificial light sufficient to permit the maintenance of sanitary conditions, and the safe occupancy of the space and utilization of the appliances, equipment and fixtures.

## SECTION 403
## VENTILATION

**403.1 Habitable spaces.** Every habitable space shall have at least one openable window. The total openable area of the window in every room shall be equal to at least 45 percent of the minimum glazed area required in Section 402.1.

> **Exception:** Where rooms and spaces without openings to the outdoors are ventilated through an adjoining room, the unobstructed opening to the adjoining room shall be at least 8 percent of the floor area of the interior room or space, but not less than 25 square feet (2.33 m²). The ventilation openings to the outdoors shall be based on a total floor area being ventilated.

**403.2 Bathrooms and toilet rooms.** Every bathroom and toilet room shall comply with the ventilation requirements for habitable spaces as required by Section 403.1, except that a window shall not be required in such spaces equipped with a mechanical ventilation system. Air exhausted by a mechanical ventilation system from a bathroom or toilet room shall discharge to the outdoors and shall not be recirculated.

**403.3 Cooking facilities.** Unless approved through the certificate of occupancy, cooking shall not be permitted in any rooming unit or dormitory unit, and a cooking facility or appliance shall not be permitted to be present in the rooming unit or dormitory unit.

> **Exceptions:**
> 1. Where specifically approved in writing by the code official.
> 2. Devices such as coffee pots and microwave ovens shall not be considered cooking appliances.

**403.4 Process ventilation.** Where injurious, toxic, irritating or noxious fumes, gases, dusts or mists are generated, a local exhaust ventilation system shall be provided to remove the contaminating agent at the source. Air shall be exhausted to the exterior and not be recirculated to any space.

**403.5 Clothes dryer exhaust.** Clothes dryer exhaust systems shall be independent of all other systems and shall be exhausted in accordance with the manufacturer's instructions.

## SECTION 404
## OCCUPANCY LIMITATIONS

**404.1 Privacy.** Dwelling units, hotel units, housekeeping units, rooming units and dormitory units shall be arranged to provide privacy and be separate from other adjoining spaces.

**404.2 Minimum room widths.** A habitable room, other than a kitchen, shall not be less than 7 feet (2134 mm) in any plan dimension. Kitchens shall have a clear passageway of not less

LIGHT, VENTILATION AND OCCUPANCY LIMITATIONS

than 3 feet (914 mm) between counterfronts and appliances or counterfronts and walls.

**404.3 Minimum ceiling heights.** Habitable spaces, hallways, corridors, laundry areas, bathrooms, toilet rooms and habitable basement areas shall have a clear ceiling height of not less than 7 feet (2134 mm).

Exceptions:

1. In one- and two-family dwellings, beams or girders spaced not less than 4 feet (1219 mm) on center and projecting not more than 6 inches (152 mm) below the required ceiling height.

2. Basement rooms in one- and two-family dwellings occupied exclusively for laundry, study or recreation purposes, having a ceiling height of not less than 6 feet 8 inches (2033 mm) with not less than 6 feet 4 inches (1932 mm) of clear height under beams, girders, ducts and similar obstructions.

3. Rooms occupied exclusively for sleeping, study or similar purposes and having a sloped ceiling over all or part of the room, with a clear ceiling height of at least 7 feet (2134 mm) over no less than one-third of the required minimum floor area. In calculating the floor area of such rooms, only those portions of the floor area with a clear ceiling height of 5 feet (1524 mm) or more shall be included.

**404.4 Bedroom and living room requirements.** Every bedroom and living room shall comply with the requirements of Sections 404.4.1 through 404.4.5.

**404.4.1 Room area.** Every living room shall contain at least 120 square feet (11.2 m²) and every bedroom shall contain at least 70 square feet (6.5 m²).

**404.4.2 Access from bedrooms.** Bedrooms shall not constitute the only means of access to other bedrooms or habitable spaces and shall not serve as the only means of egress from other habitable spaces.

Exception: Units that contain fewer than two bedrooms.

**404.4.3 Water closet accessibility.** Every bedroom shall have access to at least one water closet and one lavatory without passing through another bedroom. Every bedroom in a dwelling unit shall have access to at least one water closet and lavatory located in the same story as the bedroom or an adjacent story.

**404.4.4 Prohibited occupancy.** Kitchens and nonhabitable spaces shall not be used for sleeping purposes.

**404.4.5 Other requirements.** Bedrooms shall comply with the applicable provisions of this code including, but not limited to, the light, ventilation, room area, ceiling height and room width requirements of this chapter; the plumbing facilities and water-heating facilities requirements of Chapter 5; the heating facilities and electrical receptacle requirements of Chapter 6; and the smoke detector and emergency escape requirements of Chapter 7.

**404.5 Overcrowding.** The number of persons occupying a dwelling unit shall not create conditions that, in the opinion of the code official, endanger the life, health, safety or welfare of the occupants.

**404.6 Efficiency unit.** Nothing in this section shall prohibit an efficiency living unit from meeting the following requirements:

1. A unit occupied by not more than two occupants shall have a clear floor area of not less than 220 square feet (20.4 m²). A unit occupied by three occupants shall have a clear floor area of not less than 320 square feet (29.7 m²). These required areas shall be exclusive of the areas required by Items 2 and 3.

2. The unit shall be provided with a kitchen sink, cooking appliance and refrigeration facilities, each having a clear working space of not less than 30 inches (762 mm) in front. Light and ventilation conforming to this code shall be provided.

3. The unit shall be provided with a separate bathroom containing a water closet, lavatory and bathtub or shower.

4. The maximum number of occupants shall be three.

**404.7 Food preparation.** All spaces to be occupied for food preparation purposes shall contain suitable space and equipment to store, prepare and serve foods in a sanitary manner. There shall be adequate facilities and services for the sanitary disposal of food wastes and refuse, including facilities for temporary storage.

# CHAPTER 5

# PLUMBING FACILITIES AND FIXTURE REQUIREMENTS

## SECTION 501
## GENERAL

**501.1 Scope.** The provisions of this chapter shall govern the minimum plumbing systems, facilities and plumbing fixtures to be provided.

**501.2 Responsibility.** The owner of the structure shall provide and maintain such plumbing facilities and plumbing fixtures in compliance with these requirements. A person shall not occupy as owner-occupant or permit another person to occupy any structure or premises which does not comply with the requirements of this chapter.

## [P] SECTION 502
## REQUIRED FACILITIES

**502.1 Dwelling units.** Every dwelling unit shall contain its own bathtub or shower, lavatory, water closet and kitchen sink which shall be maintained in a sanitary, safe working condition. The lavatory shall be placed in the same room as the water closet or located in close proximity to the door leading directly into the room in which such water closet is located. A kitchen sink shall not be used as a substitute for the required lavatory.

**502.2 Rooming houses.** At least one water closet, lavatory and bathtub or shower shall be supplied for each four rooming units.

**502.3 Hotels.** Where private water closets, lavatories and baths are not provided, one water closet, one lavatory and one bathtub or shower having access from a public hallway shall be provided for each ten occupants.

**502.4 Employees' facilities.** A minimum of one water closet, one lavatory and one drinking facility shall be available to employees.

**502.4.1 Drinking facilities.** Drinking facilities shall be a drinking fountain, water cooler, bottled water cooler or disposable cups next to a sink or water dispenser. Drinking facilities shall not be located in toilet rooms or bathrooms.

## [P] SECTION 503
## TOILET ROOMS

**503.1 Privacy.** Toilet rooms and bathrooms shall provide privacy and shall not constitute the only passageway to a hall or other space, or to the exterior. A door and interior locking device shall be provided for all common or shared bathrooms and toilet rooms in a multiple dwelling.

**503.2 Location.** Toilet rooms and bathrooms serving hotel units, rooming units or dormitory units or housekeeping units, shall have access by traversing not more than one flight of stairs and shall have access from a common hall or passageway.

**503.3 Location of employee toilet facilities.** Toilet facilities shall have access from within the employees' working area. The required toilet facilities shall be located not more than one story above or below the employees' working area and the path of travel to such facilities shall not exceed a distance of 500 feet (152 m). Employee facilities shall either be separate facilities or combined employee and public facilities.

**Exception:** Facilities that are required for employees in storage structures or kiosks, which are located in adjacent structures under the same ownership, lease or control, shall not exceed a travel distance of 500 feet (152 m) from the employees' regular working area to the facilities.

**503.4 Floor surface.** In other than dwelling units, every toilet room floor shall be maintained to be a smooth, hard, nonabsorbent surface to permit such floor to be easily kept in a clean and sanitary condition.

## [P] SECTION 504
## PLUMBING SYSTEMS AND FIXTURES

**504.1 General.** All plumbing fixtures shall be properly installed and maintained in working order, and shall be kept free from obstructions, leaks and defects and be capable of performing the function for which such plumbing fixtures are designed. All plumbing fixtures shall be maintained in a safe, sanitary and functional condition.

**504.2 Fixture clearances.** Plumbing fixtures shall have adequate clearances for usage and cleaning.

**504.3 Plumbing system hazards.** Where it is found that a plumbing system in a structure constitutes a hazard to the occupants or the structure by reason of inadequate service, inadequate venting, cross connection, backsiphonage, improper installation, deterioration or damage or for similar reasons, the code official shall require the defects to be corrected to eliminate the hazard.

## SECTION 505
## WATER SYSTEM

**505.1 General.** Every sink, lavatory, bathtub or shower, drinking fountain, water closet or other plumbing fixture shall be properly connected to either a public water system or to an approved private water system. All kitchen sinks, lavatories, laundry facilities, bathtubs and showers shall be supplied with hot or tempered and cold running water in accordance with the *International Plumbing Code*.

**[P] 505.2 Contamination.** The water supply shall be maintained free from contamination, and all water inlets for plumbing fixtures shall be located above the flood-level rim of the fixture. Shampoo basin faucets, janitor sink faucets and other hose bibs or faucets to which hoses are attached and left in

PLUMBING FACILITIES AND FIXTURE REQUIREMENTS

place, shall be protected by an approved atmospheric-type vacuum breaker or an approved permanently attached hose connection vacuum breaker.

505.3 Supply. The water supply system shall be installed and maintained to provide a supply of water to plumbing fixtures, devices and appurtenances in sufficient volume and at pressures adequate to enable the fixtures to function properly, safely, and free from defects and leaks.

505.4 Water heating facilities. Water heating facilities shall be properly installed, maintained and capable of providing an adequate amount of water to be drawn at every required sink, lavatory, bathtub, shower and laundry facility at a temperature of not less than 110°F (43°C). A gas-burning water heater shall not be located in any bathroom, toilet room, bedroom or other occupied room normally kept closed, unless adequate combustion air is provided. An approved combination temperature and pressure-relief valve and relief valve discharge pipe shall be properly installed and maintained on water heaters.

## [P] SECTION 506
## SANITARY DRAINAGE SYSTEM

506.1 General. All plumbing fixtures shall be properly connected to either a public sewer system or to an approved private sewage disposal system.

506.2 Maintenance. Every plumbing stack, vent, waste and sewer line shall function properly and be kept free from obstructions, leaks and defects.

## [P] SECTION 507
## STORM DRAINAGE

507.1 General. Drainage of roofs and paved areas, yards and courts, and other open areas on the premises shall not be discharged in a manner that creates a public nuisance.

# CHAPTER 6

# MECHANICAL AND ELECTRICAL REQUIREMENTS

## SECTION 601
## GENERAL

**601.1 Scope.** The provisions of this chapter shall govern the minimum mechanical and electrical facilities and equipment to be provided.

**601.2 Responsibility.** The owner of the structure shall provide and maintain mechanical and electrical facilities and equipment in compliance with these requirements. A person shall not occupy as owner-occupant or permit another person to occupy any premises which does not comply with the requirements of this chapter.

## SECTION 602
## HEATING FACILITIES

**602.1 Facilities required.** Heating facilities shall be provided in structures as required by this section.

**602.2 Residential occupancies.** Dwellings shall be provided with heating facilities capable of maintaining a room temperature of 68°F (20°C) in all habitable rooms, bathrooms and toilet rooms based on the winter outdoor design temperature for the locality indicated in Appendix D of the *International Plumbing Code.* Cooking appliances shall not be used to provide space heating to meet the requirements of this section.

> **Exception:** In areas where the average monthly temperature is above 30°F (-1°C), a minimum temperature of 65°F (18°C) shall be maintained.

**602.3 Heat supply.** Every owner and operator of any building who rents, leases or lets one or more dwelling units or sleeping units on terms, either expressed or implied, to furnish heat to the occupants thereof shall supply heat during the period from [DATE] to [DATE] to maintain a temperature of not less than 68°F (20°C) in all habitable rooms, bathrooms, and toilet rooms.

> **Exceptions:**
>
> 1. When the outdoor temperature is below the winter outdoor design temperature for the locality, maintenance of the minimum room temperature shall not be required provided that the heating system is operating at its full design capacity. The winter outdoor design temperature for the locality shall be as indicated in Appendix D of the *International Plumbing Code.*
>
> 2. In areas where the average monthly temperature is above 30°F (-1°C), a minimum temperature of 65°F (18°C) shall be maintained.

**602.4 Occupiable work spaces.** Indoor occupiable work spaces shall be supplied with heat during the period from [DATE] to [DATE] to maintain a temperature of not less than 65°F (18°C) during the period the spaces are occupied.

> **Exceptions:**
>
> 1. Processing, storage and operation areas that require cooling or special temperature conditions.
>
> 2. Areas in which persons are primarily engaged in vigorous physical activities.

**602.5 Room temperature measurement.** The required room temperatures shall be measured 3 feet (914 mm) above the floor near the center of the room and 2 feet (610 mm) inward from the center of each exterior wall.

## SECTION 603
## MECHANICAL EQUIPMENT

**603.1 Mechanical appliances.** All mechanical appliances, fireplaces, solid fuel-burning appliances, cooking appliances and water heating appliances shall be properly installed and maintained in a safe working condition, and shall be capable of performing the intended function.

**603.2 Removal of combustion products.** All fuel-burning equipment and appliances shall be connected to an approved chimney or vent.

> **Exception:** Fuel-burning equipment and appliances which are labeled for unvented operation.

**603.3 Clearances.** All required clearances to combustible materials shall be maintained.

**603.4 Safety controls.** All safety controls for fuel-burning equipment shall be maintained in effective operation.

**603.5 Combustion air.** A supply of air for complete combustion of the fuel and for ventilation of the space containing the fuel-burning equipment shall be provided for the fuel-burning equipment.

**603.6 Energy conservation devices.** Devices intended to reduce fuel consumption by attachment to a fuel-burning appliance, to the fuel supply line thereto, or to the vent outlet or vent piping therefrom, shall not be installed unless labeled for such purpose and the installation is specifically approved.

## SECTION 604
## ELECTRICAL FACILITIES

**604.1 Facilities required.** Every occupied building shall be provided with an electrical system in compliance with the requirements of this section and Section 605.

**604.2 Service.** The size and usage of appliances and equipment shall serve as a basis for determining the need for additional facilities in accordance with the ICC *Electrical Code.* Dwelling units shall be served by a three-wire, 120/240 volt, single-

MECHANICAL AND ELECTRICAL REQUIREMENTS

phase electrical service having a rating of not less than 60 amperes.

**604.3 Electrical system hazards.** Where it is found that the electrical system in a structure constitutes a hazard to the occupants or the structure by reason of inadequate service, improper fusing, insufficient receptacle and lighting outlets, improper wiring or installation, deterioration or damage, or for similar reasons, the code official shall require the defects to be corrected to eliminate the hazard.

## SECTION 605
## ELECTRICAL EQUIPMENT

**605.1 Installation.** All electrical equipment, wiring and appliances shall be properly installed and maintained in a safe and approved manner.

**605.2 Receptacles.** Every habitable space in a dwelling shall contain at least two separate and remote receptacle outlets. Every laundry area shall contain at least one grounded-type receptacle or a receptacle with a ground fault circuit interrupter. Every bathroom shall contain at least one receptacle. Any new bathroom receptacle outlet shall have ground fault circuit interrupter protection.

**605.3 Luminaires.** Every public hall, interior stairway, toilet room, kitchen, bathroom, laundry room, boiler room and furnace room shall contain at least one electric luminaire.

## SECTION 606
## ELEVATORS, ESCALATORS AND DUMBWAITERS

**606.1 General.** Elevators, dumbwaiters and escalators shall be maintained in compliance with ASME A17.1. The most current certification of inspection shall be on display at all times within the elevator or attached to the escalator or dumbwaiter, or the certificate shall be available for public inspection in the office of the building operator. The inspection and tests shall be performed at not less than the periodical intervals listed in ASME A17.1, Appendix N, except where otherwise specified by the authority having jurisdiction.

**606.2 Elevators.** In buildings equipped with passenger elevators, at least one elevator shall be maintained in operation at all times when the building is occupied.

**Exception:** Buildings equipped with only one elevator shall be permitted to have the elevator temporarily out of service for testing or servicing.

## SECTION 607
## DUCT SYSTEMS

**607.1 General.** Duct systems shall be maintained free of obstructions and shall be capable of performing the required function.

# CHAPTER 7

# FIRE SAFETY REQUIREMENTS

## SECTION 701
## GENERAL

**701.1 Scope.** The provisions of this chapter shall govern the minimum conditions and standards for fire safety relating to structures and exterior premises, including fire safety facilities and equipment to be provided.

**701.2 Responsibility.** The owner of the premises shall provide and maintain such fire safety facilities and equipment in compliance with these requirements. A person shall not occupy as owner-occupant or permit another person to occupy any premises that do not comply with the requirements of this chapter.

## [F] SECTION 702
## MEANS OF EGRESS

**702.1 General.** A safe, continuous and unobstructed path of travel shall be provided from any point in a building or structure to the public way. Means of egress shall comply with the *International Fire Code*.

**702.2 Aisles.** The required width of aisles in accordance with the *International Fire Code* shall be unobstructed.

**702.3 Locked doors.** All means of egress doors shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort, except where the door hardware conforms to that permitted by the *International Building Code*.

**702.4 Emergency escape openings.** Required emergency escape openings shall be maintained in accordance with the code in effect at the time of construction, and the following. Required emergency escape and rescue openings shall be operational from the inside of the room without the use of keys or tools. Bars, grilles, grates or similar devices are permitted to be placed over emergency escape and rescue openings provided the minimum net clear opening size complies with the code that was in effect at the time of construction and such devices shall be releasable or removable from the inside without the use of a key, tool or force greater than that which is required for normal operation of the escape and rescue opening.

## [F] SECTION 703
## FIRE-RESISTANCE RATINGS

**703.1 Fire-resistance-rated assemblies.** The required fire-resistance rating of fire-resistance-rated walls, fire stops, shaft enclosures, partitions and floors shall be maintained.

**703.2 Opening protectives.** Required opening protectives shall be maintained in an operative condition. All fire and smokestop doors shall be maintained in operable condition.

Fire doors and smoke barrier doors shall not be blocked or obstructed or otherwise made inoperable.

## [F] SECTION 704
## FIRE PROTECTION SYSTEMS

**704.1 General.** All systems, devices and equipment to detect a fire, actuate an alarm, or suppress or control a fire or any combination thereof shall be maintained in an operable condition at all times in accordance with the *International Fire Code*.

**704.2 Smoke alarms.** Single or multiple-station smoke alarms shall be installed and maintained in Groups R-2, R-3, R-4 and in dwellings not regulated in Group R occupancies, regardless of occupant load at all of the following locations:

1. On the ceiling or wall outside of each separate sleeping area in the immediate vicinity of bedrooms.

2. In each room used for sleeping purposes.

3. In each story within a dwelling unit, including basements and cellars but not including crawl spaces and uninhabitable attics. In dwellings or dwelling units with split levels and without an intervening door between the adjacent levels, a smoke alarm installed on the upper level shall suffice for the adjacent lower level provided that the lower level is less than one full story below the upper level.

Single or multiple-station smoke alarms shall be installed in other groups in accordance with the *International Fire Code*.

**704.3 Power source.** In Group R occupancies and in dwellings not regulated as Group R occupancies, single-station smoke alarms shall receive their primary power from the building wiring provided that such wiring is served from a commercial source and shall be equipped with a battery backup. Smoke alarms shall emit a signal when the batteries are low. Wiring shall be permanent and without a disconnecting switch other than as required for overcurrent protection.

> **Exception:** Smoke alarms are permitted to be solely battery operated in buildings where no construction is taking place, buildings that are not served from a commercial power source and in existing areas of buildings undergoing alterations or repairs that do not result in the removal of interior wall or ceiling finishes exposing the structure, unless there is an attic, crawl space or basement available which could provide access for building wiring without the removal of interior finishes.

**704.4 Interconnection.** Where more than one smoke alarm is required to be installed within an individual dwelling unit in Group R-2, R-3, R-4 and in dwellings not regulated as Group R occupancies, the smoke alarms shall be interconnected in such

*FIRE SAFETY REQUIREMENTS*

a manner that the activation of one alarm will activate all of the alarms in the individual unit. The alarm shall be clearly audible in all bedrooms over background noise levels with all intervening doors closed.

Exceptions:

1. *Interconnection is not required in buildings which are not undergoing alterations, repairs, or construction of any kind.*

2. *Smoke alarms in existing areas are not required to be interconnected where alterations or repairs do not result in the removal of interior wall or ceiling finishes exposing the structure, unless there is an attic, crawl space or basement available which could provide access for interconnection without the removal of interior finishes.*

# CHAPTER 8

# REFERENCED STANDARDS

This chapter lists the standards that are referenced in various sections of this document. The standards are listed herein by the promulgating agency of the standard, the standard identification, the effective date and title and the section or sections of this document that reference the standard. The application of the referenced standards shall be as specified in Section 102.7.

## ASME
American Society of Mechanical Engineers
Three Park Avenue
New York, NY 10016-5990

| Standard reference number | Title | Referenced in code section number |
|---|---|---|
| A17.1—2000 | Safety Code for Elevators and Escalators with A17.1a 2002 Addenda ............................................ | 606.1 |

## ASTM
ASTM International
100 Barr Harbor Drive
West Conshohocken, PA 19428-2959

| Standard reference number | Title | Referenced in code section number |
|---|---|---|
| F1346—91 (2003) | Performance Specifications for Safety Covers and Labeling Requirements for All Covers for Swimming Pools, Spas and Hot Tubs .................................................. | 303.2 |

## ICC
International Code Council
5203 Leesburg Pike, Suite 600
Falls Church, VA 22041

| Standard reference number | Title | Referenced in code section number |
|---|---|---|
| ICC EC—06 | ICC Electrical Code® — Administrative Provisions ................................................ | 201.3, 604.2 |
| IBC—06 | International Building Code® ................................................ | 102.3, 201.3, 401.3, 702.3 |
| IFC—06 | International Fire Code® ................................................ | 201.3, 702.1, 702.2, 704.1, 704.2 |
| IFGC—06 | International Fuel Gas Code® ................................................ | 102.3 |
| IMC—06 | International Mechanical Code® ................................................ | 102.3, 201.3 |
| IPC—06 | International Plumbing Code® ................................................ | 201.3, 505.1, 602.2, 602.3 |
| IZC—06 | International Zoning Code® ................................................ | 102.3, 201.3 |

# INDEX

## A

ACCEPTED ENGINEERING METHODS . . . . . . . 104.2
ACCESS
   Egress . . . . . . . . . . . . . . . . . . . . . . . . . . . . .702
   From bedrooms . . . . . . . . . . . . . . . . . . . .404.4.2
   Plumbing fixtures, access for cleaning . . . . .504.2
   To public way . . . . . . . . . . . . . . . . . . . . . .702.1
   Toilet room as passageway . . . . . . . . . . . . .503.1
   Water closet . . . . . . . . . . . . . . . . . . . . . .404.4.3
ADJACENT
   Privacy (hotel units, rooming units) . . . . . . .404.1
ADMINISTRATION
   Scope . . . . . . . . . . . . . . . . . . . . . . . . . . .101.2
AGENT (See also OPERATOR) . . . . . . . . . . . . . .202
   (See OWNER)
AIR
   Combustion air . . . . . . . . . . . . . . . . . . . . .603.5
AISLES
   Minimum width . . . . . . . . . . . . . . . . . . . . .702.2
ALTERATION
   Applicability of other codes . . . . . . . . . . . . .102.3
   Condemnation . . . . . . . . . . . . . . . . .108.1, 108.2
   Inspection . . . . . . . . . . . . . . . . . . . . . . . . .104.3
   Prosecution . . . . . . . . . . . . . . . . . . . . . . . .106.3
   Unlawful acts . . . . . . . . . . . . . . . . . . . . . .106.1
ANCHOR
   Architectural trim . . . . . . . . . . . . . . . . . . . .304.8
   Signs, marquees and awnings . . . . . . . . . . .304.9
APPEAL
   Application . . . . . . . . . . . . . . . . . . . . . . . .111.1
   Board decision . . . . . . . . . . . . . . . . . . . . . .111.6
   Board of appeals . . . . . . . . . . . . . . . . . . . .111.2
   Court review . . . . . . . . . . . . . . . . . . . . . . .111.7
   Disqualification . . . . . . . . . . . . . . . . . . . .111.2.3
   Financial interest . . . . . . . . . . . . . . . . . . .111.2.3
   Hearing, emergency orders . . . . . . . . . . . . .109.6
   Membership . . . . . . . . . . . . . . . . . . . . . . .111.2
   Notice of appeal . . . . . . . . . . . . . . . . . . . .111.1
   Postponed hearing . . . . . . . . . . . . . . . . . . .111.5
   Records . . . . . . . . . . . . . . . . . . . . . . . . . .104.7
   Right to appeal . . . . . . . . . . . . . . . . . . . . .111.1
   Vote . . . . . . . . . . . . . . . . . . . . . . . . . . . .111.6
APPLIANCE
   Cooking . . . . . . . . . . . . . . . . . . . . .403.3, 602.2
   Heating . . . . . . . . . . . . . . . . . . . . .602.2, 603.1
   Mechanical . . . . . . . . . . . . . . . . . . . . . . . .603.1
APPLICATION
   Other codes . . . . . . . . . . . . . . . . . . . . . . .102.3
APPROVAL
   Alternatives . . . . . . . . . . . . . . . . . . . . . . .105.2
   Authority . . . . . . . . . . . . . . . . . . . . .104.1, 105.2
   Modifications . . . . . . . . . . . . . . . . . . . . . .105.1
APPROVED

Alternative materials, methods and
   equipment . . . . . . . . . . . . . . . . . . . . . . . .105.2
Definition . . . . . . . . . . . . . . . . . . . . . . . . . . .202
Energy conservation devices . . . . . . . . . . . .603.6
Fireplaces . . . . . . . . . . . . . . . . . . . . . . . . .603.1
Garbage storage facilities . . . . . . . . . . . . .307.3.1
Modifications . . . . . . . . . . . . . . . . . . . . . . .105.1
Used materials and equipment . . . . . . . . . . .105.4
ARCHITECTURAL
   Structural members . . . . . . . . . . . . . . . . . .304.4
   Trim . . . . . . . . . . . . . . . . . . . . . . . . . . . .304.8
ARTIFICIAL
   Lighting of habitable rooms . . . . . . . . . . . . .401.3
   Lighting of other spaces . . . . . . . . . . . . . . .402.3
AUTOMOBILE
   Motor vehicles . . . . . . . . . . . . . . . . . . . . . .302.8
AWNING
   Signs, marquees and awnings . . . . . . . . . . .304.9

## B

BALCONY
   Handrails and guardrails . . . . . . . . . . . . . . . 306.1
BASEMENT
   Definition . . . . . . . . . . . . . . . . . . . . . . . . . . .202
   Hatchways . . . . . . . . . . . . . . . . . . . . . . .304.16
   Windows . . . . . . . . . . . . . . . . . . . . . . . .304.17
BATHROOM
   Common bathrooms . . . . . . . . . . . . .502.3, 503.1
   Hotels . . . . . . . . . . . . . . . . . . . . . . . . . . .502.3
   Lighting . . . . . . . . . . . . . . . . . . . . . . . . . .605.3
   Locks . . . . . . . . . . . . . . . . . . . . . . . . . . .503.1
   Outlets required . . . . . . . . . . . . . . . . . . . .605.2
   Privacy . . . . . . . . . . . . . . . . . . . . . . . . . .503.1
   Ventilation . . . . . . . . . . . . . . . . . . . . . . . .403.2
BATHTUB
   Required facilities . . . . . . . . . . . . . . . . . . .502.1
   Rooming houses . . . . . . . . . . . . . . . . . . . .502.2
   Sewage system . . . . . . . . . . . . . . . . . . . .506.1
   Water heating facilities . . . . . . . . . . . . . . . .505.4
   Water system . . . . . . . . . . . . . . . . . . . . . .505.1
BEDROOM
   Room area . . . . . . . . . . . . . . . . . . . . . . .404.4.1
BOILER
   Unsafe equipment . . . . . . . . . . . . . . . . . .108.1.2

## C

CAPACITY
   Heating facilities . . . . . . . . . . .602.2, 602.3, 602.4
CAR (See AUTOMOBILE)
CEILING
   Basement rooms . . . . . . . . . . . . . . . . . . . .404.3

INDEX

Fire-resistance ratings . . . . . . . . . . . . . . .703.1
Interior surfaces . . . . . . . . . . . . . . . . . . . . .305.3
Minimum height . . . . . . . . . . . . . . . . . . . . .404.3
**CHANGE, MODIFY**
Application of other codes . . . . . . . . . . . . .102.3
**CHIMNEY**
Exterior structure . . . . . . . . . . . . . . . . . .304.11
Fireplaces . . . . . . . . . . . . . . . . . . . . . . . . .603.1
Flue . . . . . . . . . . . . . . . . . . . . . . . .603.2, 603.3
**CLEANING**
Access for cleaning. . . . . . . . . . . . . . . . . .504.2
Bathroom and kitchen floors . . . . . . .305.3, 503.4
Disposal of garbage . . . . . . . . . . . . . . . . .307.3
Disposal of rubbish . . . . . . . . . . . . . . . . . .307.2
Interior sanitation . . . . . . . . . . . . . . . . . . .307.1
Interior surfaces . . . . . . . . . . . . . . . . . . . .305.3
Plumbing facilities, maintained . . . . . . . . . .504.1
Required plumbing facilities. . . . . . . . . . . . .502
Responsibility of persons . . . . . . . . . . . . . .305.1
Trash containers . . . . . . . . . . . . . . . . . . .307.3.2
Vacant structures and land. . . . . . . . . . . . .301.3
**CLEARANCE**
Heating facilities . . . . . . . . . . . . . . . . . . . .603.3
Plumbing fixtures . . . . . . . . . . . . . . . . . . . .504.2
**CLOSING**
Streets. . . . . . . . . . . . . . . . . . . . . . . . . . .109.3
Vacant structures . . . . . . . . . . . . . . . . . . .108.2
**CLOTHES DRYER**
Exhaust. . . . . . . . . . . . . . . . . . . . . . . . . . .403.5
**CODE OFFICIAL**
Condemnation . . . . . . . . . . . . . . . . . . . . .108.1
Demolition . . . . . . . . . . . . . . . . . . . . . . . . . .110
Duties. . . . . . . . . . . . . . . . . . . . . . . . . . . . .104
Emergency order. . . . . . . . . . . . . . . . . . . . .109
Enforcement authority. . . . . . . . . . . . . . . .104.1
Failure to comply with demolition order . . . .110.3
Identification . . . . . . . . . . . . . . . . . . . . . . .104.5
Inspections . . . . . . . . . . . . . . . . . . . . . . . .104.3
Liability, relief of personal . . . . . . . . . . . . .103.4
Membership of board of appeals . . . . . . . . .111.2
Notice of violation . . . . . . . . . . . . . . . .104.6, 107
Notices and orders. . . . . . . . . . . . . . . . . . . .107
Official records . . . . . . . . . . . . . . . . . . . . .104.7
Personal liability . . . . . . . . . . . . . . . . . . . .103.4
Placarding. . . . . . . . . . . . . . . . . . . . . . . . .108.4
Prosecution. . . . . . . . . . . . . . . . . . . . . . . .106.3
Removal of placard . . . . . . . . . . . . . . . . .108.4.1
Right of entry . . . . . . . . . . . . . . . . . . . . . .104.4
Rule-making authority. . . . . . . . . . . . . . . . .104.2
Transfer of ownership . . . . . . . . . . . . . . . .107.5
Vacant structures . . . . . . . . . . . . . . . . . . .108.2
Voting of appeals board. . . . . . . . . .111.2, 111.6
**COLD WATER**
Drinking. . . . . . . . . . . . . . . . . . . . . . . . . . .502.4
Required facilities . . . . . . . . . . . . . . . . . . . .502
Rooming houses. . . . . . . . . . . . . . . . . . . . .502.2
Water system. . . . . . . . . . . . . . . . . . . . . . . .505
**COMBUSTION**
Combustion air . . . . . . . . . . . . . . . . . . . . .603.5

**CONDEMNATION**
Closing of vacant structures . . . . . . . . . . . .108.2
Failure to comply. . . . . . . . . . . . . . . . . . . .110.3
General. . . . . . . . . . . . . . . . . . . . . . . . . . .108.1
Notices and orders . . . . . . . . . . . . .108.2, 108.3
Placarding . . . . . . . . . . . . . . . . . . . . . . . .108.4
Removal of placard . . . . . . . . . . . . . . . . .108.4.1
**CONFLICT**
Conflict of interest . . . . . . . . . . . . . . . . . .111.2.3
Violations . . . . . . . . . . . . . . . . . . . . . . . . .106.1
**CONNECTION**
Plumbing fixtures . . . . . . . . . . . . . . . . . . . .504.1
Sewage system . . . . . . . . . . . . . . . . . . . . .506.1
Water heating . . . . . . . . . . . . . . . . . . . . . .505.4
Water system . . . . . . . . . . . . . . . . . . . . . .505.1
**CONSTRUCTION**
Existing structures . . . . . . . . . . . . . . . . . . .101.2
**CONTAINER**
Garbage. . . . . . . . . . . . . . . . . . . . . . . . .307.3.2
Rubbish storage. . . . . . . . . . . . . . . . . . . .307.2.1
**CONTINUOUS**
Egress. . . . . . . . . . . . . . . . . . . . . . . . . . . .702.1
**CONTRACTOR**
Conflict of interest . . . . . . . . . . . . . . . . . .111.2.3
**CONTROL**
Insect and rodent control. . . . . . . . .302.5, 304.5
Safety controls . . . . . . . . . . . . . . . . . . . . .603.4
**COOLING**
Cooling towers . . . . . . . . . . . . . . . . . . . . .304.11
**CORRIDOR**
Accumulation of rubbish. . . . . . . . . . . . . . .307.1
Light . . . . . . . . . . . . . . . . . . . . . . . . . . . . .402.2
Lighting fixtures. . . . . . . . . . . . . . . . . . . . .605.3
Ratings maintained . . . . . . . . . . . . . . . . . . .703
Toilet rooms, access. . . . . . . . . . . . . . . . . .503.1

**D**

**DAMP, DAMPNESS**
Roofs. . . . . . . . . . . . . . . . . . . . . . . . . . . . .304.7
Window, door frames . . . . . . . . . . . . . . . .304.13
**DANGEROUS, HAZARDOUS**
Condemnation . . . . . . . . . . . . . . . . . . . . .108.1
Demolition . . . . . . . . . . . . . . . . . . . . . . . . . .110
Electrical hazards . . . . . . . . . . . . . . . . . . .604.3
Elevators . . . . . . . . . . . . . . . . . . . . . . . . .606.1
Existing remedies . . . . . . . . . . . . . . . . . . .102.4
Fire safety. . . . . . . . . . . . . . . . . . . . . . . . .701.1
Heating facilities . . . . . . . . . . . . . . .602, 603.1
Imminent danger . . . . . . . . . . . . . . . . . . . . .202
Unsafe structures and equipment . . . . . . . . .108
**DECKS**
Handrails and guardrails. . . . . . . . . . . . . .304.12
Maintenance . . . . . . . . . . . . . . . . .304.2, 304.10
**DECORATION**
Exterior structure . . . . . . . . . . . . . . . . . . .304.8
**DEMOLITION**
Existing remedies . . . . . . . . . . . . . . . . . . .102.4

Failure to comply. . . . . . . . . . . . . . . . . . . .110.3
General . . . . . . . . . . . . . . . . . . . . . . . . . . .110
Order. . . . . . . . . . . . . . . . . . . . . . . . . . . .110.2
Salvage materials . . . . . . . . . . . . . . . . . . . .110.4
Violations . . . . . . . . . . . . . . . . . . . . . . . . . .110.3

**DETECTORS**
Smoke . . . . . . . . . . . . . . . . . . . . . . . . . .704

**DETERIORATION**
Exterior walls . . . . . . . . . . . . . . . . . . . . . .304.6

**DIRECT**
Egress. . . . . . . . . . . . . . . . . . . . . . . . . . .702.1

**DISPOSAL**
Disposal of garbage . . . . . . . . . . . . . . . . .307.3
Disposal of rubbish. . . . . . . . . . . . . . . . . . .307.2

**DOOR**
Exit doors . . . . . . . . . . . . . . . . . . . . . . . .702.3
Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . .703.2
Hardware . . . . . . . . . . . . . . . . . . . . . . . .304.15
Insect screens. . . . . . . . . . . . . . . . . . . . .304.14
Interior surfaces . . . . . . . . . . . . . . . . . . . .305.3
Locks . . . . . . . . . . . . . . . . . . . . .304.15, 702.3
Maintenance . . . . . . . . . . . . . . .304.13, 304.15
Weather tight. . . . . . . . . . . . . . . . . . . . . .304.13
Window and door frames . . . . . . . . . . . . .304.13

**DORMITORY (ROOMING HOUSE, HOTEL, MOTEL)**
Locked doors . . . . . . . . . . . . . . . . . . . . .702.3
Privacy . . . . . . . . . . . . . . . . . . . . .503.1, 503.2

**DRAIN, DRAINAGE**
Basement hatchways . . . . . . . . . . . . . . . .304.16
Plumbing connections . . . . . . . . . . . . . . . . .506
Storm drainage . . . . . . . . . . . . . . . . . . . . . .507

**DUCT**
Exhaust duct. . . . . . . . . . . . . . . . . . . . . .304.9

**DUST**
Process ventilation . . . . . . . . . . . . . . . . . .403.4

**DWELLING**
Cleanliness . . . . . . . . . . . . . . . . . .305.1, 307.1
Definition . . . . . . . . . . . . . . . . . . . . . . . . . .202
Electrical . . . . . . . . . . . . . . . . . . . . . . . . .604.1
Heating facilities. . . . . . . . . . . . . . . . . . . . . .602
Required facilities . . . . . . . . . . . . . . . . . . . . .502

## E

**EASEMENT**
Definition . . . . . . . . . . . . . . . . . . . . . . . . . .202

**EGRESS**
Aisles . . . . . . . . . . . . . . . . . . . . . . . . . . .702.2
Emergency escape. . . . . . . . . . . . . . . . . . .702.4
General. . . . . . . . . . . . . . . . . . . . . . . . . .702.1
Lighting . . . . . . . . . . . . . . . . . . . . . . . . .402.2
Locked doors . . . . . . . . . . . . . . . . . . . . .702.3
Obstructions prohibited. . . . . . . . . . . . . . . .702.1
Stairs, porches and
  railings . . . . . . . . . .304.10, 305.4, 305.5, 306.1

**ELECTRIC, ELECTRICAL**
Condemnation . . . . . . . . . . . . . . . . . . . . .108.1

Facilities required . . . . . . . . . . . . . . . . . . .604.1
General. . . . . . . . . . . . . . . . . . . . . . . . . .601.1
Hazards . . . . . . . . . . . . . . . . . . . . . . . . .604.3
Installation. . . . . . . . . . . . . . . . . . . . . . . .605.1
Luminaires . . . . . . . . . . . . . . . . . . . . . . .605.3
Receptacles. . . . . . . . . . . . . . . .604.3, 605.2
Responsibility . . . . . . . . . . . . . . . . . . . . . .601.2
Service . . . . . . . . . . . . . . . . . . . . . . . . . .604.2

**ELEVATOR**
Condemnation . . . . . . . . . . . . . . . . . . . . .108.1
General . . . . . . . . . . . . . . . . . . . . . . . . .606.1
Maintenance . . . . . . . . . . . . . . . .606.1, 606.2

**EMERGENCY**
Emergency measures . . . . . . . . . . . . . . . . . .109
Emergency orders . . . . . . . . . . . . . . . . . . .109.1
Escape . . . . . . . . . . . . . . . . . . . . . . . . .702.4

**ENFORCEMENT**
Duties and powers. . . . . . . . . . . . . . . . . . . .104
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .101.2

**EQUIPMENT**
Alternative. . . . . . . . . . . . . . . . . . . . . . . .105.2
Combustion air . . . . . . . . . . . . . . . . . . . . .603.5
Condemnation . . . . . . . . . . . .108.1.2, 108.3
Electrical installation. . . . . . . . . . . . . . . . . .605.1
Emergency order . . . . . . . . . . . . . . . . . . .109.1
Energy conservation devices . . . . . . . . . . . .603.6
Fire safety requirements, responsibility . . . .701.2
Flue. . . . . . . . . . . . . . . . . . . . . . . . . . . .603.2
Installation. . . . . . . . . . . . . . . . . . . . . . . .603.1
Interior structure . . . . . . . . . . . . . . . . . . . .305.1
Placarding . . . . . . . . . . . . . . . .108.3, 108.4
Prohibited occupancy . . . . . . . . . . . . . . . .108.5
Responsibility . . . . . . . . . . . . . . . . . . . . . .601.2
Safety controls . . . . . . . . . . . . . . . . . . . . .603.4
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .101.2
Scope, mechanical and electrical. . . . . . . . .601.1
Unsafe . . . . . . . . . . . . . . . . . . . . . . . . . . .108
Used . . . . . . . . . . . . . . . . . . . . . . . . . . .105.4

**EXHAUST**
Clothes dryer . . . . . . . . . . . . . . . . . . . . . .403.5
Exhaust ducts. . . . . . . . . . . . . . . . . . . . . .304.9
Process ventilation . . . . . . . . . . . . . . . . . .403.4

**EXISTING**
Remedies . . . . . . . . . . . . . . . . . . . . . . . .102.4
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .101.2
Structural members . . . . . . . . . . . . . . . . . .304.4
Structures . . . . . . . . . . . . . . . . . . . . . . . .101.3

**EXTERIOR**
Decorative features. . . . . . . . . . . . . . . . . .304.8
Egress. . . . . . . . . . . . . . . . . . . . . . . . . .702.1
Exterior structure . . . . . . . . . . . . . . . . . . . .304
Exterior walls . . . . . . . . . . . . . . . . . . . . . .304.6
Painting . . . . . . . . . . . . . . . . . .304.2, 304.6
Rodent harborage . . . . . . . . . . . .302.5, 304.5
Sanitation . . . . . . . . . . . . . . . . . . . . . . . .304.1
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .301.1
Stair. . . . . . . . . . . . . . . . . . . . . . . . . . .304.10
Street numbers . . . . . . . . . . . . . . . . . . . .304.3

INDEX

Weather tight. . . . . . . . . . . . . . . . . . . . 304.13

**EXTERMINATE**
Definition . . . . . . . . . . . . . . . . . . . . . . . .202
Insect and rodent control . . . . . 302.5, 304.5, 304.14
Responsibility of owner . . . . . . . . . . . 301.2, 306.2
Responsibility of tenant-occupant . . . 306.3, 306.5

**F**

**FAN**
Exhaust vents . . . . . . . . . . . . . . . . . . . .302.6

**FEES, EXPENSES, COST**
Closing vacant structures . . . . . . . . . . . . . 108.2
Demolition. . . . . . . . . . . . . . . 110.1, 110.3, 110.4
Extermination . . . . . . 308.2, 308.3, 308.4, 308.5
General. . . . . . . . . . . . . . . . . . . . . . . . . .103.5
Relief from personal liability . . . . . . . . . . . . 103.4
Responsibility, fire safety . . . . . . . . . . . . . 701.2

**FENCE**
Accessory. . . . . . . . . . . . . . . . . . . . . . .302.7
Maintenance . . . . . . . . . . . . . . . . . . . . .304.2

**FIRE**
Fire-resistance ratings . . . . . . . . . . . . . . 703.1
General, fire-protection systems . . . . . . . . . . 704
Responsibility, fire safety . . . . . . . . . . . . . .701.2
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .101.2
Scope, fire safety . . . . . . . . . . . . . . . . . . 701.1
Smoke alarms. . . . . . . . . . . . . . . . . . . . .704.2

**FLAMMABLE LIQUID**
Containers . . . . . . . . . . . . . . . . . . . . . 108.1.2

**FLOOR, FLOORING**
Area for bedrooms and living rooms . . . . . 404.4.1
Fire-resistance ratings . . . . . . . . . . . . . . .703.1
Interior surfaces. . . . . . . . . . . . . . . 305.1, 305.5
Space requirements . . . . . . . . . . 404.4.1, 404.6

**FOOD PREPARATION**
Cooking equipment . . . . . . . . . . . . 403.3, 602.2
Sanitary condition . . . . . . . . . . . . . 305.1, 404.7
Ventilation . . . . . . . . . . . . . . . . . . . . . .403.4

**FOUNDATION**
Condemnation . . . . . . . . . . . . . . . . . . 108.1.1
Foundation walls. . . . . . . . . . . . . . . . . . .304.5

**FRAME**
Window and door frames . . . . . . . . . . . . .304.13

**G**

**GAS**
Energy conservation devices . . . . . . . . . . . 603.6
Exhaust vents . . . . . . . . . . . . . . . . . . . .302.6
Process ventilation . . . . . . . . . . . . . . . . . .403.4

**GLAZING**
Materials . . . . . . . . . . . . . . . . . . . . . . 304.13.1

**GRADE**
Drainage . . . . . . . . . . . . . . . . . . . . .302.2, 507

**GUARD**
Basement windows. . . . . . . . . . . . . . . . 304.17
Definition . . . . . . . . . . . . . . . . . . . . . . . .202

Anchorage and maintenance . . . . . . . . . . .304.12

**H**

**HABITABLE**
Definition . . . . . . . . . . . . . . . . . . . . . . . .202
Light . . . . . . . . . . . . . . . . . . . . . . . . . . .402
Minimum ceiling height. . . . . . . . . . . . . . .404.3
Minimum room width. . . . . . . . . . . . . . . .404.2
Required plumbing facilities. . . . . . . . . . . . .502
Residential heating facilities . . . . . . . 602.2, 602.3
Space requirements . . . . . . . . . . . . . . . 404.4.1
Ventilation . . . . . . . . . . . . . . . . . . . . . . .403

**HANDRAIL**
Handrails . . . . . . . . . . . . . . 304.12, 305.5, 306.1

**HARDWARE**
Door hardware. . . . . . . . . . . . . . . . 304.15, 702.3
Openable windows . . . . . . . . . . . . . . . 304.13.2

**HAZARDOUS (See DANGEROUS, HAZARDOUS)**

**HEAT, HEATING**
Cooking equipment . . . . . . . . . . . . 403.3, 602.2
Energy conservation devices . . . . . . . . . . . 603.6
Fireplaces . . . . . . . . . . . . . . . . . . . . . . .603.1
Heating . . . . . . . . . . . . . . . . . . . . . . . .603.1
Mechanical equipment . . . . . . . . . . . . . . .603.1
Required capabilities . . . . . . . . . . . . . . . . .602
Residential heating . . . . . . . . . . . 602.2, 602.3
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .101.2
Supply. . . . . . . . . . . . . . . . . . . . . . . . .602.3
Water heating facilities . . . . . . . . . . . . . . .505.4
Water system . . . . . . . . . . . . . . . . . . . . .505

**HOUSEKEEPING UNIT**
Definition . . . . . . . . . . . . . . . . . . . . . . . .202

**HEIGHT**
Minimum ceiling height. . . . . . . . . . . . . . .404.3

**HOT (See HEAT, HEATING)**

**HOTELS, ROOMING HOUSES AND DORMITORY UNITS, MOTELS**
Definition . . . . . . . . . . . . . . . . . . . . . . . .202
Locked doors . . . . . . . . . . . . . . . . . . . .702.3
Required facilities . . . . . . . . . . . . . . . . . . .502
Toilet rooms . . . . . . . . . . . . . . . . . . . . . .503

**I**

**IDENTIFICATION**
Code official . . . . . . . . . . . . . . . . . . . . .104.5

**INFESTATION**
Condemnation . . . . . . . . . . . . . . . . . . 108.1.3
Definition . . . . . . . . . . . . . . . . . . . . . . . .202
Insect and rodent . . . . . . . . 302.5, 304.14, 308.1

**INSECTS**
Extermination. . . . . . . . . . . . . . . . . . . . . .308
Infestation. . . . . . . . . . . . . . . . . . . . . . .308.1
Insect screens. . . . . . . . . . . . . . . . . . . .304.14

**INSPECTIONS**
General. . . . . . . . . . . . . . . . . . . . . . . . .104.3
Right of entry . . . . . . . . . . . . . . . . . . . . .104.4

2006 INTERNATIONAL PROPERTY MAINTENANCE CODE®

**INSPECTOR**
Identification . . . . . . . . . . . . . . . . . . . . . 104.5
Inspections . . . . . . . . . . . . . . . . . . . . . . . 104.3
Records . . . . . . . . . . . . . . . . . . . . . . . . . . 104.7
**INTENT**
Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101.3
Rule-making authority. . . . . . . . . . . . . . . . 104.2
**INTERIOR**
Interior structure . . . . . . . . . . . . . . . . . . . 305
Interior surfaces . . . . . . . . . . . . . . . . . . . 305.3
Means of egress . . . . . . . . . . . . . . . . . . . . 702
Sanitation . . . . . . . . . . . . . . . . . . . . . . . . 305.1

**J**

**JURISDICTION**
Title. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101.1

**K**

**KITCHEN**
Electrical outlets required . . . . . . . . . . . . . 605.2
Minimum width . . . . . . . . . . . . . . . . . . . . 404.2
Prohibited use . . . . . . . . . . . . . . . . . . . . 404.4.4
Room lighting . . . . . . . . . . . . . . . . . . . . . 605.3
Water heating facilities . . . . . . . . . . . . . . . 505.4

**L**

**LANDING**
Handrails and guards . . . . . 304.12, 305.4, 305.5,
306.1
Maintenance . . . . . . . . . . . . . . . . . 304.10, 305.4
**LAUNDRY**
Room lighting . . . . . . . . . . . . . . . . . . . . . 605.3
Water heating facilities . . . . . . . . . . . . . . . 505.4
**LAVATORY**
Hotels . . . . . . . . . . . . . . . . . . . . . . . . . . . 502.3
Required facilities . . . . . . . . . . . . . . . . . . 502
Rooming houses. . . . . . . . . . . . . . . . . . . 502.2
Sanitary drainage system . . . . . . . . . . . . . 506
Water heating facilities . . . . . . . . . . . . . . . 505.4
Water system. . . . . . . . . . . . . . . . . . . . . . 505
**LEASE (SELL, RENT)**
Heat supplied . . . . . . . . . . . . . . . . . . . . . 602.3
Salvage materials . . . . . . . . . . . . . . . . . . 110.4
Transfer of ownership . . . . . . . . . . . . . . . 107.5
**LIEN**
Closing of vacant structures . . . . . . . . . . . 108.2
Demolition. . . . . . . . . . . . . . . . . . . . . . . 110.3
Failure to comply. . . . . . . . . . . . . . . . . . . 110.3
**LIGHT, LIGHTING**
Common halls and stairways. . . . . . . 402.2, 605.3
Luminaires . . . . . . . . . . . . . . . . . . . . . . . 605.3
General . . . . . . . . . . . . . . . . . . . . . . . . . 402
Habitable rooms . . . . . . . . . . . . . . . . . . . 402.1
Other spaces . . . . . . . . . . . . . . . . . . . . . 402.3

**LIVING ROOM**
Responsibility . . . . . . . . . . . . . . . . . . . . . 401.2
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . 101.2
Toilet rooms . . . . . . . . . . . . . . . . . . . . . . 605.3
**LIVING ROOM**
Room area. . . . . . . . . . . . . . . . . . . . . . . 404.4.1
**LOAD, LOADING**
Elevators, escalators and dumbwaiters . . . . 606.1
Handrails and guards . . . . . . . . . . 304.12, 305.5
Live load . . . . . . . . . . . . . . . . . . . . 304.4, 305.2
Stairs and porches. . . . . . . . . . . . 304.10, 305.2
Structural members. . . . . . . . . . . . 304.4, 305.2

**M**

**MAINTENANCE**
Required. . . . . . . . . . . . . . . . . . . . . . . . . 102.2
**MATERIAL**
Alternative. . . . . . . . . . . . . . . . . . . . . . . . 105.2
Salvage. . . . . . . . . . . . . . . . . . . . . . . . . . 110.4
Used . . . . . . . . . . . . . . . . . . . . . . . . . . . 105.4
**MEANS OF EGRESS (See EGRESS)**
**MECHANICAL**
Installation. . . . . . . . . . . . . . . . . . . . . . . 603.1
Responsibility . . . . . . . . . . . . . . . . . . . . . 601.2
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . 601.1
Ventilation, general . . . . . . . . . . . . . . . . . 403
Ventilation, toilet rooms. . . . . . . . . . . . . . 403.2
**MINIMUM**
Ceiling height . . . . . . . . . . . . . . . . . . . . . 404.3
Room width. . . . . . . . . . . . . . . . . . . . . . 404.2
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . 301.1
**MODIFICATION**
Approval . . . . . . . . . . . . . . . . . . . . . . . . 105.1
**MOTEL (See HOTELS)**
**MOTOR VEHICLES**
Inoperative . . . . . . . . . . . . . . . . . . . . . . . 302.8
Painting. . . . . . . . . . . . . . . . . . . . . . . . . 302.8

**N**

**NATURAL**
Lighting . . . . . . . . . . . . . . . . . . . . . 401.3, 402
Ventilation . . . . . . . . . . . . . . . . . . . 401.3, 403
**NOTICE**
Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . 111.1
Form. . . . . . . . . . . . . . . . . . . . . . . . . . . 107.2
Method of service . . . . . . . . . . . . . . . . . . 107.3
Orders . . . . . . . . . . . . . . . . . . . . . . . . . 107
Owner, responsible person. . . . . . . . . . . . 107.1
Penalties . . . . . . . . . . . . . . . . . . . . . . . . 107.4
Placarding of structure . . . . . . . . . . . . . . 108.4
Transfer of ownership . . . . . . . . . . . . . . . 107.5
Vacating structure. . . . . . . . . . . . . . . . . . 108.2
**NOXIOUS**
Process ventilation . . . . . . . . . . . . . . . . . 403.4
Weeds. . . . . . . . . . . . . . . . . . . . . . . . . . 302.4

INDEX

**NUISANCE**
Closing of vacant structures . . . . . . . . . . . . . 108.2

**O**

**OBSTRUCTION**
Light . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402.1
Right of entry . . . . . . . . . . . . . . . . . . . . . . 104.4
**OCCUPANCY (See USE)**
**OPENABLE**
Definition . . . . . . . . . . . . . . . . . . . . . . . . . . 202
Habitable rooms . . . . . . . . . . . . . . . . . . . . . 403.1
Locked doors . . . . . . . . . . . . . . . . . . . . . . . 702.3
Windows . . . . . . . . . . . . . . . . . . . . . . . . . 304.13.2
**OPERATOR**
Definition . . . . . . . . . . . . . . . . . . . . . . . . . . 202
**ORDER (See NOTICE)**
**ORDINANCE, RULE**
Applicability . . . . . . . . . . . . . . . . . . . . . . . . 102
Application for appeal . . . . . . . . . . . . . . . . . 111.1
**OUTLET**
Electrical . . . . . . . . . . . . . . . . . . . . . . . . . . 605.2
**OWNER**
Closing of vacant structures . . . . . . . . . . . . 108.2
Definition . . . . . . . . . . . . . . . . . . . . . . . . . . 202
Demolition . . . . . . . . . . . . . . . . . . . . . . . . . 110
Extermination . . . . . . . . . . . . . . . . . . . . . . . 308.2
Failure to comply . . . . . . . . . . . . . . . . . . . . 110.3
Insect and rodent control . . . . 302.5, 308.2, 308.4
Notice . . . . . . . . . . . . . . . . . . . . . . . . 107.1, 108.3
Placarding of structure . . . . . . . . . . . . . . . . 108.4
Responsibility . . . . . . . . . . . . . . . . . . . . . . . 301.2
Responsibility, fire safety . . . . . . . . . . . . . . 701.2
Responsibility, light, ventilation . . . . . . . . . . 401.2
Responsibility, mechanical and electrical . . . 601.2
Responsibility, plumbing facilities . . . . . . . . 501.2
Right of entry . . . . . . . . . . . . . . . . . . . . . . . 104.4
Rubbish storage . . . . . . . . . . . . . . . . . . . . . 307.2.1
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101.2
Transfer of ownership . . . . . . . . . . . . . . . . . 107.5

**P**

**PASSAGEWAY**
Common hall and stairway . . . . . . . . . . . . . 402.2
Interior surfaces . . . . . . . . . . . . . . . . . . . . . 305.3
Toilet rooms, direct access . . . . . . . . . . . . . 503.1
**PENALTY**
Notices and orders . . . . . . . . . . . . . . . . . . . 107.4
Placarding of structure . . . . . . . . . . . . . . . . 108.4
Prohibited occupancy . . . . . . . . . . . . . . . . . 108.5
Removal of placard . . . . . . . . . . . . . . . . . . . 108.4.1
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101.2
Violations . . . . . . . . . . . . . . . . . . . . . . . . . . 106.4
**PEST (VERMIN)**
Condemnation . . . . . . . . . . . . . . . . . . . . . . 108.1
Extermination . . . . . . . . . . . . . . . . . . . . . . . 308.1
Insect and rat control . . . . . . 302.5, 304.14, 308.1

**PLACARD, POST**
Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . 108.2
Condemnation . . . . . . . . . . . . . . . . . . . . . . 108.1
Demolition . . . . . . . . . . . . . . . . . . . . . . . . . 110
Emergency, notice . . . . . . . . . . . . . . . . . . . 109.1
Notice to owner . . . . . . . . . . . . . . . . 107.1, 108.3
Placarding of structure . . . . . . . . . . . . . . . . 108.4
Prohibited use . . . . . . . . . . . . . . . . . . . . . . . 108.5
Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . 108.4.1
**PLUMBING**
Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . 504.2
Clean and sanitary . . . . . . . . . . . . . . . . . . . 504.1
Connections . . . . . . . . . . . . . . . . . . . . . . . . 505.1
Contamination . . . . . . . . . . . . . . . . . . . . . . 505.2
Employee's facilities . . . . . . . . . . . . . . . . . . 503.3
Fixtures . . . . . . . . . . . . . . . . . . . . . . . . . . . . 504.1
Required facilities . . . . . . . . . . . . . . . . . . . . 502
Responsibility . . . . . . . . . . . . . . . . . . . . . . . 501.2
Sanitary drainage system . . . . . . . . . . . . . . 506
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 501.1
Storm drainage . . . . . . . . . . . . . . . . . . . . . . 507
Supply . . . . . . . . . . . . . . . . . . . . . . . . . . . . 505.3
Water heating facilities . . . . . . . . . . . . . . . . 505.4
**PORCH**
Handrails . . . . . . . . . . . . . . . . . . . . . . . . . . 306.1
Structurally sound . . . . . . . . . . . . . . . . . . . . 304.10
**PORTABLE (TEMPORARY)**
Cooking equipment . . . . . . . . . . . . . . . . . . . 603.1
**PRESSURE**
Water supply . . . . . . . . . . . . . . . . . . . . . . . . 505.3
**PRIVATE, PRIVACY**
Bathtub or shower . . . . . . . . . . . . . . . . . . . . 503.1
Occupancy limitations . . . . . . . . . . . . . . . . . 404.1
Required plumbing facilities . . . . . . . . . . . . . 502
Sewage system . . . . . . . . . . . . . . . . . . . . . . 506.1
Water closet and lavatory . . . . . . . . . . . . . . 503.1
Water system . . . . . . . . . . . . . . . . . . . . . . . 505.1
**PROPERTY, PREMISES**
Cleanliness . . . . . . . . . . . . . . . . . . . . 304.1, 307.1
Condemnation . . . . . . . . . . . . . . . . . . . . . . 108
Definition . . . . . . . . . . . . . . . . . . . . . . . . . . 202
Demolition . . . . . . . . . . . . . . . . . . . . . . . . . 110
Emergency measures . . . . . . . . . . . . . . . . . 109
Exterior areas . . . . . . . . . . . . . . . . . . . . . . . 302
Extermination, multiple occupancy . . 302.5, 308.4
Extermination, single occupancy . . . . 302.5, 308.3
Failure to comply . . . . . . . . . . . . . . . . . . . . 110.3
Grading and drainage . . . . . . . . . . . . . . . . . 302.2
Responsibility . . . . . . . . . . . . . . . . . . . . . . . 301.2
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301.1
Storm drainage . . . . . . . . . . . . . . . . . . . . . . 507
Vacant structures and land . . . . . . . . . . . . . 301.3
**PROTECTION**
Basement windows . . . . . . . . . . . . . . . . . . . 304.17
Fire-protection systems . . . . . . . . . . . . . . . . 704
Signs, marquees and awnings . . . . . . . . . . . 304.9
**PUBLIC**
Cleanliness . . . . . . . . . . . . . . . . . . . . 304.1, 305.1
Egress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 702.1

Hallway . . . . . . . . . . . . . . . . . . . . . . . . .502.3
Sewage system . . . . . . . . . . . . . . . . . . . .506.1
Toilet rooms . . . . . . . . . . . . . . . . . . . . . . .503
Vacant structures and land . . . . . . . . . . . .301.3
Water system. . . . . . . . . . . . . . . . . . . . . . .505

**PUBLIC WAY**
Definition . . . . . . . . . . . . . . . . . . . . . . . . .202

**R**

**RAIN**
Basement hatchways . . . . . . . . . . . . . . . .304.16
Exterior walls . . . . . . . . . . . . . . . . . . . . .304.6
Grading and drainage . . . . . . . . . . . . . . .303.2
Roofs. . . . . . . . . . . . . . . . . . . . . . . . . . .304.7
Window and door frames . . . . . . . . . . . .304.13

**RECORD**
Official records . . . . . . . . . . . . . . . . . . . .104.7

**REHABILITATION**
Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . .101.3

**REPAIR**
Application of other codes . . . . . . . . . . . .102.3
Chimneys . . . . . . . . . . . . . . . . . . . . . . .304.11
Demolition . . . . . . . . . . . . . . . . . . . . . . .110.1
Exterior surfaces . . . . . . . . . . . . . . . . . .304.1
Maintenance . . . . . . . . . . . . . . . . . . . . .102.2
Public areas . . . . . . . . . . . . . . . . . . . . .302.3
Signs, marquees and awnings . . . . . . . . .304.9
Stairs and porches . . . . . . . . . . . . . . . . .304.10
Weather tight. . . . . . . . . . . . . . . . . . . . .304.13
Workmanship . . . . . . . . . . . . . . . . . . . . .102.5

**REPORTS**
Test reports . . . . . . . . . . . . . . . . . . . . . .105.3.2

**RESIDENTIAL**
Extermination. . . . . . . . . . . . . . . . . . . . . .308
Residential heating. . . . . . . . . . . . . . . . .602.2
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .101.2

**RESPONSIBILITY**
Extermination. . . . . . . . . . . . . . . . . . . . . .308
Fire safety. . . . . . . . . . . . . . . . . . . . . . . .701.2
Garbage disposal . . . . . . . . . . . . . . . . . .307.3
General . . . . . . . . . . . . . . . . . . . . . . . . .301.2
Mechanical and electrical . . . . . . . . . . . .601.2
Persons. . . . . . . . . . . . . . . . . . . . . . . . .301.1
Placarding of structure . . . . . . . . . . . . . .108.4
Plumbing facilities . . . . . . . . . . . . . . . . .501.2
Rubbish storage. . . . . . . . . . . . . . . . . . .307.2.1
Scope. . . . . . . . . . . . . . . . . . . . .101.2, 301.1

**REVOKE, REMOVE**
Demolition . . . . . . . . . . . . . . . . . . . . . . .110
Existing remedies . . . . . . . . . . . . . . . . . .102.4
Process ventilation . . . . . . . . . . . . . . . . .403.4
Removal of placard . . . . . . . . . . . . . . . . .108.4.1
Rubbish removal . . . . . . . . . . . . . . . . . . .307.2.1

**RIGHT OF ENTRY**
Duties and powers of code official . . . . . . .104.4
Inspections . . . . . . . . . . . . . . . . . . . . . . .104.3

**RODENTS**
Basement hatchways . . . . . . . . . . . . . . .304.16
Condemnation . . . . . . . . . . . . . . . . . . . .108
Exterior surfaces. . . . . . . . . . . . . . . . . . .304.6
Extermination . . . . . . . . . . . . . . . . .302.5, 308
Guards for basement windows . . . . . . . . .304.17
Harborage. . . . . . . . . . . . . . . . . . . . . . .302.5
Insect and rodent control . . . . . . . . . . . .308.1

**ROOF**
Exterior structure . . . . . . . . . . . . . . . . . .304.1
Roofs. . . . . . . . . . . . . . . . . . . . . . . . . . .304.7
Storm drainage . . . . . . . . . . . . . . . . . . .507

**ROOM**
Bedroom and living room . . . . . . . . . . . .404.4
Cooking facilities. . . . . . . . . . . . . . . . . . .403.3
Direct access . . . . . . . . . . . . . . . . . . . . .503.2
Habitable. . . . . . . . . . . . . . . . . . . . . . . .402.1
Heating facilities. . . . . . . . . . . . . . . . . . .602
Light . . . . . . . . . . . . . . . . . . . . . . . . . . .402
Minimum ceiling heights . . . . . . . . . . . . .404.3
Minimum width . . . . . . . . . . . . . . . . . . . .404.2
Overcrowding . . . . . . . . . . . . . . . . . . . .404.5
Prohibited use . . . . . . . . . . . . . . . . . . . .404.4.4
Temperature . . . . . . . . . . . . . . . . . . . . .602.5
Toilet. . . . . . . . . . . . . . . . . . . . . . . . . . .503
Ventilation . . . . . . . . . . . . . . . . . . . . . . .403

**ROOMING HOUSES (See DORMITORY)**

**RUBBISH**
Accumulation . . . . . . . . . . . . . . . . . . . . .307.1
Definition . . . . . . . . . . . . . . . . . . . . . . . .202
Disposal . . . . . . . . . . . . . . . . . . . . . . . .307.2
Garbage facilities . . . . . . . . . . . . . . . . . .307.3.1
Rubbish storage. . . . . . . . . . . . . . . . . . .307.2.1
Storage . . . . . . . . . . . . . . . . . . . . . . . . .307.2.1

**S**

**SAFETY, SAFE**
Chimney . . . . . . . . . . . . . . . . . . . . . . . .304.11
Condemnation . . . . . . . . . . . . . . . . . . . .108.1
Electrical installation . . . . . . . . . . . . . . . .605.1
Emergency measures . . . . . . . . . . . . . . .109
Fire safety requirements . . . . . . . . . . . . .701
Fireplaces . . . . . . . . . . . . . . . . . . . . . . .603.1
Intent. . . . . . . . . . . . . . . . . . . . . . . . . . .101.3
Safety controls . . . . . . . . . . . . . . . . . . . .603.4
Scope . . . . . . . . . . . . . . . . . . . . . . . . . .101.2
Unsafe structures and equipment . . . . . . .108

**SANITARY**
Bathroom and kitchen floors. . . . . . . . . . .305.3
Cleanliness . . . . . . . . . . . . . . . .304.1, 305.1
Disposal of garbage . . . . . . . . . . . . . . . .307.3
Disposal of rubbish. . . . . . . . . . . . . . . . .307.2
Exterior property areas. . . . . . . . . . . . . . .302.1
Exterior structure . . . . . . . . . . . . . . . . . .304.1
Food preparation . . . . . . . . . . . . . . . . . .404.7
Furnished by occupant. . . . . . . . . . . . . . .302.1
Interior surfaces . . . . . . . . . . . . . . . . . . .305.3

INDEX

Plumbing fixtures . . . . . . . . . . . . . . . . . . . 504.1
Required plumbing facilities. . . . . . . . . . . . . . 502
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101.2

**SASH**
Window. . . . . . . . . . . . . . . . . . . . . . . . . . 304.13

**SCREENS**
Insect screens. . . . . . . . . . . . . . . . . . . . . 304.14

**SECURITY**
Basement hatchways. . . . . . . . . . . . . . 304.18.3
Building. . . . . . . . . . . . . . . . . . . . . . . . . . 304.18
Doors . . . . . . . . . . . . . . . . . . . . . . . . . . 304.18.1
Vacant structures and land. . . . . . . . . . . . 301.3
Windows . . . . . . . . . . . . . . . . . . . . . . . 304.18.2

**SELF-CLOSING SCREEN DOORS**
Insect screens. . . . . . . . . . . . . . . . . . . . . 304.14

**SEPARATION**
Fire-resistance ratings. . . . . . . . . . . . . . . . 703
Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . 404.1
Separation of units . . . . . . . . . . . . . . . . . 404.1
Water closet and lavatory . . . . . . . . . . . . . 502.1

**SERVICE**
Electrical . . . . . . . . . . . . . . . . . . . . . . . . 604.2
Method . . . . . . . . . . . . . . . . . . . . . . . . . . . 107.3
Notices and orders . . . . . . . . . . . . . 107.1, 108.3
Service on occupant. . . . . . . . . . . . . . . . . 108.3

**SEWER**
General. . . . . . . . . . . . . . . . . . . . . . . . . . 506.1
Maintenance . . . . . . . . . . . . . . . . . . . . . . 506.2

**SHOWER**
Bathtub or shower. . . . . . . . . . . . . . . . . . 502.1
Rooming houses. . . . . . . . . . . . . . . . . . . . 502.2
Water heating facilities . . . . . . . . . . . . . . 505.4
Water system. . . . . . . . . . . . . . . . . . . . . . . 505

**SIGN**
Signs, marquees and awnings . . . . . . . . . 304.9

**SINGLE-FAMILY DWELLING**
Extermination. . . . . . . . . . . . . . . . . . . . . . . 308

**SINK**
Kitchen sink . . . . . . . . . . . . . . . . . . . . . . 502.1
Sewage system . . . . . . . . . . . . . . . . . . . . . 506
Water supply. . . . . . . . . . . . . . . . . . . . . . 505.3

**SIZE**
Habitable room, light . . . . . . . . . . . . . . . . . 402
Habitable room, ventilation . . . . . . . . . . . . . 403
Room area . . . . . . . . . . . . . . . . . . . . . . 404.4.1

**SMOKE**
Alarms. . . . . . . . . . . . . . . . . . . . . . . . . . . 704.2
Interconnection. . . . . . . . . . . . . . . . . . . . . 704.4
Power source . . . . . . . . . . . . . . . . . . . . . 704.3

**SPACE**
General, light . . . . . . . . . . . . . . . . . . . . . . 402
General, ventilation . . . . . . . . . . . . . . . . . . 403
Occupancy limitations . . . . . . . . . . . . . . . . 404
Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . 404.1
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . 401.1

**STACK**
Chimneys . . . . . . . . . . . . . . . . . . . . . . . 304.11

**STAIRS**
Common halls and stairways, light . . . . . . . 402.2
Exit facilities . . . . . . . . . . . . . . . . . . . . . . 305.4
Handrails . . . . . . . . . . . . . . . . . . 304.12, 305.5
Luminaires . . . . . . . . . . . . . . . . . . . . . . . 605.3
Public areas . . . . . . . . . . . . . . . . . . . . . . 302.3
Stairs and porches . . . . . . . . . . . . . . . . . 304.10

**STANDARD**
Referenced . . . . . . . . . . . . . . . . . . . . . . . 102.7

**STORAGE**
Food preparation . . . . . . . . . . . . . . . . . . . 404.7
Garbage storage facilities . . . . . . . . . . . . . 307.3
Rubbish storage facilities. . . . . . . . . . . . . 307.2.1
Sanitation . . . . . . . . . . . . . . . . . . . . . . . . 307.1

**STRUCTURE**
Accessory structures . . . . . . . . . . . . . . . . 302.7
Closing of vacant structures. . . . . . . . . . . . 108.2
Definition . . . . . . . . . . . . . . . . . . . . . . . . . . 202
Emergency measures . . . . . . . . . . . . . . . . . 109
General, exterior. . . . . . . . . . . . . . . . . . . . 304.1
General, condemnation . . . . . . . . . . . . . . . . 110
General, interior structure. . . . . . . . . . . . . 305.1
Placarding of structure . . . . . . . . . . . . . . . 108.4
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . 301.1
Structural members . . . . . . . . . . . 304.4, 305.2
Vacant structures and land. . . . . . . . . . . . . 301.3

**SUPPLY**
Combustion air . . . . . . . . . . . . . . . . . . . . 603.5
Connections . . . . . . . . . . . . . . . . . . . . . . 505.1
Water heating facilities . . . . . . . . . . . . . . 505.4
Water supply. . . . . . . . . . . . . . . . . . . . . . 505.3
Water system. . . . . . . . . . . . . . . . . . . . . . . 505

**SURFACE**
Exterior surfaces . . . . . . . . . . . . . 304.2, 304.6
Interior surfaces . . . . . . . . . . . . . . . . . . . 305.3

**SWIMMING**
Swimming pools . . . . . . . . . . . . . . 303.1, 303.2
Safety covers . . . . . . . . . . . . . . . . . . . . . 303.2


## T

**TEMPERATURE**
Nonresidential structures . . . . . . . . . . . . . 602.4
Residential buildings . . . . . . . . . . . . . . . . 602.2
Water heating facilities . . . . . . . . . . . . . . 505.4

**TENANT**
Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . 101.2

**TEST, TESTING**
Agency. . . . . . . . . . . . . . . . . . . . . . . . . . 105.3.2
Methods. . . . . . . . . . . . . . . . . . . . . . . . . 105.3.1
Reports . . . . . . . . . . . . . . . . . . . . . . . . . 105.3.3
Required . . . . . . . . . . . . . . . . . . . . . . . . . 105.3

**TOXIC**
Process ventilation . . . . . . . . . . . . . . . . . 403.4

**TRASH**
Rubbish and garbage . . . . . . . . . . . . . . . . . 307

## U

**UNOBSTRUCTED**
Access to public way . . . . . . . . . . . . . . .702.1
General, egress . . . . . . . . . . . . . . . . . . . .702.1

**UNSAFE**
Equipment . . . . . . . . . . . . . . . . . . . . .108.1.2
Existing remedies . . . . . . . . . . . . . . . . . .102.4
General, condemnation . . . . . . . . . . . .108, 110
General, demolition . . . . . . . . . . . . . . . . . .110
Notices and orders . . . . . . . . . . . . .107, 108.3
Structure . . . . . . . . . . . . . . . . . . . . . .108.1.1

**USE**
Application of other codes . . . . . . . . . . . .102.3
General, demolition . . . . . . . . . . . . . . . . . .110

## V

**VACANT**
Closing of vacant structures . . . . . . . . . . .108.2
Emergency measure . . . . . . . . . . . . . . . . . .109
Method of service . . . . . . . . . . . .107.3, 108.3
Notice to owner or to person
responsible . . . . . . . . . . . . . . . . .107, 108.3
Placarding of structure . . . . . . . . . . . . . .108.4
Vacant structures and land . . . . . . . . . . . .301.3

**VAPOR**
Exhaust vents . . . . . . . . . . . . . . . . . . . .302.6
Process ventilation . . . . . . . . . . . . . . . . .403.4

**VEHICLES**
Inoperative . . . . . . . . . . . . . . . . . . . . . .302.8
Painting . . . . . . . . . . . . . . . . . . . . . . . .302.8

**VENT**
Connections . . . . . . . . . . . . . . . . . . . . .504.3
Exhaust vents . . . . . . . . . . . . . . . . . . . .302.6
Flue . . . . . . . . . . . . . . . . . . . . . . . . . . .603.2

**VENTILATION**
Clothes dryer exhaust . . . . . . . . . . . . . . .403.5
Combustion air . . . . . . . . . . . . . . . . . . .603.5
Definition . . . . . . . . . . . . . . . . . . . . . . . .202
General, ventilation . . . . . . . . . . . . . . . . . .403
Habitable rooms . . . . . . . . . . . . . . . . . .403.1
Process ventilation . . . . . . . . . . . . . . . . .403.4
Recirculation . . . . . . . . . . . . . . . .403.2, 403.4
Toilet rooms . . . . . . . . . . . . . . . . . . . . .403.2

**VERMIN**
Condemnation . . . . . . . . . . . . . . . . . . . . .108
Insect and rat control . . . . . . . . . . . .302.5, 308

**VIOLATION**
Condemnation . . . . . . . . . . . . . . . . . . . . .108
General . . . . . . . . . . . . . . . . . . . . . . . . . .106
Notice . . . . . . . . . . . . . . . . . . . . .107, 108.3
Penalty . . . . . . . . . . . . . . . . . . . . . . . . .106.4
Placarding of structure . . . . . . . . . . . . . .108.4
Prosecution . . . . . . . . . . . . . . . . . . . . .106.3
Strict liability offense . . . . . . . . . . . .106.3, 202
Transfer of ownership . . . . . . . . . . . . . . .107.5

## W

**WALK**
Sidewalks . . . . . . . . . . . . . . . . . . . . . . .302.3

**WALL**
Accessory structures . . . . . . . . . . . . . . . .302.7
Exterior surfaces . . . . . . . . . . . .304.2, 304.6
Exterior walls . . . . . . . . . . . . . . . . . . . .304.6
Foundation walls . . . . . . . . . . . . . . . . . .304.5
General, fire-resistance rating . . . . . . . . . .703.1
Interior surfaces . . . . . . . . . . . . . . . . . .305.3
Outlets required . . . . . . . . . . . . . . . . . . .605.2
Temperature measurement . . . . . . . . . . .602.5

**WASTE**
Disposal of garbage . . . . . . . . . . . . . . . .307.3
Disposal of rubbish . . . . . . . . . . . . . . . . .307.2
Dwelling units . . . . . . . . . . . . . . . . . . . .502.1
Garbage storage facilities . . . . . . . . . . .307.3.1

**WATER**
Basement hatchways . . . . . . . . . . . . . . .304.16
Connections . . . . . . . . . . . . . . . . . . . . .506.1
Contamination . . . . . . . . . . . . . . . . . . . .505.2
General, sewage . . . . . . . . . . . . . . . . . . .506
General, storm drainage . . . . . . . . . . . . . .507
General, water system . . . . . . . . . . . . . . .505
Heating . . . . . . . . . . . . . . . . . . . . . . . .505.4
Hotels . . . . . . . . . . . . . . . . . . . . . . . . .502.3
Kitchen sink . . . . . . . . . . . . . . . . . . . . .502.1
Required facilities . . . . . . . . . . . . . . . . . .502
Rooming houses . . . . . . . . . . . . . . . . . .502.2
Supply . . . . . . . . . . . . . . . . . . . . . . . . .505.3
System . . . . . . . . . . . . . . . . . . . . . . . . .505
Toilet rooms . . . . . . . . . . . . . . . . . . . . .503
Water heating facilities . . . . . . . . . . . . . .505.4

**WEATHER, CLIMATE**
Heating facilities . . . . . . . . . . . . . . . . . . .602
Rule-making authority . . . . . . . . . . . . . . .104.2

**WEATHERSTRIP**
Window and door frames . . . . . . . . . . . .304.13

**WEEDS**
Noxious weeds . . . . . . . . . . . . . . . . . . .302.4

**WIDTH**
Minimum room width . . . . . . . . . . . . . . .404.2

**WIND**
Weather tight . . . . . . . . . . . . . . . . . . . .304.13
Window and door frames . . . . . . . . . . . .304.13

**WINDOW**
Emergency escape . . . . . . . . . . . . . . . . .702.4
Glazing . . . . . . . . . . . . . . . . . . . . . . .304.13.1
Guards for basement windows . . . . . . . . .304.17
Habitable rooms . . . . . . . . . . . . . . . . . .402.1
Insect screens . . . . . . . . . . . . . . . . . . .304.14
Interior surface . . . . . . . . . . . . . . . . . . .305.3
Light . . . . . . . . . . . . . . . . . . . . . . . . . . .402
Openable windows . . . . . . . . . . . . . . .304.13.2
Toilet rooms . . . . . . . . . . . . . . . . . . . . .403.2
Ventilation . . . . . . . . . . . . . . . . . . . . . . .403
Weather tight . . . . . . . . . . . . . . . . . . . .304.13
Window and door frames . . . . . . . . . . . .304.13

INDEX

**WORKER**
    Employee facilities . . . . . . . . . . . . . . . 503.3, 602.4
**WORKMANSHIP**
    General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102.5

# Exhibit E

## APPENDIX B ZONING*

*Editor's note:* Appendix B sets out the zoning ordinance, enacted on Jan. 13, 1983, by Ord. No. 83-1, as the same was originally enacted by the city. Amendments will be cited in a history note following the affected section. The editor has incorporated a uniform printing style for purposes of maintaining Code format; however, no substantive changes have been made.

*Cross references:* Buildings and building regulations, ch. 14; community development, ch. 18; environment, ch. 26; floods, ch. 34; transitional living residences, § 42-1; sexually oriented entertainment businesses, § 54-1941 et seq.; mobile home parks, ch. 58; planning, ch. 66; signs, ch. 70; streets, sidewalks and other public places, ch. 78; telecommunications, ch. 86; ordinances related to zoning, app. C.

Sec. I. Title.
Sec. II. Intent and purpose.
Sec. III. Rules and definitions.
Sec. IV. General provisions.
Sec. V. Nonconforming buildings and uses.
Sec. VI. Zoning districts and zoning district map.
Sec. VII. Residence districts.
Sec. VIII. Commercial business district.
Sec. IX. Industrial districts.
Sec. X. Off-street parking and loading.
Sec. XI. Reserved.
Sec. XII. Administration.
Sec. XIII. Amendments.
Sec. XIV. Violations; penalty.
Sec. XV. Enactment.

*An Ordinance to Classify, Regulate and Restrict the Location of Trades and Industries and the Location of Buildings Designed for the Specified Industrial, Commercial, Residential and Other Uses and to Regulate and Limit the Height and Bulk of Buildings Hereafter Erected; to Regulate and Determine the Area of Yards, Courts and Other Open Spaces Within and Surrounding Such Buildings and to Establish the Boundaries of Districts for the Said Purposes and Prescribing Penalties for the Violation of its Provisions; and for Creating a Board of Appeals.*

*Now, Therefore, Be and It Is Hereby Ordained by the City Council of Calumet City, Illinois:*

## Sec. I. Title.

This ordinance shall be known, referred to and recited as "The Zoning Ordinance of the City of Calumet City."

(Code 1980, App. B, § I)

## Sec. II. Intent and purpose.

The prime tool of planning is land use control, most commonly referred to as zoning. The purposes of zoning are many, but foremost among these purposes are:

To promote and protect the public health, safety, morals, comfort and general welfare of the people;

To divide the City of Calumet City into zones or districts restricting and regulating therein the location, erection, construction, reconstruction, alteration and use of buildings, structures, and land for residence, business manufacturing and other specified uses;

To provide adequate light, air, privacy and conveniences of access to property;

To protect the character and the stability of the residential, business, and manufacturing areas within the City of Calumet City and to promote the orderly and beneficial development of such areas;

*Lot width:* The minimum horizontal distance between the side lot lines of a lot measured at the narrowest width within the buildable area.

*Lots of record:* A single lot which is part of a subdivision, the plat of which has been recorded in the office of the recorder of deeds of Cook County, Illinois; or a single parcel of land, the deed of which has been recorded in the office of the recorder of deeds of Cook County, Illinois.

*Manufacturing establishment:* An establishment, the principal use of which is manufacturing, fabricating, processing, assembly, repairing, storing, cleaning, servicing, or testing of materials, goods, or products.

*Marquee or canopy:* A roof-like structure of a permanent nature which projects from the wall of a building.

*Micron:* A unit of length, equal to one-thousandth part of one millimeter (.001 millimeter).

*Mobile home:* A trailer designed and constructed for dwelling purposes.

*Moderate burning:* Implies a rate of combustion described by material which supports combustion and is consumed slowly as it burns.

*Motor freight terminal:* A building or area in which freight brought by motor truck or railroad is assembled or stored for routing in intra-state or interstate shipment by motor truck.

*Nameplate:* A sign indicating the name and address of a building, or the name of an occupant thereof, and the practice of a permitted occupation therein.

*No-access strip:* A strip of land along the rear lot line, adjoining a thoroughfare right-of-way, of a through lot, and which is designated on a recorded subdivision plat or property deed as land over which motor vehicular travel shall not be permitted.

*Nonconforming building or structure:* Any building or structure lawfully established which: (a) does not comply with all the regulations of this ordinance or of any amendment hereto governing bulk of the district in which such building or structure is located; or (b) is designed or intended for a nonconforming use.

*Nonconforming use:* Any building or structure and the use thereof or the use of land that does not conform with the regulations of this ordinance or any amendment hereto governing use in the district in which it is located but conformed with all of the codes, ordinances, and other legal requirements applicable at the time such building, or structure was erected, enlarged, or altered, and the use thereof or the use of land was established.

*Noxious matter or material:* A material which is capable of causing injury to living organisms by chemical reaction or is capable of causing detrimental effect on the physical or economic well-being of individuals.

*Nursery, child-care, or nursery school:* A building containing facilities for the part-time care of five (5) or more children of pre-elementary school are and may include in addition the dwelling unit of the family residing therein.

*Nursing home:* A building containing facilities for the care and home of aged, chronically ill, infirm, or incurable persons, or a place of rest for those persons suffering bodily disorders, in which three (3) or more persons not members of the family residing on the premises are received, and provided with food, shelter, and care, but not including hospitals, clinics, or similar institutions devoted primarily to the diagnosis and treatment of disease or injury, maternity cases, or mental illness.

*Octave band:* A method of dividing the range of sound frequencies into octaves in order to classify sound according to pitch.

*Odor:* The minimum concentration of odorous matter in the air that can be detected as an odor.

*Off-street parking area or lot:* Land which is improved and used or structure which is designed and used exclusively for the storage of passenger motor vehicles, either for accessory off-street parking spaces or commercial off-street parking spaces when permitted herein by district regulations.

*Open sales lot:* Land used or occupied for the purpose of buying, selling, or renting merchandise stored or displayed out-of-doors prior to sale. Such merchandise includes automobiles, trucks, motor scooters, motorcycles, boats, or similar commodities.

*Parking space:* An area, enclosed in a building or unenclosed, reserved for the parking of one (1) motor vehicle and which is accessible to and from a street or alley.

*Particular matter:* Finely divided solid or liquid matter, other than water, which is released into the

manufacturer in letters not to exceed two (2) inches in height;

(b)  Shall be compatible with the appearance of the neighborhood;

(c)  Shall be limited to one (1) per lot or per building, whichever is less;

(d)  Shall not exceed twelve (12) feet in diameter;

(e)  If roof-mounted, shall be to a maximum height of thirty (30) feet. Additional requirements shall apply to roof-mounted satellite receiving antennas;

(f)  Shall not be visible between ground level and ten (10) feet above ground level from any street adjoining the lot;

(g)  Ground-mounted; not to be located between a building and a front lot line. The full impact of satellite receiving antennas shall be reduced by screening. If the subject parcel adjoins a residential district, all antennas shall be placed a minimum of ten (10) feet from any lot line and effectively screened by a fence, wall, or dense screening hedge to a maximum height of six (6) feet. Said fence, wall or hedge shall be located on or near the lot line bounding the residential district and shall otherwise comply with the applicable zoning requirements governing its location, shall be located in a rear yard a minimum of ten (10) feet from any lot line;

(h)  Permit fee and inspection required;

(i)  Drawings submitted to building commissioner for approval before installation;

(j)  Letter of consent from owner of property.

*4.18 Application.*

Any person desiring to erect a satellite receiving antenna shall apply in writing to the city clerk's office upon a form furnished by said office. A permit fee of twenty-five dollars ($25.00) shall be paid.

(Code 1980, App. B, § IV; Ord. No. 84-15, § 1, 4-26-1984; Ord. No. 85-32, § 1, 9-26-1985; Ord. No. 89-5, § 1, 1-26-1989; Ord. No. 96-30, § 1(Exh. A), 5-23-1996; Ord. No. 99-33, § 1, 6-10-1999)

## Sec. V. Nonconforming buildings and uses.

### 5.1 Continuance of use.

Any lawfully established use of a building or land, on the effective date of the ordinance or of amendments thereto, that does not conform to the use of regulations for the district in which it is located, shall be deemed to be a legal nonconforming use and may be continued, except as otherwise provided herein.

Any legal, nonconforming building or structure may be continued in use provided there is no physical change other than necessary maintenance and repair, as otherwise permitted herein.

Any building for which a permit has been lawfully granted prior to the effective date of the ordinance, or of amendments thereto, may be completed in accordance with the approved plans; provided construction is started within ninety (90) days and diligently prosecuted to completion. Such building shall thereafter be deemed a lawfully established building.

### 5.2 Discontinuance of use.

Whenever any part of a building, structure or land occupied by a nonconforming use is changed to or replaced by a use conforming to the provisions of the ordinance, such premises shall not thereafter be used or occupied by a nonconforming use, even though the building may have been originally designed and constructed for the prior nonconforming use.

Whenever a nonconforming use of a building or structure or part thereof has been discontinued for a period of twelve (12) consecutive months, or whenever there is evident a clear intent on the part of the owner to abandon a nonconforming use, such use shall not after being discontinued or abandoned, be reestablished, and the use of the premises thereafter shall be in conformity with the regulations of the district.

Where no enclosed building is involved, discontinuance of a nonconforming use for a period of twelve (12) months shall constitute abandonment and shall not thereafter be used in a nonconforming manner.

A nonconforming use not authorized by the provisions of the zoning ordinance in effect at the time the amendatory ordinance becomes effective, shall be discontinued and not reestablished except when the provisions of the amendatory ordinance find the use to be conforming to the district in which it is then located.

### 5.3 Change of nonconforming use.

The nonconforming use of any building, structure or portion thereof, which is designed or intended for a use not permitted in the district in which it is located, may be changed to another nonconforming use thereof but only if such other use is permitted by a special use permit as authorized in the administration section.

A nonconforming structure that was erected, converted or structurally altered in violation of the provisions of the ordinance which this ordinance amends shall not be validated by the adoption of this ordinance, and such violations or any violations of this ordinance may be ordered removed or corrected by the proper officials at any time.

### 5.4 Repairs and alterations.

Normal maintenance of a building or other structure containing a nonconforming use is permitted, including necessary nonstructural repairs and incidental alterations which do not extend or intensify the nonconforming use.

No structural alteration shall be made in a building or other structure containing a nonconforming use, except in the following situations:

   (a)  When the alteration is required by law.

   (b)  When the alteration will actually result in eliminating the nonconforming use.

   (c)  When a building in a residential district containing residential nonconforming uses may be altered in any way to improve livability, provided no structural alteration shall be made which would increase the number of dwelling units or the bulk of the building.

### 5.5 Damage and destruction.

If a building or other structure containing a nonconforming use is damaged or destroyed by any means to the extent of fifty (50) percent or more of its replacement value at that time, the building or other structure can be rebuilt or used thereafter only for a conforming use and in compliance with the provisions of the district in which it is located. In the event the damage or destruction is less than fifty (50) percent of its replacement value, based upon prevailing costs, the building may then be restored to its original condition and the occupancy or use of such building may be continued which existed at the time of such partial destruction.

In either event, restoration or repair of the building or other structure must be started within a period of six (6) months from the date of damage or destruction, and diligently prosecuted to completion.

### 5.6 Additions and enlargements.

A nonconforming building may be enlarged or extended only if the entire building is hereafter devoted to a conforming use, and is made to conform to all the regulations of the district in which it is located.

No building partially occupied by a nonconforming use shall be altered in such a way as to permit the enlargement or expansion of the space occupied by such nonconforming use.

No nonconforming use may be enlarged or extended in such a way as to occupy any required useable open space, or any land beyond the boundaries of the zoning lot as it existing on the effective date of the ordinance, or to displace any conforming use in the same building or on the same parcel.

A building or structure which in nonconforming with respect to yards, floor area ratio, or any other element of bulk regulated herein shall not be altered or expanded in any manner which would increase the degree or extent of its nonconformity with respect to the bulk regulations for the district in which it is located.

### 5.7 Exempted buildings, structures and uses.

Wherever a lawfully existing building or other structure otherwise conforms to the use regulations herein but is nonconforming only in the particular manner hereinafter specified, the building and use thereof shall be exempt from the requirements of sections 5.4 and 5.5.

In any residential district where a dwelling is nonconforming only as to the number of dwelling units it contains, provided no such building shall be altered in any way so as to increase the number of dwelling units therein.

In any residential district, where a use permitted in the B-1 district occupies ground floor space within a multiple-family dwelling located on a corner lot.

In any business or manufacturing district, where the use is less distant from a residential district than that specified in the regulations for the district in which it is located.

In any district, where an established building, structure or use is nonconforming with respect to the standards prescribed herein for any of the following:

     (a) Floor area ratio;

     (b) Yards, front, side, rear, or transitional;

     (c) Off-street parking or loading;

     (d) Building height;

     (e) Gross floor area.

*5.8 Conversion to special use.*

Any nonconforming use may be made a special use by the granting of a special permit, as authorized in the administrative section.

(Code 1980, App. B, § V; Ord. No. 94-23, § 1, 5-26-1994)

**Sec. VI. Zoning districts and zoning district map.**

*6.1 Classes of districts.*

In order to classify, regulate and restrict the location of trades, industries and the location of buildings designed for specified uses, to regulate and limit the height and bulk of buildings hereafter erected or structurally altered, to regulate and limit the intensity of the use of the lot areas, and to regulate and determine the areas of yards, courts and other open spaces within and surrounding such buildings, the City of Calumet City, Illinois, is hereby divided into ten (10) classes of districts:

    R-1 One-family residence district

    R-2 Two-family and three-family residence district

    R-3 Multiple-family residence district

    B Commercial business district

    B-2 Service business commercial district

    B-3 Community commercial business district

    M-1 Light industrial district

    M-2 Heavy industrial district

    OR Office research district

      Public land use

and the location and boundaries of which are shown on the map and notations thereon titled "The Zoning Map of Calumet City," which said map is on file in the office of the building commission of Calumet City, and together with all notations, references, and other information shown thereon, are a part of this ordinance and have the same force and

# Exhibit F

## ARTICLE IX. CODE ENFORCEMENT*

---

*Cross references: Fire code prevention, § 30-161 et seq.

State law references: Administrative adjudication of ordinances, 65 ILCS 5/1-2.1-1 et seq.

---

### Sec. 2-941. Purpose.

The stated purpose of this article is to provide for the fair and efficient enforcement of the Municipal Code of Calumet City, Illinois, other than those ordinances pertaining to vehicular standing, parking or vehicle compliance regulation (hereafter the "City Code"), as may be allowed by law and directed by ordinance, through an administrative adjudication of violations; and, establishing a schedule of fines and penalties, and authority and procedures for collection of unpaid fines and penalties.

(Code 1980, § 2-501; Ord. No. 99-63, § VI, 11-10-1999)

### Sec. 2-942. Creation.

There is hereby established a department of the city government to be known as the ordinance enforcement department and to have the power to enforce any municipal ordinance as from time to time authorized by the city council, except for (i) any offense enforced pursuant to Article VII.5 of Chapter 17 of this Code; (ii) any offense under the Illinois Vehicle Code (625 ILCS 5/1-100 et seq.); or a similar offense that is a traffic regulation governing the movement of vehicles; and, (iii) except for any reportable offense under 625 ILCS 5/6-204. The establishment of the ordinance enforcement department does not preclude the mayor and city council from using any other method or court with jurisdiction to enforce ordinances of the city.

(Code 1980, § 2-503; Ord. No. 99-63, 11-10-1999)

### Sec. 2-943. Administrative composition.

(a) The ordinance enforcement department shall be composed of a hearing officer, an ordinance enforcement administrator, system coordinator/computer operator and hearing room security personnel, with the power and authority as hereinafter set forth.

   (1) The hearing officer is authorized and directed to:

      a. The hearing officer, prior to appointment, must be an attorney licensed to practice law for at least three (3) years in the State of Illinois. The hearing officer shall preside over all adjudicatory hearings and shall have the following powers and duties:

         1. To administer oaths;

         2. To hear testimony and accept evidence that is relevant to the existence of the City Code violation;

         3. To issue subpoenas directing witnesses to appear and give relevant testimony at the hearing, upon the request of the parties or their representatives;

         4. To preserve and authenticate the record of the hearing and all exhibits and evidence introduced at the hearing;

         5. To issue and sign a written finding, decision and order stating whether a City Code violation exists;

6.  To impose penalties, sanctions or such other relief consistent with applicable City Code provisions and assessing costs upon finding a party liable for the charged violation, except however, that in no event shall the hearing officer have authority to impose a penalty of incarceration; and,

7.  To review final determination of liability for an ordinance violation in accordance with the administrative review procedures hereinafter set forth.

b.  Prior to conducting administrative adjudication proceedings under this article, the hearing officer shall have successfully completed a formal training program which includes the following:

1.  Instruction on the rules of procedure of the administrative hearings over which the hearing officer shall preside;

2.  Orientation to each subject area of the code violations that he/she will adjudicate;

3.  Observation of administrative hearings; and

4.  Participation in hypothetical cases, including ruling on evidence and issuing final orders.

(2)  The ordinance enforcement administrator is authorized and directed to:

a.  Operate and manage the ordinance enforcement department.

b.  Adopt, distribute and process all notices as may be required under this article or as may be reasonably required to carry out the purpose of this article.

c.  Collect moneys paid as fines and/or penalties assessed after a final determination of liability.

d.  Certify copies of final determinations of an ordinance violation adjudicated pursuant to this article, and any factual reports verifying the final determination of any violation liability which was issued in accordance with this article.

e.  Promulgate rules and regulations reasonably required to operate and maintain the administrative adjudication system hereby created.

f.  Collect unpaid fines and penalties through private collection agencies and direct the pursuit of all post-judgment remedies available by law.

(3)  The system coordinator/computer operator is hereby authorized and directed to operate and maintain the computer programs for the administrative adjudication system of the ordinance enforcement department hereby created, on a day-to-day basis, including but not limited to:

a.  Input of violation notice information.

b.  Establishing hearing dates and notice dates.

c.  Record fine and penalty assessment and payments.

d.  Issue payment receipts.

e.  Issue succeeding notice of hearing dates and/or final determination of liability.

f.  Keep accurate records of appearances and nonappearances at administrative hearings, pleas entered, judgments entered, sanctions imposed, if any, fines and penalties assessed and paid.

(4)  All hearing room security personnel shall be qualified off-duty, full-time, part-time or auxiliary police officers who are hereby authorized and directed to:

a.  Maintain hearing room decorum.

b.  Have and execute authority as is granted to courtroom deputies of the circuit court.

c.  Perform such other duties or acts as may reasonably be required and as directed by the hearing officer or ordinance enforcement administrator.

(b)  The mayor is hereby authorized to appoint persons to hold the positions above set forth. Other than the hearing officer, one person may hold and fulfill the requirements of one (1) or more of the above stated

positions and compensation for each of the above stated positions shall be as approved by the city council.

(Code 1980, § 2-504; Ord. No. 99-63, 11-10-1999; Ord. No. 01-56, 11-19-2001)

## Sec. 2-944. Procedures.

The system of administrative adjudication of any ordinance violation authorized to be adjudicated hereunder, shall afford a party due process of law and the hearings shall be conducted in accordance with the following procedures:

(1)  Violation notices of any City Code shall be issued by the persons authorized under this Code and shall contain information and shall be certified and constitute *prima facie* evidence of the violation cited as hereinafter set forth.

(2)  All full-time, part-time and auxiliary police officers as well as other specifically authorized individuals of any department of the city shall have the authority to issue violation notices.

(3)  Any individual authorized hereby to issue violation notices and who detects any ordinance violation authorized to be adjudicated under this article, is authorized to issue notice of violation thereof and shall make service thereof as is hereinafter set forth.

(4)  The violation notice of the City Code shall contain, but shall not be limited to, the following information:

a.  The name of the party violating the ordinance, if known.

b.  The date, time and place of the violation (date of issuance).

c.  The particular ordinance violated.

d.  The fine and any penalty which may be assessed for the ordinance violation.

e.  The signature and identification number of the person issuing the notice.

f.  The date and location of the adjudicating hearing of ordinance violations, and the penalties for failure to appear at the hearing.

g.  That payment of the indicated fine and any late payment shall operate as a final disposition of the violation.

(Code 1980, § 2-505; Ord. No. 99-63, 11-10-1999; Ord. No. 01-56, 11-19-2001)

## Sec. 2-945. Service.

(a)  Service of any violation notice shall be made by the person issuing such notice by:

(1)  Handing the notice to the person responsible for the ordinance violation;

(2)  Handing the notice to the responsible person or leaving the notice with any person twelve (12) years of age or older at the residence of the responsible person;

(3)  Mailing the notice by first class mail, postage prepaid, to the person responsible for the ordinance violation; or,

(4)  Posting the notice upon the property where the violation is found when the person is the owner or manager of the property.

(b)  The correctness of facts contained in any violation notice shall be verified by the person issuing said notice by:

(1)  Signing his name to the notice at the time of issuance; or

(2)  In the case of a notice produced by a computer device, by signing a single certificate, to be kept by the ordinance enforcement administrator, attesting to the correctness of all notices produced by the device while under his control.

(c)  The original or a facsimile of the violation notice shall be retained by the ordinance enforcement administrator and kept as a record in the ordinary course of business.

(d)  Any violation notice issued, signed and served in accordance herewith, or a copy of the notice, shall be *prima facie* correct and shall be  *prima facie*  evidence of the correctness of the facts shown on the notice.

(Code 1980, § 2-506; Ord. No. 99-63, 11-10-1999)

## Sec. 2-946. Administrative hearings.

An administrative hearing to adjudicate any alleged City Code ordinance violation on its merits shall be granted to the person named in the ordinance violation notice. All administrative hearings shall be recorded and shall culminate in a determination of liability or nonliability, made by the hearing officer, who shall consider facts and/or testimony without the application of the formal or technical rules of evidence. Evidence, including hearsay, may be admitted only if it is of a type commonly relied upon by reasonable prudent persons in the conduct of their affairs. The hearing officer shall, upon a determination of liability, assess fines, penalties and costs in accordance with section 2-952 hereof. Persons appearing to contest the alleged violation on its merits may be represented by counsel at their own expense. The burden of proof shall be on the alleged offender to refute the *prima facie*  case set forth in the verified notice of violation.

(Code 1980, § 2-507; Ord. No. 99-63, 11-10-1999)

## Sec. 2-947. Notices.

(a)  Upon failure of the person receiving a notice of a violation of the City Code to appear at the time and date designated for a hearing, the ordinance enforcement administrator shall send, or cause to be sent, notices as provided in subsection (b) of this section, by first class mail, postage prepaid, to the person who received the notice of an ordinance violation. Service of notices sent in accordance herewith shall be complete as of the date of deposit in the United States mail.

(b)  The notices sent pursuant to subsection (a) of this section shall be in the following sequence and contain, but not be limited to, the following information:

(1)  Date and location of violation cited in the violation notice.

(2)  Particular ordinance violated.

(3)  Fine and any penalty that may be assessed for late payment.

(4)  A section titled "Notice of Hearing" which shall clearly set forth that the person receiving a notice of the City Code ordinance violation may appear at an administrative hearing to contest the validity of the violation notice on the date and at the time and place as specified in the notice of hearing.

(5)  Date, time and place of the administrative hearing at which the alleged violation may be contested on its merits.

(6)  Statement that failure to either pay fine and any applicable penalty or failure to appear at the hearing on its merits on the date and at the time and place specified will result in a final determination of liability for the "cited" violation in the amount of the fine and penalty indicated.

(7)  Statement that upon the occurrence of a final determination of liability for the failure, and the exhaustion of, or the failure to exhaust, available administrative or judicial procedures for review, any unpaid fine or penalty will constitute a debt due and owing the city.

(c)  A notice of final determination of liability shall be sent following the conclusion of administrative hearing, as is hereinafter set forth, and shall contain, but not be limited to, the following information and warnings:

(1)  A statement that the unpaid fine and any penalty assessed is a debt due and owing the city;

(2)  A statement of any sanction ordered or costs imposed which costs are debts due and owing the city; and

(3)  A warning that failure to pay the fine and any penalty due and owing the city within the time

specified may result in proceeding with collection procedures in the same manner as a judgment entered by any court of competent jurisdiction.

(Code 1980, § 2-508; Ord. No. 99-63, 11-10-1999)

**Sec. 2-948. Final determination of liability.**

A final determination of liability shall occur following the failure to pay the fine or penalty after the hearing officer's determination of liability and the exhaustion of, or the failure to exhaust, any administrative review procedures hereinafter set forth. Where a person fails to appear at the administrative hearing to contest the alleged violation on the date and at the time and place specified in a prior served or mailed notice pursuant to section 2-947(b) hereof, the hearing officer's determination of liability shall become final either upon a denial of a timely petition to set aside that determination or upon the expiration of the period for filing a petition without a filing having been made.

(Code 1980, § 2-509; Ord. No. 99-63, 11-10-1999)

**Sec. 2-949. Petition to set aside determination.**

A petition to set aside a final determination of liability may be filed with the ordinance enforcement administrator within twenty-one (21) days of the date of the final determination of liability and payment of twenty-five dollars ($25.00).

(Code 1980, § 2-510; Ord. No. 99-63, 11-10-1999)

**Sec. 2-950. Judicial review.**

Any final decision by a hearing officer that a City Code violation does or does not exist shall constitute a final determination for purposes of judicial review under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.).

(Code 1980, § 2-511; Ord. No. 99-63, 11-10-1999)

**Sec. 2-951. Enforcement of judgment.**

(a)  Any fine, other sanction, or costs imposed, or part of any fine, other sanction, or costs imposed, remaining unpaid after the exhaustion of or the failure to exhaust judicial review procedures under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.) are a debt due and owing the municipality and may be collected in accordance with applicable law.

(b)  After expiration of the period in which judicial review under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.) may be sought for a final determination of a code violation, unless stayed by a court of competent jurisdiction, the findings, decision, and order of the hearing officer may be enforced in the same manner as a judgment entered by a court of competent jurisdiction.

(c)  In any case in which a hearing officer finds that a defendant has failed to comply with a judgment ordering a defendant to correct a code violation or imposing any fine or other sanction as a result of a code violation, any expenses incurred by the city to enforce the judgment including, but not limited to, attorney's fees, court costs, and costs related to property demolition or foreclosure after they are fixed by the hearing officer, shall be a debt due and owing the municipality and may be collected in accordance with applicable law.

(d)  A lien shall be imposed on the real estate or personal estate, or both, of the defendant in the amount of any debt due and owing the city under this section. The lien may be recorded and enforced in the same manner as a judgment lien pursuant to a judgment of a court of competent jurisdiction. No lien may be enforced under this section until it has been recorded in the manner provided by Article XII of the Code of Civil Procedure (735 ILCS 5/1-101 et seq.) or by the Uniform Commercial Code (810 ILCS 5/1-101et seq.).

(e)  A hearing officer may set aside any judgment entered by default and set a new hearing date upon a petition filed within twenty-one (21) days after the issuance of the order of default if the hearing officer determines that the petitioner's failure to appear at the hearing was for good cause or at any time if the

petitioner establishes that the municipality did not provide proper service of process.

(Code 1980, § 2-512; Ord. No. 99-63, 11-10-1999)

**Sec. 2-952. Schedule of fines/penalties.**

For an ordinance violation of the City Code, fines and penalties shall be as established from time to time by the mayor and city council.

(Code 1980, § 2-513; Ord. No. 99-63, 11-10-1999)

**//Calumet City, Illinois//MUNICIPAL CODE CALUMET CITY, ILLINOIS Codified through Ord. No. 07-72, enacted June 14, 2007. (Supplement No. 7)/Chapter 2 ADMINISTRATION*/ARTICLE IX. CODE ENFORCEMENT***

# Exhibit G

## DIVISION 2. RENTAL DWELLING INSPECTIONS*

*Editor's note: Ord. No. 06-49, adopted June 22, 2006, amended division 2 in its entirety to read as herein set out. Former division 2, which consisted of §§ 14-711—14-718, pertained to similar subject matter and derived from the 1980 Code; Ord. No. 87-5, adopted Mar. 26, 1987; Ord. No. 87-16, adopted July 23, 1987; Ord. No. 88-2, adopted Feb. 25, 1988; Ord. No. 88-8, adopted Feb. 9, 1989; Ord. No. 89-40, adopted Nov. 9, 1989; Ord. No. 90-1, adopted Jan. 11, 1990; Ord. No. 94-16, adopted May 12, 1994; and Ord. No. 04-42, adopted June 29, 2004.

### Sec. 14-711. Certificate of occupancy requirement.

(a) No owner, agent or person (hereinafter referred to as "responsible party") in charge of a one-family, two-family or multiple-family dwelling (hereinafter referred to as "rental dwelling"), as those terms are defined in the property maintenance code, shall allow any person to occupy the same as a tenant or lessee or for valuable consideration unless said dwelling or structure shall have been inspected and determined to be in compliance with all of the provisions of the property maintenance code as well as all health and building ordinances as evidenced by a certificate of occupancy issued by the department of inspectional services ("department"). Thereafter, all rental properties shall be inspected annually and an updated certificate of occupancy issued.

(b) No certificate of occupancy shall be issued unless the applicant[] owner or operator agrees in his application to an inspection pursuant to this section. Notwithstanding any other provisions of this Code, when the city conducts inspections of a tenant's rental dwelling, the city must obtain the consent of such tenant to conduct the inspection. If a tenant refuses consent, the city may attempt to obtain a warrant pursuant to subsection (d) below.

(c) Prior to the time that the department is scheduled to conduct the inspection, the department shall deliver to the owner and occupants of the structure written notice that includes the following:

   (1) Date and time of the inspection;

   (2) A statement that the owner or tenant has the right to withhold his consent to the inspection and require the city to attempt to obtain a warrant to conduct the inspection;

(d) If the owner or occupant does not consent to the attempted inspection, the director of inspectional services ("director") or his designee shall seek in the circuit court of Cook County a warrant in accordance with the appropriate laws of the State of Illinois to allow an inspection. The application for the warrant shall specify the basis upon which the warrant is being sought and shall include a statement that the inspection will be limited to a determination whether there are violations of the city building and zoning ordinances or any applicable housing, fire or property maintenance codes or regulations. The court may consider any of the following factors along with such other matters as it deems pertinent in its decision as to whether a warrant shall issue:

   (1) Eyewitness account of violation;

   (2) Citizen complaints;

   (3) Tenant complaints;

   (4) Plain view violations;

   (5) Violations apparent from city records;

   (6) Property deterioration;

   (7) Age of property;

   (8) Nature of alleged violation;

   (9) Similar properties in the area;

DIVISION 2. RENTAL DWELLING INSPECTIONS*                                    Page 2 of 3

(10)  Documented violations on similar properties in the area;

(11)  Passage of time since last inspection;

(12)  Previous violations on the property.

(e)  If the annual inspection establishes that the rental dwelling complies with all the provisions of the property maintenance code as well as all other health, zoning, and building ordinances of the city, then the department of inspectional services shall issue a certificate of occupancy for said dwelling or structure. The certificate shall indicate the date of the inspection; that such dwelling or structure complies with the requirements of the property maintenance code as well as other health and building ordinances that apply to the dwelling. One (1) copy of the certificate shall be delivered to or mailed to the owner of the dwelling unit. A record of all certificates shall be kept on file by the department, and copies shall be furnished upon request to any person having a proprietary interest or tenancy interest in the dwelling affected. The director shall submit once a month to the mayor and the city council a list of addresses of those dwellings which have been inspected the previous month with an indication whether or not said dwellings have been issued certificate of occupancy permits. Every certificate of occupancy shall be issued for a period of one (1) year after its date of issuance, unless sooner revoked.

(f)  Inspection fee schedule.

(1)  Fifty dollars ($50.00) yearly.

(2)  Ten dollars ($10.00) per additional unit.

(3)  All inspection fees as herein provided shall be paid prior to the issuance of a certificate of occupancy.

(4)  Each fee set for the above covers the cost of one (1) follow-up inspection to verify compliance. In the event that additional inspections are required because full compliance did not exist at the time of the reinspection, then an additional reinspection fee of fifty dollars ($50.00) plus ten dollars ($10.00) per unit shall be assessed.

(5)  If an owner, agent or tenant has failed to appear for two previously scheduled inspections, an additional inspection fee of fifty dollars ($50.00) plus ten dollars ($10.00) per unit shall be assessed.

(Ord. No. 06-49, § 1, 6-22-2006)

Sec. 14-712. Notice of violation.

(a)  Whenever the building official determines that any rental dwelling or the premises surrounding fails to meet the requirements set forth in this chapter or in applicable rules and regulations issued pursuant thereto, the building official in accordance with the property maintenance code and the other city health, and building codes shall issue a notice setting forth the alleged failures and advising the responsible party that such failures must be corrected. This notice shall:

(1)  Be in writing.

(2)  Set forth the alleged violations of this chapter or of applicable rules and regulations issued pursuant thereto.

(3)  Describe the rental dwelling where the violations are alleged to exist or to have been committed. Such written notice shall specify an appropriate or acceptable method of correction.

(4)  Specify a specific date for the correction of any violation alleged.

(5)  Be served upon the responsible party of the rental dwelling by the building official, or mailed to the responsible party. If one (1) or more persons to whom such notice is addressed cannot be found after diligent effort to do so, service may be made upon such persons by posting the notice in or about the rental dwelling described in the notice.

(b)  At the end of the period of time allowed for the correction of any violation alleged, which was stated in the inspection notice, the building official shall reinspect the rental property described in the notice.

(c)  If, upon reinspection, the violations are determined by the building official not to have been corrected, the

DIVISION 2. RENTAL DWELLING INSPECTIONS*                                    Page 3 of 3

building official, in turn, shall issue an O.V. (ordinance violation) ticket to initiate legal proceedings to be handled in Calumet City's housing court for the immediate correction of the alleged violations or shall order the rental property vacated within thirty (30) days, or both.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-713. Responsibility of tenants.

No tenant shall damage or cause to be damaged any unit or building leased nor shall any damage be caused to the general premises of any building used by the tenants. Each tenant and the families of each tenant shall maintain his rental unit free of any litter, and tenants shall not litter any of the premises or the buildings provided for use by the tenants. The tenants must maintain their responsibilities as outlined in the property maintenance code, subject to O.V. citations.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-714. Penalties.

Any responsible party of a rental dwelling who has received an order or notice of an alleged violation of this article shall be subject to a penalty of not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) for each day the alleged violation continues after expiration of the specified reasonable consideration period; provided that no such penalty shall be applicable while reconsideration, hearing or appeal to a court of competent jurisdiction is pending in the matter.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-715. Validity and severability.

If any section, subsection, paragraph, sentence, clause, or phrase of this Code shall be declared invalid for any reason whatsoever, this decision shall not affect the remaining portions of this Code, which shall continue in full force and effect, and to this end, the provisions of this Code are hereby declared to be severable.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-716. Savings clause.

This Code shall not affect violations of any other ordinance, code or regulation of the jurisdiction existing prior to the effective date hereof, and any such violation shall be governed and shall continue to be punishable to the full extent of the law under the provisions of those ordinances, codes or regulations in effect at the time the violation was committed.

(Ord. No. 06-49, § 1, 6-22-2006)

Secs. 14-717—14-750. Reserved.

# Exhibit H



1994 WL 601863 (Ill.A.G.)                                                    Page 1


1994 WL 601863 (Ill.A.G.)

                        Office of the Attorney General
                            State of Illinois

                            File No. 94-024

                            October 25, 1994

MUNICIPALITIES:

Requirement that Title Insurance Reports Reflect Payment of Document Inspection Fee

Mr. Frank C. Casillas
Director

Dear Mr. Casillas

I have your letter wherein you inquire regarding the validity of ordinances adopted
by non-home-rule municipalities which require the inspection of documents and the
payment of fees prior to the transfer of real property lying within the
municipality. Of particular concern to the Department, which regulates title
insurance companies (215 ILCS 155/1 et seq. (West 1992)), is a provision in the
ordinances which mandates that the requirement of inspection and payment of fees be
reflected in title insurance reports. For the reasons hereinafter stated, it is my
opinion that the ordinances in question are not valid.

In February, 1994, the village of Westchester adopted ordinance no. 94-1387, which
purports to require that any document evidencing the transfer of ownership of real
estate located in the village must be submitted to the village for inspection and
review. Upon payment of a fee of $25, the village will affix a stamp to the
document if the subject property is found to be in compliance with all village
codes in force at the time the document is submitted. The ordinance further
provides that the requirement be reflected on all real estate title insurance
reports conducted precedent to the transfer of ownership, to give public notice of
the mandatory inspection. In April, 1994, the village of River Grove adopted a
similar ordinance. Both Westchester and River Grove are non-home-rule
municipalities.

Non-home-rule municipalities have only those powers which are expressly granted by
statute and the constitution, those powers which are incident to those which have
been expressly granted and those powers which are indispensable to the
accomplishment of the declared objects and purposes of the municipal corporation.
(Pesticide Pub. Pol. v. Village of Wauconda (1987), 117 Ill.2d 107, 111-112.)
Consequently, as a threshold issue, it must be determined whether Westchester and
River Grove have the power to adopt the ordinances in question. Only if this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

question is answered affirmatively will it be necessary to consider whether the villages' power is preempted by State law relating to title insurers.

Neither village has cited any authority for the adoption of these ordinances. The only purpose suggested within the body of each ordinance, apart from the collection of a $25 fee, is to determine whether the property is in compliance with village codes (Village of Westchester Ordinance No. 94-1387, adopted February 8, 1994, at p. 1) or to determine whether any "outstanding obligation is due to the [v]illage with respect to the property" (Village of River Grove Ordinance No. 1994-05, adopted April 21, 1994, at p. 1). Municipalities are authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 et seq. (West 1992)), to adopt a number of ordinances and codes designed to protect public health and safety, and are authorized to enforce such codes by requiring permits, fees, and fines. (E.g., 65 ILCS 5/11-31.1-1 et seq.; 5/11-37-1 et seq.; 5/11-38-4 (West 1992).) Further, municipalities may impose various fees for other services relating to real property. In no instance, however, are municipalities authorized to limit the alienability of property in order to enforce such codes.

Although these ordinances do not expressly so state, I assume that the villages will refuse to affix the "document review" stamp to any deed for property which is not in compliance with the village codes (the village of Westchester) or concerning which unpaid obligations may be deemed to be due (the village of River Grove). Thus, even if the deeds are returned to the persons submitting them, if they proceed with the transactions they will violate the application ordinance and be subjected to its penalties. This attempt to make alienability subject to municipal regulation clearly exceeds the villages' powers.

Further, non-home-rule municipalities have no authority to impose a tax on the transfer of real property. The authority to impose such a tax is expressly reserved to home rule municipalities (65 ILCS 5/8-11-6a (West 1992)). While the fee imposed by the River Grove and Westchester ordinances is denominated a document inspection fee, rather than a transfer tax, there can be little doubt that it operates as the letter. As previously discussed, the villages' authority to enforce their health and safety codes is entirely unrelated to the transfer of property. Moreover, a document inspection would provide no basis upon which to determine whether the property was in compliance with codes, and the ordinances do not even suggest that the affixing of the required stamp will depend upon an inspection of the property itself. In my opinion, the inspection fee is, in both operation and effect, a prohibited transfer tax.

Because the non-home-rule villages in question have no authority to enact or enforce ordinances restricting the transfer of real property or to impose a fee or tax thereon, it is my opinion that the ordinances are void and unenforceable. Because of this conclusion, it is not necessary to determine whether such ordinances, with respect to their effect on title insurers, are preempted or superseded by State laws requiring the licensure of title insurers.

Respectfully yours,
Roland W. Burris
Attorney General

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 3

1994 WL 601863 (Ill.A.G.)

1994 WL 601863 (Ill.A.G.)
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT B



### Mainstreet Organization of REALTORS®
### STANDARD RESIDENTIAL EXCLUSIVE MARKETING AGREEMENT



BROKER (Name and Address): _____    SELLER(s)* (Name and Address): _____

_____    _____

_____    _____

_____    _____

*Seller represents and warrants that title to the property is in the name of _____

_____ and Seller has the authority to sell the Property.

**1. Property:** This Agreement is between the above-mentioned "Broker" and "Seller," in consideration of their acceptance of the terms hereof and, of Broker's efforts to advertise, market, promote, and sell the real estate commonly known as
Address:_____,
Unit No: _____, City: _____,
County: _____, State: _____, Zip Code: _____,
Permanent Index No.:_____, hereinafter referred to as "Property."

Condo, Coop, or Townhome Parking Space Included: (check type) ___deeded space; ___limited common element; ___assigned: Parking space # ____
**2. Term and Conditions:**   The term of this Agreement begins 12:01 A.M. Month:_____ Day:_____
Year:_____ and terminates 11:59 P.M. Month:_____ Day: _____ Year:_____ ("marketing period").
Seller gives to Broker the exclusive right to market, sell, option, or exchange the Property to qualified purchasers and to share the Property with participants in the Multiple Listing Service of Northern Illinois, Inc., and/or any other Multiple Listing Service in which Broker is a participant, in accordance with the applicable rules and regulations of that Multiple Listing Service.

**(____/____) THE PARTIES UNDERSTAND AND AGREE THAT IT IS ILLEGAL FOR EITHER OF THEM TO**
*(Seller(s)'s Initials)* **DISCRIMINATE AGAINST ANY PROSPECTIVE SELLER OR LESSOR ON THE BASIS OF RACE, AGE, COLOR, RELIGION, SEX, ANCESTRY, MARITAL STATUS, PHYSICAL OR MENTAL HANDICAP, FAMILIAL STATUS, NATIONAL ORIGIN, SEXUAL ORIENTATION, OR ANY OTHER CLASS PROTECTED BY ARTICLE 3 OF THE ILLINOIS HUMAN RIGHTS ACT. THE PARTIES AGREE TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, AND LOCAL FAIR HOUSING LAWS.**

**3. Marketing Price:** The price shall be $_____
**4. Possession:** Possession is to be negotiated at time of sales contract.
**5. Seller's Designated Agent:** Broker designates and Seller accepts _____
("Seller's Designated Agent"), a sales associate affiliated with Broker, as the only legal agent of Seller to market and sell Seller's Property. Broker reserves the right to appoint additional designated agents for Seller when, in Broker's discretion, it is necessary. If additional designated agents are appointed, Seller shall be informed in writing within a reasonable time of such appointment. Seller authorizes Seller's Designated Agent, from time to time, to allow another sales associate, who is not an agent of the Seller, to sit an open house of Seller's Property or provide similar support to Designated Agent in the marketing of Seller's Property. Seller understands and agrees that this Agreement is a contract for Broker to market and sell Seller's Property and that Seller's Designated Agent is the only legal agent of Seller.  Seller's Designated Agent will be primarily responsible for the direct marketing and sale of Seller's Property.  The duties owed to Seller as referred to in the Illinois Real Estate License Act of 2000, will only be owed to Seller by the Designated Agent.  The Broker and the Designated Agent will have only those duties to the Seller as are required by statute.
**6. Possible Dual Agency:** The above named Designated Agent (hereinafter sometimes referred to as "Licensee") may undertake a dual representation (represent both the seller or landlord and the buyer or tenant) for the sale or lease of the Property. Seller acknowledges he was informed of the possibility of this type of representation. Before signing this document, Seller must read the following:
Representing more than one party to a transaction presents a conflict of interest, since both clients may rely upon Licensee's advice and the clients' respective interests may be adverse to each other. Licensee will undertake this representation only with the written consent of ALL clients in the transaction. Any agreement between the clients as to a final contract price and other terms is a result of negotiations between the clients acting in their own best interests and on their own behalf.  Seller acknowledges that Licensee has explained the implications of dual representation, including the risks involved, and understands that he has been advised to seek independent advice from advisors or attorneys before signing any documents in this transaction.

_____ *Broker Initial*                                    _____ *Seller(s) Initial_____ Seller(s) Initial*
*Address:* _____            _____

60  WHAT A LICENSEE CAN DO FOR CLIENTS WHEN ACTING AS A DUAL AGENT:
61  1.  Treat all clients honestly.
62  2.  Provide information about the Property to the buyer or tenant.
63  3.  Disclose all latent material defects in the Property that are known to Licensee.
64  4.  Disclose financial qualification of the buyer or tenant to the Seller or landlord.
65  5.  Explain real estate terms.
66  6.  Help the buyer or tenant to arrange for Property inspections.
67  7.  Explain closing costs and procedures.
68  8.  Help the buyer compare financing alternatives.
69  9.  Provide information about comparable properties that have sold so both clients may make educated decisions on what
70      price to accept or offer.
71
72  WHAT A LICENSEE CANNOT DISCLOSE TO CLIENTS WHEN ACTING AS A DUAL AGENT:
73  1.  Confidential information that Licensee may know about the clients, without the client's permission.
74  2.  The price the seller or landlord will take other than the listing price without permission of the seller or landlord.
75  3.  The price the buyer or tenant is willing to pay without permission of the buyer or tenant.
76  4.  A recommended or suggested price the buyer or tenant should offer.
77  5.  A recommended or suggested price the seller or landlord should counter with or accept.
78
79  **If Seller is uncomfortable with this disclosure and dual representation, please let Licensee know.  Seller is not required to**
80  **accept this section unless Seller wants to allow the Licensee to proceed as a Dual Agent in this transaction.**

81  ☐                ☐              By checking "Yes" and initialing, Seller acknowledges that Seller has read and understands
82  Yes              No             this section and voluntarily consents to the Licensee acting as a Dual Agent (that is, to
83  (_____/_____)             representing BOTH the Seller or landlord and the buyer or tenant) should that become
84  *(Seller(s)'s Initials)*        necessary.
85

86  **7. Buyer's Agent:** Seller acknowledges that Seller has been informed and understands that as part of Broker's real estate business,
87  Broker, from time to time, enters into representation Agreements with Buyers, and, as such, may designate certain of its Sales
88  Associates as Exclusive Buyers Agents for the purpose of showing and negotiating the purchase of real estate listed with Broker or
89  other real estate Brokerage firms.
90  **8. Buyer Confidentiality:** Seller understands that Broker and/or Designated Agent may have previously represented a buyer who
91  is interested in Seller's Property.  During that representation, Broker and/or Designated Agent may have learned material
92  information about the Buyer that is considered confidential.  Under the law, neither Broker nor Designated Agent may disclose any
93  such confidential information to Seller even though the Broker and/or Designated Agent now represent the Seller.
94  **9. Broker's Affiliates:**  Seller understands and agrees that other Sales Associates affiliated with Broker, may represent the actual
95  or prospective Buyer of Seller's Property.  Further, Seller understands and agrees that if the Property is sold through the efforts of
96  a Sales Associate affiliated with Broker who represents the Buyer, the other Sales Associate affiliated with Broker will be acting as
97  a Buyer's Designated Agent.
98  **10. Consent to Represent Other Sellers:**  Seller understands and agrees that Broker and Designated Agent may from time to time
99  represent or assist other Sellers who may be interested in selling their Property to Buyers.  The Seller consents to Broker's and
100 Designated Agent's representation of such other Sellers before, during, and after the expiration of this Exclusive Marketing
101 Agreement and expressly waives any claims including but not limited to breach of duty or breach of contract based solely upon
102 Broker's or Designated Agent's representation or assistance of other Sellers who may be interested in selling their Property to
103 Buyers.
104 **11. Brokerage Fee:**  In consideration of the obligations of the Broker, the Seller agrees:
105 (a) To pay Broker, at the time of closing of the sale of the property and from the disbursement of the proceeds of said sale,
106 compensation in the amount of _____ % of the sale price (to be distributed _____ % to the listing office
107 and _____ % to the selling office) for the Broker's services in effecting the sale by finding a Buyer ready, willing, and able to
108 purchase the property.  If the transaction shall not be closed because of refusal, failure, or inability of the Seller to perform, the
109 Seller shall pay the sales commission in full to Broker upon demand. Should a sale be in pending or contingent status at the
110 expiration of this Agreement, Seller shall pay Broker the full commission set forth upon closing of said sale.
111 (b) To pay Broker the commission specified above if Broker procures a buyer, if the Property is sold within said time by Seller or
112 any other person, or if the property is sold within _____ days from the expiration date herein to any prospect to whom
113 the said listing information was submitted during the term of this exclusive agreement.  However, Seller shall not be obligated to
114 pay said commission if a valid, written listing agreement is entered into during the term of said protection period with another
115 broker and the sale of the Property is made during the term of the subsequent listing agreement.

_____ *Broker Initial*                                    _____ *Seller Initial* _____ *Seller Initial*
*Address:* _____

116 **12. Administration Fee:** In addition to the Brokerage commission set forth herein, Seller shall pay Broker an administration fee
117 of _____ to offset Broker's administration costs in processing this Agreement. Said fee shall be paid
118 to Broker on _____
119 **13. Cooperation and Compensation:** Broker is authorized to show the Property to prospective buyers through cooperating
120 agents; and Broker, on a case-by-case basis, may pay a part of its brokerage commission to cooperating agents. Broker is
121 authorized, in its sole discretion, to determine with which brokers it will cooperate and the amount of compensation that it will
122 offer cooperating brokers in the sale of Seller's Property. Seller acknowledges that the compensation offered to such cooperating
123 brokers may vary from broker to broker.
124 **14. Title Insurance and Survey:** Seller acknowledges that Seller has not added to nor disposed of any part of the Property, or
125 gained any easements in favor of or against the Property not disclosed in the Title Guaranty Policy except as stated herein. Prior to
126 closing, Seller agrees to furnish at Seller's expense a title insurance commitment for an Owner's Title Insurance Policy in the
127 amount of the sale price, showing good title in the owner's name. After a sales contract has been signed, arrangements must be
128 made to secure title insurance and schedule the closing. Seller understands that Seller is not required to use any particular title
129 insurance company and that Seller or Seller's attorney may select any qualified licensed company for Seller's title insurance needs.
130 Not less than one (1) business day prior to closing, except where the subject property is a condominium, Seller may be required, at
131 Seller's expense, to furnish a Plat of Survey dated *not more than six (6) months prior to the date of closing*, prepared by an Illinois
132 registered land surveyor, showing any encroachments, measurements of all lot lines, all easements of record, building set-back
133 lines of record, fences, all building and other improvements on the real estate and distances therefrom to the nearest two lot lines.
134 In addition, the survey to be provided shall be a boundary survey conforming to the requirements of the *Illinois Department of*
135 *Professional Regulation* found at 68 Ill. Adm. Code, Sec. 170.56. The survey shall show all corners staked and flagged or
136 otherwise monumented. The survey shall have the following statement prominently appearing near the professional land surveyor
137 seal and signature: "This professional service conforms to the current *Illinois minimum standards for a boundary survey.* A
138 *Mortgage Inspection,* as defined, is not a boundary survey, and does not satisfy the necessary requirements."
139
140 With regard to the issuance of title insurance:
141 ❏ ( ___/___ )   Seller authorizes Broker to order title insurance and related services on Seller's behalf through _____
142    *Seller(s)'s Initials*         _____, an affiliate of Broker, for the estimated charges as disclosed
143                in the Federal and State Disclosure Statements provided Seller by Broker.
144 ❏ ( ___/___ )   Seller directs that _____ provide the title insurance
145    *Seller(s)'s Initials*   and related services as stated above.
146 ❏ ( ___/___ )   Seller or Seller's attorney will make the necessary arrangements for title insurance and any related services.
147    *Seller(s)'s Initials*
148
149 **15. Fixtures and Personal Property:** All of the fixtures and personal property stated herein are owned by Seller and, to the best
150 of Seller's knowledge, are in operating condition unless otherwise noted. Seller agrees to transfer to Buyer all fixtures, all heating,
151 electrical, and plumbing systems together with the following items of personal property by Bill of Sale (Check or enumerate
152 applicable items):

| | | | |
|---|---|---|---|
| ___ Refrigerator | ___ All Tacked Down Carpeting | ___ Fireplace Screen(s)/Door(s)/Grate(s) | ___ Central Air Conditioning |
| ___ Oven/Range/Stove | ___ All Window Treatments & Hardware | ___ Fireplace Gas Logs | ___ Electronic or Media Air Filter |
| ___ Microwave | ___ Built-in or Attached Shelving | ___ Existing Storms & Screens | ___ Central Humidifier |
| ___ Dishwasher | ___ Smoke Detector(s) | ___ Security System(s) (owned) | ___ Sump Pump(s) |
| ___ Garbage Disposal | ___ Ceiling Fan(s) | ___ Intercom System | ___ Water Softener (owned) |
| ___ Trash Compactor | ___ TV Antenna System | ___ Central Vac & Equipment | ___ Outdoor Shed |
| ___ Washer | ___ Window Air Conditioner(s) | ___ Electronic Garage Door Opener(s) | ___ Attached Gas Grill |
| ___ Dryer | ___ All Planted Vegetation | with ___ Transmitter(s) | ___ Light Fixtures (as they exist) |
| ___ Satellite Dish and System | ___ Invisible Fence System, Collar(s) and Box | | |

162 **Other items included:** _____
163 **Items NOT included:** _____
164 Unless otherwise agreed to in writing by Seller and Buyer, Seller shall warrant to Buyer that all fixtures, systems and personal
165 property included in this Agreement shall be in operating condition at possession, except: _____
166 _____. A system or item shall be deemed
167 to be in operating condition if it performs the function for which it is intended, regardless of age, and does not constitute a threat to
168 health or safety.
169 **16. Home Warranty:** Seller shall agree to provide to Buyer a limited home warranty program from _____
170 _____ at a charge of $ _____. Seller acknowledges that a
171 home warranty program is a limited warranty with a deductible. (STRIKE THROUGH IF NOT OFFERED.)
172 **17. Disclosure:** All inquires about this Property made directly to Seller shall be immediately referred to Broker and/or Seller's
173 Designated Agent. Seller understands that the information which Seller provides to Seller's Designated Agent as marketing
174 information will be used to advertise Seller's Property to the public and submitted to the Multiple Listing Service. It is essential

_____ *Broker Initial*                                         _____ *Seller Initial*_____ *Seller Initial*
*Address:* _____

175 that this information be accurate and truthful. Seller agrees to comply with the provisions of the Illinois Residential Real Property
176 Disclosure Act, and, if applicable, the Federal Lead Based Paint Disclosure Regulations. Seller shall complete the applicable
177 disclosure document(s) in a timely manner, shall not knowingly provide false or inaccurate information therein, and shall comply
178 with all local government ordinances. Although Seller is marketing Seller's Property in its present physical condition, Seller
179 understands that Seller may be held responsible by a buyer for any latent or hidden, undisclosed defects in the Property which are
180 known to Seller but which are not disclosed to buyer. Seller shall indemnify, save, defend and hold Broker, Broker's Sales
181 Associates, and Seller's Designated Agent harmless from all claims, disputes, litigation, judgments and/or costs (including
182 reasonable attorney's fees), whether or not frivolous, arising from any misrepresentations made by the Seller, from any incorrect
183 information supplied by the Seller, or from any material fact concerning the Property including latent defects which the Seller fails
184 to disclose. Further, Seller shall indemnify, save, defend, and hold Broker, Broker's Sales Associates, and Seller's Designated
185 Agent harmless from any claim, loss, damage, or injury to any person or Property while viewing the Property arising from the
186 condition of Seller's Property.
187 **18. Broker Limitations:** The Broker's sole duty is to effect a sale of the Property. The Broker, Seller's Designated Agent,
188 members of the Multiple Listing Service(s) to which the Broker belongs, and the Mainstreet Organization of
189 REALTORS® and are not charged with the custody of the Property, its management, maintenance, upkeep, or repair. Illinois
190 law allows Brokers to prepare the sales contract using approved preprinted forms, but does not allow Brokers, real estate agents, or
191 sales associates to draft other legal documents required to close the sale. Therefore, the Seller agrees to draft and furnish, or have
192 Seller's attorney draft and furnish all other legal documents necessary to close the sale.
193 **19. Minimum Standards:** Illinois law provides that all exclusive brokerage agreements must specify that the sponsoring broker,
194 (_____/_____) through one or more sponsored licensees, must provide at a minimum, the following services: (1) accept delivery
195 *Seller's Initials* of and present to the client offers and counter-offers to buy, sell, or lease the client's property or the property the
196 (_____/_____) client seeks to purchase or lease; (2) assist the client in developing, communicating, negotiating, and presenting
197 *Broker Initials* offers, counter offers, and notices that relate to the offers and counteroffers until a lease or purchase agreement is
198 signed and all contingencies are satisfied or waived; and (3) answer the client's questions relating to the offers,
199 counter-offers, notices, and contingencies.
200 **20. Marketing Authorization:** Broker is authorized to advertise, promote, and market the Property which shall include, but not
201 be limited to, in Broker's sole discretion, the display of signs, placement of the Property in any Multiple Listing Service in which
202 Broker is a participant, and promotion of the Property through any electronic medium and/or on any Internet Homepage to which
203 the Broker may subscribe. Broker is authorized to affix a keybox to the Property, and provided the owner is absent, any MLS
204 participant or subscriber associated with the Multiple Listing Service(s), whether acting as Buyer's agent or otherwise, shall have
205 the right, through use of said keybox, to show the Property at any reasonable time. It is not a requirement of the Multiple Listing
206 Service or Broker that a Seller allow use of a keybox. Seller acknowledges that neither listing nor selling Broker, the Mainstreet
207 Organization of REALTORS®, nor any Multiple Listing Service is an insurer against the loss of Seller's
208 personal property. Seller is advised to safeguard or remove valuables now located on said Property. Seller is further advised to
209 verify the existence of said valuables and obtain personal property insurance through Seller's insurance agent. Further, Seller
210 hereby grants Broker and Broker shall have the right, and Seller acknowledges that Broker may have an obligation under
211 applicable Multiple Listing Service rules and regulations as a condition of placing Seller's Property in such Multiple Listing
212 Service, to release information as to the amount of selling price, type of financing, and number of days to sell the Property to any
213 Multiple Listing Service of which Broker is a member at the time the Property is sold and closed.
214 **21. Taxes and Assessments:** All taxes and all usually prorated expenses shall be prorated pursuant to the terms of the sales
215 contract. Seller shall disclose any assessments or special taxes for improvements or lien for improvements, either of record or in
216 process, applicable to the Property marketed herein, and should the Seller receive any notice thereof, Seller agrees to notify the
217 Broker immediately.
218 **22. Earnest Money:  The Earnest Money shall be held by the Listing Broker, in trust for the mutual**
219 **benefit of the Parties in a manner consistent with Illinois State Law.  Upon initial closing, or**
220 **settlement, or upon breach of Contract, the Earnest Money shall be applied first to the payment of any**
221 **expenses incurred by the Broker on Seller's behalf in the sale, and second to payment of the Broker's**
222 **sales commission, rendering the surplus, if any, to the Seller.  If a dispute arises between Seller and**
223 **Buyer as to whether a default has occurred, Broker shall hold the Earnest Money and pay it out as**
224 **agreed in writing by Seller and Buyer or as directed by a court of competent jurisdiction.  In the event**
225 **of such dispute, Seller agrees that Broker may deposit the funds with the clerk of the Circuit Court by**
226 **an action in the nature of interpleader.  Seller agrees Broker may be reimbursed from the Earnest**
227 **Money for all costs, including reasonable attorney's fees, related to the filing of the interpleader and**
228 **hereby agrees to indemnify and hold Broker harmless from any and all claims and demands, including**
229 **the payment of reasonable attorney's fees, costs, and expenses arising out of such default, claims, and**
230 **demands. If Seller defaults, Earnest Money, at the option of Buyer, shall be refunded to Buyer, but**

_____ *Broker Initial*                                              _____ *Seller Initial*_____ *Seller Initial*
*Address:* _____

231 such refunding shall not release Seller from the obligation of this Marketing Agreement. There shall
232 be no disbursement of Earnest Money unless Escrowee has been provided written agreement from
233 Seller and Buyer. In anticipation of Closing, the Parties direct Escrowee to close the account no
234 sooner than 10 (ten) business days prior to the anticipated Closing date.
235 **23. Amendments:** Should it be necessary to amend or modify this Agreement, facsimile signatures of all parties to this
236 Marketing Agreement are accepted as original signatures. This Agreement may be executed in multiple copies and Seller's
237 signature hereon acknowledges that Seller has received a signed copy.
238 **24. Mediation:** Any controversy or claim arising out of, or relating to, this Agreement, or the breach thereof, shall be mediated, in
239 accordance with rules, then pertaining, of the American Arbitration Association, Chicago, Illinois.
240 **25. Indemnification of Broker:** Seller agrees to indemnify Broker and to save, defend, and hold Broker harmless on account of
241 any and all loss, damage, cost, or expense (including reasonable attorney's fees) incurred by Broker, arising out of this Agreement,
242 or in the collection of fees or commissions due Broker pursuant to the terms and conditions of this Agreement provided Broker is
243 not at fault.
244 **26. Disclaimer:** Seller acknowledges that Broker and Seller's Designated Agent are acting solely as real estate professionals, and
245 not as attorney, tax advisor, surveyor, structural engineer, home inspector, environmental consultant, architect, contractor, or other
246 professional service provider. Seller understands that such other professional service providers are available to render advice or
247 services to the Seller, if desired, at Seller's expense.
248 **27. Costs of Third-Party Services or Products:** Seller is responsible for the costs of all third-party products or services such as
249 surveys, soil tests, title reports, well and septic tests, etc.
250 **28. Lease of Property:** Although the purpose of this Agreement is to bring about a sale, option, or exchange of the Property,
251 Seller agrees to pay Broker a leasing commission of _____ if the Property is leased within the marketing period.
252 If the tenant to whom the Property is leased later purchases the Property, Seller agrees to pay Broker a sales commission of
253 _____ on the full sale price.
254 **29. Severability:** In case any one or more provisions of this Agreement shall, for any reason, be held to be invalid, illegal, or
255 unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this
256 Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.
257 **30. Notice:** All notices required shall be in writing and shall be served by one Party to the other Party. Notice to any one of the
258 multiple-person Party shall be sufficient notice to all. Notice shall be given in the following manner:
259     (a) By personal delivery of such notice; or
260     (b) By mailing of such notice to the addresses recited herein by regular mail and by certified mail, return receipt requested.
261        Except as otherwise provided herein, notice served by certified mail shall be effective on the date of mailing; or
262     (c) By sending facsimile transmission. Notice shall be effective as of date and time of facsimile transmission, provided that
263        the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time). In
264        the event fax notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the
265        first business day after transmission; or
266     (d) By sending e-mail transmission. Notice shall be effective as of date and time of e-mail transmission, provided that
267        the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time), and
268        provided further that the **recipient provides written acknowledgment to the sender** of receipt of the transmission (by e-
269        mail, facsimile, or by regular mail). In the event e-mail notice is transmitted during non-business hours, the effective date
270        and time of notice is the first hour of the first business day after transmission.
271 **31. Entire Agreement:** This Agreement constitutes the complete understanding and entire agreement between the parties relating
272 to the subject thereof, and any prior agreements pertaining thereto, whether oral or written, have been merged and integrated into
273 this Agreement. This Agreement may not be terminated or amended prior to its termination date without the express written
274 consent of both parties to this Agreement.
275 Seller hereby acknowledges receipt of a signed copy of this Agreement and all attachments. The attachments include the
276 following (HERE LIST ALL ATTACHMENTS): _____
277 _____

278                *(Signatures are required of all who have a legal or equitable interest in the Property)*

279 _____    _____
280 BROKER                                  SELLER
281
282 _____    _____
283 BY (Signature)                           SELLER
284
285 _____    _____
286 DATE                                    ADDRESS
287
288 _____
DESIGNATED AGENT

_____ *Broker Initial*                      _____ *Seller Initial*_____ *Seller Initial*
*Address:* _____

289
290  DATE _____        E-MAIL ADDRESS _____
291
292  _____              _____
293  PHONE _____        PHONE _____  ˙FAX _____
294
295  _____              _____
296  OFFICE _____       DATE _____
297

_____ *Broker Initial*                              _____ *Seller Initial* _____ *Seller Initial*
*Address:* _____

*(Page 6 of 6) October 2005 Code 6000  Mainstreet Organization of REALTORS®*

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REALTOR® ASSOCIATION OF WEST/ SOUTH SUBURBAN CHICAGOLAND, | ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 06 C 2271 |
| v. | ) ) | Judge Milton I. Shadur |
| CALUMET CITY, ILLINOIS, | ) ) | |
| *Defendant.* | ) ) ) | |

## ORDER GRANTING PRELIMINARY INJUNCTION

This matter coming to be heard on Plaintiff's motion for a preliminary injunction, due

notice having been given, and the Court being fully advised in the premises, for the reasons set

forth on the record at the hearing of this matter on August 2, 2006, and at prior hearings, and

based on the written submissions of the parties, the Court finds that, as to Plaintiff's claims that

the Deconversion Provisions and the Point of Sale Inspection Ordinance (as defined below) are

facially unconstitutional: (i) Plaintiff has associational standing, (ii) Plaintiff has established a

high likelihood of success on the merits, (iii) there is no adequate remedy at law and Plaintiff and

its Members will suffer irreparable harm if injunctive relief is not granted, (iv) the irreparable

harm the Plaintiff and its Members will suffer if injunctive relief is wrongfully denied will

outweigh any irreparable harm the Defendant will suffer if injunctive relief is wrongfully

granted, and (v) granting injunctive relief will not disserve the public interest in terms of the

consequences to non-parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Calumet City, Illinois, including its agents, employees, officers, successors and

members (collectively, the "City"), is prohibited and enjoined from enforcing (i) Section 14-1 of

86409v4

Chapter 14, Article I of the Calumet City Code (the "Point of Sale Inspection Ordinance"),

including but not limited to those provisions of the Point of Sale Inspection Ordinance that

require sellers of legal nonconforming property to "deconvert" them into structures with fewer

income-producing rental units (the "Deconversion Provisions"), and (ii) Section 327(b) of

Chapter 82, Article X of the Calumet City Code.  This Order shall not prohibit the City from

attempting to collect unpaid water bills by lawful means other than pursuant to Section 327(b) of

Chapter 82, Article X of the Calumet City Code.

     2.     The City is prohibited and enjoined from (i) conducting inspections pursuant to

the Point of Sale Inspection Ordinance; (ii) prohibiting the sale of property and refusing to issue

transfer stamps in the absence of a point of sale inspection and/or issuance of a "certificate of

compliance" or "conditional certificate of compliance;" and (iii) ordering the deconversion of

legal nonconforming property.  The City shall allow the sale or transfer of property without

requiring point of sale inspections or deconversions of legal nonconforming property.

     3.     This order shall remain in effect until the trial on the merits, unless modified by

this Court.

     4.     Because no costs or damages will be incurred or suffered by the City if the

requested injunction is issued, the Court deems it proper that, pursuant to Fed. R. Civ. P. 65(c),

no security need be given by the Plaintiff.

Dated:     August _8_, 2006     ENTERED:

_Milton I. Shadur_ (signature)

Judge Milton I. Shadur

-2-

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| REALTOR® ASSOCIATION OF WEST/ SOUTH SUBURBAN CHICAGOLAND,<br><br>                *Plaintiff,*<br><br>    v.<br><br>CALUMET CITY, ILLINOIS,<br><br>                *Defendant.* | Case No. 06 C 2271<br><br>Judge Milton I. Shadur |

### ORDER GRANTING PRELIMINARY INJUNCTION

This matter has come on to be heard on the motion of plaintiff ("Association") for a preliminary injunction, with due notice having been given and this Court being fully advised in the premises. For the reasons set forth on the record at the hearing of this matter on August 2, 2006 and at other hearings, and based on the written submissions of the parties, this Court finds that as to Association's claims that the Deconversion Provisions and the Amended Point of Sale Inspection Ordinance (as defined below) are facially unconstitutional:

1. Association has established associational standing.

2. Association has established a high likelihood of success on the merits.

3. There is no adequate remedy at law, and Association and its Members will suffer irreparable harm if injunctive relief is not granted.

4. Such irreparable harm that Association and its Members will suffer if injunctive relief is wrongfully denied substantially outweighs any irreparable harm that defendant Calumet City ("City") will suffer if injunctive relief is wrongfully granted.

5. Granting injunctive relief will not disserve the public interest – indeed, will serve the public interest – in terms of the consequences to non-parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.       City and its agents, employees, officers, successors and members (collectively included within "City," though treated for convenience as a singular noun in this Order), is prohibited and enjoined from enforcing (a) Section 14-1 of Chapter 14, Article I of the Calumet City Code, as amended by Ordinance No. 06-68 (the "Amended Point of Sale Inspection Ordinance"), including but not limited to any provisions of the Amended Point of Sale Inspection Ordinance that require sellers of legal nonconforming property to "deconvert" them into structures with fewer income-producing rental units (the "Deconversion Provisions"), and (b) Section 327(b) of Chapter 82, Article X of the Calumet City Code ("Section 327(b)"). This Order shall not prohibit City from attempting to collect unpaid water bills by lawful means other than pursuant to Section 327(b).

2.       City is prohibited and enjoined from (a) conducting inspections pursuant to the Amended Point of Sale Inspection Ordinance; (b) prohibiting the sale of property and refusing to issue transfer stamps in the absence of a point of sale inspection and/or issuance of a "certificate of compliance" or "conditional certificate of compliance;" and (c) ordering the deconversion of legal nonconforming property. City shall allow the sale or transfer of property without requiring point of sale inspections or deconversions of legal nonconforming property.

3.       This order shall remain in effect until the trial on the merits, unless modified by this Court.

4.       Because no costs or damages will be incurred or suffered by City if the requested injunction is issued, this Court deems it proper that, pursuant to Fed. R. Civ. P. 65(c), no security need be given by Association.

2

5.      This Court's August 8, 2006 Order Granting Preliminary Injunction as to an earlier version of the now-Amended Point of Sale Ordinance is now moot, and the injunction granted thereby is dissolved.

Dated:        December 8, 2006              ENTERED:

*Milton I. Shadur*

Judge Milton I. Shadur

3

# EXHIBIT E

LEXSEE 2005 USDISTLEXIS 36386

**DONALD N. HORINA, Plaintiff, vs. CITY OF GRANITE CITY, ILLINOIS, Defendant.**

**05-cv-0079-MJR**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

*2005 U.S. Dist. LEXIS 36386*

**August 29, 2005, Decided**
**August 29, 2005, Filed**

**SUBSEQUENT HISTORY:** Injunction granted at *Horina v. City of Granite City,* 2006 U.S. Dist. LEXIS 31746 (S.D. Ill., May 19, 2006)

**COUNSEL:** [*1] For Donald N. Horina, Plaintiff: Jason R. Craddock, Sr., Law Offices of Jason Craddock, Sauk Village, IL.

For City of Granite City IL, Defendant: Heidi L. Eckert, Hinshaw & Culbertson - Belleville, Belleville, IL; John L. Gilbert, Hinshaw & Culbertson LLP - Edwardsville, IL, Generally Admitted, Edwardsville, IL.

**JUDGES:** REAGAN, District Judge.

**OPINION BY:** MICHAEL J. REAGAN

**OPINION**

**MEMORANDUM and ORDER**

**REAGAN, District Judge:**

On April 27, 2005, Plaintiff Donald N. Horina filed a "Motion for Temporary and Preliminary Injunction" (Doc. 7) against Defendant City of Granite City, Illinois (hereinafter "Granite City"). In his motion, Horina moves for temporary and preliminary injunction against Granite City prohibiting Granite City from enforcing its ordinance, Chapter 5.78.010, which in part, makes it unlawful to distribute handbills on any public place in Granite City. Horina argues that the ordinance violates both his and other third persons' *First* and *Fourteenth Amendment* rights.

A hearing was held on this matter on May 20, 2005, where testimony was heard, evidence was presented, and arguments were made. Because all parties received notice of and participated in the May 20, 2005 hearing, [*2] the Court construes the instant motion as solely seeking preliminary injunction pursuant to *FEDERAL RULE OF CIVIL PROCEDURE 65(a)* and denies as moot the motion for a temporary restraining order.

At the hearing, Granite City challenged whether Horina has standing to seek an injunction against Granite City. As a result, the Court had the parties brief the issue (*see* Docs. 17, 23, and 25) and entered an Order on August 1, 2005 finding that Horina has standing to challenge the ordinance (Doc. 27). In its August 1st Order, the Court set a briefing schedule as to the merits of Horina's motion. Accordingly, Granite City filed its response brief at Doc. 33 to which Horina replied at Doc. 34. This matter being fully briefed as to the merits of Horina's motion for preliminary injunction, the Court begins its analysis with a recitation of the factual background and procedural history as detailed in its August 1st Order.

**Factual Background and Procedural History**

Horina is a Christian who feels obligated to tell others about their need to be "born again." He accomplishes his purpose primarily through public distribution of free religious literature, also known as gospel tracts. [*3] [1] Horina offers the tracts on public sidewalks and places them on automobile windshields in a manner that does not impede pedestrian traffic.

1 Horina testified his religious tracts carry the following message: "Jesus loves the sinners, Jesus died on the cross, shed his blood so that sinners, which we all are, can have our sins forgiven, and if we'll all trust Jesus alone, we can go

to heaven on the merits of Christ and not our own merits." Transcript, p. 10.

On July 26, 2003, Horina was distributing gospel tracts on a public sidewalk in Granite City, Illinois on the 2000 block of Iowa Avenue, which is a sidewalk located in front of Hope Clinic. Hope Clinic is a medical facility, that among other procedures, performs abortions. Horina placed a gospel tract through the open window of a vehicle belonging to Nathaniel Lang ("Lang"), a security guard employed at Hope Clinic. Lang had repeatedly asked Horina not to put anything on or in his car. As a result of Horina's placing the gospel tract in the car, Lang [*4] contacted the Granite City Police Department. Granite City Police Officer Ronald Fisher issued a ticket to Horina for violating Chapter 5.78.010 [2], the Handbill Distribution Ordinance (hereinafter "the ordinance").

> 2    Granite City Ordinance Chapter 5.78.010 states in pertinent part: "It is unlawful for any person, firm or corporation to distribute indiscriminately to the public any cards, circulars, handbills, samples of merchandise or any advertisement or advertising matter whatsoever on any public street or sidewalk or other public place in the city; provided, that this section shall not be construed to prohibit the peddling or sale of any article or publication that may carry or be accompanied by advertising matter where a charge is made or a price is paid for such article or publication."

On April 19, 2004, Horina appeared at an administrative hearing regarding the ticket. At the hearing the citation was amended to a charge of trespass to vehicle under a different city ordinance, and Horina was fined [*5] $ 100.00. Plaintiff's Exhibit 3.

On February 4, 2005, Horina filed his "Plaintiffs' [sic] Verified Complaint for Declaratory Judgment, Preliminary and Permanent Injunctive Relief and Compensatory Damages" (Doc. 1). In his complaint, Horina seeks to enjoin Granite City from enforcing the ordinance on the grounds that it unconstitutionally prohibits Horina, as well as other similarly situated third persons, from exercising their rights to freedom of speech and religion, and violates their equal protection rights under the *First* and *Fourteenth Amendments*. Then on April 27, 2005, Horina filed his "Motion for Temporary and Preliminary Injunction" (Doc. 7) seeking, among other things, preliminary and permanent injunctions restraining Defendant from enforcing the ordinance.

The Court held a hearing regarding Horina's motion for temporary and preliminary injunction on May 20, 2005. At the hearing, Horina testified that prior to being cited under the ordinance, he would leaflet about once a

week. Transcript, p. 7. Horina testified that he has curtailed leafleting as a result of having received the citation, as every time he leaflets he fears being cited under the ordinance and having to [*6] go to Court and pay fines. *Id.* He stated that "every time I [leaflet], I keep one eye out for the law so I don't get a ticket. I am fearful." *Id.* at 15. Horina further stated that if the ordinance were not in place he would not be in fear of leafleting. *Id.* at 7. Horina also stated that the times he did leaflet since having received the citation, no one from Granite City cited him under the ordinance. *Id.* at 10. However, Horina did state that at least twice when he was leafleting outside the Hope Clinic, Granite City police officers approached him and told him that he could not hand out literature as it is against city ordinance. [3] *Id.* at 11.

> 3    On cross-examination, Horina was uncertain whether the officers approached him and told him he could not hand out literature as it is against city ordinance at the clinic before or after his arrest in July 2003. Transcript, p. 13.

Also testifying at the hearing was Granite City Police Chief David Ruebhausen who has served as chief for eleven [*7] years. Ruebhausen stated that the Granite City Police Officers "bend over backwards to protect the protesters' *First Amendment* rights." *Id.* at 22. Ruebhausen has never cited anyone under the ordinance in question and has been handed literature that would fall under the ordinance. *Id.* at 23. To his knowledge, Horina was the first and only person to ever be cited under the ordinance. *Id.* at 24-25. However, Ruebhausen did state that if a person came up to a Granite City police officer upset that they had been given a piece of pro-life literature and wanted something to be done about it, a recourse available to the officer would be to issue a citation under the ordinance at issue in this matter, to the person that was leafleting. *Id.* at 35. Officer Ronald Fischer, the officer that issued Horina the citation under the ordinance, also testified. He stated he issued Horina a citation under the ordinance as he felt his conduct fell under the perimeters of the ordinance. *Id.* at 41.

At the close of the hearing, Granite City argued that Horina does not have standing to challenge the ordinance because the earlier charge against him was resolved and there are no pending charges [*8] under the ordinance against him. As a result, the Court set a briefing schedule regarding the issue of standing. Granite City filed its brief (Doc. 17) to which Horina responded (Doc. 23) and then Granite City replied (Doc. 25). On August 1, 2005, the Court entered its Order finding that Horina has standing to seek a temporary and preliminary injunction against Granite City (Doc. 27). In that same Order, the Court set a briefing schedule as to the merits of Horina's motion. Accordingly, Granite City filed its response brief

at Doc. 33 to which Horina replied at Doc. 34. This matter being fully briefed, the Court finds as follows.

## Standard for a Preliminary Injunction

To obtain a preliminary injunction, Horina must show: (1) a reasonable likelihood of success on the merits; (2) that there is no adequate remedy at law; (3) that Horina will suffer irreparable harm if an injunction is not issued; (4) that the threatened injury he faces outweighs the injury Granite City will suffer if the injunction is granted; and (5) that an injunction is in the public interest. *JAK Prods., Inc. v. Wiza, 986 F.2d 1080, 1084 (7th Cir. 1993).* If the movant can meet this [*9] threshold burden, then the inquiry becomes a "sliding scale analysis" where these factors are weighed against one another. *See AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002).*

When a party seeks a preliminary injunction on the basis of a potential *First Amendment* violation, the likelihood of success on the merits will often be the determinative factor. *Joelner v. Village of Washington Park, Illinois, 378 F.3d 613, 620 (7th Cir. 2004).* "The loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and money damages are therefore inadequate. *See Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).* As well, there can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because "it is always in the public interest to protect *First Amendment* liberties." *Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998).* Therefore, if Horina can show a likelihood of success on the merits, the Court will balance the harms to the parties and the public interest. *See*   [*10]  *Joelner, 378 F.3d at 627-29.*

## Analysis

## 1. Whether Horina's motion is moot in light of Granite City's counsel's representations to this Court that it will not enforce the ordinance until there is a final disposition of this case.

Before the Court can address the merits of Horina's motion for preliminary injunction, the Court must address Granite City's arguments that Horina's motion for preliminary injunction is moot in light of Granite City's counsel's representations to the Court in its response brief at Doc. 33 that until there is a final disposition of this case, or until the ordinance is repealed, it will not enforce the ordinance. Horina responds that his motion is not moot in spite of these representations. A defendant carries a heavy burden when it argues that a plaintiff's claims are moot, *see Kikimura v. Turner, 28 F.3d 592,*

*597 (7th Cir. 1994),* and this Court is not convinced by Granite City's arguments.

As this Court *previously* addressed in its August 1st Order, disavowal of a statute requires that the state do more than say during the litigation that it might never prosecute plaintiff or that it does not [*11]  intend to prosecute plaintiff. *See Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 302, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (7th Cir. 1979); Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1192-93 (10th Cir. 2000).* In order to disavow the statute, the state must instead take some affirmative step against enforcement. *See Wisconsin Right to Life, Inc. v. Paradise, 138 F.3d 1183, 1185 (7th Cir. 1998)(court found plaintiff did not face a credible threat of prosecution where the state body that enforced the law had promulgated a rule stating that it would not enforce the law against groups like the plaintiff and had consistently for twenty-five years followed an Attorney General Opinion recommending against enforcement).*

While the Court made those findings in its discussion as to whether Horina faced a credible threat of prosecution in order to confer standing on him to bring the instant motion, they are analogously applicable to the discussion of whether Granite City's current representations make the motion moot. This is because the United States Court of Appeals for the Seventh Circuit has "long recognized .  [*12]  .. that a defendant cannot moot a claim simply by voluntarily ceasing behavior when it is free to resume that behavior at any time." *See Edwards v. Illinois Bd. of Admissions to Bar, 261 F.3d 723 (7th Cir. 2001); Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 747 (7th Cir. 1999); Sefick v. Gardner, 164 F.3d 370, 372 (7th Cir. 1998); Jones v. Sullivan, 938 F.2d 801, 807 (7th Cir. 1991).* For instance, in *Citizens for a Responsible Government, 236 F.3d at 1192-93,* the United States Court of Appeals for the Tenth Circuit found that the plaintiff therein faced a credible threat of prosecution even though the state had insisted throughout the litigation it would not prosecute groups like plaintiff. The court held that the state's assertions during the litigation were not binding on future administrations. *Id.* This Court finds the same to be true in the case at bar. Accordingly, the Court finds that Horina's claims are not moot even in light of Granite City's latest representations to the Court that it will not enforce the ordinance.

## 2. Whether Horina is likely to succeed on the [*13]  merits of his motion.

The Court must decide, in the context of a preliminary injunction, whether a municipality can prohibit leafleting in all public places in its borders. Horina argues that he will succeed on the merits as: (1) the ordinance is

unconstitutionally overbroad, and (2) the ordinance is unconstitutional as applied to him. The difference between the two arguments, is that an "as-applied" challenge consists of a challenge to a regulation's application only to the party before the court. *City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758-59, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1998).* If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable. *Id.* However, if an overbroad challenge is successful, the statute may not be applied to anyone. *Id.* The Court will begin its analysis as to whether the ordinance is unconstitutional as applied to Horina.

**2a. Whether the ordinance is unconstitutional as applied to Horina.**

The *First Amendment* provides that "Congress shall make no law ... abridging the freedom of speech, or of the press." *U.S. Const. Amend. I.* The United States Supreme Court [*14] recognized in *Gitlow v. New York, 268 U.S. 652, 666, 45 S. Ct. 625, 69 L. Ed. 1138 (1925)*, that this provision also applies to state governments under the *Fourteenth Amendment.* Horina wants to pass out his religious leaflets free of fear that he will be cited under the city ordinance. Leafleting is a form of speech arguably protected by the *Free Speech Clause of the First Amendment. Martin v. City of Struthers, 319 U.S. 141, 143, 63 S. Ct. 862, 87 L. Ed. 1313 (1943).* Further, Horina's speech addressing religious matters is speech of the highest constitutional order. *See DeBoer v. Vill. of Oak Park, 267 F.3d 558, 570 (7th Cir. 2001), citing Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995).*

Important to the standard or review in this matter, the ordinance in question prohibits leafleting on any public street or sidewalk or other public place in Granite City. "Public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz, 487 U.S. 474, 480, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988).* When regulating *First Amendment* activity in a public forum, the government has a difficult [*15] burden to carry. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983).* For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Id. at 44, citing Carey v. Brown, 447 U.S. 455, 461, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980).* The state may also enforce regulations of the time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Id., citing United States Postal Service v. Council of*

*Greenburgh, 453 U.S. 114, 101 S. Ct. 2676, 69 L. Ed. 2d 517 (1981).* Therefore, this Court must determine whether the ordinance at issue here is content-based or content-neutral so as to apply the proper level of scrutiny.

Content-based regulations are presumptively invalid under the *First Amendment* and subject to strict scrutiny, while content-neutral restrictions receive lesser scrutiny. *Schultz v. City of Cumberland, 228 F.3d 831, 840 (7th Cir. 2000).* Content-based regulations are defined as [*16] those which distinguish favored from disfavored speech based on the ideas expressed. *Turner Broadcasting Sys., Inc. v. F.C.C., 512 U.S. 622, 643, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994).* If it is necessary to look at the content of the speech in question to determine whether the speaker violated the regulation, then the regulation is content-based. *Gresham v. Peterson, 225 F.3d 899, 905 (7th Cir. 2000).* For instance, "a general ban on speech in the vicinity of a school is content-neutral ... whereas an analogous ban on speech containing an exemption for speech relating to labor disputes is content-based. The former regulation requires no consideration to content before applying the ban, while the latter regulation requires consideration of whether the speech in question refers to a labor dispute before it is possible to determine if the regulation applies." *Schultz, 228 F.3d at 840-41.*

Horina argues that the ordinance is content-based since it requires a determination as to whether the literature being distributed falls within the category of "peddling" or "advertising" as the ordinance allows for the peddling or sale of any item that contains or [*17] is accompanied by an advertisement. However, the Court finds that this exemption is not enough to automatically qualify the ordinance as being content-based.

Horina alleges that the ordinance is not content-neutral as it permits the sale of materials having advertisements. The Court construes this exception as allowing for the sale of newspaper or magazine-like materials. Similar to the Seventh Circuit's decision in *Weinberg v. City of Chicago, 310 F.3d 1029 (7th Cir. 2002)*, the Court finds that Horina's argument fails for several reasons. In *Weinberg,* the plaintiff tried to argue that the ordinance he was challenging, that prohibited the peddling of books within a 1000 feet of the United Center, was not content-neutral because it made a distinction between peddling books and peddling newspapers. In that case, the Seventh Circuit found that the because the City of Chicago did not adopt the regulation of speech "because of disagreement with the message [the speech] conveys," the ordinance was content neutral. *Id. at 1037, citing Ward v. Rock against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661.* The Seventh Circuit stated that "the ordinance is wholly indifferent [*18] to

any specific message or viewpoint. These regulations do not single out a certain message for different treatment." *Id., citing Schultz, 228 F.3d at 840.*

Similarly, in the case at bar, the leafleting ordinance does not require one to consider the content of the leaflet, merely whether it is being handed out for free, and if not, whether it involves advertisements. Since Granite City treats those handing out any type of material for free, regardless of its content, equally, the Court cannot find that the ordinance is content-based. The fact that the ordinance adversely affects those handing out leaflets while not affecting those peddling materials with advertisements, is of little importance, as "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward, 491 U.S. at 791.* What matters to the Court is that the ordinance does not require one to consider the content of the speech, merely its format. Since the ordinance treats anyone distributing leaflets without advertisements, regardless of its content, equally, this [*19] Court cannot find that the ordinance is content-based. Therefore, the Court finds that the ordinance is content-neutral.

As the Court finds that the ordinance is content-neutral, the Court must now determine whether Horina has a likelihood of success in proving that the ordinance is not a content neutral time, place and manner regulation, that is narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. *Id., citing United States Postal Service, 453 U.S. at 114.* Turning to whether the ordinance is narrowly tailored to achieve a significant governmental interest, the Court finds that there is no doubt a city has a legitimate interest in protecting its citizens and ensuring that its streets and sidewalks are safe for all citizens. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 683-85, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992).* A city's interest in maintaining the flow of pedestrian traffic is intertwined with the concern for public safety. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650-51, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981).* However, Granite City must be able to justify [*20] the necessity of the ordinance. In the context of a *First Amendment* challenge under the narrowly tailored test, Granite City has the burden of showing that there is evidence supporting its proffered justification. *DiMa Corp. v. Town of Hallie, 185 F.3d 823, 829 (7th Cir. 1999).*

However, neither at the hearing nor in its pleadings submitted after the Court directed the parties to the brief the merits of Horina's preliminary injunction motion, did Granite City offer justification for the necessity of the ordinance. While the Court assumes that some sort of safety and congestion concerns motivated Granite City's

invocation of the ordinance, Granite City "cannot blindly invoke safety and congestion concerns without more." [4] *Weinberg, 310 F.3d at 1038.* However, Granite City has offered no empirical studies, no police records, no reported injuries, nor evidence of any lawsuits filed as a result of leafleting in Granite City. The Court finds that only speculation exists as to the justification of this ordinance, which is problematic, as the United States Supreme Court has stated that it has "never accepted mere conjecture as adequate to carry [*21] a *First Amendment* burden." *Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 392, 120 S. Ct. 897, 145 L. Ed. 2d 886 (2000).* Moreover, "using a speech restrictive blanket with little or no factual justification flies in the face of preserving one of our most cherished rights." *Weinberg, 310 F.3d at 1039.* Accordingly, the Court finds that at this stage Granite City has failed to show the ordinance advances a significant governmental interest. [5] *Cf. Watseka v. Illinois Public Action Council, 796 F.2d 1547 (7th Cir. 1986), aff'd, 479 U.S. 1048, 107 S. Ct. 919, 93 L. Ed. 2d 972 (1987).*

    4    As well, the Court notes that the ordinance bans leafleting, but permits such activities as newspaper and magazine sales, peddling, street performances, and charitable solicitations. Any possible argument by Granite City that the ordinance is to advance the city's interest in maintaining traffic congestion is without merit based on its inconsistent approach. *Cf. Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002).*

    5    The Court notes that most of the testimony at the May 20, 2005 hearing focused on those leafleting near the Hope Clinic. The Court finds it noteworthy that Granite City Police Chief Ruebhausen testified at the hearing that the protestors leafleting at Hope Clinic, which included Horina, were always peaceful and harmless.

[*22] Having found that Granite City has failed to show the ordinance advances a significant governmental interest, discussion as to whether the ordinance is a reasonable time, place and manner restriction is not necessary for purposes of issuing a preliminary injunction. However, the Court also finds that at this stage in the proceedings it is unlikely that Granite City has narrowly tailored the leafleting ordinance. A regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward, 491 U.S. at 799.* To satisfy the narrowly tailored test, an ordinance need not be the least restrictive method for achieving the government's goal. *Id. at 797.* Nevertheless, while a regulation does not have to be a perfect fit for the government's needs, it

cannot substantially burden more speech than necessary. *Id. at 800.*

The ordinance completely prohibits all leafleting in any public place in Granite City. This ordinance leaves no alternative means available to those seeking to leaflet. There is no middle ground available, such as a restriction of a certain [*23] distance from highly congested areas or from leafleting on certain narrow sidewalks. Such alternatives would be less restrictive, less encompassing and less intrusive on *First Amendment* rights. *See Weinberg, 310 F.3d at 1040.*

As well, the Court finds as highly instructive *Krantz v. City of Fort Smith, 160 F.3d 1214, 1222 (8th Cir. 1998).* In *Krantz,* the United States Court of Appeals for the Eighth Circuit found that a content-neutral law prohibiting leafleting on vehicles was not narrowly tailored to serve a substantial state interest. The Eighth Circuit found that the regulation was not narrowly tailored because instead of permitting automobile owners who were interested in receiving messages from doing so and allowing uninterested owners to place the equivalent of a no-trespassing sign on their dashboards, the ordinance simply prohibited all leafleting. *Id.* As a result, the Court found that the law restricted more speech than was necessary. Similarly, Granite City's complete prohibition on leafleting in all public areas in Granite City is too great of a restriction that "cannot be reconciled with our *First Amendment* rights. [*24] " *See Cox v. Louisiana, 379 U.S. 559, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965).* Accordingly, the Court finds at this stage in the proceeding for purposes of issuing a preliminary injunction, the ordinance burdens more speech than is necessary and is not sufficiently narrow to promote its legitimate interest.

Final inquiry in determining whether Granite City's ordinance is a reasonable time, place and manner restriction is whether the law leaves open ample alternative channels. Again, while the Court need not decide this issue, it seems unlikely that Granite City's ordinance leaves open ample alternative channels. An adequate alternative does not have to be the speaker's first choice. *Heffron, 452 U.S. at 647.* Yet an alternative is not adequate if it"foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Gresham v. Peterson, 225 F.3d 899, 907.*

In the case at bar, Horina is prevented from leafleting in any public forum in Granite City. While Granite City could argue that Horina could post his message via other channels of communication, such as the internet, the fact that Horina can communicate [*25] his message elsewhere does not end this Court's analysis if the intended message is rendered useless or is seriously burdened. *See City of Ladue v. Gilleo, 512 U.S. 43, 56-57, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994).* Leafleting is

an inexpensive, unobtrusive, peaceful manner of disseminating information. It allows those not interested to simply not take a leaflet and for others to take one, and read the information. The audience Horina wants to reach are those using the abortion services of the Hope Clinic. As the Seventh Circuit stated in *Weinberg,* "an alternative is not ample if the speaker is not permitted to reach his intended audience." *310 F.3d at 1042.* This Court is not prepared to say that the alternatives available to Horina are ample, as the Court believes his ability to communicate effectively is likely threatened. *See City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984); Schneider, 308 U.S. at 162-63; American Civil Liberties Union of Nevada v. City of Las Vegas, 333 F.3d 1092, 1106 (9th Cir. 2003).* Accordingly, the Court finds that Horina is likely to succeed on the merits as [*26] to demonstrating that the ordinance is not a reasonable time, place and manner restriction and is unconstitutional as applied to Horina.

**2b. Whether the ordinance is unconstitutionally overbroad.**

Horina also challenges the ordinance contending that it is unconstitutionally overbroad. Under the *First Amendment* overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face "because it also threatens others not before the court -- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985).* A statute may be invalidated on its face, however, only if the overbreadth is "substantial." *City of Houston v. Hill, 482 U.S. 451, 458-59, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987).* The requirement that the overbreadth be substantial arose from our recognition that application of the overbreadth doctrine is, "manifestly, strong medicine," *Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973),* and that "there must be [*27] a realistic danger that the statute itself will significantly compromise recognized *First Amendment* protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *City Council of Los Angeles, 466 U.S. at 801.*

In addition to the findings made above in the discussion of the ordinance as it was applied to Horina, on its face, the ordinance appears to be overbroad as it effectively prohibits all leafleting in Granite City of any material that is free of charge. The ordinance broadly prohibits any distribution of any cards, circulars, handbills, samples of merchandise or any advertising matter whatsoever. As a result, the ordinance, as written, manifestly applies to any pamphlets, magazines and periodicals that

are being distributed free of charge. The ordinance is not limited to materials that are obscene or offensive to public morals or that advocate for unlawful conduct. In the case at bar, there is no suggestion that Horina was passing out materials of this nature. Instead, Horina was ticketed under the ordinance for handing out religious leaflets, speech which is protected and of the highest constitutional order. [*28] *See Martin, 319 U.S. at 143 (leafleting is a form of speech arguably protected by the Free Speech Clause of the First Amendment). See also DeBoer, 267 F.3d at 570, citing Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995)(speech addressing religious matters is speech of the highest constitutional order).* The ordinance clearly includes an entire spectrum of protected *First Amendment* expression, not only leafleting and religious speech, but would apply to anyone who "wishes to present his views on political, social or economic questions" or advocate for any cause. *Schneider v. State of New Jersey, 308 U.S. 147, 163, 60 S. Ct. 146, 84 L. Ed. 155 (1939); see also McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995)(describing the long-standing practice in this country of anonymous pamphleteering).*

As well, the ordinance appears to be overbroad as it is comprehensive with respect to the method of distribution. It covers anyone who "indiscriminately distributes" materials. As a result, there is no restriction in the ordinance's application to time or place. The ordinance "is not limited to ways [*29] which might be regarded as inconsistent with the maintenance of public order, or as involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets." *Lovell v. City of Griffin, 303 U.S. 444, 451, 58 S. Ct. 666, 82 L. Ed. 949 (1938).* Consequently, the ordinance prohibits the distribution of all materials that are not for sale at any time, at any place, and in any manner.

Finally, the Court recognizes that overbreadth challenges are only successful when a limiting construction cannot be used to narrow the challenged statute and "remove the seeming threat or deterrence to constitutionally protected speech." *Broadrick, 413 U.S. at 613.* However, at this stage in the proceeding, the Court does not believe the ordinance is susceptible to a narrowing construction. The ordinance sweeps into it constitutionally protected *First Amendment* speech, including political materials. It also sweeps into its coverage all public areas in Granite City, it does not limit the time or place of distribution. Given the broad scope of this ordinance's application, the Court believes, at this stage in the proceedings, that limiting the ordinance would [*30] require a complete overhaul of the ordinance, a task the Court finds is better

left to Granite City. *See Kraimer v. City of Schofield, 342 F.Supp.2d 807, 823 (E.D. Wisc. 2005).*

Accordingly, the Court finds that Horina is likely to succeed in proving that the ordinance is invalid on its face. Whatever Granite City's motive is in creating the ordinance, its character is such that it strikes at the very foundation of the freedom of speech and the right to leaflet. As the United States Supreme Court states in *Lovell,* "[Pamphlets and leaflets] indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest." *303 U.S. at 452.* Consequently, the Court concludes the ordinance is overbroad.

**3. Balancing the harm to the parties and the public interest.**

As to Horina's irreparable injury, as explained earlier, the United States Supreme Court has stated that the "loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod, 427 U.S. at 373.* Horina has testified that he has curtailed [*31] his leafleting in fear of being cited under the ordinance again. Yet on the other hand, Granite City has offered no evidence of the harm that would befall it if an injunction were put in place preventing them from enforcing the ordinance against Horina or any other person. In fact, Granite City offered to abstain from enforcing the ordinance until this matter reached its conclusion, leading this Court to believe that no harm would befall Granite City if an injunction were granted. Moreover, the public interest weighs in favor of granting the injunction. *See Newsom v. Albemarle County School Bd., 354 F.3d 249, 261 (4th Cir. 2003)*("Surely, upholding constitutional rights serves the public interest"). *Cf. Homans v. City of Albuquerque, 264 F.3d 1240, 1244 (10th Cir. 2001)*("We believe that the public interest is better served by following binding Supreme Court precedent and protecting the core *First Amendment* right of political expression.") Accordingly the Court finds the balance of harm to the parties weighs in favor of issuing the injunction.

**Conclusion**

The Court hereby **GRANTS** *in part* and **DENIES** *in part* Plaintiff [*32] Donald N. Horina's "Motion for Temporary and Preliminary Injunction" (Doc. 7). The Court **DENIES** the motion in that as all parties received notice of and participated in the May 20, 2005 hearing on the motion for temporary and preliminary injunction, the Court denies as moot the request for temporary injunction. The Court **GRANTS** the motion in that it issues a preliminary injunction preventing Defendant City of Granite City, Illinois from enforcing Granite City Ordinance Chapter 5.78.010 against Plaintiff Donald H.

2005 U.S. Dist. LEXIS 36386, *

Horina or any other person(s) until this litigation is resolved.

Therefore, pursuant to *FEDERAL RULE OF CIVIL PROCEDURE 65(c)*, the Court **DIRECTS** Donald H. Horina to post a bond of One Thousand Dollars ($ 1,000.00) with the Clerk of this Court **on or before Thursday, September 22, 2005** to cover taxable costs in the event Granite City prevails.

Additionally, the Court hereby **SETS** an in-court status conference for **Friday, September 23, 2005 at** 3:30 p.m. to discuss the further pretrial proceedings of this case in light of the Court's rulings in this Order.

**IT IS SO ORDERED.**

**DATED this 29th day of August, 2005.**

s/ Michael [*33]   J. Reagan

**MICHAEL J. REAGAN**

**United States District Judge**

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NICK SALINSKE, for himself and all others   )
similarly situated,                           )
                                    )     Case No. 08-cv-03017
               *Plaintiffs,*     )
                          )     Judge Wayne R. Anderson
    v.                      )     Magistrate Judge Morton Denlow
                          )
CALUMET CITY, ILLINOIS,           )
                          )
                          )
              *Defendant.*     )

## DECLARATION OF DONNA HANRAHAN

I, DONNA HANRAHAN, declare as follows:

1.     The following facts are personally known to me, and if called to testify, I could and would competently testify thereto.

2.     I am a realtor licensed in Illinois and Indiana. Pursuant to a written exclusive agreement, I acted as realtor for the property located at 527 155th Street, Calumet City, Illinois, which is owned by Plaintiff Nick Salinske ("Salinske").

3.     In July 2008, Salinske found a potential buyer for his property, which is listed for $130,000. The potential buyer stated that he was willing to purchase the property for between $115,000 and $120,000, subject to his confirmation that there were no major problems with the property. The price range orally offered to Salinske was acceptable to him.

4.     After Salinske's buyer made his oral offer, I went to Defendant Calumet City, Illinois' ("City") Department of Inspectional Services to determine what needed to be done to complete the sale of the property. During my meeting with City, City confirmed that the tax records for Salinske's property confirmed that the property has been taxed as a two flat since

542905.1

Salinske acquired it.  Nonetheless, City told me that Salinske's property is "illegal" nonconforming and must be deconverted to a single family home before it can be sold.  City also claimed that if the building on Salinske's property was destroyed, *nothing* could be re-built on the property.

   5.  After being informed on City's position and contentions, the potential buyer's agent informed me that he would not purchase the property because he was only interested in the property if it could be purchased (and subsequently leased) as a two flat.  To date, Salinske has been unable to locate another buyer or sell his property.  Salinske has informed me that he will likely lose his property to foreclosure as a result of City's interference with the sale of his property.

   I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 28, 2008       *Donna Hanrahan*
                 Donna Hanrahan

# EXHIBIT G

LEXSEE 2001 USDISTLEXIS 16958

**CLAUDINE WILFONG, LISA ADAMS, TERRY BLACKBURN, LISA CHEN-
ELLE, TONI COHEN, MARSHA CROMWELL, DeELLEN DICKERSON, VE-
RONICA DROPTHMORE, KIM HAMMER, MARY JOHNSON, KATHLEEN
LIPHART, TEIA MALONE, KAREN DUEKER MEYER, DAWN PEMBERTON,
HERMANETTE PORTIS, AMY PRATT, LINDA SHEATTLER, MICHELLE
SMITH, MELANIE WATSON, LINDA WIGGER and ROBIN YEUBANKS, Plain-
tiffs, vs. RENT-A-CENTER, INC., Defendant.**

**No. 00-CV-0680-DRH**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IL-
LINOIS**

*2001 U.S. Dist. LEXIS 16958; 87 Fair Empl. Prac. Cas. (BNA) 1094; 80 Empl. Prac.
Dec. (CCH) P40,579*

**May 11, 2001, Decided
May 14, 2001, Filed**

**SUBSEQUENT HISTORY:** Class certification granted
by, Motion denied by *Wilfong v. Rent-A-Center, Inc.,
2001 U.S. Dist. LEXIS 22718 (S.D. Ill., Dec. 27, 2001)*

**PRIOR HISTORY:** *Wilfong v. Rent-A-Center, Inc.,
2001 U.S. Dist. LEXIS 26074 (S.D. Ill., Mar. 14, 2001)*

**DISPOSITION:** [*1] Governmental agency's motion
to intervene was granted.

**COUNSEL:** For CLAUDINE WILFONG, LISA AD-
AMS, TERRY BLACKBURN, LISA CHENELLE,
TONI COHEN, MARSHA CROMWELL, DEELLEN
DICKERSON, VERONICA DROPTHMORE, KIM
HAMMER, MARY JOHNSON, KAREN DUEKER
MEYER, DAWN PEMBERTON, HERMANETTE
PORTIS, AMY PRATT, LINDA SHEATTLER, MICH-
ELE SMITH, MELANIE WATSON, LINDA WIGGER,
ROBIN YEUBANKS, KATHLEEN LIPHART, TEIA
MALONE, DIANA ALBRECHT, DEBORAH HES-
TER, ANICESHA JONES, MILA KING, MELODY
LUCE, DORA NELSON, plaintiffs: Jerome J. Schlich-
ter, Schlichter, Bogard et al., St. Clair County, Swansea,
IL.

For CLAUDINE WILFONG, LISA ADAMS, TERRY
BLACKBURN, LISA CHENELLE, TONI COHEN,
MARSHA CROMWELL, DEELLEN DICKERSON,
VERONICA DROPTHMORE, KIM HAMMER, MARY
JOHNSON, KAREN DUEKER MEYER, DAWN

PEMBERTON, HERMANETTE PORTIS, AMY
PRATT, LINDA SHEATTLER, MICHELE SMITH,
MELANIE WATSON, LINDA WIGGER, ROBIN
YEUBANKS, plaintiffs: Mary Anne Sedey, Attorney at
Law, St. Louis, Mo.

For KATHLEEN LIPHART, TEIA MALONE, DIANA
ALBRECHT, DEBORAH HESTER, ANICESHA
JONES, MILA KING, MELODY LUCE, DORA NEL-
SON, plaintiffs: Mary Anne Sedey, Jon A. Ray, Attorney
at Law, St. Louis, Mo.

For RENT A CENTER INC, defendant: John L. Gilbert,
Hinshaw & Culbertson, [*2] St. Clair County, Belle-
ville, IL.

For RENT A CENTER INC, defendant: Thomas E.
Berry, Jr., Kevin J. Lorenz, McMahon, Berger et al., St.
Louis, MO.

For RENT A CENTER INC, defendant: Larry M. Bauer,
Eric A. Todd, Stinson, Mag et al., St. Louis, MO.

For RENT A CENTER INC, defendant: Michael V. Ab-
carian, Michael E. Coles, Franklin E. Wright, Lisa W.
Sorrell, Dan C. Dargene, John D. Smart, Winstead,
Sechrest et al., Dallas, TX.

For EQUAL EMPLOYMENT OPPORTUNITY COM-
MISSION, intervenor: Donna L. Harper, Anne E.

2001 U.S. Dist. LEXIS 16958, *; 87 Fair Empl. Prac. Cas. (BNA) 1094;
80 Empl. Prac. Dec. (CCH) P40,579

Gusewelle, Equal Employment Opportunity Commission, St. Louis, MO.

**JUDGES:** DAVID R. HERNDON, United States District Judge.

**OPINION BY:** DAVID R. HERNDON

**OPINION**

**MEMORANDUM AND ORDER**

**Herndon, District Judge:**

**I. Introduction**

Now before the Court is the Equal Employment Opportunity Commission's motion for leave to intervene (Doc. 44). Rent-A-Center objects the motion. Pursuant to *FEDERAL RULE OF CIVIL PROCEDURE 24(b)*, the Court grants the motion.

In August 2000, Plaintiffs brought this action pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* (Doc. 1). The Plaintiffs are residents [*3] of various states and allegedly have all been employed or have applied for employment with Defendant Rent-A-Center, Inc. ("Rent-A-Center"). On October 18, 2000, Plaintiffs filed an amended complaint adding additional Plaintiffs (Doc. 15). Rent-A-Center, a corporation with its headquarters in Plano, Texas, operates rent-to-own stores in various locations throughout the United States. Plaintiffs seek to be certified as representatives of a class, alleging that Rent-A-Center has maintained a pattern and practice of sex discrimination against women employees and women applicants for employment.

On February 6, 2001, the Court denied Rent-A-Center's motion to transfer (Doc. 24). Now before the Court is the EEOC's motion for leave to intervene. [1] The EEOC argues that because this is a case of general importance it should be allowed to intervene to advance the same Title VII claims of discrimination as well as a claim that Rent-A-Center has failed to preserve records it was required to preserve under Title VII. Rent-A-Center responds that the motion should be denied because the intervention will unduly delay the adjudication of the issues, prejudice Rent-A-Center and expand the scope of [*4] the original lawsuit. Based on the reasons stated herein, the Court grants the motion to intervene.

1   As of this date, Plaintiffs have not objected to the EEOC's motion for leave to intervene. In fact, the EEOC asserts that Plaintiffs have consented to the motion (Doc. 45, p. 3).

**II. Permissive Intervention**

*FEDERAL RULE OF CIVIL PROCEDURE 24(b)* states in pertinent part:

Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

It is well established that district courts have broad discretion to grant or deny motions to intervene under *Rule 24(b)(2)*. *See Sokaogon Chippewa Community v. Babbitt, 214 F.3d 941, 949 (7th Cir. 2000)*; [*5] *United States v. 36.96 Acres of Land, 754 F.2d 855, 860 (7th Cir. 1985)*. In deciding whether to grant permissive intervention under *Rule 24(b)(2)*, the court must consider three requirements: (1) whether the petition was timely; (2) whether a common question of law or fact exists; and (3) whether granting the petition to intervene will unduly delay or prejudice the adjudication of the rights of the original parties. *Security Ins. Co. of Hartford v. Schipporeit, 69 F.3d 1377, 1381 (7th Cir. 1995) Southmark Corp. v. Cagan, 950 F.2d 416, 419 (7th Cir. 1991)*

**III. Analysis**

**A. Timeliness**

The Court must consider the "totality of the circumstances" to determine whether a petition is timely. *United States v. City of Chicago, 908 F.2d 197, 199 (7th Cir. 1990)*, cert. denied *498 U.S. 1067 (1991)*. In particular, four factors must be considered: (1) the length of time the intervenor knew or should have known of his or her interest in this case, (2) the prejudice to the original parties caused by the delay, (3) the resulting prejudice to intervenor if the motion is denied, and [*6] (4) any unusual circumstances. *Shea v. Angulo, 19 F.3d 343, 346*; *Ragsdale v. Turnock, 941 F.2d 501, 504 (7th Cir. 1991)*, cert. denied *502 U.S. 1035 (1992)*. The test establishes a reasonableness standard: "potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *Nissei Sangyo Am., Ltd. v. United States, 31 F.3d 435, 438 (7th Cir. 1994)*. The most important consideration in this regard is whether the delay will prejudice the original parties to the case. *Id.* (citing **Wright & Miller, Federal Practice & Procedure: Civil 2d § 1916 (1986)**). Whether a petition is timely

2001 U.S. Dist. LEXIS 16958, *; 87 Fair Empl. Prac. Cas. (BNA) 1094;
80 Empl. Prac. Dec. (CCH) P40,579

presented is within the district court's discretion. *City of Chicago, 908 F.2d at 199.*

Here, the EEOC moved to intervene five months after Plaintiffs filed their amended complaint. Discovery on the merits of this case has been stayed until ruling on Plaintiffs' motion for class certification. The only discovery which has been permitted has been on the class certification issues. [2] Further, the EEOC filed its [*7] motion prior to Plaintiffs filing their motion for class certification. The Court does not find the five month gap between the filing of the amended complaint and the filing of the motion to intervene to be prejudicial to Rent-A-Center. Under the totality of the circumstances, the motion to intervene is timely.

> 2 Pursuant to the Scheduling and Discovery Order entered on November 9, 2000, Plaintiffs have up to and including October 1, 2001, to file their motion for class certification (Doc. 17). As of this date, Plaintiffs have not filed their motion for class certification.

**B. Common Questions of Law and Fact**

The questions of law and fact to be raised by the EEOC are virtually identical to Plaintiffs' claims with the exception of the EEOC's claim that the Rent-A-Center violated § 709(c) of Title VII, *42 U.S.C. § 2000e-8(c)* and *29 C.F.R. § 1602.14* by failing to preserve employment records. The Court finds that the additional claim [*8] asserted by the EEOC relates to the allegations in the amended complaint. Thus, the EEOC has satisfacto-

rily established that its claims and Plaintiffs' claims involve common questions of facts.

**C. Prejudice or Delay of Adjudication**

The original parties have not yet initiated discovery on the merits of Plaintiffs' claims. This process will not begin until after the Court rules on the motion for class certification. The motion for class certification will not be ripe for disposition until after December 3, 2001 (the date Rent-A-Center's response the class certification motion is due). Permitting the EEOC to join the case at this juncture will not delay the progression of this case through pre-trial discovery or trial preparation. Moreover, the EEOC has intervened many times in other similar litigations and are thus well-versed in the subject matter of the issues to be tried before the Court. Accordingly, the Court concludes that intervention will not prejudice or delay adjudication of this case.

**IV. Conclusion**

Accordingly, the Court **GRANTS** the EEOC's motion to intervene (Doc. 44). The Court **DIRECTS** the Clerk of the Court to docket and file stamp the [*9] Intervenor's Complaint *instanter*.

**IT IS SO ORDERED.**

Signed this 11th day of May, 2001.

**DAVID R. HERNDON**

**United States District Judge**

# EXHIBIT H

LEXSEE 2004 USDISTLEXIS 7355

**UNITED STATES OF AMERICA, Petitioner, v. SIDLEY AUSTIN BROWN & WOOD LLP, Respondent.**

**Case No. 03 C 9355**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 7355; 2004-2 U.S. Tax Cas. (CCH) P50,289; 93 A.F.T.R.2d (RIA) 2031*

**April 28, 2004, Decided**

**SUBSEQUENT HISTORY:** As Amended June 1, 2004

**PRIOR HISTORY:** *United States v. Sidley Austin Brown & Wood LLP, 2004 U.S. Dist. LEXIS 6452 (N.D. Ill., Apr. 15, 2004)*

**DISPOSITION:** [*1] Government's petition to enforce summons [docket # 1] granted. Government's motion for reconsideration of order granting permissive intervention denied.

**COUNSEL:** For UNITED STATES OF AMERICA, petitioner: John A. Lindquist, III, United States Department of Justice, Washington, DC.

For SIDLEY AUSTIN BROWN & WOOD LLP, with respect to the matter of the tax liabilities of, respondent: William F. Conlon, Michael James Sweeney, Gerard David Kelly, Julie Kathryn Zeglis, Sidley Austin Brown & Wood LLP, Chicago, IL.

For JOHN DOES, United States taxpayers who, during any part of the period 1/1/96 through 10/15/03, participated in a transaction which was or later became a "listed transaction" or other "potentially abusive tax shelter" organized or sold by the law firm of Sidley Austin Brown & Wood LLP and its predecessor, Brown & Wood LLP, respondent: Gregory S Lynam, Thomas V.M. Linguanti, Baker & McKenzie, Chicago, IL. Robert E. McKenzie, Richard Keith Hellerman, Shekar Adiga, Arnstein & Lehr, Chicago, IL. Ronald S. Safer, Schiff Hardin LLP, Chicago, IL. Harvey M. Silets, Katten Muchin Zavis Rosenman, Chicago, Il. Michael I Saltzman, Kathleen M Pakenham, Danielle M Smith, White & Case, [*2] New York, NY. Daniel Thomas

Hartnett, Martin, Brown, Sullivan & Bowman, Chicago, IL. Steven Spencer Brown, Royal B. Martin, Jr., Martin, Brown & Sullivan, Ltd., Chicago, IL.

For ARNSTEIN DOE 2, intervenor: Harvey M. Silets, Katten Muchin Zavis Rosenman, Chicago, Il.

For BAKER BAKER DOE 1, BAKER BAKER DOE 2, intervenors: Gregory S Lynam, Baker & McKenzie, Chicago, IL.

**JUDGES:** MATTHEW F. KENNELLY, United States District Judge.

**OPINION BY:** MATTHEW F. KENNELLY

**OPINION**

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

This case arises from an Internal Revenue Service investigation into the organization and sale of tax shelters by a former partner of Sidley Austin Brown & Wood (hereinafter "SAB&W") during his tenure at Brown & Wood, one of the predecessor firms to SAB&W. The United States has sought enforcement of a summons served on SAB&W to obtain the names of former clients of the firm. We allowed more than forty former clients (referred to as the "Does" or "Intervenors") to intervene under *Rule 24(b)* to challenge the summons on the ground that it is ambiguous. For the reasons stated below, the Court grants the Government's motion to enforce the summons and [*3] denies the Government's motion to reconsider the decision to allow intervention.

**Analysis**

2004 U.S. Dist. LEXIS 7355, *; 2004-2 U.S. Tax Cas. (CCH) P50,289;
93 A.F.T.R.2d (RIA) 2031

Before determining whether the summons should be enforced, the Government urges, the Court should reconsider its decision to allow SAB&W's former clients to intervene in these proceedings. Specifically, the Government argues that the Does do not meet the jurisdictional prerequisites for intervention. Because the Court did not fully discuss the issue of jurisdiction in its opinion permitting the Does to intervene under *Rule 24(b)*, the Court will do so briefly now.

The Government reasons as follows: in finding the Does do not have a right to intervene under *Rule 24(a)(2)*, the Court concluded that the Does did not have a "protectable interest"; "absent a 'protectable interest,' the Does do not have a legally redressable injury"; and "absent a legally redressable injury, the Court lacks jurisdiction" to consider the Does' objections to enforcement." U.S. Mot. for Reconsideration at 5. There are two significant flaws in the Government's logic. First of all, it is an "open question" in the Seventh Circuit as to "whether Article III standing is required for permissive intervention under *Rule* [*4] *24(b)*." *Transamerica Insurance Co. v. South, 125 F.3d 392, 396 n.4 (7th Cir. 1997)*. In fact, "it appears that the intervenor-by-permission does not even have to be a person who would have been a proper party at the beginning of the suit, since of the two tests for permissive joinder of parties, a common question of law or fact and some right to relief arising from the same transaction, only the first is stated as a limitation on intervention." C. Wright & A. Miller, Federal Practice and Procedure (Civil) § 1911 (2d ed. 1986). Second, "the standing doctrine, which is derived from the Article III case or controversy requirements of the Constitution, applies only to plaintiffs." *Wynn v. Carey, 599 F.2d 193, 196 (7th Cir. 1979)*. Under normal circumstances, a defendant need not show an injury to be a party to a case -- and the Intervenors are effectively defendants in this case, raising defenses to the enforcement of the summons.

Even if the Does had to demonstrate an injury in fact to intervene, they have done so. The Government argues that "the law does not recognize an IRS examination as an injury." U.S. Mot. for Reconsideration at 5-6. But it is undeniable [*5] that "the burden on a taxpayer of being tied up in an audit that may continue for months, if not years, and may or may not culminate in further civil or criminal proceedings, should not be underestimated." *United States v. Beacon Federal Savings & Loan, 718 F.2d 49, 54 (2d Cir. 1983)* (quoting *United States v. Schipani, 289 F. Supp. 43, 63 (E.D.N.Y. 1968), aff'd, 414 F.2d 1262 (2d Cir. 1969))*. In addition, SAB&W has information about the Does that will be communicated to the Government if the summons is enforced; the Government will obtain information about them that it does not now have. Whether or not the Does have a protect-

ible interest sufficient to establish a right to intervene under *Rule 24(a)(2)*, they risk a prospective injury sufficient to create Article III standing, assuming that is a prerequisite for permissive intervention as a defendant. The Government's contrary argument amounts to a contention we have already rejected, namely that if a person cannot intervene as of right in a summons enforcement action, he cannot intervene at all. The Government has cited no authority supporting the proposition that *Rule 24(b)* is wiped [*6] from the books in summons enforcement cases. For these reasons, the Court denies the Government's motion for reconsideration. We now therefore consider whether the summons should be enforced.

Before reaching the merits of the Intervenors' opposition to enforcement, the Court will consider two arguments by the Government that are in essence procedural. The Government argues that the Intervenors' ambiguity claim cannot be raised in these proceedings because it is just an attempt to challenge the issuance of the summons, and such challenges cannot be raised in enforcement proceedings. A John Doe IRS summons cannot be issued until a court has determined that

> (1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,
>
> (2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and
>
> (3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

[*7] *26 U.S.C. § 7609(f)*. The Supreme Court has explained that "what *§ 7609(f)* does is to provide some guarantee that the information that the IRS seeks through a summons is relevant to a legitimate investigation, albeit that of an unknown taxpayer." *Tiffany Fine Arts, Inc., v. United States, 469 U.S. 310, 321, 83 L. Ed. 2d 678, 105 S. Ct. 725 (1985)*. It puts the court in "the place of the affected taxpayer under *§§ 7609(a) and (b)* and exerts a restraining influence on the IRS." *Id.* In this case, Judge Suzanne Conlon approved the issuance of the John Doe summons.

2004 U.S. Dist. LEXIS 7355, *; 2004-2 U.S. Tax Cas. (CCH) P50,289;
93 A.F.T.R.2d (RIA) 2031

The Government argues that the Court cannot revisit Judge Conlon's determination that the § 7609(f) criteria have been met. The Government points out that three courts of appeals have held that "the criteria for the service of a third-party, John Doe summons under *section 7609(f)* cannot be collaterally challenged during proceedings to enforce the summons." *United States v. John G. Mutschler & Associates, Inc., 734 F.2d 363, 366 (8th Cir. 1984); United States v. Samuels, Kramer & Co., 712 F.2d 1342, 1346 (9th Cir. 1983)* ("Notwithstanding the added protection [*8] *sections 7609(f) and (h)* provide against improper *issuance* of John Doe summonses, then, the sections do not expand beyond the *Powell* criteria the substantive grounds on which a record-keeping taxpayer can resist *enforcement* of a summons once it has been served." (emphasis in original; citation omitted)); *Agricultural Asset Management Co. v. United States, 688 F.2d 144, 145-46 (2d Cir. 1982)* ("The criteria in *26 U.S.C. § 7609(f)* governing ex parte issuance of a John Doe summons pursuant to *26 U.S.C. 7609(h)(1)* are not appropriate grounds to challenge enforcement of the summons.").

If the Intervenors were challenging the summons on the ground that it failed to "relate[] to the investigation of an . . . ascertainable group or class of persons," the Government would be correct that the Intervenors are pursuing an invalid argument against enforcement. But that is not the Intervenors' claim. This is best illustrated by comparing the Intervenors' claim of ambiguity to the arguments against enforcement in the cases cited by the Government. In *John G. Mutschler & Associates*, the party opposing enforcement argued [*9] that the affidavit supporting issuance of the summons had been misleading and that the Government had alternative means of learning the Does' names. In *Samuels, Kramer*, the party opposing enforcement attempted to challenge the factual findings made at the time the summons was issued. And in *Agricultural Asset Management Co.*, Ag Asset opposed enforcement of the summons on the ground that investigations of known participants in the program had not resulted in findings of liability; the Government had failed to show it had a reasonable basis for doubting the veracity of the Does' tax returns; and the Government had failed to show it did not already have the information it sought. *In re Agricultural Asset Management Co., 541 F. Supp. 213, 216 (N.D.N.Y. 1982).* In contrast, the Intervenors argue that the summons is ambiguous. There is no indication that Judge Conlon addressed that point when she authorized issuance of the summons.

As we previously noted in our decision permitting intervention, ambiguity is generally an appropriate defense against enforcement of a summons. *Beacon Federal Savings & Loan*, 718 at 54 (quoting S. Rep. No.

938, 94th Cong., 2d Sess. [*10] 370 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad. News at 3799-800). The Government argues, however, that the Intervenors cannot challenge enforcement of the summons on the basis of ambiguity in this case because SAB&W has already compiled a list of names that they believe to be responsive to the summons. The Intervenors' claim cannot be dismissed so easily.

The Government bases its argument on *United States v. Berg, 20 F.3d 304 (7th Cir. 1994)*, in which the court considered an appeal from a contempt citation by an individual who refused to comply with a summons directing him to appear to turn over documents regarding two of his companies, Particle Data Inc. ("PDI") and Particle Data Laboratories, Ltd. ("PDL"). Berg had assembled the documents he believed were responsive to the summons, but he refused to turn them over to the Government. On appeal he argued that he should not have been held in contempt because the summonses and orders were vague. *Berg, 20 F.3d at 310.* The court stated that it would

> not entertain an argument concerning the clarity of the orders as they pertain to PDI and PDL because Berg had in fact assembled those documents [*11] but simply refused to turn them over to the Service. The fact that he actually compiled the required materials renders moot any argument that an ambiguity in the order prevented him from complying.

*Id. at 311.* The Government urges the Court to extrapolate from these two sentences a general rule that arguments of ambiguity are moot if the summonsed party has assembled documents it believes are responsive to the summons.

This case exemplifies why such a rule would be untenable in some situations. The Intervenors do not deny that SAB&W has assembled a list of names in response to the summons. But they argue that the list is overinclusive because the summons is ambiguous and SAB&W has an incentive to read any ambiguities in favor of disclosure in hopes of pacifying the IRS. The fact that SAB&W has compiled a list of names does not show that the summons is not vague or ambiguous -- it may just show SAB&W's desire to cooperate. *Berg* does not render moot the Intervenors' claim of ambiguity.

Thus we must address the claim of ambiguity on the merits. In a summary enforcement proceeding, the initial burden is on the Government to show

Case 1:08-cv-03017   Document 48-5   Filed 09/03/2008   Page 35 of 63

Page 4

2004 U.S. Dist. LEXIS 7355, *; 2004-2 U.S. Tax Cas. (CCH) P50,289;
93 A.F.T.R.2d (RIA) 2031

(1) that the investigation [*12] will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the Commissioner's possession, and (4) that the administrative steps required by the Code have been followed in particular, that the "Secretary or his delegate," after investigation, has determined the further examination to be necessary and has notified the taxpayer in writing to that effect.

*United States v. Kis, 658 F.2d 526, 536 (7th Cir. 1981)* (quoting *United States v. Powell, 379 U.S. 48, 57-58, 13 L. Ed. 2d 112, 85 S. Ct. 248 (1964)).* The Government has met this "slight" burden. *Id.* Thus the "heavy" burdens of production and of proof shift to the Intervenors to show that the summons should not be enforced. *Id. at 538* (citation omitted). "The taxpayer must 'establish any defenses or . . . prove that enforcement would constitute an abuse of the court's process.'" *Id.* (citation omitted). And "the taxpayer must do more than just produce evidence that would call into question the Government's prima facie case. The burden of proof in these contested areas rests squarely on the taxpayer. [*13] " *Id. at 538-39.* The Court sees two ways of analyzing the Intervenors' claim of ambiguity: as an attempt to rebut the Government's claim of relevance on the issue of relevance or as a facial challenge to the sufficiency of the summons. But we conclude that the Intervenors have failed to meet their burden of proof under either theory.

The Government suggests that the Intervenors' claim of ambiguity is really a claim that their identities are not relevant to the Government's investigation -- a challenge to the Government's prima facie case for enforcement. Although the Intervenors do not explicitly raise the issue of relevancy, the Government's interpretation of the Intervenors' argument is not entirely off the mark. As we mentioned earlier, the Intervenors' primary concern with the summons as written is that SAB&W will read the summons overinclusively and provide more names than are necessary. The issue of overinclusiveness is closely related to the issue of relevance. *See United States v. Turner, 480 F.2d 272, 278-79 (7th Cir. 1973)* (discussing whether a summons was too broad in terms of whether the information sought was relevant); *United States v. BDO Seidman, LLP, 225 F. Supp. 2d 918, 920 (N.D. Ill. 2002)* [*14] (recognizing no overbreadth is the corollary requirement of relevance).

The Government must show only that the summons seeks information with *"potential* relevance." *United States v. Arthur Young & Co., 465 U.S. 805, 814, 79 L.*

*Ed. 2d 826, 104 S. Ct. 1495 (1984)* (emphasis in original). "The standard for relevancy in summons enforcement cases is relaxed." *2121 Arlington Heights Corp. v. IRS, 109 F.3d 1221, 1224 (7th Cir. 1997).* This is because the IRS "can hardly be expected to know whether such data will in fact be relevant until it is procured and scrutinized." *Arthur Young & Co., 465 U.S. at 814.* The Intervenors cannot substitute their opinion of relevance for that of the IRS: "If the target's own opinion of relevance controlled, the entire audit process would be eviscerated." *United States v. Arthur Young & Co., 677 F.2d 211, 216 (2d Cir. 1982), aff'd in part and rev'd in part on other grounds, 465 U.S. 805, 79 L. Ed. 2d 826, 104 S. Ct. 1495 (1984).*

The Seventh Circuit's opinion in *United States v. Turner* is instructive. In *Turner* an undercover IRS agent asked Turner to prepare his tax return. Because of inaccuracies in the return, the [*15] IRS questioned the veracity of all the returns Turner had prepared. The IRS issued Turner a summons to provide the names of people whose tax returns he had prepared in 1970 and 1971. Turner challenged the summons on the ground that it was overly broad. The Seventh Circuit addressed his challenge as one as to relevancy. It explained that "the government need only show that the records it seeks are relevant and material to its investigation, *i.e.,* that the inspection of the desired records might throw light upon the correctness of a taxpayer's return." *Turner, 480 F.2d at 279* (citing *United States v. Shlom, 420 F.2d 263, 265 (2d Cir. 1969)*, cert. denied, 397 U.S. 1074, 25 L. Ed. 2d 809, 90 S. Ct. 1521 (1970)). The court concluded that based on the fact that Turner had prepared one return inaccurately, "the government [had] made a sufficient showing of its reasons to scrutinize the tax returns of particular unnamed persons and to redetermine their tax liabilities." *Id.* (citation omitted).

The facts in this case are somewhat similar. The Government attached to its petition for enforcement an affidavit and exhibits suggesting that SAB&W marketed [*16] tax shelters and sold opinion letters to tax shelter participants. Just as the IRS had reason to question the tax liability of Turner's clients, the IRS has reason to question the accuracy of returns filed by those who received opinion letters from SAB&W. The IRS has reason to believe that those who received opinion letters from SAB&W regarding questionable tax transactions may have participated in listed transactions or abusive tax shelters. The Intervenors dispute who actually sold them the tax transactions in which they participated or whether they knew SAB&W had an interest in the shelters, but that does not diminish the Government's reasons for believing the Intervenors have understated their tax liability. If one false return prepared by Turner made his other clients' names relevant to the IRS's investigation, the

Case 1:08-cv-03017    Document 48-5    Filed 09/03/2008    Page 36 of 63

Page 5

2004 U.S. Dist. LEXIS 7355, *; 2004-2 U.S. Tax Cas. (CCH) P50,289;
93 A.F.T.R.2d (RIA) 2031

evidence the IRS has obtained about SAB&W's practices likewise makes the Intervenors' names relevant to the extent required under *Kis*. Thus the Intervenors have failed to rebut the Government's prima facie case for enforcement.

The Court next considers the Intervenors' claim as a facial challenge to the sufficiency of the summons. The Intervenors argue that the [*17] summons leaves SAB&W to interpret nine terms and phrases with guidance as to their meaning only from Treasury regulations and notices, which "themselves are uncertain and require subjective judgment." Intervenors Brief Opposing Enforcement at 2. The summons states:

> Please produce the name, address and taxpayer identification number for each United States taxpayer who, during any part of the period January 1, 1996 through October 15, 2003, participated in a transaction which was or later became a 'listed transaction' or other 'potentially abusive tax shelter' organized or sold by the law firm of Sidley Austin Brown & Wood LLP and its predecessor, Brown & Wood LLP.

Summons (dated Oct. 15, 2003). The Intervenors argue seven of the terms and phrases are ambiguous. These phrases can be divided into two categories: those in common usage and those defined by Treasury regulations. We will address the former first.

The Intervenors argue that the following terms are ambiguous because they are not defined in the summons: "United States taxpayer," "participated," "transaction," and "was or later became." We agree with Judge Leisure's statement that "protestation that phrases in [*18] the summonses such [as] 'any subsidiary or affiliate' are impermissibly vague is disingenuous to say the least." *United States v. Diversified Group, Inc.*, *2002 U.S. Dist. LEXIS 23920, No. M-18-304, 2002 WL 31947904, at *4 (S.D.N.Y. Dec. 13, 2002)*. These phrases have common meanings, and when taken in context, they are not at all ambiguous.

The second category of phrases challenged by the Intervenors are those defined in the summons by reference to Treasury regulations and notices:

> As a guide to your compliance, as used herein:

>   A. The term "potentially abusive tax shelter" is defined by *26 U.S.C. § 6112* and Treas. Reg. *§ 301.6112-1(b)*, without

regard to the effective date of this regulation;

>   B. The term "listed transaction" is defined by Treas. Reg. *§ 301.6111-2(b)(2)and 301.6112-1(b)(2)(i)(A)*, incorporating by reference a transaction defined in Treas. Reg. *§ 1.6011-4(b)(2)*, without regard to the effective dates of these regulations.

>   C. The terms "organizer" and "seller" are defined by Treas. Reg. *§ 301.6112-1(c)*, without regard to the effective [*19] date of this regulation.

Summons (dated Oct. 15, 2003). The Intervenors argue that the regulations are complicated and vague, forcing SAB&W to draw legal conclusion to give the terms in the summons meaning. In *Diversified Group*, the court refused to entertain the argument that "the summonses require DGI to make legal judgments." *Diversified Group, 2002 U.S. Dist. LEXIS 23920, 2002 WL 31947904, at *4*. Though we believe the issue is worth discussion, we similarly find the claim lacking in merit.

The Court noted in an earlier opinion that "the issue of whether SAB&W organized or sold tax shelters within the meaning of *§ 6112* is a complicated question." *United States v. Sidley Austin Brown & Wood LLP, 2004 U.S. Dist. LEXIS 6452, No. 03 C 9355, 2004 WL 816448, at *6 (N.D. Ill. April 15, 2004).* But just because the issue is complicated does not necessarily mean the governing regulations are ambiguous or impermissibly require SAB&W to draw legal conclusions. The Government has referenced regulations that define the terms with a great deal of particularity. Although the applicable regulations are rather long, this is not particularly unusual with IRS regulations, and the Court does not believe that [*20] the regulations referenced in the summons are so vague or ambiguous as to make the summons unenforceable. Cf. *Chicago Board of Realtors, Inc. v. City of Chicago, 819 F.2d 732, 739 (7th Cir. 1987)* (rejecting a void-for-vagueness challenge to an ordinance because it "incorporates municipal laws and regulations and provides twenty-seven examples of what the term means," which the court felt constituted a "clear and detailed treatment").

Any marginal uncertainty that the summons leaves with SAB&W does not defeat its enforceability. Some "uncertainty is a fact of legal life." *Coleman v. Commissioner of Internal Revenue, 791 F.2d 68, 71 (7th Cir. 1986)* (finding "the ambiguities that lurk in 'frivolous' (or any other word) in marginal cases do not prevent the imposition of penalties"). And though a finding of liabil-

2004 U.S. Dist. LEXIS 7355, *; 2004-2 U.S. Tax Cas. (CCH) P50,289;
93 A.F.T.R.2d (RIA) 2031

ity for tax deficiencies necessarily will involve legal conclusions, the summons does not ask SAB&W to make determinations of liability. *Kis, 658 F.2d at 535* ("[Summons enforcement actions] occur . . . at only the investigative stage of any action against a taxpayer, and no guilt or liability on the part of the taxpayer is established. [*21] "). The Court does not believe that the summons requires SAB&W impermissibly to draw legal conclusions regarding unduly vague terms in order to comply with the terms of the summons. The Intervenors have failed to meet their heavy burden of showing the summons is unenforceable as written.

### Conclusion

For the reasons stated above, the Court grants the Government's petition to enforce the summons [docket # 1]. The Government's motion for reconsideration of order granting permissive intervention is denied. All other pending motions are terminated. The Clerk is directed to enter judgment ordering Sidley Austin Brown & Wood to comply with the summons.

IT IS HEREBY ORDERED AND ADJUDGED that the Court grants the Government's petition to enforce the summons. The Government's motion for reconsideration of order granting permissive intervention is denied. Judgment is entered ordering Sidley Austin Brown & Wood to comply with the summons.

MATTHEW F. KENNELLY

United States District Judge

Date: April 28, 2004

# EXHIBIT I

# B Y L A W S
## of the
## Mainstreet Organization of REALTORS®

## A R T I C L E   I  -  N A M E

Section 1.  Name
The name of this organization shall be the Mainstreet Organization of REALTORS®, hereafter referred to as the "Association."

Section 2.  REALTORS®
Inclusion and retention of the term REALTORS® in the name of the Association shall be governed by the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS® as from time to time amended.

## A R T I C L E   I I  -  O B J E C T I V E S

The objects of the Association are:

Section 1.
To unite those engaged in the recognized branches of the real estate profession for the purpose of exerting a beneficial influence upon the profession and related interests.

Section 2.
To promote and maintain high standards of conduct in the real estate profession as expressed in the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®.

Section 3.
To provide a unified medium for real estate owners and those engaged in the real estate profession whereby their interests may be safeguarded and advanced.

Section 4.
To further the interest of home and other real property ownership.

Section 5.  To safeguard and advance the interests of real estate owners, occupants or users, and those engaged in the real estate profession.

Section 6.  To ensure that real estate services are not denied to any individual because of age, race, color, religion, sex, ancestry, marital status, physical or mental handicap, familial status, national origin, sexual orientation, military status, dishonorable discharge from the military service, or any other class protected by the Illinois Human Right Act.

Section 7.  To ensure strict compliance by federal, state and local governments or their agencies, with the Constitution of the United States and the Illinois State Constitution in real estate matters.

Section 8.  To protect, secure and vindicate through petition and, if necessary, litigation, the rights of owners, occupants or other users of real estate and real estate professionals, secured by the Constitution of the United States and the Illinois State Constitution.

Section 9.
To unite those engaged in the real estate profession with the Illinois Association of REALTORS® and the NATIONAL ASSOCIATION OF REALTORS®, thereby furthering their own objectives throughout the state and the nation and obtaining the benefits and privileges of membership therein.

Section 10.
To designate, for the benefit of the public, individuals authorized to use the terms REALTOR® and REALTORS® as licensed, prescribed, and controlled by the NATIONAL ASSOCIATION OF REALTORS®.

# A R T I C L E   I I I  -  J U R I S D I C T I O N

Section 1.
The territorial jurisdiction of the Association as a member of the NATIONAL ASSOCIATION OF REALTORS® shall include the following area:

All of the County of DuPage plus that area in Cook County contiguous to DuPage County and bounded as follows:  **ON THE NORTH:**  all of Leyden Township in Cook County except that portion of Park Ridge in Leyden Township and except O'Hare International Airport and that part of the City of Chicago leading thereto, but including Elmwood Park, River Grove, Franklin park, Schiller Park, and Northlake Village. **ON THE EAST:**  south along the Des Plaines River beginning at North Avenue to the north side of Cermak Road; west along Cermak Road to the west side of 19th Avenue, then to the south boundary of Broadview, Illinois;  west to the Indiana Harbor Belt Railroad; south along the Indiana Harbor Belt Railroad to 26th Street; then east to Harlem Avenue;  south along Harlem Avenue to Ogden Avenue;  west on Ogden Avenue to Custer Avenue;  south on Custer Avenue to 47th Street; east on 47th Street to 1st Avenue;  south on 1st Avenue to the Illinois and Michigan Canal.  **ON THE SOUTH:**  west along the Illinois and Michigan Canal to Cook-DuPage County line, including the villages of Riverside, Brookfield, LaGrange, LaGrange Park, Western Springs, Countryside, LaGrange Highland, and lands south of these villages to the Illinois and Michigan Canal.

Where the Cal-Sag Canal meets the Will County Line; South on the Will County Line to the East jog (135th Street); East on 135th Street to South jog (Will/Cook Road); South on Will/Cook Road to 183rd Street to Harlem Avenue; South on Harlem Avenue to Interstate 80; South on the Will County Line and proceeding in a straight line South to the Will County/Kankakee County Line; East to the Illinois/Indiana State Line; North along said Line to 138th Street; West on 138th Street to Indiana Street; North on Indiana Street to Little Calumet River; Then, in a West by Northwesterly direction along the Little Calumet River to Morgan Street; North on Morgan Street

to 127th Street; East on 127th Street to Halsted; North on Halsted Street to Chicago Limits (123rd Street); West on 123rd Street to Ashland; North on Ashland to 119th Street to Sacramento; North on Sacramento to

115th Street; West on 115th Street to Crawford Avenue; North on Crawford Avenue to 103rd Street; East on 103rd Street to California Avenue; North on California Avenue to 99th Street; East on 99th Street to Western Avenue; North on Western Avenue to 87th Street; West on 87th Street to Cicero Avenue; North on Cicero Avenue to 79th Street; West on 79th Street to Cal-Sag Canal; Southwesterly along Cal-Sag Canal to Will County Line, point of beginning.    To include Communities of Evergreen Park, Hometown, Bridgeview, Justice, Lemont, Orland Park, Tinley Park, Matteson, Beecher, Sauk Village, Lynwood, Lansing, Calumet City and Burnham.  Worth Township (Except Chicago); Calumet Township (Except Chicago); Thornton Township in Blue Island; and Orland, Bremen, and Palos Townships – All in Cook County.

Townships included in the Will Country area included in those boundaries are Will, Monee, Crete, and Washington, excluding the portion of the town of Peotone which lies in the Township of Will (in the Will County area); and also, city limits of Calumet City and Burnham.

Section 2.
Territorial jurisdiction is defined to mean the right and duty to control the use of the terms REALTOR® and REALTORS®, subject to the conditions set forth in these Bylaws and those of the NATIONAL ASSOCIATION OF REALTORS®, in return for which the Association agrees to protect and safeguard the property right of the National Association in the terms.

# A R T I C L E   I V  -  M E M B E R S H I P

There shall be eight (8) classes of Members as follows:

Section 1.   REALTOR® Members
    a.          REALTOR® Members, whether primary or secondary, shall be:

        (1) Individuals who, as sole proprietors, partners, corporate officers, or branch office managers, are engaged actively in the real estate profession, including buying, selling, exchanging, renting or leasing, managing appraising for others for compensation, counseling, building, developing or subdividing real estate, and who maintain or is associated with an established real estate office in the state of Illinois or a state contiguous thereto. All persons who are partners in a partnership, or all officers in a corporation who are actively engaged in the real estate profession within the state or a state contiguous thereto shall qualify for REALTOR® Membership only, and each is required to hold REALTOR® Membership (except as provided in the following paragraph) in an Association of REALTORS® within the state or a state contiguous thereto unless otherwise qualified for Institute Affiliate Membership as described in Section 1 (b) of Article IV.

In the case of a real estate firm, partnership, or corporation, whose business activity is substantially all commercial, only those principals actively engaged in the real estate business in connection with the same office, or any other offices within the jurisdiction of the board in which one of the firm's principals holds REALTOR® membership, shall be required to hold REALTOR® membership unless otherwise qualified for Institute Affiliate Membership as described in Section 1 (b) of Article IV.

      (2) Individuals licensed by the State of Illinois who are engaged in the real estate profession other than as principal, partner, corporate officer or branch office manager, and as such are associated with a REALTOR® Member and meet the qualifications set out in Article V.

      (3) Corporate officers (who may be licensed or unlicensed) of a real estate brokerage franchise organization with at least one hundred fifty (150) franchisees located within the United States, its insular possessions and the commonwealth of Puerto Rico, elected to membership pursuant to the provisions in the NAR Constitution and Bylaws. Such individuals shall enjoy all of the rights, privileges and obligations of REALTOR® membership (including compliance with the Code of Ethics) EXCEPT: obligations related to Board mandated education, meeting attendance, or indoctrination classes or other similar requirements; the right to use the term REALTOR® in connection with their franchise organization's name; the right to hold elective office in the local Board, State Association and National Association.

b.     Primary and secondary REALTOR® Members. An individual is a primary member if the Association pays state and national dues based on such member. An individual is a secondary member if state and national dues are remitted through another association/board. One of the principals in a real estate firm must be a Designated REALTOR® Member of the Association in order for licensees affiliated with the firm to select the Association as their "primary" Association.

c.     Designated REALTOR® Members. Each firm shall designate in writing one REALTOR® Member who shall be responsible for all duties and obligations of membership including the obligation to arbitrate pursuant to Article 17 of the Code of Ethics and the payment of Association dues as established in Article X of the Bylaws. The Designated REALTOR® must be a sole proprietor, partner, corporate officer, or branch office manager acting on behalf of the firm's principal(s) and must meet all other qualifications for REALTOR® Membership established in Article V, Section 2, of the Bylaws.

Section 2.    Institute Affiliate Members
Institute Affiliate Members shall be individuals who hold a professional designation by an Institute, Society, or Council affiliated with the NATIONAL ASSOCIATION OF REALTORS® that addresses a specialty area other than residential brokerage or individuals who otherwise hold a class of membership in such Institute, Society, or Council that confers the right to hold office. Any such individual, if otherwise eligible, may elect to hold REALTOR® membership, subject to payment of applicable dues for such Membership.

Section 3. Affiliate Members
Affiliate Members shall be real estate owners and other individuals or firms who, while not engaged in the real estate profession as defined in Section 1, Parts a or b, of this Article, have interests requiring information concerning real estate and are in sympathy with the objects of the Association. (They shall not be eligible to vote or hold elective office in this Association.)

Section 4. Public Service Members
Public Service Members shall be individuals who are interested in the real estate profession as salaried employees of educational, public utility, governmental, or other similar organizations, but are not engaged in the real estate

profession on their own account or in association with an established real estate business. (They shall not be eligible to vote or hold elective office in this Association.)

Section 5.  Honorary Members
Honorary Members shall be individuals who have performed notable service for the real estate profession, for the Association, and for the public; and whose honorary membership has been approved by a vote of the Board of Directors. Honorary Members shall also include any past president who has been with the Association for at least 20 years.  Honorary Members do not pay local dues.

Section 6.    Student Members
Student Members shall be individuals who are seeking an undergraduate or graduate degree with a specialization or major in real estate at institutions of higher learning and who have completed at least two years of college and at least one college level course in real estate, but are not engaged in real estate business on their own account or not associated with an established real estate office.  (They shall not be eligible to vote or hold elective office in this Association.)

Section 7.    REALTORS® Emeritus
A REALTOR® Member who has achieved forty (40) cumulative years of  membership as a REALTOR® and/or REALTOR-ASSOCIATE® in the National Association, and this Association or another association/board is entitled to membership classification as a "REALTOR® Emeritus," subject to approval by the Board of Directors of the NATIONAL ASSOCIATION OF REALTORS®.

Section 8.    Honorary Life Members
Any past President or other REALTOR® Member who is no longer actively engaged in the field of real estate and who has been proposed and approved by two-thirds of the Board of Directors shall be an Honorary Life Member. Honorary Life Members shall have the privileges and rights of REALTOR® Members.

Section 9.   Distinguished Members
The Distinguished Membership category will be a tool to show appreciation for those members who have served the Association for twenty-five years or longer and who are leaving the real estate field but want to remain a part of the Association.

# ARTICLE V - QUALIFICATION AND ELECTION

Section 1. Application
An application for membership shall be made in such manner and form as may be prescribed by the Board of Directors and made available to anyone requesting it.  The application form shall contain among the statements to be signed by the applicant (1) that applicant agrees as a condition of membership to thoroughly familiarize himself with the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®, the Constitution, Bylaws, and Rules and Regulations of the Association and of the State and National Associations and, if elected a Member, to abide by the Constitutions and Bylaws and Rules and Regulations of the Association and of the State and National Associations and, if a REALTOR® Member, to abide by the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®, including the obligation to arbitrate controversies arising out of real estate transactions as specified by Article 17 of the Code of Ethics and as further specified in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®, as from time to time amended, and (2) that applicant

consents that the Association may invite and receive information and comment about applicant from any member or other person and that response to the invitation shall be conclusively deemed to be privileged and not form the basis of any action for slander, libel, or defamation of character. The applicant shall, with the form of application, have access to a copy of the Bylaws, Constitution, Rules and Regulations, and Code of Ethics referred to above.

Section 2. Qualification

    a.    An applicant for REALTOR® Membership

        1.    Shall supply satisfactory evidence as follows:

            (a)    If a principal, partner, corporate officer, or branch office manager, written evidence that he is actively engaged in the real estate business, that he maintains a current valid real estate broker's or salesperson's license or is licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property, and that he has a place of business within the state or a state contiguous thereto.

            (b)    If an individual other than a principal, partner, corporate officer, or branch office manager, a written application affirming that he is associated either as an employee or as an independent contractor with a REALTOR® Member who maintains an established real estate business.

        2.    Shall complete a course of instruction covering the Bylaws and Rules and Regulations of the Association, the Bylaws of the Illinois Association of REALTORS®, and the Constitution, Bylaws, and Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS®. Failure to satisfy this requirement within _____90_____ days of the date that provisional membership was granted, will result in denial of the membership application or terminating of provisional membership.

        3.    Shall agree, if elected to membership, to abide by the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and the Constitution, Bylaws, and Rules and Regulations of the Association, the Illinois Association and the National Association.

        4.    Shall agree to attend or complete, on at least a biennial basis, continuing education instruction of at least six hours; of which 3 hours must be on the Code of Ethics. Deadline for the completion of this education requirement shall coincide with that established for the continuing education required by Illinois state law, and courses taken to meet the continuing education required by Illinois state law may coincidentally meet the Association education requirement. Failure to meet the education requirement of the Association shall result in suspension of membership until such time as the requirement has been met.

    b.    Applicants for membership as Affiliate Members, Public Service Members, Honorary Members, Student Members, REALTORS® Emeritus, and Honorary Life Members shall meet such requirements and follow such procedures as are defined in Article IV and further implemented as necessary by the Board of Directors.

Section 3.  Ethics Training

    a.    Shall be required to complete quadrennial ethics training of not less than two hours and thirty minutes of instructional time effective January 1, 2001, through December 31, 2004, and for successive four-year periods thereafter.  This requirement will be satisfied upon presentation of documentation that the member has completed a course of instruction conducted by this or another association, the State Association of REALTORS®, the NATIONAL ASSOCIATION OF REALTORS®, or any other recognized educational institution or provider which meets the learning objectives and minimum criteria established by the NATIONAL ASSOCIATION OF REALTORS® from time to time.  REALTOR® members who have completed training as a requirement of membership in another association and REALTOR® members who have completed the New Member Code of Ethics Orientation during any four year cycle shall not be required to complete additional ethics training until a new four year cycle commences.  Failure to satisfy this requirement within ___90___ days of the date that membership was granted, will result in denial of the membership application or terminating of membership.

    Failure to satisfy this requirement shall be considered a violation of membership duty for which REALTOR® membership shall be suspended.

    Members suspended for failing to meet the requirement for the first four (4) year cycle (2001-2004) will have until December 31, 2005 to meet the requirement.  Failure to meet the requirement by that time will result in automatic termination of membership.

    Failure to meet the requirement of the second (2005 – 2008) cycle and subsequent four (4) year cycles will result in suspension of membership for the first two months (January and February) of the year following the end of any four (4) year cycle or until the requirement is met, whichever occurs sooner.  On March 2 of that year, the membership of member who is still suspended as of that date will be automatically terminated.

Section 4.  Election

The procedure for election to membership shall be as follows:

    a.    The Membership Department shall determine whether the class of membership for which applicant is applying is one for which he would be eligible if otherwise possessing the qualifications of membership.  It shall then give written notice to the REALTOR® Members of such application and invite written comment thereon.  Written notice can be given via, mail, e-mail or by publishing in the "Insider" publication.

    b.    If any REALTOR® Member objects to the approval of the application, basing such objection on lack of qualification as set forth in these Bylaws, the REALTOR® member must submit the objection in writing.

    c.    The Membership Department shall report its findings to the Board of Directors in writing.  If an objection has arisen to the approval of the application, the objecting member shall be invited to appear before the Board and substantiate his objections.  Objections which are not substantiated shall be totally disregarded.  The Board may not find objections substantiated without (1) informing the applicant in advance, in writing, of the objections and the identity of the objecting

member and (2) giving the applicant a full opportunity to appear before the Board and establish his qualifications.

d.   The Board of Directors shall review the qualifications of the applicant and then vote on his eligibility to membership. If the applicant receives a majority vote of the Board of Directors, he shall be declared elected to membership and shall be so advised by notice in writing. Such membership is conditioned upon attendance at a mandatory orientation session within three subsequent offerings of the orientation.

e.   An application for membership shall be acted upon by the Board of Directors within sixty (60) days from the date of application for membership.

f.   The Board of Directors may not reject an application without first giving the applicant an opportunity to appear before it, to call witnesses in his behalf, to be represented by counsel, and to make such statements as he deems relevant. The Board of Directors may also have counsel present. The Board of Directors shall cause written minutes to be made of any hearing before it or may electronically or mechanically record the proceedings.

g.   If the Board of Directors determines that the application shall be rejected, it shall record its reasons with the Secretary-Treasurer. If the Board of Directors believes that the applicant may resort to legal action because of rejection of his application, it may specify that rejection shall become effective upon entry in a suit by the Association for a declaratory judgment by a court of competent jurisdiction of a final judgment declaring that the rejection violates no rights of applicant.

# A R T I C L E   V I  -  P R I V I L E G E S   A N D   O B L I G A T I O N S

Section 1.
The privileges and obligations of members, in addition to those otherwise provided in these Bylaws, shall be as specified in this Article.

Section 2.
Any member of the Association may be reprimanded, fined, placed on probation, suspended, or expelled by the Board of Directors for a violation of these Bylaws or Association Rules and Regulations not inconsistent with these Bylaws, after a hearing as provided in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®. Although members other than REALTOR® Members are not subject to the Code of Ethics or its enforcement by the Association, such members are encouraged to abide by the principles established in the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and conduct their business and professional practices accordingly. Further, members other than REALTOR® Members may, upon recommendation by a hearing panel of the Professional Standards Committee and/or action of the Board of Directors, be subject to discipline as described above for any conduct which, in the opinion of the Board of Directors, applied on a non-discriminatory basis, reflects adversely on the terms REALTOR® or REALTORS® and the real estate industry or for conduct that is inconsistent with or adverse to the objectives and purposes of the Association, the Illinois Association of REALTORS®, and the NATIONAL ASSOCIATION OF REALTORS®.

Section 3.
Any REALTOR® Member of the Association may be disciplined by the Board of Directors for violations of the Code of Ethics or other duties of membership, after a hearing as described in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®, provided that the discipline imposed is consistent with the discipline authorized by the Professional Standards Committee of the NATIONAL ASSOCIATION OF REALTORS® as set forth in the Code of Ethics and Arbitration Manual of the National Association.

Section 4.    REALTOR® Members

a.    Only those REALTOR® Members, both primary and secondary, whose financial obligations to the Association are paid in full and whose educational requirement has been met shall be entitled to vote and to hold elective office in the Association.

b.    Resignations of members shall become effective when received in writing by the Board of Directors.  The resignation does not release the member from any past financial obligation. However, if the member submitting the resignation is indebted to the Association for dues, fees, fines, or other assessments of the Association or any of its services and/or has failed to meet the education requirement, the Association may condition the right of the resigning member to re-apply for membership upon payment in full of all such monies owed and/or completion of the education requirement.  Resignation does not negate any pending arbitration.  If a member resigns from the Association with an ethics complaint pending, the Board of Directors may condition the right of the resigning member to re-apply for membership upon certification that he will submit to the pending ethics proceeding and will abide by the decision of the hearing panel; or if a member resigns or otherwise causes membership to terminate, the duty to submit to arbitration continues in effect even after membership lapses or is terminated, provided that the dispute arose while the former member was a REALTOR®; or if the member resigns without having complied with an award or arbitration, the Board of Directors may condition any re-application of the former member upon his promise to pay the award, plus any costs that have previously been established as due and payable by the former member, provided that the award has not, in the meanwhile, been otherwise satisfied.

c.    REALTOR® Members who have been suspended or terminated for failure to meet the education requirement may be reinstated in good standing by completing the requirement and rendering proof of completion to the Association within one year of the effective date of suspension or termination.

d.    Only REALTOR® Members may use the terms REALTOR® and REALTORS®, which use shall be subject to the provisions of Article VIII.

e.    REALTOR® Members have the primary responsibility to safeguard and promote the standards, interests, and welfare of the Association and the real estate profession.

f.    If a REALTOR® Member is a principal in a firm, partnership, or corporation and is suspended or expelled, the firm, partnership, or corporation shall not use the terms REALTOR® or REALTORS® in connection with its business during the period of suspension or until readmission to REALTOR® Membership or unless connection with the firm, partnership, or corporation is severed, whichever may apply.  The membership of all other principals, partners, or corporate officers shall suspend or terminate during the period of suspension of the disciplined member, or

until readmission of the disciplined member, or unless connection of the disciplined member with the firm, partnership, or corporation is severed, whichever may apply. Further, the membership of REALTORS® other than principals who are employed by or affiliated as independent contractors with the disciplined member shall suspend or terminate during the period of suspension of the disciplined member or until readmission of the disciplined member or until connection of the disciplined member with the firm, partnership, or corporation is severed or unless the REALTOR® Member (non-principal) elects to sever his connection with the REALTOR® and affiliate with another REALTOR® Member in good standing in the Association, whichever may apply. If a REALTOR® Member other than a principal in a firm, partnership, or corporation is suspended or expelled, the use of the terms REALTOR® and REALTORS® by the firm, partnership, or corporation shall not be affected.

g.   As required by state law, each office or branch office must have a Designated Broker Manager.

Section 5. Institute Affiliate Members
Institute Affiliate Members shall have rights and privileges and be subject to obligations as are prescribed by the Board of Directors consistent with the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS®.

Section 6. Affiliate Members
Affiliate Members shall have such privileges and rights and be subject to such obligations as may be prescribed by the Board of Directors.

Section 7. Public Service Members
Public Service members shall have such privileges and rights and be subject to such obligations as may be prescribed by the Board of Directors.

Section 8. Honorary Members
Honorary Members shall have such privileges and rights and be subject to such obligations as may be prescribed by the Board of Directors.

Section 9. Student Members
Student Members shall have such privileges and rights and shall be subject to such obligations as may be prescribed by the Board of Directors.

Section 10. REALTORS® Emeritus
A REALTOR® Emeritus is not obligated to pay dues for himself, but is obligated to pay annual membership dues based on the number of licensees employed by or associated with the REALTOR® Emeritus. Only REALTORS® Emeritus whose financial obligations to the Association are paid in full shall be entitled to vote and to hold elective office in the Association.

Section 11. Honorary Life Members
Honorary Life Members shall have such privileges and rights and be subject to such obligations and disciplines as may be prescribed by the Board of Directors.

Section 12. Harassment

Any member of the Association may be reprimanded, placed on probation, suspended or expelled for harassment of an Association or MLS employee or Association Officer or Director after a hearing in accordance with the established procedures of the Association. Disciplinary action may also consist of any sanction authorized in the association's Code of Ethics and Arbitration Manual. As used in this Section, harassment means any verbal or physical conduct including threatening or obscene language, unwelcome sexual advances, stalking, actions including strikes, shoves, kicks, or other similar physical contact, or threats to do the same, or any other conduct with the purpose or effect of unreasonably interfering with an individual's work performance by creating a hostile, intimidating or offensive work environment. The decision of the appropriate disciplinary action to be taken shall be made by the investigatory team comprised of the President, and President-elect and/or Vice President and one member of the Board of Directors selected by the highest ranking officer not named in the complaint, upon consultation with legal counsel for the Association. If the complaint names the President, President-Elect or Vice President, they may not participate in the proceedings and shall be replaced by the Immediate Past President or, alternatively, by another member of the Board of Directors selected by the highest ranking officer not named in the complaint.

# ARTICLE VII - PROFESSIONAL STANDARDS AND ARBITRATION

Section 1.

The responsibility of the Association and of Association members relating to the enforcement of the Code of Ethics, the disciplining of members and the arbitration of disputes, and the organization and procedures incidental thereto shall be governed by the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®, as from time to time amended, which by reference is made a part of these Bylaws.

Section 2.

It shall be the duty and responsibility of every REALTOR® Member of this Association to abide by the Constitution and Bylaws and the Rules and Regulations of the Association, the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS®, including the duty to arbitrate controversies arising out of real estate transactions as specified by Article 17 of the Code of Ethics and as further defined by and in accordance with the procedures set forth in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS® as from time to time amended.

Section 3.

Professional Standards and Arbitration Section 53. The Award.  If an award has been rendered, the nonprevailing party must, within (10) days following receipt of the award, either (1) pay the award to the party(ies) named in the award or (2) deposit the funds with the board Secretary or Board Executive Officer to be held in a special Board escrow account maintained for this purpose.  Failure to satisfy the award or to deposit the funds with the Board within this time period may be considered a violation of a membership duty and may subject the member to disciplinary action at the discretion of the Board of Directors.

The nonprevailing party shall have twenty (20) days following receipt of the award to request procedural review of the arbitration hearing procedure or to have legal counsel notify the board Secretary or Executive Officer that a legal challenge to the validity of the award has been initiated.

If a request for limited procedural review of the arbitration procedure is received within twenty (20) days, the funds deposited with the Board shall be retained in the Board's escrow account until the review is completed. If the arbitration award is confirmed by the Board of Directors following the conduct of the limited procedural review, the nonprevailing party shall have an additional fifteen (15) days to institute an appropriate legal challenge to the validity of the arbitration award. In such case, the nonprevailing party shall also cause legal counsel to advise the Board in writing that a suit challenging the validity of the arbitration award has been filed during this additional fifteen (15) day period. After fifteen (15) days, if written notice of a suit challenging the validity of the arbitration award has not been received by the Board, the funds shall be released from escrow and paid to the prevailing party. If written notification is received during the fifteen (15) day period, the funds will be held in escrow pending the determination of the matter by a court of competent jurisdiction.

If the nonprevailing party does not request the Board to conduct a procedural review of the arbitration hearing process during the twenty (20) day period following service of the award, then written notification that a legal challenge has been instituted must be received within the twenty (20) days following service of the award. Failure to provide written notification that a suit challenging the validity of the award has been filed within twenty (20) days following service of the award will result in the award being paid from the Board's escrow to the prevailing party.

# ARTICLE VIII - USE OF THE TERMS REALTOR® AND REALTORS®

Section 1.
Use of the terms REALTOR® and REALTORS® by members shall, at times, be subject to the provisions of the Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS® and to the rules and regulations prescribed by its Board of Directors. The Association shall have the authority to control, jointly and in full cooperation with the NATIONAL ASSOCIATION OF REALTORS®, use of the terms within its jurisdiction. Any misuse of the terms by members is a violation of a membership duty and may subject members to disciplinary action by the Board of Directors after a hearing as provided for in the Association's Code of Ethics and Arbitration Manual (Amended 6/06).

Section 2.
REALTOR® Members of the Association shall have the privilege of using the terms REALTOR® and REALTORS® in connection with their places of business within the state or a state contiguous thereto so long as they remain REALTOR® Members in good standing. No other class of membership shall have this privilege.

Section 3.
A REALTOR® Member who is a principal of a real estate firm, partnership, or corporation may use the terms REALTOR® and REALTORS® only if all the principals of such firm, partnership, or corporation who are actively engaged in the real estate profession within the state or a state contiguous thereto are REALTOR® Members of the Association or Institute Affiliate Members as described in Section 1 (b) of Article IV.

(a) in the case of a REALTOR® member who is a principal of a real estate firm, partnership, or corporation whose business activity is substantially all commercial, the right to use the term REALTOR® or REALTORS® shall be limited to office locations in which a principal, partner, corporate officer, or branch office manager of the firm,

partnership or corporation holds REALTOR® membership.  If a firm, partnership, or corporation operates additional places of business in which no principal, partner, corporate officer, or branch office manager holds REALTOR® membership, the term REALTOR® or REALTORS® may not be used in any reference to those additional places of business.

Section 4.
Institute Affiliate Members shall not use the terms REALTOR® or REALTORS® nor the imprint of the emblem seal of the NATIONAL ASSOCIATION OF REALTORS®.

# ARTICLE IX - STATE AND NATIONAL MEMBERS

Section 1.
The Association shall be a member of the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS®.  By virtue of such membership, each REALTOR® Member of the Association shall be entitled to membership in the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS® without further payment of dues. The Association shall continue as a member of the State and National Associations unless, by a majority vote of all its REALTOR® Members, decision is made to withdraw, in which case the State and National Associations shall be notified at least one month in advance of the date designated for the termination of such membership.

Section 2.
The Association recognizes the exclusive property right of the NATIONAL ASSOCIATION OF REALTORS® in the terms REALTOR® and REALTORS®.  It shall forthwith discontinue use of the terms in any form in its name upon ceasing to be a member of the National Association or upon a determination by the Board of Directors of the National Association that it has violated the conditions imposed upon the terms.

Section 3.
The Association hereby adopts the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and agrees to enforce the code among its membership.  Although members other than REALTOR® Members are not subject to the Code of Ethics or its enforcement by the Association, such members are encouraged to abide by the principles established in the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and to conduct their business and professional practices accordingly.  The Association agrees to abide by the Constitution, Bylaws, Rules and Regulations, and policies of the

National Association and the Illinois Association of REALTORS®, and all its members shall subscribe to and comply therewith.

# ARTICLE X - DUES AND ASSESSMENTS

Section 1.

a. Application Fee.  The Board of Directors may adopt an application fee for REALTOR® Membership in reasonable amount, not exceeding three times the amount of the annual dues for REALTOR® Membership, which shall be required to accompany each application for REALTOR® Membership and which shall become the property of the Association upon final approval of the application.

b. Reinstatement Fee.  Any member may be reinstated, with a reinstatement fee, during the current year if dues for the current year and all other fees are paid in full.

c. Initiation Fee.  Any member reinstating membership that has lapsed more than the current year will be required at the time of rejoining to pay all current membership fees along with the initiation fee.

d. MLS Fees Medical Waiver.  A MLS medical waiver may be granted by the Board of Directors under the following conditions:
    1. Medication (Must be accompanied by a doctor's note, with an expiration date).
    2. Non-listing and/or non-selling officer of the company.  (President, Vice-President, Treasurer; must supply an affidavit of such position).
    3. Family Medical Waiver. (Must be accompanied by a doctor's note, with an expiration date).
    At the end of such MLS Medication Waiver, the REALTOR® member shall be reinstated with no additional fees except the unpaid MLS fees prior to granting the MLS Medical Waiver shall be paid in full.

e. Military MLS Fees and Membership Dues Waiver.  A MLS Medical Waiver and Membership Dues Waiver may be granted by the Board of Directors under the following conditions:
    1. Active Military Service (Must be accompanied by documentation of active service).
    At the end of such MLS/Membership Medical Waiver, the REALTOR® member shall be reinstated with no additional fees except the unpaid MLS fees and Association dues prior to granting the MLS/Membership Medical Waiver shall be paid in full.

Section 2. Dues

a. REALTOR® Members.  The annual dues of each Designated REALTOR® Member shall be in an amount to be established annually by the Board of Directors, plus an additional amount to be established annually by the Board of Directors times the number of real estate brokers, salespersons, branch office managers, and licensed or certified appraisers (1) who are employed by or affiliated as independent contractors or who are otherwise directly or indirectly licensed with such REALTOR® Member and (2) who are not REALTOR® Members of any Association in the state or a state contiguous thereto or Institute Affiliate Members of the Association.  In calculating the dues payable to the Board by a Designated REALTOR® Member, non-member licensees as defined above shall not be included in the computation of dues if the Designated REALTOR® has paid dues based on said non-member licensees in another association/board in the state or a state contiguous thereto, provided the Designated REALTOR® notifies the Association in writing of the identity of the association/board to which dues have been remitted.  The annual dues of each

REALTOR® Member other than the Designated REALTOR® shall be in an amount to be established annually by the Board of Directors. In the case of a Designated REALTOR® Member in a firm, partnership, or corporation whose business activity is substantially all commercial, any assessments for non-member licensees shall be limited to licensees affiliated with the Designated REALTOR®, (as defined in this paragraph) in the office where the Designated REALTOR® holds membership, and any other offices of the firm located within the jurisdiction of this Association.

(1)For the purpose of this Section, a REALTOR® Member of a Member Board shall be held to be any Member who has a place or places of business within the state or a state contiguous thereto and who, as a principal, partner, corporate officer, or branch office manager of a real estate firm, partnership, or corporation, is actively engaged in the real estate profession as defined in Article III, Section 1, of the Constitution of the NATIONAL ASSOCIATION OF REALTORS®. An individual shall be deemed to be licensed with a REALTOR® if the license of the individual is held by the REALTOR®, or by any broker who is licensed with the REALTOR®, or by any entity in which the REALTOR® has a direct or indirect ownership interest and which is engaged in other aspects of the real estate business (except as provided for in Section 2(a) (1) hereof) provided that such licensee is not otherwise included in the computation of dues payable by the principal, partner, corporate officer, or branch office manager of the entity.

A REALTOR® with a direct or indirect ownership interest in an entity engaged exclusively in soliciting and/or referring clients and customers to the REALTOR® for consideration on a substantially exclusive basis shall annually file with the association on a form approved by the association a list of the licensees affiliated with that entity and shall certify that all of the licensees affiliated with the entity are solely engaged in referring clients and customers and are not engaged in listing, selling, leasing, managing, counseling or appraising real property. The individuals disclosed on such form shall not be deemed to be licensed with the REALTOR® filing the form for purposes of this Section and shall not be included in calculating the annual dues of the Designated REALTOR®.

Membership dues shall be prorated for any licensee included on a certification form submitted to the association who during the same calendar year applies for REALTOR® membership in the association. However, membership dues shall not be prorated if the licensee held REALTOR® membership during the preceding calendar year.

b.    Institute Affiliate Members. The annual dues of each Institute Affiliate Member shall be as established in Article II of the Bylaws of the NATIONAL ASSOCIATION OF REALTORS®.

c.    Affiliate Members. The annual dues of each Affiliate Member shall be as prescribed from time to time by the Board of Directors. Statements issued to Affiliate Members for dues shall show as separate items an allocation of local Association dues to reflect the Association's dues obligations to the Illinois Association.

d.    Public Service Members. The annual dues of each Public Service Member shall be as prescribed from time to time by the Board of Directors, plus the annual dues for the Illinois Association of REALTORS®.

e.     Student Members.  Dues payable, if any, shall be at the discretion of the Board of Directors.

f.     Honorary Members, and Honorary Life Members.  No dues shall be payable.

g.     REALTOR® Emeritus.  REALTOR® Emeritus dues will be waived effective beginning the quarter of which approval of the designation is awarded.  Such designation for National Association membership shall be furnished by the NATIONAL ASSOCIATION OF REALTORS® certificate.

Section 3.  Dues Payable
Dues for all members shall be payable annually in advance on the first day of December.  All outstanding fees or monies owed to the Association must be current in accordance to the Association's financial policies for membership to be renewed. Dues shall begin on the first day of the month in which a member shall be notified of election and shall be prorated for the year.

Section 4.  Non-Payment of Financial Obligations
If dues, fees, fines, and other assessments including amounts owed to the Association or the Association's Multiple Listing Services are not paid within thirty (30) days after the due date, membership or services of the non-paying member shall automatically terminate unless, within that time, the amount due is paid or is disputed in writing.  However, no action shall be taken to suspend or expel a member for non-payment of the disputed amount until the accuracy of the amount owed has been confirmed by the Board of Directors.  A former member who has had his membership or services suspended or terminated for non-payment of dues, fees, fines, or other assessments duly levied in accordance with the provisions of these Bylaws or the provisions of other rules and regulations of the Association or any of its services, departments, or divisions may apply for reinstatement in a manner prescribed for new applicants, after making payment in full of all accounts due as of the date of suspension or termination.

Section 5.  Deposit
All monies received by the Association for any purpose shall be deposited to the credit of the Association in a financial institution or institutions selected by resolution of the Board of Directors.

Section 6.  Expenditures
The Board of Directors shall administer the finances of the Association and approve the annual budget, provided, however, that the total Association expenditure in any fiscal year of the Association shall not exceed the total Association revenue of that fiscal year plus ten percent (10%) of the reserves.

Section 7.  Segregation of Dues
The Treasurer shall record separately the dues collected and owing to the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS® and shall forward such dues to the respective Associations when collected.  No portion of the sums collected on behalf of the NATIONAL ASSOCIATION OF REALTORS® and the Illinois Association of REALTORS® shall be used for purposes of the Association.

Section 8.  Audit
The accounts of the Association shall be audited annually effective the last day of the fiscal year, and report of such audit shall be furnished to the Board of Directors for their review and approval.

Section 9. Certification of REALTORS®
Each Designated REALTOR® Member of the Association shall certify to the Association annually on a form provided by the Association a complete listing of all individuals licensed with the Designated REALTOR® Member firm within the state and shall designate a primary association/board for each individual. These declarations shall be used for purposes of calculating dues under Article X, Section 2, Part a, of the Bylaws. Designated REALTOR® Members shall also notify the Association of the affiliation of any licensee with the firm or of the severance of affiliation of any licensee with the firm within ten (10) days of the affiliation or severance of affiliation.

# ARTICLE XI - OFFICERS AND DIRECTORS

Section 1. Officers
The officers of the Association shall be a President, a President-Elect, and a Secretary-Treasurer. The officers shall serve for a term of one (1) year. The Board of Directors, at the March meeting preceding the annual election, shall from the Board of Directors elect the officers for the next year, except for the President. The President-Elect shall become President the year following his election to President-Elect. The Immediate Past President is ineligible for any office.

Section 2. Duties of Officers
    a.    The duties of the officers shall be such as their titles, by general usage, would indicate and such as may be assigned to them by the Board of Directors.

    b.    The President-Elect shall assume the duties of the President if the President is unable to serve. The President may delegate other duties, as deemed necessary and appropriate.

Section 3. Executive Committee
The Board of Directors, by resolution adopted by a majority of the number of Directors fixed by the Bylaws or otherwise, shall designate the Immediate Past President, President, President-Elect, and Secretary-Treasurer to constitute an Executive Committee, which Committee, to the extent provided in such resolution, shall have and exercise all the authority of the Board of Directors in the management of the Association, except as otherwise required by law. Vacancies in the membership of the Committee shall be filled by the Board of Directors at a regular or special meeting of the Board of Directors. The Executive Committee shall keep regular minutes of its proceedings and report the same to the Association when required.

Section 4. Board of Directors
    a.    The governing body of the REALTOR® Association of West/South Suburban Chicagoland shall be a Board of Directors. The Board of Directors shall consist of the Immediate Past President, President, President-Elect, Treasurer, one REALTOR® member of the Commercial Investment Committee (confirmed by the Board of Directors), one Affiliate member (confirmed by the Board of Directors), and eleven (11) additional members who are authorized to hold elective office in the Association. No member may hold an elected office in the REALTOR® Association of West/South Suburban Chicagoland, or participate on the Board of Directors unless the member's primary income is derived from the real estate industry.

1. Affiliate Director: There shall be one director who shall be an Affiliate Member (the "Affiliate Director"). The Affiliate Director shall be selected by the President-Elect, with the advice and consent of the Board of Directors, at any meeting of the Board of Directors prior to September 1 of each year. The Affiliate Director may not vote on professional standards matters relating to the enforcement of professional standards or recommendations of hearing panels related to ethics and arbitration hearings. Affiliate Director shall not sit on appeal or procedural review panels for the board. The term of the Affiliate Director shall commence on September 1 and shall be for one year or until a qualified successor is duly appointed.

2. Commercial Director: There shall be one director who shall be a Commercial Member (the "Commercial Director"). The Commercial Director shall be selected by the President-Elect, with the advice and consent of the Board of Directors, at any meeting of the Board of Directors prior to September 1 of each year. The Commercial Director may vote on all matters. The term of the Commercial Director shall commence on September 1 and shall be for one year or until a qualified successor is duly appointed.

b. The eleven (11) elected Directors shall each serve a term of three (3) years. The terms of four (4) Directors shall expire each year, except that every third year the terms of three (3) Directors shall expire. No Director may serve more than two (2) consecutive terms, whether elected or appointed. In the instance of being appointed to fill an unexpired term, an appointee serving eighteen (18) months or more of the unexpired term will be considered to have served a full term.

Section 5. Chief Executive Officer
The Chief Executive Officer shall be an employee REALTOR® Association of West/South Suburban Chicagoland, and subject to the direction and control of the Executive Committee; shall be in charge of the business of REALTOR® Association of West/South Suburban Chicagoland®; shall see that the resolutions and directions of the Board of Directors are carried into effect except in those instances in which that responsibility is specifically assigned to some other person by the Executive Committee; and shall have such other duties as may be prescribed by the Executive Committee from time to time.

Section 6. Election of Officers and Directors
a. At the October Board of Directors meeting, the President shall appoint, with the approval of the Board of Directors, a Nominating Committee consisting of seven (7) REALTOR® Members authorized to vote (with no more than one (1) per firm) including the Immediate Past President, who may serve as Chairman. Prior to the March Board of Directors meeting, announcement of the formation of the Nominating Committee shall be sent to the members authorized to vote reciting the names, addresses, and telephone numbers of the members of the Nominating Committee and urging members to submit profiles of members for nomination for a position on the Board. A report of the Nominating Committee shall be presented to the Board of Directors at the April Board of Directors meeting. The minimum number of nominees the Nominating Committee may submit to the Board of Directors is the number of positions available; the maximum number of nominees is three (3) times the number of positions available. No member of the Nominating Committee may be nominated by the Committee. If approved by the Board of Directors, the slate will be furnished to those members authorized to vote within two (2) weeks after approval. Additional candidates for the offices to be filled may be placed in nomination by a petition signed by three (3) percent of the members authorized to vote. The petition shall be filed with the

Secretary-Treasurer at least four (4) weeks before the election. The Secretary-Treasurer shall send notice of such additional nominees to all members authorized to vote before the election.

b.    At the April Board of Directors meeting, the President shall appoint, with the approval of the Board of Directors, an Election Committee consisting of three (3) members authorized to vote who are not candidates, not on the Board of Directors, and not on the Nominating Committee. The Election Committee shall conduct the election by establishing the form of ballots and the election rules and procedures as it deems appropriate, subject to the approval of the Board of Directors.

c.    The election shall be held no later than the last Monday in June. The entire membership may vote for all Directors. The candidates with the highest number of votes will fill the positions. In the event of a tie for any Director position available, a run-off election between the candidates who are tied shall be conducted.

Section 7.  Vacancies

a.    A vacancy on the Board of Directors shall be filled by appointment by the President, with the approval of the Board of Directors, for the balance of the term, or until the next annual election. A vacancy shall be discussed at the Board of Directors meeting following the vacating of the position.

b.    In the event that a vacancy is created by the election of a Director to the Executive Committee prior to the expiration of that Director's term, the vacancy shall be filled, prior to the vacating of the position, by appointment by the President, subject to the approval of the Board of Directors.

Section 8.  Suspension and Removal of Officers and Directors

Any officer elected or appointed by the Board of Directors and any Director may be suspended or removed by the Board of Directors whenever, in its judgment, the best interests of the Association would be served thereby. A two-thirds (2/3) majority vote is needed for such suspension or removal except that, in the suspension or removal of a Director, the two-thirds (2/3) majority must equal at least fifty percent (50%) of the number of Directors holding office. The unexcused absence of any Director from three (3) meetings shall be grounds for removal from the Board of Directors.

Section 9.  Meetings

a.    Regular Meetings. The Board of Directors shall designate a regular time and place of meetings.

b.    Special Meetings. Special meetings of the Board of Directors or the Executive Committee may be called by the President or at the request of any two (2) members thereof.

c.    Notice of Meetings. Notice of any special meeting shall be given at least three (3) days previous thereto by notice to each Director at his business address or e-mail address. The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting.

d.    Quorum.  A majority of the number of Directors holding office shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, except that a quorum for considering the suspension or removal of a Director shall be two thirds (2/3) of the number of Directors holding office.

Section 10. Indemnification of Directors and Officers
The REALTOR® Association of West/South Suburban Chicagoland shall indemnify every Director or Officer against expenses reasonably incurred by him in connection with any action, suit, or proceeding to which he may be made a party by reason of his being or having been a Director or officer of the REALTOR® Association of West/South Suburban Chicagoland, except in relation to matters as to which he shall be adjudged in such action, suit, or proceeding to be liable for negligence or misconduct in the performance of duty; in the event of settlement, indemnification shall be provided if it shall be found by a majority of the Directors not involved in the matter in controversy that it was in the interests of the REALTOR® Association of West/South Suburban Chicagoland that such settlement be made and that such Director or officer was not guilty of negligence or misconduct.  The foregoing right of indemnification shall not be exclusive of other rights to which such Director or officer may be entitled.

Section 11.  Manner of Acting
The act of the majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 12.  Presumption of Assent
A Director of the Association who is present at a meeting of the Board of Directors at which action on any Association matter is taken shall be conclusively presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Treasurer of the Association immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favor of such action.


# A R T I C L E   X I I   -   M E E T I N G S

Section 1.  Annual Meeting
The annual meeting of the Association shall be held during September of each year, the date, place, and hour to be designated by the Board of Directors.

Section 2.  Other Meetings
Meetings of the Association members may be held at such other times as the President or the Board of Directors may determine, or upon the written request of at least ten (10) percent of the members authorized to vote.

Section 3.  Notices of Meetings
Written notice shall be given to every member entitled to participate in the meeting at least one week preceding all meetings.  If a special meeting is called it shall be accompanied by a statement of the purpose of the meeting.

Section 4.  Quorum
A quorum for the transaction of business shall consist of three (3) percent of the members authorized to vote.

# Article XIII - VOTING OF THE MEMBERSHIP

**Section 1.**
The Board of Directors shall pass a resolution authorizing the submission of the question or questions to be voted upon by the membership.

**Section 2.**
Notice shall be sent to the membership in writing at least fifteen (15) days prior to the date of the ballot and shall include the voting procedure and the deadline for receiving ballots. No ballot received after 4:00 p.m. on the effective date shall be counted.

**Section 3.**
The Board of Directors shall determine the voting procedure, which may include voting in person at a meeting or a polling place and/or voting by fax, mail, or internet. Each ballot must be properly submitted, and each voter must be a member in good standing and provide proper identification.

**Section 4.**
Any vote taken only at a polling place must have a response of a minimum of three (3) percent of the members authorized to vote, and any vote taken only at a meeting must have a quorum present. To be valid, any vote which includes ballots submitted by fax, mail, or internet, must have a response of a minimum of five (5) percent of the members authorized to vote.

**Section 5.**
A majority of the ballots received shall decide the question submitted except for the election of Directors, which shall be determined as established in Article XI, Section 6 and Section 7.

# ARTICLE XIV - COMMITTEES

**Section 1. Standing Committees**
The President shall appoint Chairmen and Committee members from among the REALTOR® and Affiliate members, subject to confirmation by the Board of Directors, for the following standing committees:
> Commercial Investment Committee
> Governmental Affairs Committee
> Grievance Committee
> Professional Standards Committee

**Section 2. Special Committees/Task Forces.**
The President shall appoint, subject to confirmation by the Board of Directors, special committees and/or task forces, in addition to those listed below, as deemed necessary:
> Affiliates Task Force
> Broker/Lawyer Committee

Financial Task Force
Fair Housing/Cultural Diversity Program

**Section 3.  Organization**
All committees and other groups shall be of such size and shall have such duties, functions, and powers as may be assigned to them by the President or the Board of Directors, except as otherwise provided in these Bylaws.

**Section 4.  President**
The President shall be an ex officio member of all committees and other groups and shall be notified of their meetings.

**Section 5.  Notice of Meetings**
Notice shall be given to every member entitled to participate in the meeting.

# ARTICLE XV - FISCAL AND ELECTIVE YEAR

**Section 1.**
The fiscal year of the Association shall be the Calendar Year.

**Section 2.**
The term of office of any officer or director of the Association shall commence September 1.

# ARTICLE XVI - RULES OF ORDER

Robert's Rules of Order, latest edition, shall be recognized as the authority governing the meetings of the Association, its Board of Directors, and its committees in all instances wherein the provisions do not conflict with these Bylaws.

# ARTICLE XVII - AMENDMENTS

**Section 1.    Manner of Amendment**
These Bylaws may be amended by a majority vote by those members authorized to vote in accordance with the procedure outlined in Article XIII.

**Section 2.  Notice of Amendment**
Written notice of consideration of an amendment and the substance of such amendment shall be given to every member authorized to vote at least fifteen (15) days prior to the date of the vote.

Section 3. Exceptions
    a.    Article IX may be amended only by a two-thirds (2/3) majority vote of a quorum of all members authorized to vote.
    b.    The Board of Directors may, at any regular or special meeting of the Board of Directors at which a quorum is present, approve amendments to the Bylaws which are mandated by the NATIONAL ASSOCIATION OF REALTORS® policy.
    c.    Amendments to these Bylaws affecting the admission or qualification of REALTOR® Members and Institute Affiliate Members, the use of the term REALTOR® and REALTORS®, or any alteration in the territorial jurisdiction of the Association shall become effective upon approval by the Board of Directors of the NATIONAL ASSOCIATION OF REALTORS®.

# ARTICLE XVIII – DISSOLUTION AND MERGER

Section 1.
Upon dissolution or winding up of the affairs of this Association, the Board of Directors, after providing for payment of all obligations, shall distribute any remaining assets to the Illinois Association of REALTORS® or, within its discretion, to any other non-profit tax-exempt organization.

Section 2.
Provided that the Association shall be the Surviving Corporation, Members shall not be entitled to vote on Mergers or consolidations of the Association. The Board of Directors of the Association, by an affirmative vote of a majority of the directors in office, at a meeting of the Board of Directors, or by written consent signed by all the directors in office, shall vote on a merger or consolidation in which the Association shall be the Surviving Corporation. In the event the Association shall not be the Surviving Corporation of a merger or consolidation, the Members shall be entitled to vote on such merger or consolidation.

# ARTICLE XIX - MULTIPLE LISTING SERVICE

Section 1. Authority
The Association shall maintain for the use of its members a multiple listing service, which shall be subject to the Bylaws of the REALTOR® Association of West/South Suburban Chicagoland and such Rules and Regulations as may be hereinafter adopted.

Section 2. Purpose
A Multiple Listing Service is a means by which authorized Participants make blanket unilateral offers of compensation to other Participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants in enhanced; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which Participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so

Participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as a procuring cause of the sale (or lease).

Section 3.  Participation
Any REALTOR® member of this Association or of any other member association/board, who is a principal, partner, or corporate officer or a branch manager acting on behalf of a principal, shall be eligible, without further qualifications, to participate in the multiple listing service upon agreeing in writing to conform to the Rules and Regulations and to pay the costs incidental thereto.  However, under no circumstances are any individuals or firms, regardless of membership status, entitled to multiple listing service "Membership" or "Participation" unless they hold a current valid Illinois real estate broker's license and are capable of offering and accepting cooperation and compensation to and from other Participants or are licensed or certified by the State of Illinois to engage in the appraisal of real property.  Use of information developed by or published by an Association multiple listing service is strictly limited to the activities authorized under a participant's licensure or certification, and unauthorized uses are prohibited.  Further, none of the foregoing is intended to convey "Participation" or "Membership" or any right of access to information developed by or published by an Association multiple listing service where access to such information is prohibited by law.

Section 4.  Supervision
The activities of the multiple listing service shall be operated under the supervision of the Multiple Listing Service Of Northern Illinois (MLSNI), in accordance with the MLSNI Bylaws and its Rules and Regulations.

Section 5.  Representation on MLSNI Board of Directors
a.  Nomination of Representative(s).  The President shall nominate, subject to confirmation by the Board of Directors, one representative to the Board of Directors of MLSNI and such additional representatives as may be determined by the MLSNI Shareholders.

b. Vacancies.   Vacancies in unexpired terms shall be filled as in the case of original nominees.

c. Tenure and Qualification.  Tenure and qualification shall be in accordance with the MLSNI Bylaws.

Section 6.  Access to Comparable and Statistical Information
Members who are actively engaged in real estate brokerage, management, mortgage financing, appraising, land development, or building, but who do not participate in the multiple listing service, are nonetheless entitled to receive, by purchase or lease, all information other than current listing information that is generated wholly or in part by the multiple listing service including "comparable" information, "sold" information, and statistical reports. This information is provided for the exclusive use of members and individuals affiliated with members who are also engaged in the real estate business and may not be transmitted, retransmitted, or provided in any other manner to any unauthorized individual, office, or firm except as otherwise specified in the multiple listing service Rules and Regulations.  Members who receive such information, either as an Association service or through the Association's multiple listing service, are subject to the applicable provisions of the multiple listing service Rules and Regulations whether they participate in the multiple listing service or not.

# ARTICLE XX - CONFLICT OF INTEREST

Section 1. Contracts, Sales and Purchases:

a.          Directors, Officers, Committee Members or Employees of the Association shall not be
             financially interested in any contract made by them in their official capacity on behalf of the
             Association, nor shall they be purchasers at any sale or vendors at any purchase made by them in their
             official capacity on behalf of the Association, unless the full nature and extent of such financial
             interest and/or status as prospective purchaser or vendor has first been disclosed in writing to the
             Association.

b.          The Association shall authorize, approve or ratify a contract in good faith by a vote of its
             members or Directors sufficient for that purpose without counting the vote or votes of
             the Directors, Officers, Committee Members or Employees who has disclosed said interest
             and who shall be ineligible to vote thereon.

Section 2.  Confidential Information.

a.          Directors, Officers, Committee Members or Employees of the Association shall not disclose to any
             other person, confidential information acquired by them in the course of their official duties, or use
             any such information for the purpose of pecuniary gain in any manner which is contrary to the best
             interests of the Association.

b.          This section shall not apply to any disclosure made to any law enforcement agency, nor to any
             disclosure made pursuant to subpoena or other similar legal process.